### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCEND PERFORMANCE MATERIALS HOLDINGS INC., *et al.*,[1] | ) ) | Case No. 25-90127 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

### DEBTORS' EMERGENCY MOTION
### FOR ENTRY OF INTERIM AND FINAL
### ORDERS (I) AUTHORIZING THE DEBTORS TO
### OBTAIN POSTPETITION FINANCING, (II) GRANTING
### LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
### ADMINISTRATIVE EXPENSE STATUS, (III) AUTHORIZING THE
### USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY;
### (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

> **Emergency relief has been requested. Relief is requested not later than 2:30 p.m. (prevailing Central Time) on April 22, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on April 22, 2025, at 2:30 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoTo platform. Connect via the free GoTo application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Ascend. The location of Debtor Ascend Performance Materials Holdings Inc.'s principal place of business is 1010 Travis St., Suite 900, Houston, Texas 77002.

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's homepage.  Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors," or the "Company") state the following in support of this motion (this "Motion"):[2]

### Preliminary Statement

1.      The Debtors begin the Chapter 11 Cases with an urgent need for liquidity in order to pay employee wages and benefits, fulfill obligations to critical vendors, and keep the Debtors' sophisticated, cash-intensive plants operating in the ordinary course of business.  The DIP Facilities, taken as a whole, are the best available source of critical financing to meet the Debtors' cash needs and enable a value-maximizing outcome of the Debtors' comprehensive restructuring process.  Entry into and performance under the DIP Documents represents a sound exercise of the Debtors' business judgment and should be approved.

2.      In the face of an acute liquidity crisis brought on by a series of macroeconomic, industry-wide, and Company-specific challenges set forth in greater detail in the First Day Declaration, the Debtors began exploring strategic alternatives in January 2025.  After retaining Kirkland & Ellis LLP ("Kirkland") as legal counsel, PJT Partners, Inc. ("PJT") as investment

---

[2]     A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of Robert Del Genio, Chief Restructuring Officer of Each of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.  Capitalized terms used but not defined elsewhere in this Motion shall have the meanings ascribed to them in the First Day Declaration or the Interim Order, as applicable.  In support of this Motion, the Debtors also submit:  (a) the *Declaration of Robert Del Genio in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing The Use of Cash Collateral, (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Del Genio Declaration"); and (b) the *Declaration of Matthew O'Connell in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing The Use of Cash Collateral, (IV) Modifying the Automatic Stay; (V) Schedule a Final Hearing, and (VI) Granting Related Relief* (the "O'Connell Declaration").

2

banker, and FTI Consulting, Inc. ("FTI"), as financial advisor, (collectively with Kirkland and PJT, the "Advisors"), the Company, with the assistance of the Advisors, approached an ad hoc group of the Debtors' Prepetition Term Loan Lenders (the "Ad Hoc Group of Term Loan Lenders") regarding the provision of an emergency financing facility to bridge the Company to an orderly chapter 11 filing.  Following good faith, arm's length negotiations with the Ad Hoc Group of Term Loan Lenders, on March 7, 2025, the parties entered into an agreement whereby the Ad Hoc Group of Term Loan Lenders provided the Debtors with a $40 million new-money, super-senior term loan facility (the "Bridge Facility").   The Bridge Facility also included a provision for incremental financing up to an additional $60 million to be paid in subsequent tranches.  The Bridge Facility provided much-needed liquidity, which allowed the Debtors to fund operations and provided breathing space for the Company and the Advisors to evaluate potential long-term restructuring options.   Nevertheless, the Debtors' liquidity issues persisted, and on March 25, 2025, the Ad Hoc Group of Term Loan Lenders provided an additional tranche of $35 million in new-money financing under the Bridge Facility.

3.      With comprehensive restructuring negotiations proceeding in parallel, on March 31, 2025, and April 1, 2025, the Debtors entered into forbearance agreements (the "Forbearance Agreements") with the Prepetition ABL Agent, the Prepetition Term Loan Agent, and Prepetition Term Loan Lenders, respectively, pursuant to which the Prepetition Secured Parties agreed not to exercise certain rights and remedies under the Prepetition ABL Documents and the Prepetition Term Loan Documents until April 30, 2025.  The Forbearance Agreements enabled the Debtors to avoid a near-term, disorganized, and value-destructive chapter 11 filing and afforded the parties additional time to negotiate the terms of an orderly chapter 11 filing.  Also on April 1, 2025, the Ad Hoc Group of Term Loan Lenders provided a

third tranche of $40 million in new-money financing under the Bridge Facility to continue to fund the Debtors' operations in the ordinary course, exceeding the original contemplated upsizing of the Bridge Facility.

4.     Despite the capital made available under the Bridge Facility, the Debtors' liquidity failed to firmly stabilize, and the Debtors focused their efforts on preparing for a near-term chapter 11 filing.  In late March 2025, the Debtors instructed PJT to begin a thorough marketing process to explore third-party debtor-possession financing options.  O'Connell Decl. ¶ 13.  As described further in the O'Connell Declaration, PJT contacted sixteen sophisticated third-party financial institutions that are experienced in providing emergency debtor-in-possession financings in special situations.  *Id*.  Of the parties PJT contacted, seven signed confidentiality agreements and received financial diligence from the Debtors.  *Id*.  None of these seven parties submitted an actionable proposal.  *Id.*

5.     In parallel with the third-party marketing process, the Debtors engaged with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Lenders regarding debtor-in-possession financing.  Conversations were constructive, and the parties coalesced around a postpetition financing structure that would include both asset-based and term loan debtor-in-possession facilities, thereby enabling the Debtors to fund their operations in the same manner they did on a prepetition basis.  As part of these negotiations, in mid-April, the Prepetition ABL Lenders also agreed to relax the minimum excess availability requirement under the Prepetition ABL Facility to allow the Debtors to access an incremental $15 million in liquidity in the week before this filing while the parties finalized their negotiations and the Debtors prepared to file the Chapter 11 Cases.  *Id.* ¶ 26.  The Prepetition ABL Lenders also agreed to provide the Debtors with

continued access to letters of credit on a postpetition basis and to allow the Debtors to maintain their prepetition commercial banking products in the ordinary course of business. *Id.*

6.     In the final days leading up to the Petition Date, and after several rounds of extensive, hard-fought negotiations with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Lenders, the Debtors reached agreements in principle with both lender groups to provide debtor-in-possession financing facilities (the "DIP Facilities").  The DIP Facilities comprise:  (a) an approximately $400 million senior secured superpriority term loan facility (the "DIP Term Loan Facility"), composed of (i) $250 million in new money, $150 million of which will be available upon entry of the Interim Order, and (ii) a "roll-up" of approximately $150 million of Super Priority Term Loan Obligations upon entry of the Interim Order ((ii), the "DIP Term Loan Roll-Up"); and (b) a $500 million senior secured superpriority asset-based financing facility (the "DIP ABL Facility" and, together with the DIP Term Loan Facility, the "DIP Facilities"), composed of (i) postpetition access to all of the commitments under the Prepetition ABL Facility, (ii) a "roll-up", upon entry of the Interim Order, of all Bank Product Obligations, all Letters of Credit (including, without limitation, the Existing Letters of Credit and Letter of Credit Usage (each as defined in the Prepetition ABL Credit Agreement)) and all unpaid and accrued interest, fees, interest on interest, and expenses due under the Prepetition ABL Facility, (iii) a "creeping roll-up," whereby, upon entry of the Interim Order and consistent with the DIP ABL Documents, all postpetition cash, collections, and proceeds of DIP ABL Priority Collateral will be used to pay down Prepetition ABL Obligations, and (iv) a full roll-up of all remaining Prepetition ABL Obligations upon entry of the Final Order ((ii)–(iv) together, the "DIP ABL Roll-Up" and, together with the DIP Term Loan Roll-Up, the "Roll-Ups").

7.      Notwithstanding the failure of the third-party marketing process to produce an actionable competing offer, the Debtors' negotiating efforts resulted in final terms markedly better than those initially proposed by the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Lenders.  *Id* ¶ 20.  Specifically, the final terms of the deal include reduced fees, more favorable milestones, and less restrictive covenants than the facilities originally proposed.

8.      Importantly, pursuant to the DIP Term Loan Credit Agreement, the Backstop Parties (as defined in the DIP Term Loan Credit Agreement), comprising certain of the Ad Hoc Group of Term Loan Lenders, agreed to provide a full backstop of the $250 million new money component of the DIP Term Loan Facility.  This backstop commitment will ensure that the Debtors remain adequately capitalized during these Chapter 11 Cases.  The Backstop Parties also agreed that, following the closing of the DIP Term Loan Facility, they will open up participation in the DIP Term Loan Facility to all lenders under the Bridge Facility on a *pro rata* basis, thus ensuring that all lenders under the Bridge Facility will get the same opportunity to fund and participate in the DIP Term Loan Facility if they so choose.  The Backstop Parties, under the applicable terms of the Bridge Facility, were not required to open syndication of the DIP Term Loan Facility to anyone besides themselves.  Further, the Backstop Parties negotiated for the DIP Term Loan Roll-Up to apply on a *pro rata* basis to all Bridge Facility lenders, with no requirement for participation in syndication.  This avoided the prospect of a costly and value-destructive fight with any minority Bridge Facility lenders and/or a substantially more costly adequate protection package.  Lastly, the Backstop Parties and the broader Ad Hoc Group of Term Loan Lenders agreed that the Backstop Premium and Closing Fee would be paid in kind and not as a current cash obligation despite both being earned and payable upon entry of the Interim Order.

9.      Without these key and material concessions from the Backstop Parties, there would be no guarantee that the Debtors would be able to begin these Chapter 11 Cases on a fully consensual basis.  As a result of the Backstop Parties' agreements contained in the DIP Term Loan Credit Agreement, the DIP Term Loan Facility is being funded by a group of the Debtors' prepetition secured lenders that have a vested interest in the success of the Chapter 11 Cases and have demonstrated a willingness to provide capital on an expedited basis to ensure the maximization of the estates.  In exchange, the Backstop Parties are seeking, upon entry of the Interim Order, a Backstop Premium that compensates them for an upfront commitment to provide the full amount of the DIP Term Loan Facility (including of the Interim and Final Draws).

10.      The Debtors and their estates would suffer immediate and irreparable harm if denied the financing needed to sustain ongoing business operations during the critical first weeks of these cases.  As described further in the Del Genio Declaration, the Debtors enter these Chapter 11 Cases with approximately $3.7 million in cash on hand, which is insufficient to support the Debtors' restructuring efforts while simultaneously ensuring business operations continue uninterrupted.  Del Genio Decl. ¶ 12.  It is vital that the Debtors obtain immediate approval of the DIP Facilities so they may, among other things, honor employee wages and benefits, pay vendors of critical goods and services, and fund the administration of these Chapter 11 Cases, all in accordance with the Initial DIP Budget, a copy of which is attached to the Interim Order as Schedule 1.  Without immediate access to the DIP Facilities, the Debtors would be unable to meet these obligations, to the detriment of all stakeholders.  On the other hand, the DIP Facilities will enable the Debtors to operate in the ordinary course during these Chapter 11 Cases while they negotiate a comprehensive restructuring with their key stakeholders.  The DIP Facilities also contain milestones that contemplate a 125-day case, which is both expeditious and realistic, and

will incentivize all parties in interest to work constructively to chart a value-maximizing path forward.

11.     For these reasons and for the reasons set forth below, as well as in the O'Connell Declaration, the Del Genio Declaration, and the First Day Declaration, the Debtors believe that the DIP Facilities will maximize value for all the Debtors' stakeholders and is in the exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court grant the relief requested in the Motion.

## Jurisdiction and Venue

12.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Order of Reference to Bankruptcy Judges from the United States District Court for the Southern District of Texas*, entered May 24, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 2002-1, 4001-1, 4002-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Relief Requested

17.     The Debtors seek entry of an interim order, substantially in the form attached hereto (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>,"[3] and together with the Interim Order, the "<u>DIP Orders</u>"):

      a.   authorizing the Debtors to enter into the DIP ABL Facility (such funding commitments thereunder, the "<u>DIP ABL Commitments</u>") in the aggregate principal amount of up to $500 million (all amounts extended under the DIP ABL Facility, the "<u>DIP ABL Loans</u>"), subject to the Borrowing Base, the U.S. Borrowing Base, and the U.K. Borrowing Base (each as defined in the DIP ABL Credit Agreement) under the DIP ABL Facility, which provides for (i) upon entry of the Interim Order, the deemed cashless dollar-for-dollar conversion and exchange of all (a) Commitments (as defined in the Prepetition ABL Credit Agreement (as defined below)) into DIP ABL Commitments; (b) all Bank Product Obligations (as defined in the Prepetition ABL Credit Agreement) into DIP ABL Obligations (as defined below); (c) all Letters of Credit (as defined in the Prepetition ABL Credit Agreement), including, without limitation, the Existing Letters of Credit and Letter of Credit Usage (each as defined in the Prepetition ABL Credit Agreement) into DIP ABL Obligations; and (d) all unpaid and accrued interest, fees, interest on interest, expenses (including, without limitation, attorneys' and advisors' fees and costs), whether contingent, unmatured, or otherwise due under the Prepetition ABL Facility into DIP ABL Obligations (ii) on and after the entry of the Interim Order, pursuant to a "creeping roll-up" whereby all cash, collections, and proceeds securing the DIP ABL Facility shall be used to pay down and deemed to reduce, on a dollar-for-dollar basis, the Prepetition ABL Obligations and (ii) upon entry of the Final Order, any and all remaining Prepetition ABL Obligations shall be deemed fully rolled up and converted into and shall constitute DIP ABL Obligations, in accordance with the terms and conditions of the Interim Order and that certain *Ratification and Amendment Agreement* attached to the Interim Order as <u>Exhibit A</u> (as the same may be modified prior to execution and as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>DIP ABL Credit Agreement</u>"), by and among Ascend Performance Materials European Limited ("<u>U.K. Borrower</u>") and each of the Debtors party thereto, as borrowers (collectively, the "<u>DIP ABL Borrowers</u>"), Ascend Performance Materials Netherlands Holding B.V. (the "<u>Dutch Pledgor</u>"), each of the Debtors party thereto, and Ascend Performance Materials Belgium Holdco SRL as guarantors (each, a "<u>DIP ABL Guarantor</u>," and collectively, the "<u>DIP ABL Guarantors</u>," and together with the DIP ABL Borrowers and the Dutch Pledgor, the "<u>DIP ABL Loan Parties</u>"), Wells Fargo Capital Finance, LLC, as administrative agent and collateral agent, and Wells Fargo Bank, National Association, London Branch, as U.K. Security Agent (in such capacities, the "<u>DIP ABL Agent</u>"), and the

---

[3]     The Debtors will file the form of Final Order prior to the Final Hearing.

lenders party thereto (the "<u>DIP ABL Lenders</u>," and together with the DIP ABL Agent, the "<u>DIP ABL Secured Parties</u>");

b.  authorizing the Debtors to enter into the DIP Term Loan Facility (such funding commitment thereunder, the "<u>DIP Term Loan Commitments</u>," and together with the DIP ABL Commitment, the "<u>DIP Commitments</u>"), in the aggregate principal amount of up to $400 million (all amounts extended under the DIP Term Loan Facility, the "<u>DIP Term Loans</u>," and together with the DIP ABL Loans, the "<u>DIP Loans</u>"), participation in which will be offered, on a *pro rata* basis, to all Prepetition Super Priority Term Loan Lenders, consisting of: (A) $250 million of new money term loans, of which (1) $150 million shall be made available for borrowing upon the entry of the Interim Order, (the "<u>Interim Draw</u>") and shall be funded into the DIP Account with release of such escrowed loans subject to the terms and conditions of the DIP Term Loan Credit Agreement (as defined below) and (2) $100 million shall be made available for borrowing and funded into the DIP Account upon the entry of the Final Order, in each case, with release of such escrowed loans subject to the terms and conditions of the DIP Term Loan Credit Agreement; and in each case, the portion of the DIP Term Loan Facility funded into the DIP Account at any given time (the "<u>Escrowed Amount</u>"); *provided*, that the Escrowed Amount shall accrue interest and fees, commencing with the funding into escrow thereof, and (B) $149,542,180.98 of Super Priority Term Loan Roll-Up, pursuant to the terms and conditions of that certain Superpriority Senior Secured Debtor-in-Possession Credit Agreement attached to the Interim Order as <u>Exhibit B</u> (as the same may be modified prior to execution and as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>DIP Term Loan Credit Agreement</u>," and together with the DIP ABL Credit Agreement, the "<u>DIP Credit Agreements</u>"), by and among Ascend Performance Materials Operations LLC, as borrower (in such capacity, the "<u>DIP Term Loan Borrower</u>," and together with the DIP ABL Borrowers, the "<u>DIP Borrowers</u>"), each of the Debtors and certain non-Debtors party thereto as guarantors (each, a "<u>DIP Term Loan Guarantor</u>," and collectively, the "<u>DIP Term Loan Guarantors</u>," and together with the DIP ABL Guarantors, the "<u>DIP Guarantors</u>"; the DIP Term Loan Guarantors and the DIP Term Loan Borrower, collectively, the "<u>DIP Term Loan Obligors</u>"; and the DIP Term Loan Obligors and the DIP ABL Obligors, collectively, the "<u>DIP Loan Parties</u>"), Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, the "<u>DIP Term Loan Agent</u>," and together with the DIP ABL Agent, the "<u>DIP Agents</u>"), and the lenders party thereto (the "<u>DIP Term Loan Lenders</u>," and together with the DIP ABL Lenders, the "<u>DIP Lenders</u>"; the DIP Term Loan Lenders and the DIP Term Loan Agent, collectively, the "<u>DIP Term Loan Secured Parties</u>," and together with the DIP ABL Secured Parties, the "<u>DIP Secured Parties</u>");

c.  authorizing the Debtors to execute, deliver, and perform under (i) the DIP ABL Credit Agreement and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual

property security agreements, or notes) (as amended, restated, amended and restated, supplemented, waived, and/or modified from time to time, collectively, the "DIP ABL Documents") and (ii) the DIP Term Loan Credit Agreement and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes) (as amended, restated, amended and restated, supplemented, waived, and/or modified from time to time, collectively, the "DIP Term Loan Documents," and together with the DIP ABL Documents, the Interim Order, and the Final Order, the "DIP Documents"), and to perform such other acts as may be necessary or desirable in connection with the Interim Order and the DIP Documents, and the transactions contemplated thereby;

d. authorizing the DIP Borrowers to incur, and the DIP Guarantors to guarantee on an unconditional joint and several basis, the principal, interest, fees, premiums, interest on interest, costs, expenses, obligations (whether contingent, unmatured, or otherwise), and all other amounts and obligations owing under and/or secured by (A) the DIP ABL Documents (as defined below) (including, without limitation, all "Obligations" as described in the DIP ABL Credit Agreement), which for the avoidance of doubt shall include all U.K. Obligations (as defined in the DIP ABL Credit Agreement) arising as a result of any guaranty by a Debtor of any U.K. Obligations) (collectively, the "DIP ABL Obligations"), and (B) the DIP Term Loan Documents (as defined below) (including, without limitation, all "Obligations" as described in the DIP Term Loan Credit Agreement) (collectively, the "DIP Term Loan Obligations," and collectively with the DIP ABL Obligations, the "DIP Obligations");

e. on the terms and conditions set forth in the syndication procedures (the "Syndication Procedures") attached to the Interim Order as Exhibit C, upon the entry of the Interim Order, each Prepetition Super Priority Term Loan Lender shall be offered the right to purchase the specified amount of DIP Term Loans *pro rata* based on their holdings of the 2019 Term Loans (as defined in the Syndication Procedures) as of the Petition Date;

f. subject to the Carve Out and to the relative priorities provided in the Interim Order, granting (x) the DIP Term Loan Obligations and (y) the DIP ABL Obligations, respectively, and allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases, as and to the extent provided in the Interim Order;

g. subject to the Carve Out, the Permitted Liens, and the relative priorities set forth in the Interim Order, including the postpetition lien priorities set forth on Annex A thereto (the "Lien/Claim Priorities Annex"), granting to the DIP Term Loan Agent (for the benefit of the DIP Term Loan Secured Parties) automatically and validly perfected security interests in and liens on the DIP Collateral, including all property constituting Cash Collateral;

h. subject to the Carve Out, the Permitted Liens, and the relative priorities and limitations as set forth in the Interim Order, including the Lien/Claim Priorities Annex, granting to the DIP ABL Agent, for the benefit of the Secured Parties (as defined in the DIP ABL Credit Agreement, automatically and validly perfected security interests in and liens on the DIP Collateral, including all property constituting Cash Collateral;

i. authorizing the Debtors to transfer, or in any event to be deemed to have transferred, all cash, collections and proceeds of DIP ABL Priority Collateral to the DIP ABL Agent on each business day, which Collections shall be applied as set forth in paragraph [23] of the Interim Order;

j. authorizing and directing the Debtors to pay the principal, interest, premiums, fees, interest on interest, expenses, and other amounts payable (whether contingent or otherwise, and whether unmatured or otherwise) under the DIP ABL Documents and the DIP Term Loan Documents, respectively, including the DIP Term Loan Premium and the Closing Fee, as set forth in the Interim Order and as such become earned, due, and payable;

k. authorizing the Debtors to use the Prepetition Collateral, including any Cash Collateral, of the Prepetition Secured Parties under the Prepetition Credit Documents;

l. providing adequate protection to the Prepetition Secured Parties as provided for in the Interim Order for, solely to the extent of any diminution in value of the Prepetition Collateral, from and after the Petition Date, including on account of the Debtors' sale, lease, or use of the Prepetition Collateral, including Cash Collateral, the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, and the priming of the Prepetition Secured Parties' respective interests in the Prepetition Collateral (including by the Carve Out) ("Diminution in Value");

m. effective upon the entry of the Interim Order, authorizing the Debtors to waive (a) any right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise and (b) the equitable doctrine of marshaling and other similar doctrines with respect to the DIP Collateral and the DIP Obligations; *provided* that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order;

n. subject to and effective upon the entry of the Final Order, authorizing the Debtors to waive (a) any right to surcharge the Prepetition Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (b) the equitable doctrine of marshaling and other similar doctrines, and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral and the Prepetition Secured Obligations;

o.   authorizing the Debtors to: (a) fund, among other things, ongoing working capital, general corporate expenditures, and other financing needs of the Debtors, (b) pay transaction fees and other costs and expenses of administration of the Chapter 11 Cases, and (c) pay the reasonable and invoiced fees and expenses (including reasonable and invoiced attorneys' and advisors' fees and expenses) and interest and other payments owed to the DIP Secured Parties pursuant to the DIP ABL Documents and the DIP Term Loan Documents, respectively, and the Interim Order (and in the case of (a) and (b) (other than with regard to the fees and expenses of the Professional Persons), the DIP Budget (subject to Permitted Deviations));

p.   approving certain stipulations and releases by the Debtors with respect to the Prepetition Credit Documents and the Prepetition Collateral as set forth in the Interim Order;

q.   vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP ABL Documents and the DIP Term Loan Documents and the Interim Order, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, and providing for the immediate effectiveness of the Interim Order; and

r.   scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested herein and approving the form of notice with respect to the Final Hearing.

### <u>Concise Statement of the Material Term</u><br><u>of the Interim Order Pursuant to Bankruptcy Rule 4001</u><br><u>and the Procedures for Complex Cases in the Southern District of Texas</u>

18.     The following chart contains a summary of the material terms of the proposed Interim Order, together with references to the applicable sections of the Interim Order and other relevant source documents, including the DIP Credit Agreements, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[4]

---

[4]   The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Rule | [Summary of Material Terms][5] |
|---|---|
| **DIP Loan Parties**<br>Bankruptcy Rule<br>4001(c)(1)(B) | **DIP ABL Borrowers**:  Ascend Performance Materials Operations LLC; Ascend Performance Materials Inc.; Ascend Performance Materials Texas Inc.; and Ascend Performance Materials European Limited<br><br>**DIP ABL Guarantors**:  Ascend Performance Materials Holdings Inc.; Ascend Performance Materials Consumer Solutions Holdings LLC; Ascend Performance Materials Consumer Solutions LLC; APM Disc Holdings LLC; APM Disc Inc.; APM Foreign Holdings LLC; APM (Canada) LLC; APM (PR) LLC; Ascend Performance Materials Netherlands Holding B.V.; and Ascend Performance Materials Belgium Holdco SRL<br><br>**DIP Term Loan Borrowers**:  Ascend Performance Materials Operations LLC<br><br>**DIP Term Loan Guarantors**:  Ascend Performance Materials Inc., Ascend Performance Materials Texas Inc., Ascend Performance Materials European Limited; Ascend Performance Materials Holdings Inc.; Ascend Performance Materials Consumer Solutions Holdings LLC; Ascend Performance Materials Consumer Solutions LLC; APM Disc Holdings LLC; APM Disc Inc.; APM Foreign Holdings LLC; APM (Canada) LLC; APM (PR) LLC; Ascend Performance Materials Netherlands Holding B.V.; and Ascend Performance Materials Belgium Holdco SRL |
| **DIP Secured Parties**<br><br>Bankruptcy Rule<br>4001(c)(1)(B) | **DIP ABL Lenders**:  The Lenders Party Thereto from Time to Time<br>**DIP ABL Agent**:  Wells Fargo Capital Finance, LLC<br><br>**DIP Term Loan Lenders**:  The Lenders Party Thereto from Time to Time<br>**DIP Term Loan Agent**:  Wilmington Savings Fund Society, FSB |
| **Term**<br>Bankruptcy Rules<br>4001(c)(1)(B), (B)(iii) | **DIP ABL Credit Facility:**  The Maturity Date shall be the earliest of (i) the date that is six months after the Closing Date, subject to four one-month extensions at the election of the Debtors, (ii) the date on which all Loans are accelerated and all unfunded Commitments (if any) have been terminated in accordance with the DIP ABL Credit Agreement, by operation of law or otherwise, (iii) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor, (iv) the closing of any sale of assets pursuant to Section 363 of the U.S. Bankruptcy Code, which when taken together with all other sales of assets since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties and (v) the Chapter 11 Plan Effective Date. |

---

[5]   **[The proposed Interim Order, DIP ABL Credit Agreement, and DIP Term Loan Credit Agreement remain under review and revision and subject to material change.]**

| Bankruptcy Rule | [Summary of Material Terms]5 |
|---|---|
| | *See* DIP ABL Credit Agreement, §§ [●]<br><br>**DIP Term Loan Credit Facility:** The Maturity Date shall be the earliest of (i) the date that is six months after the Closing Date, subject to four one-month extensions at the election of the Debtors, (ii) the date on which all Loans are accelerated and all unfunded Commitments (if any) have been terminated in accordance with the DIP Term Loan Credit Agreement, by operation of law or otherwise, (iii) the date the Bankruptcy Court orders a conversion of the Chapter 11 Cases to a chapter 7 liquidation or the dismissal of the chapter 11 case of any Debtor, (iv) the closing of any sale of assets pursuant to Section 363 of the U.S. Bankruptcy Code, which when taken together with all other sales of assets since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties and (v) the Chapter 11 Plan Effective Date.<br><br>*See* DIP Term Loan Credit Agreement, §§ 1.01 "Maturity Date", 2.19 |
| **Commitments**<br>Bankruptcy Rule 4001(c)(1)(B) | **DIP ABL Facility**: $500 million in aggregate principal, including (i) a "roll-up", upon entry of the Interim Order, of all Bank Product Obligations, all Letters of Credit (including, without limitation, the Existing Letters of Credit and Letter of Credit Usage (each as defined in the Prepetition ABL Credit Agreement)) and all unpaid and accrued interest, fees, interest on interest, and expenses due under the Prepetition ABL Facility, and (ii) a "creeping roll-up" whereby, upon entry of the Interim Order, all cash, collections, and proceeds of DIP ABL Priority Collateral will pay down Prepetition ABL Obligations, and any remaining outstanding Prepetition ABL Obligations will be fully "rolled" into the DIP ABL Facility upon entry of the Final Order.<br><br>*See* DIP ABL Credit Agreement, [Art. II]<br><br>**DIP Term Loan Facility:** $250 million of new money term loans, $150 million of which shall be made available for borrowing upon the entry of the Interim Order and $100 million of which shall be made available for borrowing upon the entry of the Final Order.<br><br>*See* DIP Term Loan Credit Agreement, § 2.01(a) |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Documents include standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lender to make DIP Loans.<br><br>*See* DIP Term Loan Credit Agreement, Art. IV–VII; DIP ABL Credit Agreement, [●] |

| Bankruptcy Rule | [Summary of Material Terms]⁵ |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule<br>4001(c)(1)(B) | **DIP ABL Facility:**<br><br>(a) Term SOFR / SONIA + Credit Support Adjustment + 3.50% per annum, payable in cash monthly, or<br><br>(b) Base Rate / EURIBOR + Credit Support Adjustment + 2.50% per annum, payable in cash monthly.<br><br>(c) Default Rate equal to 2.00%, payable in cash monthly (if applicable)<br><br>The Credit Spread Adjustment shall equal 0.10% with respect to the Term SOFR rate and shall equal 0.0326% with respect to the SONIA rate.<br><br>*See* DIP ABL Credit Agreement, §§ 1.01 "Applicable Margin," 2.06(a)<br><br>**DIP Term Loan Facility:**<br><br>(a) Term SOFR + 10.00% per annum *with* 1.50% per annum, payable in cash monthly *and* 8.50% per annum, payable in kind monthly; or<br><br>(b) Base Rate + 9.00% per annum, *with* 0.50% per annum, payable in cash monthly *and* 8.50% per annum, payable in kind monthly.<br><br>(c) Default Rate equal to 2.00%, payable in cash monthly (if applicable)<br><br>*See* DIP Term Loan Credit Agreement, § 1.01 "Applicable Rate," 2.08 |
| **Use of DIP Facilities and Cash Collateral**<br>Bankruptcy Rule<br>4001(b)(l)(B)(ii) | No DIP Proceeds, the DIP Collateral, the Prepetition Collateral, the Carve Out, or any Cash Collateral may be used by the DIP Loan Parties or any other party-in-interest, or their representatives, to (or support any other party to) (a) investigate, analyze, commence, prosecute, threaten, litigate, object to, contest, or challenge in any manner or raise any defenses to the debt, collateral position, liens, or claims of the DIP Agents, any of the DIP Secured Parties, or any of the Prepetition Secured Parties, whether by (i) challenging the validity, extent, amount, perfection, priority, or enforceability of the DIP ABL Obligations, the DIP Term Loan Obligations, or the Prepetition Secured Obligations, (ii) challenging the validity, extent, perfection, priority, or enforceability of the DIP Term Loan Liens, the DIP ABL Liens, the Prepetition Liens, or any mortgage, security interest, or lien with respect thereto, or any other rights or interests or replacement liens with respect thereto or any other rights or interests of any of the DIP Agents, the DIP Secured Parties, any Prepetition Agent, or the Prepetition Secured Parties, (iii) seeking to subordinate (other than to the Carve Out or as expressly set forth in the Interim Order) or recharacterize the DIP ABL Obligations, the DIP Term Loan Obligations, or any of the Prepetition Secured Obligations, or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or payment thereunder, or (iv) asserting any claims or causes of action, including, without limitation, any Avoidance Actions, against the DIP Agents, any of the other DIP Secured Parties, any Prepetition Agent, or any of the other Prepetition Secured Parties, or any of their respective |

| Bankruptcy Rule | [Summary of Material Terms][5] |
|---|---|
| | Representatives; (b) prevent, hinder, or otherwise delay the DIP Agents', any of the other DIP Secured Parties', or any of the Prepetition Secured Parties' assertion, enforcement, or realization on the DIP Collateral or the Prepetition Collateral in accordance with the Interim Order and the DIP Documents, or the Prepetition Credit Documents, or the exercise of rights by the DIP Agents or any Prepetition Agents, as applicable, once a DIP Term Loan Termination Event, an Event of Default or DIP ABL Termination Event has occurred and is continuing; (c) seek to modify the rights granted to the DIP Agents, any of the other DIP Secured Parties, or any of the Prepetition Secured Parties under the DIP Documents or the Prepetition Credit Documents, respectively, in each case without such parties' prior written consent, which may be given or withheld by such party in the exercise of its respective sole discretion; or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of the Court (which order may be the Interim Order or the Final Order) and (ii) permitted by the DIP Documents; *provided* that prior to the Challenge Deadline, an investigation budget of no more than $50,000.00 (the "Investigation Budget") of the DIP Facilities, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, and the proceeds thereof used to fund the Carve Out, may be used by the Committee (if appointed) to investigate, but not to prepare, initiate, litigate, prosecute, object to, or otherwise Challenge, the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability, or extent of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations.<br><br>*See* Interim Order ¶ [33] |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition ABL Secured Parties, Prepetition Term Loan Secured Parties, Prepetition Super Priority Secured Parties, DIP ABL Secured Parties, and DIP Term Loan Secured Parties all have interests in the DIP Collateral, which encompasses the Cash Collateral.<br><br>*See* Interim Order ¶¶ [8–10, 17], Annex A "Lien/Claim Priority Annex" |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | The **DIP ABL Facility** provides for fees that are usual and customary for credit facilities of that type.<br><br>*See* DIP ABL Credit Agreement, §§ 1.01 "Applicable Unused Line Percentage," 2.10(b); Fourth Amended and Restated Fee Letter<br><br>**DIP Term Loan Facility:**<br><br>(a) Backstop Premium:  10.00% of the aggregate principal amount of the New Money DIP Term Loan Commitments, payable in kind, due and payable upon entry of the Interim Order |

| **Bankruptcy Rule** | **[Summary of Material Terms]**[5] |
|---|---|
| | (b) <u>Closing Fee</u>: 0.75% of the aggregate principal amount of New Money DIP Term Loan Commitments, payable in kind, due and payable upon entry of the Interim Order<br><br>*See* Term Loan DIP Credit Agreement, §§ 1.01 "Backstop Premium," "Closing Fee"; 2.09(a), (e) |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | The Debtors shall, immediately upon receipt of any proceeds of the DIP Term Loan Facility (including the Interim Draw), deposit such amounts into a segregated escrow account (the "<u>DIP Account</u>") maintained by the DIP Term Loan Agent, which amounts may only be drawn in accordance with an escrow agreement and the DIP Budget (subject to Permitted Deviations) and the DIP Term Loan Credit Agreement, and with all funds held in the DIP Account deemed to be DIP Term Loan Collateral (*provided* that the DIP Account shall not be subject to any liens of the DIP ABL Agent or the other DIP ABL Secured Parties). Funds in the DIP Account will become available to be drawn by and/or shall be disbursed to the Debtors in accordance with the DIP Budget (subject to Permitted Deviations) and the DIP Term Loan Credit Agreement. The DIP Term Loan Agent shall be deemed to have "control" over the DIP Account for all purposes of perfection under the Uniform Commercial Code pursuant to the Interim Order and, to the extent required under the DIP Term Loan Credit Agreement, pursuant to a control agreement acceptable to the DIP Term Loan Required Lenders.<br><br>The Debtors shall use the proceeds of all borrowings under the DIP Term Loan Facility and Cash Collateral in accordance with the DIP Budget (subject to Permitted Deviations), *provided* that the DIP Budget will not operate as a cap on professional fees. The DIP Budget annexed to the Interim Order as <u>Schedule 1</u> shall constitute the initial DIP Budget (the "<u>Initial DIP Budget</u>").<br><br>The "<u>DIP Budget</u>"[6] means the rolling 13-week operating cash flow forecast/budget of the Debtors, which, in the first instance, shall be the Initial DIP Budget (which, for the avoidance of doubt, is acceptable to the DIP Term Loan Required Lenders and the DIP ABL Agent. On or prior to 5:00 p.m. (Prevailing Eastern Time) on every second Thursday beginning on May 1, 2025 (each, a "<u>Testing Date</u>"), the Debtors shall deliver to the DIP Term Lender Advisors and the DIP ABL Agent Advisors a revised proposed budget (a "<u>Revised Proposed Budget</u>"), and the DIP Term Lender Advisors and the DIP ABL Agent shall inform the Debtors no later than two (2) business days after such receipt whether such Revised Proposed Budget has been approved by the DIP Term Loan Required Lenders and the DIP ABL Agent. A Revised Proposed Budget that is approved by the DIP Term Loan Required Lenders and the DIP ABL Agent shall become the DIP Budget for all purposes of the Interim Order. All approved DIP Budgets shall be sent by the Debtors to the DIP Term Loan Agent and the DIP ABL Agent for posting in the applicable lender data site. In the event a Revised Proposed Budget is not approved, or if the Debtors, the DIP Term Loan Required Lenders, and the DIP ABL Agent otherwise |

---

[6]   Each DIP Budget shall set forth the Actual Restructuring Related Amounts, the Budgeted Restructuring Related Amounts, the Budgeted Disbursements, and the Budgeted Receipts, each of which is defined in the DIP Term Loan Credit Agreement.

| Bankruptcy Rule | [Summary of Material Terms][5] |
|---|---|
| | affirmatively agree, the DIP Budget then in effect shall continue to govern.  It shall be a condition precedent to the effectiveness of the DIP Term Loan Facility that the Debtors shall have delivered a DIP Budget in form and substance reasonably acceptable to the DIP Term Loan Required Lenders and the DIP ABL Agent.  Compliance with the Initial DIP Budget and each subsequent DIP Budget shall be tested on each Testing Date. |
| | An "Approved Variance Report" means each budget variance report/reconciliation in form reasonably satisfactory to the DIP Term Loan Required Lenders and the DIP ABL Agent  and delivered by the Debtors to the DIP Term Lender Advisors and the DIP ABL Agent Advisors on each Testing Date, setting forth in detail (i) the operating disbursements (the "Actual Disbursements") on a line-by-line and aggregate basis for the two weeks ending on the Friday following the preceding applicable Testing Date (the "Testing Period"), (ii) the total receipts (collectively, the "Actual Receipts"), on a line-by-line and aggregate basis for the applicable Testing Period, (iii) a comparison (whether positive or negative, in dollars and expressed as a percentage) of (A) the Actual Receipts (and each line item thereof) for the Testing Period to the Budgeted Receipts (and each line item thereof) and (B) the Actual Disbursements (and each line item thereof) for the Testing Period to the Budgeted Disbursements (and each line item thereof), in each case, as set forth in the DIP Budget for the applicable Testing Period; and (iv) as to each variance contained in the Approved Variance Report, an indication as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance; *provided* that the Testing Period shall not apply to the Initial DIP Budget but shall apply to all subsequent DIP Budgets. |
| | "Permitted Deviations" means (i) in respect of aggregate Actual Disbursements (excluding, for the avoidance of doubt, Actual Restructuring Related Amounts), 15% of Budgeted Disbursements (excluding, for the avoidance of doubt, Budgeted Restructuring Related Amounts) for each Testing Period (the "Disbursements Permitted Deviation") and (ii) in respect of aggregate Actual Receipts, 15% Budgeted Receipts for each Testing Period (or, with the prior written consent of the DIP Term Loan Required Lenders and the DIP ABL Required Lenders, 20%) (the "Receipts Permitted Deviation").  All spending must be consistent with the disbursements in the DIP Budget (subject to Permitted Deviations); *provided* that Professional Persons' fees and expenses shall not be subject to the variance testing set forth in this paragraph and to the extent such fees and expenses exceed the applicable fees and expenses set forth in the DIP Budget for the applicable testing period, such excess shall be a "Permitted Budget Variance." |
| | DIP Reporting.  The Debtors shall timely provide the DIP Term Lender Advisors and the DIP ABL Agent Advisors (each as defined below), the DIP Agents, and the Prepetition Agents with the following (in each case as may be extended by the respective DIP Term Lender Advisors and DIP ABL Agent Advisors (which may be by email)): |
| | *See* Interim Order ¶ [18] |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | The Debtors, shall, or shall cause the following to occur, by the times and dates set forth below. <br><br>    (a)  By three (3) Business Days after the Petition Date:  Entry of the Interim Order. |

| Bankruptcy Rule | [Summary of Material Terms][5] |
|---|---|
| | (b) By ten (10) days after the Petition Date:  Agreement on a proposed timeline to file motion(s) to reject executory contracts and unexpired leases.<br><br>(c) By ten (10) Business Days after the Petition Date:  Motion filed establishing a general claims bar date.<br><br>(d) By thirty-six (36) calendar days after the Petition Date:  Entry of the Final Order.<br><br>(e) By forty-five (45) calendar days after the Petition Date:  Filing of chapter 11 plan and disclosure statement.<br><br>(f) By sixty (60) days after the Petition Date:  Agreement on a business plan for Debtor and non-Debtor affiliates.<br><br>(g) By eighty (80) calendar days after the Petition Date:  Entry of the order approving the disclosure statement.<br><br>(h) By one hundred and fifteen (115) calendar days after the Petition Date:  Entry of the confirmation order.<br><br>(i) By one hundred and twenty-five (125) calendar days after the Petition Date:  Effective date of the chapter 11 plan; *provided that*, if the necessary regulatory approvals associated with the effectuation of the chapter 11 plan remain pending as of such date, this milestone shall be extended to the date that is the third Business Day following receipt of all necessary regulatory approvals.<br><br>(j) By thirty (30) days following the Petition Date:  Each Foreign Subsidiary (other than an Excluded Subsidiary, Belgian Guarantor or a U.K. Subsidiary) that the Required Lenders request, in their commercially reasonable discretion, shall become a Subsidiary Guarantor and shall deliver such documents and take such actions reasonably requested by the Required Lenders in connection with such designation within ten (10) business days.<br><br>*See* DIP Term Loan Credit Agreement, § 6.21; DIP ABL Credit Agreement, § [6.21] |
| **Liens and Priorities**<br>Bankruptcy Rule<br>4001(c)(l)(B)(i) | For each of the following categories of DIP Collateral, the priority of liens shall be as follows, subject to the Carve Out and the Permitted Liens:<br><br>• <u>DIP Collateral that Constitutes Revolving Priority Collateral</u>:  (a) DIP ABL Liens; (b) Prepetition ABL Adequate Protection Liens; (c) Prepetition ABL Liens; (d) DIP Term Loan Liens; (e) Prepetition Superpriority Term Loan Adequate Protection Liens; (f) Prepetition Superpriority Liens; (g) Prepetition Term Loan Adequate Protection Liens; and (h) Prepetition Term Loan Liens.<br><br>• <u>DIP Collateral that Constitutes Term Loan Priority Collateral</u>:  (a) DIP Term Loan Liens; (b) Prepetition Superpriority Term Loan Adequate Protection Liens; (c) Prepetition Superpriority Term Loan Liens; (d) Prepetition Term Loan Adequate Protection Liens; (e) Prepetition Term Loan Liens; (f) DIP ABL Liens; (g) Prepetition ABL Adequate Protection Liens; and (h) Prepetition ABL Liens.<br><br>• <u>DIP Collateral That Constitutes Previously Unencumbered Property of the Nature of Term Loan Priority Collateral</u>:   (a) DIP Term Loan Liens; |

| **Bankruptcy Rule** | **[Summary of Material Terms]**[5] |
|---|---|
| | (b) Prepetition Superpriority Term Loan Adequate Protection Liens; (c) Prepetition Term Loan Adequate Protection Liens; (d) DIP ABL Liens; (e) Prepetition ABL Adequate Protection Liens<br><br>• <u>DIP Collateral That Constitutes Previously Unencumbered Property of the Nature of Revolving Priority Collateral</u>:  (a) DIP ABL Liens; (b) Prepetition ABL Adequate Protection Liens; (c) DIP Term Loan Liens; (d) Prepetition Superpriority Term Loan Adequate Protection Liens; and (e) Prepetition term Loan Adequate Protection Liens<br><br>• <u>DIP Collateral That Constitutes Previously Unencumbered Property Not in the Nature of Term Loan Priority Collateral or ABL Priority Collateral</u>:  (a) DIP Term Loan Liens and DIP ABL Liens; (b) Prepetition Superpriority Term Loan Adequate Protection Liens; and (c) Prepetition Term Loan Adequate Protection Liens and Prepetition ABL Adequate Protection Liens<br><br>*See* Interim Order, Annex A "Lien/Claim Priorities Annex" |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | The Interim Order provides for a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim Order ¶ [31] |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B) | Prior to the Challenge Deadline, a party in interest with the requisite standing may commence an appropriate proceeding or contested matter challenging any of the Debtors' Stipulations and all other admissions, agreements, and releases contained in the Interim Order, including the Releases and the Roll-Up Obligations.<br><br>The "<u>Challenge Deadline</u>" shall mean the earlier of (i) the date of confirmation of a plan of reorganization, and (ii) (A) as to the Committee, sixty (60) calendar days from the date of the formation of the Committee (if appointed) and (B) as to any other party-in-interest, sixty (60) calendar days following the entry of the Interim Order.  The Challenge Deadline may be extended (i) in writing prior to the expiration of the Challenge Deadline (which writing may be in the form of email by counsel) from time to time in the sole discretion of the DIP ABL Agent, with respect to any Challenge to the Creeping ABL Roll-Up and the Final ABL Roll-Up, the DIP Term Loan Agent (at the direction DIP Term Loan Required Lenders) with respect to any Challenge to the Super Priority Term Loan Roll-Up, or the applicable Prepetition Agents (at the direction of holders of a majority of the applicable Prepetition Secured Obligations) with respect to any Challenge to the applicable Prepetition Secured Obligations or Prepetition Liens, as applicable, or (ii) by this Court for good cause shown pursuant to an application filed and served by a party-in-interest prior to the expiration of the Challenge Deadline.  If the Chapter 11 Cases are converted to chapter 7, or a chapter 7 or chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Deadline, any such estate representative or trustee shall receive the full benefit of any remaining time before |

| Bankruptcy Rule | [Summary of Material Terms][5] |
|---|---|
| | expiration of the Challenge Deadline, which shall be extended for a period of sixty (60) calendar days.<br><br>*See* Interim Order ¶¶ [39(a), (d)] |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(ii), (iv) | The Prepetition Secured Parties are entitled to usual and customary adequate protection of their respective interests in the Prepetition Collateral, including Cash Collateral, to the extent of any Diminution in Value of their interests therein, including (i) Adequate Protection Liens, (ii) 507(b) Claims, and (iii) Adequate Protection Fees and Expenses.<br><br>*See* Interim Order ¶ [17] |
| **Events of Default**<br>Bankruptcy Rule<br>4001(c)(l)(B) | The DIP Facilities contain Events of Default that are usual and customary for debtor-in-possession financings.<br><br>*See* DIP ABL Credit Agreement, § [8.01]; DIP Term Loan Credit Agreement, § 8.01 |
| **Stipulations**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains customary stipulations with respect to (i) the outstanding Prepetition Secured Obligations as of the Petition Date, (ii) the validity, priority, enforceability, and non-avoidability of the Prepetition Liens on the Prepetition Collateral, (iii) the lack of claims or causes of actions existing against, or with respect to, the Prepetition Secured Parties under the Prepetition Credit Documents, (iv) the extent to which the Debtors' cash and other amounts on deposit or maintain in any account or accounts by the Debtors constitutes Cash Collateral, and (v) the Prepetition Secured Parties' lack of control over the Debtors or their property or operations; *provided* that the stipulations shall be subject to the Challenge Period.<br><br>*See* Interim Order ¶ [G] |
| **Releases**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | [Subject to and upon the entry of the Final Order, and subject to the Challenge Deadline provided for in the Interim Order, in exchange for good and valuable consideration, the adequacy of which is thereby confirmed, each of the Debtors and (subject to paragraph [37] of the Interim Order) each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present, and future subsidiaries and assigns (collectively, the "Releasing Parties") unconditionally and irrevocably releases, acquits, absolves, forever discharges, and covenants not to sue the DIP Secured Parties, the Prepetition Secured Parties, and each such entities' current and former affiliates, and each such entity's current and former directors, officers, managers |

| Bankruptcy Rule | [Summary of Material Terms][5] |
|---|---|
| | and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, attorneys, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "Released Parties") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively) that exist on the date hereof, with respect to or relating to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, or the Prepetition Obligations or the Prepetition Liens, as applicable, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all claims and causes of action arising under the Bankruptcy Code, and (c) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties, other than any claims and liabilities arising from the actual fraud, gross negligence, or willful misconduct of a Released Party.] <br><br> *See* Interim Order ¶ [42] |
| **Waiver/Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362 of the Bankruptcy Code shall be modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and 507(b) Claims; (b) permit the Debtors to perform such acts as the DIP Agents, the other DIP Secured Parties, or the Prepetition Term Loan Agent each may reasonably request to assure the perfection and priority of the liens granted in the Interim Order; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agents, the DIP Secured Parties, and the Prepetition Secured Parties under the Prepetition Credit Documents, the DIP Documents, the DIP Facilities, and the Interim Order, as applicable; and (d) authorize the Debtors to make, and the DIP Agents, the DIP Secured Parties, and the Prepetition Secured Parties to retain and apply, payments in accordance with the terms of the Interim Order. <br><br> *See* Interim Order ¶ [21] |

| Bankruptcy Rule | [Summary of Material Terms][5] |
|---|---|
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | [The DIP Secured Parties and the Prepetition Secured Parties (the "Indemnified Parties"), respectively, have acted in good faith in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Term Loan Liens, the DIP ABL Liens, and the Adequate Protection Liens, respectively, any challenges or objections to the DIP Facilities or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) with respect to liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of proceeds of any loans made under the DIP Facilities, and such other liabilities as set forth in accordance with and subject to the limitations of the DIP Documents; *provided* that no Indemnified Parties will be indemnified for any losses, claims, damages, liabilities or related expenses to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such Indemnified Parties.]<br><br>*See* Interim Order ¶ [35] |
| **Waiver of Section 506(c)**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Term Loan Agent, the DIP Term Loan Secured Parties, the DIP ABL Agent, the DIP ABL Secured Parties, the DIP Collateral, or, subject to and upon entry of the Final Order, any Prepetition Agent, the Prepetition Secured Parties, or the Prepetition Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Term Loan Agent (at the direction of the DIP Term Loan Required Lenders) or the DIP ABL Agent, as applicable, or the applicable Prepetition Agent (at the direction of holders of a majority of the applicable Prepetition Secured Obligations), as may be applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.<br><br>*See* Interim Order¶ [41] |

**[Statement Regarding Significant Provisions]**[7]

19.     The DIP Orders contain certain of the provisions (the "Significant Provisions")[8]

identified in paragraph 8 of the Complex Case Procedures as set forth below:

a.  ***Plan and Disclosure Statement-Related Milestones.***  The DIP Credit Agreements and the DIP Orders provide for certain milestones, as described further in the Summary of Material Terms.  *See* DIP Term Loan Credit Agreement, § 6.21; DIP ABL Credit Agreement, § [6.21].

b.  ***Cross Collateralization***.  The DIP Orders do not authorize, and the DIP Facilities does not provide for, any cross-collateralization of the Debtors' funded debt.

c.  ***Roll Up***.  The DIP Credit Agreements and Interim Order provide for (i) a "roll-up" of approximately $150 million in aggregate principal of Super Priority Term Loans upon entry of the Interim DIP Order, (ii) a "roll-up" of all Bank Product Obligations, all Letters of Credit (including, without limitation, the Existing Letters of Credit and Letter of Credit Usage (each as defined in the Prepetition ABL Credit Agreement)) and all unpaid and accrued interest, fees, interest on interest, and expenses due under the Prepetition ABL Facility upon entry of the Interim DIP Order, and (iii) a "creeping roll-up" of Prepetition ABL Obligations whereby (A) upon entry of the Interim Order, and consistent with the DIP ABL Documents, all postpetition cash, collections, and proceeds of DIP ABL Priority Collateral will be used to pay down Prepetition ABL Obligations, and (B) all remaining Prepetition ABL Obligations will "roll up" upon entry of the Final Order.  *See* Interim Order ¶ [5]; DIP Term Loan Credit Agreement, § 2.03; DIP ABL Credit Agreement, § 1.01 "Roll-Up."

d.  ***Liens on Proceeds of Avoidance Actions***.  The Interim Order grants liens on the proceeds of claims and causes of action arising under chapter 5 of the Bankruptcy

---

[7]   **[The proposed DIP Order, DIP ABL Credit Agreement, and DIP Term Loan Credit Agreement remain under review and revision and subject to material change.]**

[8]   Significant Provisions refer to those provisions that:  (a) require sale or plan confirmation milestones; (b) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (c) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; (d) grant prepetition secured creditors liens on the debtor's claims and causes of action arising under chapter 5 of the Bankruptcy Code; (e) are self-executing default provisions or those that preclude court oversight, including (i) provisions terminating the automatic stay without further order, (ii) provisions waiving rights to challenge lenders' ability to exercise post-default remedies, and (iii) provisions limiting required proof or altering the burden of proof at post-default hearings; (f) release claims; (g) limit the use of cash collateral or DIP proceeds (other than general "carve-outs") to pay approved fees and expenses of advisors to official committees or future trustees; (h) contain non-consensual priming liens; or (i) otherwise limit the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.  *See* Complex Case Procedures ¶8.

Code but not, for the avoidance of doubt, on the avoidance actions themselves. *See* Interim Order ¶ [8(a)].

e.  ***Default Provisions and Remedies***.

   i.   The occurrence of any of the following, unless waived or extended (as applicable) in writing by the DIP Required Lenders, which may be by email from counsel, shall constitute a "DIP Termination Event" under the Interim Order (each a "<u>DIP Termination Event</u>," and the date upon which the earliest such DIP Termination Event occurs, the "<u>DIP Termination Date</u>"): (A) the occurrence of the Maturity Date (as defined in the DIP Term Loan Credit Agreement and the DIP ABL Credit Agreement); (B) the Debtors' board of directors approves a restructuring transaction or the Debtors file or support the filing of a plan with the Court that does not have the consent of the DIP Term Loan Required Lenders and the DIP ABL Required Lenders (such consent not to be unreasonably withheld); (C) failure by the DIP Loan Parties to comply with any of the Milestones (as defined in the DIP Term Loan Credit Agreement and the DIP ABL Credit Agreement) to the extent such Milestones remain in force; and (D) the occurrence of any Event of Default (under and as defined in the DIP Term Loan Credit Agreement and the DIP ABL Credit Agreement) (subject to any applicable notice or grace periods specified in the Interim Order, the DIP Term Loan Credit Agreement, or the DIP ABL Credit Agreement).

   ii.  ***DIP Facilities Termination***.  The DIP Term Loan Agent (at the direction of the DIP Term Loan Required Lenders) or the DIP ABL Agent (at the direction of the DIP ABL Required Lenders), shall promptly provide notice to counsel to the DIP Agents, the DIP Lenders, counsel to the Committee, if any, and counsel to the DIP Lenders of the occurrence of any DIP Termination Event.  Upon the occurrence and during the continuation of a DIP Termination Event and following the giving of not less than five (5) business days' advance written notice by counsel for the applicable DIP Agent, which may be by email (such period, the "<u>Notice Period</u>," and such notice, the "<u>Enforcement Notice</u>"), to counsel to the Debtors, the U.S. Trustee, counsel to the DIP Lenders, counsel to the non-noticing DIP Agent and counsel to the Committee, if any, subject to the obligations with respect to the Carve Out and subject to paragraph [30(b)] of the Interim Order, (A) the DIP Agents, acting at the direction of applicable DIP Lenders (as set forth in the applicable DIP Documents) may exercise any rights and remedies against the DIP Collateral available to them under the Interim Order, the DIP Documents and applicable non-bankruptcy law, and the DIP Secured Parties may exercise such rights available to them under the DIP Documents or the Interim Order; (B) the Prepetition Secured Parties may exercise any rights and remedies to satisfy the Prepetition Secured Obligations and Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, the Permitted Liens (if any), and consistent with the Prepetition Credit Documents, including the Intercreditor Agreements, and the relative rights and priorities as set forth on <u>Annex A</u> attached to the Interim Order, including without limitation, to charge interest at the default rate under the DIP

Term Loan Facility; and (C) the commitment of each DIP Lender to make DIP Loans will be terminated to the extent any such commitment remains under the DIP Facilities. The automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically modified with respect to the DIP Secured Parties and the Prepetition Secured Parties at the end of the Notice Period, without further notice or order of the Court, unless (I) the DIP ABL Agent (acting at the direction of the DIP ABL Required Lenders), the DIP Term Loan Agent (acting at the direction of the DIP Term Loan Required Lenders) and the Prepetition Agents (acting at the direction of the applicable requisite lenders), as applicable, elect otherwise in a written notice to the Debtors, and/or (II) the Court has determined that a DIP Termination Event has not occurred and/or is not continuing and/or (III) the Court orders otherwise.

iii.   Upon delivery of an Enforcement Notice, each of the DIP Secured Parties, the Prepetition Secured Parties, the Debtors, and the Committee (if any), as applicable, consent to a hearing on an expedited basis to consider (A) whether a DIP Termination Event has occurred and (B) any appropriate relief (including, without limitation, the Debtors' non-consensual use of Cash Collateral); *provided* that if a request for such hearing is made prior to the end of the Notice Period, then the Notice Period shall be continued until the Court hears and rules with respect thereto. During the Notice Period, notwithstanding anything to the contrary set forth in paragraph [30(a)] of the Interim Order, (I) the DIP Secured Parties may not exercise any default rights or remedies to satisfy the DIP Obligations, including any default rights and remedies against the DIP Collateral or any of the default rights set forth in paragraph [30(a)] of the Interim Order, (II) the Prepetition Secured Parties may not exercise any default rights or remedies to satisfy the Prepetition Secured Obligations and the Adequate Protection Obligations, including any rights or remedies against the Prepetition Collateral or any of the default rights set forth in paragraph [30(a)] of the Interim Order, and (III) the Debtors shall continue to have the right to use the proceeds of the DIP Facilities (the "DIP Proceeds") and the Cash Collateral in accordance with the terms of the Interim Order to avoid immediate and irreparable harm to the Debtors and their estates. At the end of the Notice Period, unless the Court has entered an order to the contrary or otherwise fashioned an appropriate remedy, the Debtors' right to use the DIP Proceeds and the Cash Collateral shall immediately cease, unless otherwise provided in the Interim Order, and the Prepetition Secured Parties, the DIP Agents and the DIP Lenders shall have the rights set forth in the paragraph immediately above, without the necessity of seeking relief from the automatic stay. *See* Interim Order ¶¶ [29–30].

f.   ***Section 506(c) and Section 552 Waivers***.

i.   Subject to and upon the entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not

apply to any of the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral; and

ii. Subject to the Carve Out, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Term Loan Agent, the DIP Term Loan Secured Parties, the DIP ABL Agent, the DIP ABL Secured Parties, the DIP Collateral or, subject to and upon entry of the Final Order, any Prepetition Agent, the Prepetition Secured Parties, or the Prepetition Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Term Loan Agent (at the direction of the DIP Term Loan Required Lenders) or the DIP ABL Agent, as applicable, or the applicable Prepetition Agent (at the direction of holders of a majority of the applicable Prepetition Secured Obligations), as may be applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party; provided that the foregoing shall be without prejudice to the terms of the Final Order with respect to the period from and after the entry of the Final Order.  *See* Interim Order ¶¶ [41, 43].

g. ***Release of Claims***.  The DIP Orders provide for customary releases of claims, as described further in the Summary of Material Terms.  *See* Interim Order ¶ [44].

h. ***Limitations on the Use of Cash Collateral Other than General "Carve-Outs" to Pay Approved Fees and Expenses of Advisors to Official Committees or Future Trustees***.  The DIP Orders provide for certain limitations on the use of Cash Collateral, as described further in the Summary of Material Terms.  *See* Interim Order ¶ [33].

i. ***Priming Liens***.  The DIP Orders do not provide for non-consensual priming liens.

j. ***No Limitation on the Ability of Estate Fiduciaries to Fulfill their Duties***.  The DIP Orders do not limit the ability of the estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

20.     As required by paragraph 8 of the Complex Case Procedures, the inclusion of each of the applicable Significant Provisions in the DIP Facilities is appropriate and necessary to permit the Debtors' access to the DIP Facilities.  The terms and conditions of each of the Significant Provisions included in the DIP Orders are the result of arm's-length negotiations between the Debtors and the DIP Lenders.  The DIP Lenders are unwilling to provide the DIP Facilities absent the inclusion of these provisions, which are fair and reasonable under the circumstances.  As set forth herein and in the O'Connell Declaration, the Del Genio Declaration, and the First Day

Declaration, granting the relief requested pursuant to the Interim Order is critical to the continued operation of the Debtors' business and will permit the Debtors to transition smoothly into these Chapter 11 Cases, preserving the value of the Debtors' estates for all parties in interest. In light of the foregoing, the Debtors submit that the Significant Provisions in the DIP Orders are appropriate and necessary under the facts and circumstances of these Chapter 11 Cases and should be approved.

## I.     The Debtors' Prepetition Capital Structure.

21.     The following table summarizes the Debtors' prepetition capital structure:

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued and Unpaid Interest, Make-Whole, and Fees | Approximate Outstanding Amount |
|---|---|---|---|---|
| **ABL Facility** | May 28, 2026[9] | $346 million | $2 million | $348 million |
| **Bridge Facility** | March 7, 2026 | $120 million | $30 million | $150 million |
| **Term Loan Facility** | August 27, 2026 | $1,043 million | $29 million | $1,072 million |
| *Total US Debt* | | *$1,509 million* | *$61 million* | *$1,570 million* |
| **Capital Leases and Sale Leasebacks** | Various | $348 million | $2 million | $350 million |
| *Total US Debt and Capital Leases* | | *$1,857 million* | *$63 million* | *$1,920 million* |
| **China Debt** | Various | $157 million | $1 million | $158 million |
| *Total Funded Debt Obligations* | | *$2,014 million* | *$64 million* | *$2,078 million* |

---

[9]     The maturity date of the ABL Facility is the earlier to occur of (a) October 28, 2027 and (b) the date that is 91 days before the maturity date of the Term Loan Facility.

**The DIP Facilities**

**I.       The Debtors Need Immediate Access to the DIP Facilities.**

22.      Approval of the proposed DIP Facilities and continued use of the Cash Collateral is essential for the Debtors to stabilize operations, fund these Chapter 11 Cases, and pursue their ongoing restructuring efforts.  As detailed in the First Day Declaration, years of macroeconomic headwinds compressed margins and softened demand across the Debtors' industry.  First Day Decl.  ¶ 3.   These headwinds, increased competition, and uneconomic long-term contracts hampered the Debtors' cash collections, reduced accounts receivable, and compressed the Debtors' borrowing base, severely impacting liquidity reserves.  Del Genio Decl. ¶ 12.  The Debtors pursued several strategies to stabilize the Company's financial condition, improve their liquidity in the face of these challenges, but ultimately such initiatives proved unavailing, and certain recent events, including a fire at the Pensacola facility, a Texas freeze impacting the Chocolate Bayou facility, and a logistics delay at the Wilson Lock inland barge, created an acute liquidity deficit for the Company.  *Id*.  As a result, the Debtors enter these Chapter 11 Cases with approximately $3.7 million in cash on hand, which is insufficient to support their global, cash intensive operations for more than a few days.  *Id*.  Absent the ability to access the funds available under the DIP Facilities and the Cash Collateral, the Debtors would likely face an immediate, value-destructive interruption to their operations and lose support from key stakeholders on which the Debtors' business depends, including vendors, customers, and employees.  *Id*.

23.      Together with FTI, the Debtors evaluated the postpetition financing needs that would be required to operate their business and fund the administrative costs of these Chapter 11 Cases.  *Id.* at ¶ 13.  As part of this evaluation, FTI assisted in the development of the Initial DIP Budget.  *Id*.  The Initial DIP Budget anticipates, among other things, cash receipts and disbursements during a thirteen-week projection period, fees and interest expenses associated with

the DIP Facilities, professional fees, customer contracts, workforce and vendor obligations, and the Debtors' sale leaseback obligations.  *Id*.  The Initial DIP Budget also makes certain assumptions, including adjustments to account for the effect of the chapter 11 filing on the Debtors' vendors and customers.  *Id*.  Based on this analysis, FTI and the Debtors determined that the Debtors would require continued access to the Prepetition ABL Facility and approximately $250 million in new money financing to continue operations in the ordinary course on a postpetition basis and to fund their restructuring process.  *Id*.

24.     The DIP Facilities are essential to the preservation of the Debtors' estates and will provide the Debtors with sufficient liquidity to stabilize their operations, fund the administration of these Chapter 11 Cases, and position the Debtors to emerge from chapter 11 as a stronger and healthier enterprise.  The proposed DIP Facilities and use of the Cash Collateral are in the best interest of the Debtors.  Without access to the DIP Facilities, the Debtors would lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these Chapter 11 Cases.

25.     Access to the DIP Facilities and the Cash Collateral will send a strong, clear message to the Debtors' customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the Debtors are able to (a) continue meeting the needs of their customers, (b) compensate their employees in the normal course, (c) pay vendors for postpetition goods and services, and (d) pay vendors for court approved prepetition goods and services.  As a result, the Debtors will be well positioned to maintain favorable trade terms with vendors and assure their other key constituencies, including landlords, customers, and employees, that the Debtors' business is on the path to improved operational results, encouraging them to work cooperatively with the Debtors through the restructuring.

II.     **Alternative Sources of Financing Are Not Available on Better Terms.**

26.     The DIP Facilities, taken as a whole, are the best financing option currently available to the Debtors under the circumstances.  With the assistance of PJT, the Debtors conducted a thorough marketing process to explore third-party debtor-in-possession financing options.  On April 1, 2025, PJT reached out to a total of sixteen sophisticated third-party financial institutions that are experienced in providing emergency debtor in possession financings in special situations.   O'Connell Decl. ¶ 13.   Of the lenders contacted, seven signed non-disclosure agreements and received financial diligence from the Debtors, but none submitted an actionable proposal.  *Id*.  These efforts were likely unsuccessful because the Prepetition Secured Parties hold liens on substantially all of the Debtors' assets and have made clear to the Debtors that they are unwilling to agree to third-party DIP financing on either a *pari passu* or priming basis.  The third parties contacted by PJT indicated that they were not interested in providing DIP financing because, among other reasons, they (i) did not wish to provide a DIP facility on a junior basis, (ii) were not interested in providing a priming facility on a nonconsensual basis and risking a value-destructive "priming fight," (iii) did not want to lend against the Debtors' pool of unencumbered assets, and/or (iv) they did not expect to be able to achieve a competitive refinancing of the Prepetition ABL Facility.  *Id*.

27.     The DIP Facilities, including the fees and interest rates thereunder, were the product of good faith, arm's-length negotiation among the Debtors, the DIP ABL Lenders, and the DIP Term Loan Lenders.  As a result of several rounds of extensive, hard-fought negotiations and the exchange of several drafts of term sheets, the Interim Order, and other DIP Documents, the Debtors were able to achieve more favorable terms, including reduced fees, more favorable milestones, and less restrictive covenants.  *Id.* ¶ 20.  Under the current circumstances, the fees, interest rates, and

other economics provided for in the DIP Facilities are reasonable and in the Debtors' best interest, particularly in light of the absence of any more favorable alternatives.  *Id*.

28.    The DIP ABL Lenders and the Ad Hoc Group of Term Loan Lenders expressly conditioned their DIP financing proposals on, among other things, customary forms of adequate protection, including replacement liens and superpriority status for adequate protection claims, the payment of fees under the DIP Credit Agreements, including the Closing Fee and Backstop Premium, and the Roll-Ups.  *Id.* ¶ 23–24.  The Roll-Ups are reasonable because, among other things, both the DIP ABL Lenders and the Ad Hoc Group of Term Loan Lenders provided the Debtors with critical incremental liquidity that bridged the Debtors to an orderly and smooth transition into these Chapter 11 Cases and, viewed holistically, no superior alternative is currently available to the Debtors under the circumstance.  The proposed DIP Facilities, taken as a whole, are the best source of financing currently available to address the Debtors' liquidity needs while preserving value for the benefit of all stakeholders.

**Basis for Relief**

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

**A.     Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

29.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  *See generally* 11 U.S.C. § 364.  Courts grant a debtor-in-possession considerable deference to act in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the Bankruptcy Code or the policies that underlie it.  *See,*

*e.g., In re N Bay Gen. Hosp., Inc.,* No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 768 (Bankr. S.D.N.Y. 2020) ("Generally, in evaluating the merits of proposed post-petition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate.").

30.     To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.,* 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").  In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.,* 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (court found DIP terms that favored the DIP lenders to be reasonable when "taken in context, and considering the relative circumstances of the parties"); *see also In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

31.     The Debtors' determination to move forward with the DIP Facilities is a sound exercise of their business judgment following an arm's-length negotiation and careful evaluation of available alternatives.  The Debtors require significant postpetition financing to support their

working capital needs and to operate smoothly in chapter 11. Del Genio Decl. ¶ 11. The DIP Facilities will allow the Debtors to fund payroll obligations and administrative cost of these Chapter 11 Cases and provide a path to emergence by allowing the Debtors to drive these Chapter 11 Cases to a value-maximizing conclusion. As discussed herein, the Debtors and their advisors determined that the DIP Facilities are the only reasonable financing options available to the Debtors, and no alternative financing is available on more favorable economic terms. The fees, rates, and other economic benefits provided for in the DIP Facilities, taken as a whole, are in the Debtors' best interests, and the DIP Facilities are the best financing option currently available to the Debtors under the circumstances. O'Connell Decl. ¶ 18. The Debtors simply do not have any actionable alternative. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

B.     **The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

32.     The Debtors propose to obtain financing under the DIP Facilities by providing security interests and liens as set forth in the DIP Documents pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lenders postpetition security interest in and liens on the DIP Collateral (as defined in the Interim Order) that are valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination immediately upon entry of the Interim Order.

33.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp.*, 71 B.R. at 549 (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

    (a)    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (*i.e.*, by granting a lender an administrative claim);

    (b)    the credit transaction is necessary to preserve the assets of the estate; and

    (c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers*, 457 B.R. at 308; *see also In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp.*, 71 B.R. at 549.

34.    The Debtors satisfy each prong of this test. ***First***, as described above and as set forth in the O'Connell Declaration, no third-party lender made an actionable offer to provide postpetition DIP financing on an unsecured basis, or *pari passu* or junior to the DIP Lenders. O'Connell Decl. ¶ 13. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the DIP Term Loan Lenders and DIP ABL Lenders. *Id.* ***Second***, the Debtors have only $3.7 million in cash on hand and have significant ongoing cash needs. Without the DIP Facilities, which are the only viable source of liquidity to administer these Chapter 11 Cases, the Debtors would risk a value-destructive, disorderly liquidation of their businesses. Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these Chapter 11 Cases. Del Genio Decl. ¶ 14. ***Third***, given the Debtors' financial circumstances, the lack of third-party financing options, and the crucial liquidity that the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Lenders provided in the lead up to the Chapter 11 Cases, the Debtors believe that the terms of the DIP Facilities, as set forth in the DIP Documents, are reasonable under the circumstances. O'Connell Decl. ¶ 13. For

these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing on a secured basis.

35.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c). As described above, the Debtors are unable to obtain junior, let alone unsecured, credit. Therefore, approving (a) superpriority claims in favor of the DIP Lenders, (b) liens in favor of the DIP Lenders on unencumbered property of the estate, and (c) junior liens in favor of the DIP Lenders on encumbered property of the estate is reasonable and appropriate.

36.     Furthermore, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). A debtor may incur "priming" liens under its debtor-in-possession facility if its prepetition secured parties have either (a) consented or (b) received adequate protection for their secured interests. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Here, the Prepetition Secured Parties have affirmatively

consented to and actively participated in making available the DIP Facilities, including the priming of their Prepetition Liens by the DIP Liens. Furthermore, as set forth more fully herein and in the Interim Order, the Debtors propose to provide a variety of forms of adequate protection to protect the interests of the Prepetition Secured Parties. The relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate. Finally, the above-described liens on the Debtors' unencumbered assets are common features of postpetition financing facilities and were a necessary feature to provide security for the proposed financings.

### C. No Comparable Alternative Is Reasonably Available on Terms More Favorable than Those Available Under the DIP Facilities.

37.      To obtain credit under section 364, a debtor need only demonstrate "by a good faith effort that credit was not available without" the inducements offered to post-petition lenders. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. at 113, *aff'd sub nom. Anchor Sav. Bank*, 99 B.R. at 120 n.4; *see also In re Snowshoe*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks' refusal to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (ruling that a debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

38.     As noted above, the Debtors do not believe that a more favorable alternative DIP financing is reasonably available given the reality of the Debtors' existing capital structure and difficulty soliciting alternative financing proposals.  O'Connell Decl. ¶ 13.  In the month leading to the Petition Date, PJT reached out to a total of sixteen sophisticated third-party financial institutions that are experienced in providing emergency debtor in possession financings in special situations.  *Id*.  Of the lenders contacted, seven signed non-disclosure agreements and received financial diligence from the Debtors but none submitted an actionable proposal.  *Id*.  Thus, the Debtors have determined that the DIP Facilities provide the only viable means through which the Debtors can secure mission-critical liquidity.  Simply put, the DIP Facilities provide the Debtors with the liquidity they need at the lowest cost available while ensuring that the Debtors can successfully execute their reorganization and continue to operate their businesses.  *Id.* ¶ 18. Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.     The Debtors Should Be Authorized to Use the Cash Collateral.**

39.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Secured Parties consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.  As described above and in the O'Connell Declaration, the Del Genio Declaration, and the First Day Declaration, access to Cash Collateral is essential to the continued operation of the Debtors' business and smooth entry into the Chapter 11 Cases.  Use of the Cash Collateral is in the best interests of the Debtors' estates and their stakeholders, including the Prepetition Secured Parties. The Debtors' use of the Cash Collateral should be approved.

**E.      Adequate Protection Provided to the Prepetition Secured Parties Is Appropriate.**

40.      The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code.  It provides in relevant part:

> If the business of the debtor is authorized to be operated under section [1108] of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).

41.      Generally, what constitutes adequate protection is decided on a case-by-case basis. While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection in each case.  *See In re Timbers of Inwood Forest Associates, Ltd.*, 793 F.2d 1380, 1393 (5th Cir. 1986) (citing legislative history for proposition that the form of adequate protection is determined on a case-by-case basis); *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 696–97 (Bankr. S.D. Tex. 2009) (same).  The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See Timbers of Inwood*, 793 F.2d at 1412; *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180–

81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value). Whether the debtor's estate will benefit on the whole from its use of cash collateral is relevant to determining the sufficiency of adequate protection. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *see also In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).

42.     As described herein and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect against the postpetition diminution in value of the Prepetition Collateral resulting from the Debtors' sale, lease, or use of the Prepetition Collateral, the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, and the priming of the Prepetition Secured Parties' respective interests in the Prepetition Collateral. The Adequate Protection package includes (a) the Adequate Protection Liens, (b) the 507(b) Claims, and (c) the Adequate Protection Fees and Expenses (collectively, the "Adequate Protection Package"). In light of the foregoing, the proposed Adequate Protection Package to be provided for the benefit of the Prepetition Secured Parties is appropriate. The Debtors' provision of the Adequate Protection Package is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Prepetition Collateral, including DIP Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

43.     The adequate protection is fair and reasonable, necessary to satisfy the requirements of sections 363(c)(2), 362(d)(1), and 363(e) of the Bankruptcy Code, and in the best interests of

the Debtors and their estates.  The importance of adequate protection packages in DIP Facilities has been repeatedly recognized by courts in this district, which have granted relief similar to the relief requested herein.  *See, e.g.*, *In re Northvolt AB*, No. 24-90577 (ARP) (Bankr. S.D. Tex. Dec. 20, 2024) (granting adequate protection liens, 507(b) claims, and adequate protection fees and expenses to prepetition secured parties); *In re Digital Media Solutions, Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Nov. 4, 2024) (same); *In re Vertex Energy, Inc.*, No. 24-90507 (CML) (Bankr. S.D. Tex. Oct. 29, 2025) (same); *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. June 12, 2023) (same).

**F.     The Scope of the Carve Out Is Appropriate.**

44.     The proposed adequate protection is subject to the Carve Out contained in the DIP Orders.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced."). The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative insolvency during the course of the Chapter 11 Cases by ensuring that assets remain for the payment of the Clerk of the Court, U.S. Trustee fees, and professional fees of the Debtors and any statutory committee appointed under section 1102 of the Bankruptcy Code in these Chapter 11 Cases.

G. **Waiver of Section 506(c) of the Bankruptcy Code with Respect to DIP Collateral is Appropriate.**

45. Section 506(c) of the Bankruptcy Code authorizes a debtor to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). The underlying premise of this exception is that unsecured creditors should not be required to bear the costs of preserving a secured creditor's collateral. *See In re Evanston Beauty Supply Inc.*, 136 B.R. 171, 175 (Bank. N.D. Ill. 1992). However, debtors can, and often do, waive the right to surcharge collateral. In exchange for the proposed DIP Facilities, as set forth herein, and after negotiations with the DIP Term Loan Lenders, the Debtors have agreed to waive, upon entry of the Final Order, certain rights to surcharge the DIP Collateral and Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code with respect to the DIP Term Loan Facility. This was an important concession given the immediate need for liquidity and the lack of other viable financing options.

H. **The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Lenders under the DIP Documents.**

46. In connection with negotiating the DIP Facilities, the Debtors have agreed, subject to Court approval, to pay certain interest, fees, and premiums to the DIP ABL Lenders and DIP Term Loan Lenders. In particular, as noted above, the Debtors have agreed to pay:

| | DIP Term Loan Facility and DIP ABL Facility |
|---|---|
| Interest Rate | **DIP ABL Facility:**<br><br>(d) Term SOFR / SONIA + Credit Support Adjustment + 3.50% per annum, payable in cash monthly, or<br><br>(e) Base Rate / EURIBOR + Credit Support Adjustment + 2.50% per annum, payable in cash monthly.<br><br>(f) Default Rate equal to 2.00%, payable in cash monthly (if applicable)<br><br>The Credit Spread Adjustment shall equal 0.10% with respect to the Term SOFR rate and shall equal 0.0326% with respect to the SONIA rate.<br><br>*See* DIP ABL Credit Agreement, §§ 1.01 "Applicable Margin," 2.06(a)<br><br>**DIP Term Loan Facility:**<br><br>(a) Term SOFR + 10.00% per annum *with* 1.50% per annum, payable in cash monthly *and* 8.50% per annum, payable in kind monthly; or<br><br>(b) Base Rate + 9.00% per annum, *with* 0.50% per annum, payable in cash monthly *and* 8.50% per annum, payable in kind monthly.<br><br>(c) Default Rate equal to 2.00%, payable in cash monthly (if applicable)<br><br>*See* DIP Term Loan Credit Agreement, § 1.01 "Applicable Rate," 2.08 |
| Fees | **DIP Term Loan Facility:**<br><br>(a) <u>Backstop Premium</u>:  10.00% of the aggregate principal amount of the New Money DIP Term Loan Commitments, payable in kind, due and payable upon entry of the Interim Order<br><br>(b) <u>Closing Fee</u>:  0.75% of the aggregate principal amount of New Money DIP Term Loan Commitments, payable in kind, due and payable upon entry of the Interim Order<br><br>*See* Term Loan DIP Credit Agreement, §§ 1.01 "Backstop Premium," "Closing Fee"; 2.09(a) and (e)<br><br>The **DIP ABL Facility** provides for fees that are usual and customary for credit facilities of that type.<br><br>*See* DIP ABL Credit Agreement, §§ 1.01 "Applicable Unused Line Percentage," 2.10(b); Fourth Amended and Restated Fee Letter. |

47.     As set forth in the O'Connell Declaration, the interest and fees to be paid under the DIP Facilities are fair under the circumstances of these Chapter 11 Cases and the marketing process undertaken, and represent the only and best terms available to the Debtors.  O'Connell Decl. ¶ 18.  The fees and rates to be paid under the proposed DIP Facilities were the subject of

good faith, arm's length negotiation between the Debtors and the DIP Lenders and are an integral component of the overall terms of the proposed DIP Facilities.  O'Connell Decl. ¶¶ 18, 20.

48.     The fees outlined above should not be viewed separately but rather as a part of the overall, substantial benefits provided under the DIP Facilities.  Moreover, the Backstop Premium enabled the Debtors to obtain the backstop commitments, which, among other things, ensure that the Debtors have access to the entire proposed DIP Term Loan Facility and may effectuate a value-maximizing chapter 11 plan.  The Debtors considered the fees described above in determining in their sound business judgment that the DIP Facilities are reasonable and constitute the best terms available for Debtors to obtain the financing necessary to continue operations and prosecute these Chapter 11 Cases.  Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facilities.

I.    **The DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).**

49.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

50.     The DIP Facilities are the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the best available terms on which to obtain critical

postpetition financing given the circumstances and (b) extensive good-faith, arm's-length negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Facilities are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code. The obligations arising under the DIP Facilities and other financial accommodations made to the Debtors have been extended by the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and, therefore, the DIP Lenders are entitled to all of the protections afforded thereby.

### J.   The Roll-Up Is Appropriate.

51.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. 11 U.S.C. § 363(b). Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation). The business judgment rule shields a debtor's management from judicial second-guessing. *In re JohnsManville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.")

52.     Repayment of prepetition debt is a common feature in DIP financing arrangements. Courts in this and other jurisdictions have regularly approved similar DIP features in other cases.

46

*See e.g.*, *In re Vertex Energy, Inc.*, 24-90507 (CML) (Bankr. S.D. Tex. Sept. 25, 2024) [Docket No 53] (authorizing approximately $280 million DIP that included approximately $200 million in prepetition debt); *In re Digital Media Solutions, Inc.*, 24-90468 (ARP) (Bankr. S.D. Tex. Sept. 13, 2024) [Docket No. 66] (authorizing approximately $121.9 million DIP that included repayment of approximately $91.9 million in prepetition debt); *In re Genesis Care Pty Limited*, 23-90577 (MI) (Bankr. S.D. Tex. June 2, 2023) [Docket No. 89] (authorizing approximately $800 million DIP that included repayment of approximately $600 million in prepetition debt); *In re QualTek Services Inc.*, 23-90614 (CML) (Bankr. S.D. Tex. May 25, 2023) [Docket No. 103] (authorizing approximately $280.8 million DIP that included repayment of approximately $139.6 million in prepetition debt).

53.     As set forth above, the DIP Term Loan Credit Agreement provides that, upon entry of the Interim Order, approximately $150 million of the Debtors' Super Priority Term Loan Obligations will "roll up" with the DIP Term Loan Facility, representing a ratio of approximately $0.60 exchanged for each $1 of DIP New Money Term Loans funded (including both the Interim Draw and the Final Draw).  The roll-up of the Super Priority Term Loan Obligations is a material component of the structure of the DIP Term Loan Facility and was required by the DIP Term Lenders as a condition to their commitment to provide postpetition financing.  O'Connell Decl. ¶ 21.  Absent the three fundings under the Bridge Loan provided by the Ad Hoc Group of Term Loan Lenders for a total amount of $120 million in principal in the weeks leading up to these Chapter 11 Cases, the Debtors would have been required to file immediate chapter 11 proceedings that would have risked liquidation of the Company, to the clear detriment of the Debtors and all stakeholders.  The continued support of the Ad Hoc Group of Term Lenders—in both quantum of

support, speed, and willingness to fund amidst ongoing diligence and negotiations—enabled the Debtors to commence an orderly filing. *Id.* ¶ 25.

54.     In addition, the Ad Hoc Group of Term Loan Lenders provided the aforementioned support despite already holding over $1 billion in debt that the parties knew would need to be reorganized in these Chapter 11 Cases.  Courts in this and other jurisdictions regularly approve roll-ups and refinancings of prepetition credit facilities upon entry of the interim order.  *See, e.g.*, *In re Mitel*, 25-90090 (CML) (Bankr. S.D. Tex. March 11, 2025) [Docket No. 61] (authorizing roll-up of $62 million in prepetition obligations upon entry of the interim order); *In re Hornblower Holdings LLC*, 24-90061 (MI) (Bankr. S.D. Tex. Feb. 22, 2024) [Docket No. 72] (authorizing refinancing of an aggregate $439.9 million in prepetition obligations upon entry of the interim order); *In re Diebold Holding Company, LLC*, 23-90602 (DRJ) (Bankr. S.D. Tex. June 2, 2023) [Docket No. 90] (authorizing refinancing of an aggregate $733 million in prepetition obligations upon entry of the interim order).

55.     Furthermore, the DIP ABL Agreement provides for (i) a "roll-up" of, upon entry of the Interim Order, all Bank Product Obligations, all Letters of Credit (including, without limitation, the Existing Letters of Credit and Letter of Credit Usage (each as defined in the Prepetition ABL Credit Agreement)) and all unpaid and accrued interest, fees, interest on interest, and expenses due under the Prepetition ABL Facility and (ii) a "creeping roll-up" of the Prepetition ABL Facility, whereby, (a) upon entry of the Interim Order, all cash, collections, and proceeds of DIP ABL Priority Collateral will pay down Prepetition ABL Obligations, and (b) any remaining outstanding Prepetition ABL Obligations will be fully "rolled" into the DIP ABL Facility upon entry of the Final Order.  The ABL Roll-Up is a material component of the structure of the DIP ABL Facility, and the DIP ABL Lenders required the roll-up of the full Prepetition ABL Facility as a condition

to provide critical prepetition liquidity and fund the DIP ABL Loans as set forth in the DIP Documents.  As further described in the O'Connell Declaration, the DIP ABL Lenders provided emergency incremental liquidity in the lead up to the Chapter 11 Cases.  In the week preceding the Petition Date, the Debtors had exhausted the Super Priority Term Loans and required $15 million of incremental liquidity to ensure an orderly filing.  O'Connell Decl. ¶ 26.  The DIP ABL Lenders agreed to provide this incremental liquidity by lowering the minimum excess availability requirement under the Prepetition ABL Credit Agreement by $15 million.  *Id*.  Absent these additional funds from the DIP ABL Lenders, the Debtors would have been required to file prematurely to the detriment of the Debtors and all stakeholders.  *Id*.

56.     The Prepetition ABL Lenders also agreed to provide the Debtors with continued access to letters of credit on a postpetition basis and to allow the Debtors to maintain their prepetition commercial banking products in the ordinary course of business.  *Id*.  Finally, the DIP ABL Lenders have specifically permitted the use of certain Intercompany Transactions (as defined in the Cash Management Motion[10]) to allow indirect access by the Debtors to additional borrowing base maintained at non-Debtor affiliate Ascend Performance Materials European Limited, effectively increasing Debtors Postpetition borrowing capacity.  *Id*.

57.     The terms of the ABL Roll-Up were key negotiating points in the DIP ABL Lenders' willingness to provide the bridge liquidity and the DIP ABL Facility.  Furthermore, courts in this and other jurisdictions regularly approve roll-ups of ABL facilities, both creeping and in full upon entry of the interim order.  *See, e.g.*, *In re Prospect Medical Holdings, Inc.*, (SGL)

---

[10]   The "Cash Management Motion" means the *Debtors Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, and (C) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactional, and (III) Granting Related Relief*, filed contemporaneously herewith.

(Bankr. N.D. Tex. Jan. 14, 2025) [Docket No. 102] (approving creeping roll-up of $90 million in prepetition ABL obligations); *In re ConvergeOne Holdings, Inc.*, 24-90194 (CML) (Bankr. S.D. Tex. May 4, 2024) [Docket No. 75] (approving creeping roll-up of $250 million in prepetition ABL obligations); *In re Instant Brands Acquisition Holdings Inc.*, 23-90716 (DRJ) (Bankr. S.D. Tex. June 14, 2023) [Docket No. 96] (authorizing full roll-up of $143.6 million in prepetition ABL obligations upon entry of the interim order); *In re QualTek Services, Inc.*, 23-90614 (CML) (Bankr. S.D. Tex. May 25, 2023) [Docket No. 97] (approving creeping roll-up of $68.7 million in prepetition ABL obligations); *In re Venator Materials PLC*, 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 98] (authorizing full roll-up of $190 million in prepetition ABL obligations upon entry of the interim order).

58.     The DIP Facilities are the only financing available on comparable terms to the Debtors and are necessary to fund the operation of their businesses.  Without the DIP Facilities, the Debtors may struggle to continue operating as a going concern, to the detriment of the Debtors' stakeholders.  In light of the circumstances, the roll-up of the prepetition Super Priority Term Loan Obligations and the Prepetition ABL Facility is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**K.     The Automatic Stay Should Be Modified on a Limited Basis.**

59.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lenders and the Prepetition Secured Parties and to incur all

liabilities and obligations set forth in the Interim Order.  The automatic stay should be modified to allow the Debtors and the DIP Lenders to effectuate the terms of the Interim Order.

      **J.**      **Failure to Obtain Immediate Interim Access to the DIP Facilities and the Cash Collateral Would Cause Immediate and Irreparable Harm.**

60.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "on motion by the debtors, a hearing . . . will routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor-in-possession financing . . . ."  Complex Case Procedures, ¶ 5.

61.      As set forth in the First Day Declaration and the Del Genio Declaration, the Debtors have an immediate postpetition need to use Cash Collateral and access the liquidity provided by the DIP Facilities.  The Debtors cannot maintain the value of their estates during the pendency of these Chapter 11 Cases without access to cash.  The Debtors entered these Chapter 11 Cases with approximately $3.7 million in cash on hand.  Del Genio Decl. ¶ 12.  Without immediate financing, the Debtors project that they will be unable to pay essential costs required to continue operating as a going concern, resulting in immediate and irreparable harm to the Debtors' business.  *Id*.  In particular, the Debtors require immediate liquidity to satisfy their obligations to, among others,

employees, vendors, and suppliers, all of whom are critical to ensuring that the Debtors can maintain their high standards of service and continue operating as a going concern. *Id.* ¶ 11–16.

62.     If unable to access the liquidity provided by the DIP Facilities and the Cash Collateral, the Debtors will be unable to operate their business or otherwise fund these Chapter 11 Cases, causing immediate and irreparable harm to the Debtors' estates.  In short, the Debtors' ability to administer these Chapter 11 Cases depends on approval of the DIP Facilities.

63.     Therefore, the Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facilities and to utilize the Cash Collateral.  The Debtors require the initial funding under the DIP Facilities prior to the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## Emergency Consideration

64.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days following the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief in this Motion during the first twenty-one days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this important juncture and cause immediate and irreparable harm.  The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and

maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," pursuant to Bankruptcy Rule 6003, and the Court should grant the requested relief.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

65.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exempt such relief from the fourteen-day stay under Bankruptcy Rule 6004(h).

## Reservation of Rights

66.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended as or should be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, priority, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; (h) a concession that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (i) a waiver of the

obligation of any party in interest to file a proof of claim; or (j) a waiver or impairment of the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### Notice

67.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc Group of Term Loan Lenders and certain of the DIP Lenders; (d) Wilmington Savings Fund Society, FSB ("WSFS"), as the agent under the DIP Term Loan Facility; (e) ArentFox Schiff LLP, as counsel to WSFS; (f) Greenberg Traurig, LLP, as counsel to the ABL Agent and the agent under the DIP ABL Facility; (g) the agents under each of the Debtors' prepetition secured credit facilities; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the Environmental Protection Agency; (k) the state attorneys general for states in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors request that the Court enter the Interim Order and the Final

Order granting the relief requested herein and such other relief as the Court deems appropriate

under the circumstances.

Houston, Texas
Dated: April 22, 2025

/s/ Jason G. Cohen

**BRACEWELL LLP**
Jason G. Cohen (TX Bar No. 24050435)
Jonathan L. Lozano (TX Bar No. 24121570)
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:      (713) 223-2300
Facsimile:       (800) 404-3970
Email:             jason.cohen@bracewell.com
                       jonathan.lozano@bracewell.com


*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher Marcus, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:             cmarcus@kirkland.com
                       derek.hunter@kirkland.com


*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**<u>Certificate of Accuracy</u>**

In accordance with Bankruptcy Local Rule 9013-1(i), I hereby certify that the foregoing statements regarding the nature of the emergency are true and accurate to the best of my knowledge.

*/s/ Jason G. Cohen*
Jason G. Cohen

**<u>Certificate of Service</u>**

I certify that on April 22, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason G. Cohen*
Jason G. Cohen