**<u>EXHIBIT 1</u>**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCEND PERFORMANCE MATERIALS | ) | Case No. 25-90127 (CML) |
| HOLDINGS INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DECLARATION OF
ROBERT DEL GENIO,
CHIEF RESTRUCTURING OFFICER OF
EACH OF THE DEBTORS, IN SUPPORT OF THE
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Robert Del Genio, hereby declare under penalty of perjury:

1.      Ascend[2] is one of the largest, fully-integrated producers of nylon, a plastic that is used in everyday essentials, like apparel, carpets, and tires, and also new technologies, like electric vehicles and solar energy systems.  Ascend's business predominately focuses on the production and sale of a specific type of nylon, nylon 6,6 or "PA66," and the chemical intermediates and downstream outputs thereof.  PA66 is used in applications which require impact, heat, abrasion, and chemical resistance.  Common applications of PA66 include heating and cooling systems, air bags, batteries, and athletic apparel.  For example, Ascend's PA66 composes approximately forty percent of the global market for air bags and tires and is used in approximately fifty percent of

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Ascend.  The location of Debtor Ascend Performance Materials Holdings Inc.'s principal place of business is 1010 Travis St., Suite 900, Houston, Texas 77002.

[2]     "Ascend" or the "Company" refers to Ascend Performance Materials Holdings Inc. together with its direct and indirect subsidiaries and certain of its affiliates.  "Debtors" refers to Ascend Performance Materials Holdings Inc. together with its debtor affiliates.  Capitalized terms used but not immediately defined shall have the meanings ascribed to them later in this Declaration.

Lululemon Athletica Inc.'s "Nulu" yoga pants and sports bras. Ascend also produces and sells several of the key chemical inputs of PA66, operating up and down the PA66 value chain. Ascend has a global workforce of approximately 2,200 employees and operates eleven manufacturing facilities that span the United States, Mexico, Europe, and Asia.

2. Ascend's origins date back nearly eight decades as a subsidiary and later, a divestiture, of the Monsanto Chemical Company ("Monsanto"). Ascend, as it exists today, was formed in 2009 when SK Titan Holdings LLC acquired the nylon business from Monsanto's spin-off, Solutia Inc. ("Solutia"). Since its founding, Ascend has been a pioneer in the production of high-quality materials for everyday products and has demonstrated strong financial performance with average annual revenue of $2.7 billion since 2020.

3. Despite its strong performance and leading position in the industry, Ascend has faced significant headwinds since mid-2022 due to global economic malaise, reduced demand, and increased competition out of China—each of which have acutely impacted Ascend's performance across its business segments. Several of the key end markets for Ascend's downstream and chemical intermediates businesses, including the manufacturing industry, have been slow to recover to pre-pandemic levels of production due to destocking, inflation, labor shortages, and supply chain issues. Due to such macroeconomic stagnation, demand for Ascend's products, including PA66, has been subdued over the last three years, causing the price of PA66 to drop significantly. Indeed, as depicted in the below graph, the average market price for PA66 has dropped by approximately forty-five percent since its COVID-peak, and as a result, the Company's EBITDA margin is near its lowest level in almost a decade.



4.     Additionally, increased competition out of China, coupled with aggressive price cutting strategies from such market players, has eroded Ascend's pricing power and further tapered demand for its products.  Over the past six years, production capacity in China for chemical intermediates has grown by ninety-three percent and downstream production capacity has grown by sixty-four percent.  Several of these new Chinese entrants have also adopted aggressive pricing strategies to gain market share, including selling chemical intermediates and downstream products at a cash loss (or pursuant to subsidies from the Chinese government).  Ascend's customers have demanded prices that are consistent with the prices offered by such Chinese competitors, thereby forcing Ascend to decide between either losing customers or cutting prices.  Critically, the combination of reduced demand and increased competition have imposed pricing pressure on Ascend, eroded its margins, and strained its liquidity position.  Since 2022, Ascend's gross profit margin has compressed by almost four percent and EBITDA has declined by approximately fifty-six percent.

5.     Ascend is also party to multiple long-term, take-or-pay contracts for certain chemical intermediates, which, when paired with the current market environment, have further undercut Ascend's margins.  When Ascend entered into these contracts, the terms were economic, reflected market prices, and presupposed that Ascend could operate at a profit.  However, given

the current market environment and trough in prices for the Company's products, Ascend is now locked into uneconomic contracts, forcing it to sell at a loss.

6.      As discussed further herein, near the end of 2022, Ascend began proactively implementing several cost rationalization measures, including reducing its headcount, imposing operating cost-cutting measures, and shrinking its footprint in an attempt to improve margins and buoy its liquidity reserves.  While these ongoing rationalization initiatives have generated significant cost savings, enduring pricing pressure has continued to impede margin growth and the Company's liquidity shortfall deepened as cash collections continued to fall.  Accordingly, the Company also began effecting various liquidity management exercises, many of which are still in effect as of the Petition Date.  These measures have included, among other things, imposing strict governance controls on spending decisions, deferring the payment of certain vendor obligations, entering into approximately $250 million in sale leaseback transactions for assets in the United States, factoring of certain of the Company's foreign accounts receivables, and reducing inventory levels.

7.      Despite such cost-saving and liquidity management measures and due to a series of one-time negative events discussed herein, the Company's liquidity crisis became increasingly severe beginning in the fourth quarter of 2024.  In response, the Company increased its vendor payment deferrals, resulting in a past-due accounts-payable wall of more than $110 million at its apex in late February 2025.  As a result of such payment deferrals, the Company's vendors began applying increased pressure on Ascend, including by demanding cash-in-advance, tightening payment terms, threatening to remove rental equipment, and ceasing to supply goods and services. A substantial portion of the Company's outstanding obligations were owed to providers of essential goods and services who, in the event that they decided to stop supplying or servicing

Ascend, could bring plant operations and sales to a standstill. Accordingly, absent a near-term capital infusion, the Company would have been forced to shut down plant operations resulting in severe operational disruption.

8.      Against the backdrop of these macroeconomic headwinds, declining liquidity, and near-term maturities, in early 2025, the Company engaged Kirkland & Ellis LLP ("Kirkland") as legal counsel, PJT Partners LP ("PJT") as investment banker, and FTI Consulting, Inc. ("FTI"), as financial advisor, (collectively with Kirkland and PJT, the "Advisors"), to evaluate potential refinancing and restructuring options.

9.      Beginning in January 2025, the Company, with the assistance of its Advisors, began to explore all strategic alternatives to alleviate pressure on its business, including seeking a capital infusion from several of its existing stakeholders, including certain of its lenders, sale leaseback counterparties, and majority and minority equityholders. The Company's equityholders conducted significant diligence regarding a potential capital solution, but ultimately, they determined that they would be unable to provide the Company with the necessary liquidity on the expedited timeline required by the Company.

10.     As part of these efforts, the Company and its Advisors also engaged with an ad hoc group of term loan lenders (the "Ad Hoc Group of Term Loan Lenders"), represented by Gibson, Dunn & Crutcher LLP as legal counsel and Evercore, Inc. as investment banker, regarding a potential bridge financing facility and a value-maximizing path forward. The Company, the Ad Hoc Group of Term Loan Lenders, and each of their respective advisors worked expeditiously to negotiate the terms of the Bridge Facility on the timeline required by the Company to avoid a value-destructive plant shutdown.

11.     Ascend and its Advisors emphasized that the provision of bridge financing in early March 2025 was imperative to preserve the value of the Company and that any delays would result in severe operational disruption.  On March 7, 2025, the Company and the Bridge Lenders agreed on the terms of a $40 million[3] super-senior term loan facility that had the ability to be upsized by another $60 million to bridge the Company's liquidity needs, allow sufficient time to prepare for a potential chapter 11 filing, and otherwise avoid a value destructive bankruptcy filing.  In light of the Company's continued liquidity needs and ongoing pressure from its vendors, on March 25, 2025 and April 1, 2025, the Company requested, and the Ad Hoc Group of Term Loan Lenders provided, an additional $35 million and $45 million, respectively, in financing under the Bridge Facility, exceeding the initial Bridge Facility commitments that were provided in early March.

12.     While the Bridge Facility was effective in providing the Company with the requisite short-term financing to avoid severe operational destruction, at this juncture, a more comprehensive transaction was necessary to stabilize its financial position.  Following entry into the Bridge Facility, the Company and its Advisors engaged in good-faith, arms'-length negotiations with the ABL Lenders, the Bridge Lenders, and the Term Loan Lenders, and certain of its equityholders regarding the terms of the chapter 11 cases and the DIP Facilities.

13.     As demonstrated by the provision of approximately $900 million in debtor-in-possession financing, including $250 million in new-money loans, Ascend enters chapter 11 with the support of its key stakeholders, including its ABL Lenders, Bridge Lenders, and Term Loan Lenders, to implement a comprehensive deleveraging transaction.  As discussed herein, the DIP Facilities contemplate certain case milestones which will ensure that the chapter 11 cases move expeditiously, thereby avoiding an unnecessarily prolonged stay in

---

[3]     All Bridge Facility funding figures described in this Declaration are net of fees.

chapter 11.  With its stakeholders' backing, Ascend will be able to pursue a value-maximizing restructuring transaction in the chapter 11 cases and will be positioned to emerge from chapter 11 as a healthy, well capitalized enterprise that will continue to provide best-in-class materials and specialty solutions to nearly 1,650 customers around the globe.

### Background and Qualifications

14.   I am the Chief Restructuring Officer of Ascend and the co-leader of the Corporate Finance and Restructuring segment of the New York Metro Region at FTI, the proposed financial advisor to the Debtors.  I have over forty years of experience in restructuring and mergers and acquisitions and have served as a financial advisor to both public and private companies, specializing in advising companies, lenders, creditors, corporate boards, and equity sponsors across a wide range of industries, both domestically and international.  I have undertaken both advisory and executive roles, including Interim Chief Executive Officer, Chief Strategic Officer, Strategic Planning Officer, and Chief Restructuring Officer.

15.   I have played a key role in many successful chapter 11 restructurings, including, but not limited to, serving as the financial advisor to Audacy Inc., Waypoint Leasing Holdings Ltd., TPC Group, Inc., GNC Holdings Inc., Catalina Marketing Corporation, Frontier Communications Corporation, OSG Group Holding, Inc., Mobileum Inc., Altera Infrastructure, LP, ESSAR Steel, Algoma Steel Inc., Reichhold Holdings US, Inc., Milacron, Inc., Bowflex Inc., Caraustar Industries, Inc., MicroAge, Inc., CST Industries, Inc., Dan River, Inc., Wheeling-Pittsburgh Steel Corp., US Internetworking, Factory Card Outlet, Malden Mills, and Metal Forming Technologies.  I have also acted as the Chief Restructuring Officer or Strategic Planning Officer, as applicable, of the following entities during their chapter 11 proceedings:  Voyager Aviation Holdings, LLC, CHC Group Ltd., RHI Entertainment, Inc., The Weinstein Company Holdings LLC, PHI, Inc., F & W Media, Inc., and Western Global Airlines LLC.  In addition,

I previously served as the Chief Strategic Officer of Production Resources Group, L.L.C. and the interim Chief Executive Officer of Panavision Inc. and was a member of the boards of Panavision Inc., Voyager Aviation Management Ireland, CHC Group Ltd., Washington Group International, Inc., Lazare Kaplan International, Inc., and Buffets, Inc.

16.     I joined FTI in 2017 when it acquired CDG Group plc, where I was a co-founder and managing member. Prior to that, I was a Corporate Finance Partner and a National Director of Ernst & Young Global Limited. I graduated from the University of Notre Dame in 1980 with high honors and a bachelor's degree in business administration and received a master's in management from the Kellogg Graduate School of Management at Northwestern University. I am also a fellow of the American College of Bankruptcy.

17.     In my role as Chief Restructuring Officer of Ascend, I am intimately involved with Ascend's day-to-day operations and familiar with Ascend's history, business and financial affairs, books and records, and the circumstances leading to the commencement of these chapter 11 cases. Except where specifically noted, the statements in this declaration are based on: (a) my personal knowledge; (b) information provided to me by the Company's management team, employees, and the Advisors; (c) my review of relevant documents and information concerning the Company's operations, financial affairs, and restructuring initiatives; or (d) my opinions based on my experience, knowledge, and familiarity with the Company's business and operations. I am over the age of eighteen, and if called upon to testify, I could and would testify competently to the facts set forth herein.

18.     On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). In

addition, the Debtors have also filed motions and pleadings seeking various types of "first day" relief that are necessary for the Debtors to meet critical obligations and fulfill their duties as debtors in possession.  I submit this declaration to assist the Court and interested parties in understanding why the Debtors filed these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested in the first day motions filed contemporaneously with the petitions (the "First Day Motions").  The facts set forth in each First Day Motion are incorporated herein by reference.

19.     To better familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief that the Debtors are seeking in the First Day Motions, I have organized this declaration into five sections:

- **Part I** provides a general overview of the Debtors' corporate history and global expansion;

- **Part II** describes the Debtors' business operations;

- **Part III** offers detailed information on the Debtors' organizational structure and prepetition capital structure;

- **Part IV** describes the circumstances leading to the commencement of these chapter 11 cases and an overview of the Debtors' prepetition restructuring efforts; and

- **Part V** sets forth the evidentiary basis for the relief requested in the First Day Motions.

## I.     Ascend's Corporate History and Global Expansion.

20.     The origins of Ascend can be traced back to the mid-twentieth century when Chemstrand Corporation ("Chemstrand"), a joint venture between Monsanto and the American Viscose Corporation, was chartered for the express purpose of developing and manufacturing nylon fibers.  Nylon was invented by E.I. du Pont de Nemours & Company

("Du Pont") in 1938 and was the first synthetic fiber.[4]  The invention of nylon revolutionized the textiles market and displaced the luxury silk market, as Du Pont successfully marketed nylon's advantageous properties, including that is was strong, elastic, and wear-and-tear resistant.[5]  Nylon first became available to the general public in 1940 in the form of stockings and achieved immediate acclaim—the limited initial supply of 4,000 nylon stockings sold out within three hours.[6]  Demand soared for nylon, but the United States entered World War II in 1941, and nylon was rationed for the war effort.  Soon thereafter, nylon was dubbed "rarer than rubies… and more costly."[7]  During this period, a single pair of nylon stockings sold on the black market for as much as $10.00, the equivalent of $176.00 today.[8]

21.     Nylon was exclusively sold by Du Pont until antitrust pressure forced Du Pont to license nylon to third parties, and in 1951, Chemstrand negotiated a contract with Du Pont which enabled Chemstrand to produce nylon employing Du Pont's design.  Just two years later, in 1953, Chemstrand established the first fully-integrated nylon plant in the United States in Pensacola, Florida which was equipped to produce nearly fifty million pounds of nylon per year.  In 1961, Monsanto acquired Chemstrand, and Chemstrand became a wholly-owned subsidiary of

---

[4]   Rayon was invented prior to nylon, but rayon is considered semisynthetic, not fully synthetic because it derives from cellulose (or wood pulp), and synthetic fibers are derived from simpler compounds like oil and coal.

[5]   Susannah Handley, Nylon: The Story of a Fashion Revolution: A Celebration of Design from Art Silk to Nylon and Thinking Fibres 26 (Johns Hopkins University Press, 1999).

[6]   Press Release, Du Pont, Public Relations Department, *Angels Had Help with Nylon 'Miracle'* 3 (October 1963) Hagley Digital Archives (April 10, 2025), https://digital.hagley.org/1984259_121412_018?solr_nav%5Bid%5D=9c462cd4b9559b22aa91&solr_nav%5Bp age%5D=0&solr_nav%5Boffset%5D=0#modal-close.

[7]   Nation's Business, *Scarce Goods on a New Market* 60 (June 1945) Hagley Digital Archives (April 10, 2025), http://digital.hagley.org/nationsbiz_061945?solr_nav[id]=2aaa3fd3e4782e0f82c6&solr_nav[page]=0&solr_nav[ offs et]=5#page/47/mode/1up.

[8]   *Id.*

Monsanto, operating as the dedicated chemicals division within Monsanto for the following thirty-six years. In 1997, Monsanto spun off its industrial chemical and fibers divisions, including what used to be Chemstrand, as an independent company, Solutia. Solutia's business consisted of three business segments, one of which focused on nylon production.

22.     Ascend, as it exists today, was formed when SK Titan Holdings LLC acquired Solutia's nylon business in 2009. Today, Ascend's business predominantly produces and sells PA66 (a type of nylon) and the inputs and outputs thereof, with a focus on higher-value add applications which take advantage of the beneficial qualities of PA66. The Company is headquartered in Houston, Texas and employs approximately 2,200 people worldwide. Ascend has three sales offices in the United States, Belgium, and China, eleven fully integrated global manufacturing facilities located across the United States, Mexico, Europe, and Asia, and numerous research and development technology centers across the globe.

23.     Sales to customers in the Americas, Asia, and EMEAI[9] accounted for approximately forty-one percent, forty percent, and nineteen percent, respectively, of Ascend's revenue in 2024. Ascend's global manufacturing and commercial footprint allows it to provide customers around the world with industry-leading and geographically flexible production capabilities. With world-wide scale throughout the PA66 value-chain, Ascend benefits from location advantage and relatively lower logistics costs.

24.     The following map depicts Ascend's global footprint.

---

[9]     "EMEAI" means Europe, the Middle East, Africa, and India.



25.     Ascend's United States' operations are based out of its Decatur, Pensacola, and Chocolate Bayou facilities which account for approximately eighty-five percent of Ascend's sales volume and generate approximately eighty percent of revenue on an annual consolidated basis. The majority of the Company's domestic and global growth has occurred after SK's acquisition of Ascend, with the expansion of its chemical compounding facilities in Pensacola, Florida in 2013 and the acquisition of an additional compounding facility in Tilburg, Netherlands in 2018. In 2020 and 2021, the Company augmented its manufacturing capabilities through the acquisition of facilities in Suzhou, China, Mozzate, Italy, and Fosses, France. Further, in 2022, the Company acquired a compounding site in San Jose Iturbide, Mexico and purchased Formulated Polymers Limited, an engineered materials producer based in Chennai, India. The company also acquired Circular Polymers, a carpet recycling facility in California in 2022. Finally, the construction of the Company's first chemical production facility outside of the United States was completed in the third quarter of 2024 in Lianyungang, China.

26.    The Company's production facilities produce (a) the chemical intermediates that comprise PA66 and (b) certain PA66 downstream products.    In contrast, the Company's compounding facilities alter PA66 to make higher-grade downstream products via chemical and other additives.

## II.    **Ascend's Business Operations.**

27.    As discussed herein, Ascend's business is predominately focused on the production and sale of PA66 and the inputs and outputs thereof.   PA66 is a high performance nylon "polymer"[10] that is used in applications which require impact, heat, abrasion, and chemical resistance.   The PA66 market is divided into the chemical "intermediates" and "downstream" markets, each of which compose separate parts of the PA66 value chain.   As a fully-integrated PA66 player with participation across the entire PA66 value chain, Ascend participates and sells at both of the (a) chemical intermediates and (b) downstream segments of the PA66 market.

28.    The following chart sets forth the PA66 value chain and depicts Ascend's participation across the market.



---

[10]    Polymers are the end product of a chain of small molecules bonded together with properties ranging from elastic to hard or rigid.

**A.     PA66 Chemical Intermediates Market.**

29.     The PA66 chemical intermediates market involves the sale, on a standalone basis, of several of the inputs or "intermediate" chemicals which comprise PA66 and are also used to make other chemicals and materials, including:

- ***Hexamethylene Diamine*** ("HMD"):  more than eighty percent of HMD is consumed in the manufacturing and production of nylon; HMD comprised approximately fourteen percent of Ascend's total annual revenue in 2024;

- ***Adiponitrile*** ("ADN"):  ADN is exclusively a precursor to HMD; ADN comprised approximately one percent of Ascend's total annual revenue in 2024;

- ***Acrylonitrile*** ("AN"):  AN is used in a variety of end markets, including oil recovery and industrial water treatment applications, electronic devices, and home furnishings; AN comprised approximately two percent of Ascend's total annual revenue in 2024;

- ***Adipic Acid*** ("AA"):   AA is predominately used in nylon production; AA comprised approximately eight percent of Ascend's total annual revenue in 2024;

- ***Hydrogen Cyanide*** ("HCN"):  HCN is extremely toxic and difficult to transport and is used in gold and silver extraction processes; HCN comprised approximately four percent of Ascend's total annual revenue in 2024; and

- ***Acetonitrile*** ("ACN"):  ACN is used in a variety of end markets, including pharmaceuticals, agricultural chemicals, and laboratory-related applications; ACN will become commercially available beginning in 2026.

30.     Ascend purchases, produces, and/or sells all seven of the foregoing chemical intermediates, and Ascend's chemical intermediates business accounted for approximately thirty-two percent of its revenue in 2024, with HMD sales comprising nearly fifty percent of its chemicals revenue.

**B.     PA66 Downstream Market.**

31.     The PA66 downstream market involves the sale of PA66 for applications across several end markets, including, among others:   (a) engineered materials markets such as automotive, e-mobility, electrical and electronic, consumer and industrial, cable management,

14

flexible films, healthcare, and textile; (b) sustainable specialties markets such as industrial and institutional cleaners, oil and gas, and coatings and adhesives; and (c) textile markets such as apparel, carpet, and safety systems.  Given the varying demands of each of these end markets, the PA66 downstream market is highly segmented between high-value and lower-value applications.

32.    High-value fibers are generally associated with enhanced performance properties, including tensile strength, impact resistance, and thermal properties.  Since such high-value fibers offer technical and application-development capabilities, they are commonly used in applications which require product specification and/or co-development.  High-value fibers are frequently employed in automotive applications, including for engine covers and airbags, electrical uses like circuit breakers, and athletic apparel for high-performance athletes.  Product differentiation and limited substitutes enable high-value downstream producers to command premium pricing and develop sticky relationships with their customers.

33.    On the other hand, lower-value fibers, like carpets and industrial filaments, are typically used in lower-value, general industrial applications which do not command high-value qualities and which require less specification.  As a result, lower-value application customers prioritize cost and operational optimization over differentiation.

34.    Historically, the PA66 downstream market has been moderately concentrated among players such as Ascend, BASF, Invista, Celanese Corporation of America, and DOMO Chemicals GmbH.  However, since late 2022, the production of PA66 has increased significantly in China, creating an oversaturated and fragmented downstream market.  Moreover, as discussed in greater detail herein, several of these new Chinese competitors have adopted aggressive pricing strategies which have placed additional margin pressure on historical players.

35. Over the last decade, Ascend has transformed its business from a producer of lower-value products to a producer of high-value products, with a targeted focus on PA66 end markets and applications with high growth expectations. To effectuate this shift, Ascend has significantly expanded its PA66 "compounding" capabilities, which as discussed above, involve the alteration of PA66 via chemical additives to provide it with properties better suited for high-value applications. For example, compounded nylon products are stronger and more heat resistant than non-compounded PA66 products.

36. Ascend is now a leading player in the PA66 high-value downstream market, and downstream applications of Ascend's PA66 include use in apparel, radiators, fuel systems, airbags, and batteries. Indeed, as noted above, Ascend's PA66 comprises forty percent of the market for front passenger air bags and high performance tires globally and is used in over fifty percent of Lululemon Athletica Inc.'s "Nulu" yoga pants and sports bras. Ascend divides its downstream business into two segments: (a) the nylon and engineered plastics divisions, which account for approximately forty percent of Ascend's revenue on an annual basis; and (b) the fibers and textiles divisions, which account for approximately twenty-five percent of Ascend's revenue on an annual basis.

## C. Guest Program.

37. While Ascend predominantly focuses on the PA66 market, Ascend also runs a strategic partnership program out of its Chocolate Bayou, Pensacola, and Decatur facilities whereby nine strategic partners (the "Guests") utilize the Company's facilities as part of their manufacturing processes (the "Guest Program"). The Guests contract with the Company to use (a) the Company's facilities and (b) certain of Ascend's chemical intermediates, specifically HCN, which would otherwise be disposed absent use in the Guest Program. For certain Guest

agreements, the Debtors also maintain the Guests' products and manage certain logistics, including transportation and delivery.

38.     The Guest Program enables Ascend and the Guests to benefit from economies of scale, shared expertise, and integrated production capacities, which ultimately lower prices, reduce costs, and create production efficiencies.  In 2024, the Guest Program generated approximately $85 million in revenue and approximately $167 million in cost recovery.  The Guest Program produces significant cost recovery due to, among other things, the utilization of HCN, which the Company would otherwise dispose due to its lack of transportability and toxicity.  The Guest Program is a critical component of Ascend's operations as it provides a consistent revenue stream, reduced production costs, and operational efficiencies.

### III.    Ascend's Organizational Structure and Prepetition Capital Structure.

#### A.    Ascend's Organizational Structure.

39.     Ascend's organizational structure consists of thirty-six entities, of which eleven are Debtors in the chapter 11 cases.  The organizational structure consists of entities incorporated in the United States, the United Kingdom, Mexico, France, Germany, Italy, Belgium, the Netherlands, China, India, Japan, Taiwan, Korea, and Singapore.  The following chart sets forth Ascend's corporate organizational structure.



## B. Ascend's Prepetition Capital Structure.

40.    As of the Petition Date, Ascend had approximately $2.0 billion in aggregate principal and accrued interest outstanding for its funded debt obligations, approximately $1.8 billion of which is held by Debtor entities.   The following table depicts the Debtors' prepetition capital structure.

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued and Unpaid Interest, Premiums, and Other Fees | Approximate Outstanding Amount |
|---|---|---|---|---|
| **ABL Facility** | May 28, 2026[11] | $346 million | $2 million | $348 million |
| **Bridge Facility** | March 7, 2026 | $120 million | $30 million | $150 million |
| **Term Loan Facility** | August 27, 2026 | $1,043 million | $29 million | $1,072 million |
| *Total US Debt* | | *$1,509 million* | *$61 million* | *$1,570 million* |
| **Capital Leases and Sale Leasebacks** | Various | $348 million | $2 million | $350 million |
| *Total US Debt and Capital Leases* | | *$1,857 million* | *$63 million* | *$1,920 million* |
| **China Debt** | Various | $157 million | $1 million | $158 million |
| *Total Funded Debt Obligations* | | *$2,014 million* | *$64 million* | *$2,078 million* |

---

[11]   The maturity date of the ABL Facility is the earlier to occur of (a) October 28, 2027 and (b) the date that is ninety-one days before the maturity date of the Term Loan Facility.

### 1. ABL Facility.

41.     The Debtors are party to that certain asset-based lending facility (the "ABL Facility") under that certain Third Amended and Restated Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement"), dated as of August 27, 2019, by and among Ascend Performance Materials Operations LLC, Ascend Performance Materials Inc., Ascend Performance Materials Texas Inc., Ascend Performance Materials European Limited Ascend Performance Materials, Holdings Inc., the guarantors from time to time party thereto, the lenders from time to time party thereto (the "ABL Lenders"), and Wells Fargo Capital Finance, LLC (the "ABL Agent"), as administrative agent.  As of the date of the Fifth Amendment to the ABL Credit Agreement, the borrowers may borrow up to an aggregate amount of $500 million (subject to borrowing base availability).  The ABL Facility matures on the earlier of October 28, 2027, and the date that is ninety-one days before the maturity date of the Term Loan Facility (*i.e.*, May 28, 2026).

42.     As of the Petition Date, an aggregate amount of approximately $348 million remains outstanding under the ABL Facility, including letters of credit issued and outstanding thereunder with face value of approximately $15 million in the aggregate.  In light of the Company's current utilization of its ABL Facility, it is required to test its borrowing base weekly.

43.     On March 31, 2025, the Debtors, the ABL Agent, and the ABL Lenders entered into a forbearance agreement (the "ABL Forbearance Agreement") whereby the ABL Agent and the ABL Lenders agreed to forbear from exercising any rights and remedies, other than a default rate of interest, with respect to certain events of default set forth therein until the earliest to occur of a Forbearance Default (as defined in the ABL Forbearance Agreement) and April 30, 2025.  The ABL Forbearance Agreement also provided for entry into a cash dominion period whereby the ABL Agent is permitted to exercise dominion and control over the Company's deposit accounts

(the "Cash Dominion Period") in light of the Debtors ongoing default under the ABL Credit Agreement. During the Cash Dominion Period, the ABL Agent may apply funds in certain of the Debtors' accounts daily against any amounts owing under the ABL Credit Agreement before such funds become available for use by the Debtors.

44. The Debtors estimate that their aggregate net balances of (a) accounts receivables totaled approximately $152 million, as of April 7, 2025, and (b) inventory totaled approximately $228 million, as of March 31, 2025, and the Debtors believe those values have not materially changed since such date. In connection with the ABL Forbearance Agreement, the Company also agreed to provide the ABL Lenders with additional credit support pursuant to additional guarantees and/or asset collateral from, and share pledges of, certain Debtor and non-Debtor entities.

### 2. Bridge Facility.

45. The Debtors are party to that certain super senior priority new-money facility (the "Bridge Facility") under that certain Super Priority Credit Agreement (as amended, restated, supplement, or otherwise modified from time to time, the "Bridge Credit Agreement"), dated as of March 7, 2025, by and among Ascend Performance Materials Operations LLC, Ascend Performance Materials Holdings Inc., the guarantors from time to time party thereto, the lenders from time to time party thereto (the "Bridge Lenders"), and Wilmington Savings Fund Society, FSB (the "Bridge Agent"), as administrative agent and collateral agent.

46. Initially, the Bridge Facility contemplated up to $100 million in funding capacity with $40 million in financing committed and provided upon closing. On March 25, 2025, the Bridge Lenders committed and provided the Company with $35 million in incremental funding under the Bridge Facility and increased the total capacity available under the Bridge Facility from $100 million to $140 million pursuant to that certain Incremental Amendment No. 1 and Amendment No. 2 to the Super Priority Credit Agreement, dated as of March 25, 2025 (the "Bridge

Amendment"). On April 1, 2025, the Bridge Lenders committed and provided the Company with $45 million in incremental funding under the Bridge Facility pursuant to that certain Incremental Amendment No. 2 and Amendment No. 3 to the Super Priority Credit Agreement, dated as of April 1, 2025. The Bridge Facility matures on March 7, 2026. As of the Petition Date, an aggregate amount of approximately $150 million remains outstanding under the Bridge Facility.

47. In accordance with the Bridge Amendment, the Company also agreed to provide the Bridge Lenders with additional credit support pursuant to additional guarantees and/or asset collateral from, and share pledges of, certain Debtor and non-Debtor entities.

### 3. Term Loan Facility.

48. The Debtors are party to that certain term loan facility (the "Term Loan Facility") under that certain Credit Agreement (as amended, restated, supplement, or otherwise modified from time to time, the "Term Loan Credit Agreement"), dated as of August 27, 2019, by and among Ascend Performance Materials Operations LLC, Ascend Performance Materials Holdings Inc., the guarantors from time to time party thereto, the lenders from time to time party thereto (the "Term Loan Lenders"), Wilmington Savings Fund Society, FSB (as successor to Bank of America, N.A., including any successors thereto, the "Term Loan Agent"), as administrative agent.

49. On April 1, 2025, the Debtors, the Term Loan Agent, and the Term Loan Lenders entered into a forbearance agreement whereby the Term Loan Agent and the Term Loan Lenders agreed to forbear from exercising any rights and remedies, other than a default rate of interest, with respect to certain events of default set forth therein until April 30, 2025.

50. The Term Loan Facility matures on August 27, 2026. In connection with the incurrence of the Bridge Facility, the Company also agreed to amend the Term Loan Credit Agreement and provide additional credit support thereunder in the form of guarantees and/or asset collateral from, and share pledges of, additional Debtor and non-Debtor entities. As of the Petition

Date, an aggregate amount of approximately $1,072 million remains outstanding under the Term Loan Facility.

### 4.    ABL Facility, Bridge Facility, and Term Loan Facility Priority.

51.    Pursuant to that certain Intercreditor Agreement between, *inter alios*, the ABL Agent, the Term Loan Agent, and the Bridge Agent, dated as of August 27, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "ABL Intercreditor Agreement"), the ABL Facility holds a first priority lien vis-à-vis the Debtors' other debt obligations with respect to Revolving Priority Collateral (as defined in the ABL Intercreditor Agreement) which includes, among other things, certain cash, accounts receivable, and inventory. Pursuant to that certain Super Priority Intercreditor Agreement between, *inter alios*, the Term Loan Agent and the Bridge Agent, dated as of March 7, 2025 (as amended, restated, supplement, or otherwise modified from time to time, the "Bridge Intercreditor Agreement"), and the ABL Intercreditor Agreement, the Bridge Facility and the Term Loan Facility respectively hold a second priority and third priority lien vis-à-vis the Debtors' other debt obligations with respect to Revolving Priority Collateral (as defined in the ABL Intercreditor Agreement) respectively.

52.    Pursuant to the ABL Intercreditor Agreement and the Bridge Intercreditor Agreement, the Bridge Facility, the Term Loan Facility, and the ABL Facility respectively hold a first priority, second priority, and third priority lien vis-à-vis the Debtors' obligations with respect to Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement), which consists of all other collateral not constituting Revolving Priority Collateral and includes, among other things, equipment, real property, fixtures, intellectual property, and stock pledges.

### 5.    Capital Leases and Sale Leasebacks.

53.    Ascend is party to certain capital leases (the "Capital Leases") for buildings, railcars, and automobiles, and sale leaseback agreements (the "Sale Leasebacks") for property,

including thermal reduction units, HMD reactors, industrial rectifiers, and various other equipment located at certain of Ascend's facilities. The Company is party to twenty-seven Capital Leases which have maturities between June 30, 2025 and December 31, 2029 and seven Sale Leasebacks[12] which have maturities between January 1, 2027 and December 1, 2030. As of the Petition Date, the aggregate minimum monthly rent due under the Capital Leases and Sale Leasebacks was approximately $10 million, and in total, the Company owes an aggregate amount of approximately $350 million on account of the Capital Leases and Sale Leasebacks.

> **6.    Receivables Facility.**

54.    In the ordinary course of business, Debtor Ascend Performance Materials Inc. (the "Originator") is party to a receivables agreement (the "Receivables Agreement") with JPMorgan Chase Bank, N.A. ("JPMorgan") for the sale of certain accounts receivables generated from the sale of chemical compounds to Honeywell International Inc. (the "Customer"). Pursuant to the Receivables Agreement, the Originator assigns and sells to JPMorgan certain of these accounts receivables (the "Designated Receivables") as a form of supply chain financing, allowing the Company to access funds sooner. JPMorgan pays the Company for the Designated Receivables at a discount to face value. Sales of the Designated Receivables to JPMorgan are intended to be "true sales," with all of the Originator's right, title, and interest in, to, and under the Designated Receivables transferred to JPMorgan free and clear of any adverse interests, including all rights to proceeds and collections with respect thereto.

55.    The Receivables Agreement allows the Company to monetize certain accounts receivables quicker than it would otherwise be able to if it waited for the Customer to pay invoices

---

[12]    For the avoidance of doubt, nothing herein shall be deemed an admission as to the validity of such Sale Leasebacks as true leases.

under the terms of sale.  If Ascend were unable to continue transacting under the Receivables Agreement, the Debtors access to approximately $500,000 to $1.0 million in revenue collection on a monthly basis would be significantly delayed given that Ascend has 105-day payment terms with the Customer.  The Company does not pay any upfront fees to JPMorgan in connection with the maintenance and administration of the facility under the Receivables Agreement.

### 7. China Debt.

56.    Certain of the Company's subsidiaries located in China, which for the avoidance of doubt, are not Debtors, are borrowers under various Chinese debt facilities, with an aggregate amount of approximately $158 million outstanding.  The maturity dates under such debt facilities vary with several upcoming debt repayments due in 2025.

### 8. Equity Interests.

57.    The equity of parent Debtor Ascend Performance Materials Holdings Inc. and Debtor APM Disc Holdings LLC consists of, as of the Petition Date, approximately 1,500 shares of common stock ("Common Stock") and 10,500 units ("Units"), respectively.  As of the Petition Date, the majority of the Common Stock and the Units are held directly by SK Titan Holdings LLC.  The Common Stock and the Units are not listed on a national securities exchange.

## IV.    Events Leading to These Chapter 11 Cases.

### A.    Operational Rationalization and Liquidity Management Measures.

58.    As discussed above, the PA66 industry has undergone a prolonged market trough, which has largely been driven by reduced demand across all end markets since 2022 and increased competition, including from new Chinese market entrants who have adopted aggressive pricing behavior.  The combination of such macroeconomic and industry headwinds have imposed severe constraints on Ascend's margins, cashflows, and liquidity.  Further, decreased cash collections and

reduced accounts receivables have compressed the Company's borrowing base under its ABL Facility, further straining the Company's liquidity reserves.

59.     To combat these challenges, Ascend has proactively taken an array of measures to improve its margins and to manage its liquidity.  The Company has implemented several cost rationalization measures, which are ongoing, including reducing its headcount, decreasing manufacturing costs via its procurement cost-reduction pipeline, and consolidating its footprint.  Indeed, since January 2024, the Company has reduced its selling, general, administrative, and travel ("SGA&T") headcount by more than twenty-four percent, which has generated nearly $60 million in savings.

60.     Additionally, Ascend has undertaken certain initiatives to reduce its manufacturing costs, enabling Ascend to cut its fixed manufacturing costs by approximately $100 million in 2024.  In conjunction with its manufacturing cost-reduction efforts, Ascend has implemented a procurement cost-reduction pipeline which, as a result of the Company's strong vendor relationships, allowed the Company to purchase certain manufacturing inputs at lower prices.  While the procurement cost-reduction pipeline was expected to yield significant savings in 2025 (as in previous years), given the Company's deferral of certain vendor obligations and the subsequent tightening of trade terms, the Company's ability to optimally leverage cost-reduction options was inhibited.  In some instances, the Company was forced to purchase more expensive inputs from third parties (which, while more expensive, come with less burdensome trade terms).  In other instances, the Company's requests for reduced pricing were dismissed due to the Company's deferral of vendor obligations.

61.     In connection with its footprint reduction efforts, the Company is in the process of exiting its Greenwood facility and shifting production to Pensacola.  Once this transition is

complete, it is projected to have the largest standalone impact on EBITDA relative to its other cost-savings initiatives, with an expected approximately $30 million of net recurring EBITDA benefits. The Company also shuttered its Tilburg compounding facility and consolidated all production and volume into the Company's compounding facility in Mozzate in mid-2024.

62.     While the Company's operational rationalization measures have generated significant cost savings, persistent pricing pressure has impeded margin growth, and the Company's liquidity crunch has deepened. As a result, Ascend has also effected various liquidity improvement exercises over the last two years and placed tight governance controls on all spending decisions. These measures have included, among other things, (a) entering into approximately $250 million in sale leaseback transactions for the Company's assets located in the United States, (b) factoring of certain of the Company's foreign accounts receivables, and (c) reducing inventory levels to safety stock levels for most of the materials used in the manufacturing process. The foregoing initiatives have extended the Company's runway by approximately fifteen months. Beginning in the fourth quarter of 2024, the Company also began deferring the payment of certain of its vendor obligations to better manage its liquidity position.

### B.    Recent Headwinds & Liquidity Pressure.

63.     Beginning in the third quarter of 2024, the Company's liquidity situation became increasingly severe due to the occurrence of the following one-time negative events: (a) a fire at the Pensacola facility; (b) a Texas freeze impacting the Chocolate Bayou facility; and (c) a logistics delay at the Wilson Lock inland barge.

64.     In December 2024, a fire occurred at the Pensacola facility which impacted its operations until the middle of February 2025 and contributed to an EBITDA loss of approximately $6 million in the first quarter of 2025. Then, below freezing temperatures in Texas in January 2025 caused Ascend to proactively shut down plant operations at its Chocolate Bayou facility to

avoid significant freeze-related damage. Temperatures below twenty-five degrees Fahrenheit can cause significant issues at Ascend's facilities, which, as discussed above, process toxic chemicals. Indeed, below freezing temperatures increase the risk of environmental incidents and mechanical failure, thereby jeopardizing Ascend's safety processes. As a result, all of Ascend's plants follow specific freezing weather protocols to prevent environmental, mechanical, and operational damage.

65.     Nonetheless, the proactive Chocolate Bayou shutdown reduced the Company's AN production capacity and increased the risk of an AN supply shortage, which, if left unaddressed, could cause significant operational disruption (including a shutdown of the Company's Decatur facility and other downstream plants). To avoid an AN supply shortage, the Company was forced to purchase AN on the open-market, further depleting its cash reserves.

66.     Additionally, the Company has been impacted by logistics delays due to the closure of the main inland barge chamber at Wilson Lock after inspections revealed cracks in the lock gates in September 2024. Wilson Lock is critical for all shipments in and out of the Company's Decatur facility; the two main waterways that the Company uses for Texas shipments, the Tennessee Tombigbee and the Mississippi rivers, can only reach Decatur via the Wilson Lock and there are no alternate routes.

67.     Accordingly, the Wilson Lock closure has introduced several incremental and unexpected costs, further exacerbating the Company's liquidity position. Given that there are no alternate waterway routes to Decatur, the Company has been forced to use a trucking alternative to transport all AN into Decatur and all ADN out of Decatur to Pensacola. The use of a trucking alternative has had a $4 million impact on the Company's first two quarters of financials in 2025 in addition to significantly increasing transit times. For example, while barge logistics times from

Chocolate Bayou to Decatur typically take fourteen days, transit is currently taking more than thirty days. Increased transit times as a result of the Wilson Lock closure have impacted the Company's AN and ADN supplies, and in order to supplement HMD production at Pensacola and to avoid severe operational disruption, Ascend was compelled to purchase both AN and ADN from third parties at a premium, creating additional and unexpected cash outlays of approximately $4 million.

68.     Collectively, each of the foregoing events decreased first quarter 2025 EBITDA by approximately $21 million and placed increased strain on the Company's already tight liquidity position. Accordingly, the Company was forced to significantly increase its payment deferrals for certain vendor obligations, resulting in a past-due accounts-payable wall of more than $110 million at its apex in late February. In light of Ascend's payment deferrals, the Company's vendors began applying increased pressure on the Company beginning in January 2025, including by demanding cash-in-advance, tightening payment terms, threatening to remove rental equipment, and ceasing to supply goods and services. Such actions required the Company to seek alternative and higher cost providers, eroded the Company's bargaining power, and endangered the Company's procurement-related cost savings, each of which increased cash outlays.

69.     Additionally, on February 18, 2025, S&P Global Inc. ("S&P") downgraded Ascend's credit rating from a "B" to a "CCC+," which rating indicates that the issuer is vulnerable and that a default is likely. To support such downgrade, S&P cited risks associated with the Term Loan Facility becoming current in 2025, the Company's tight liquidity position, and a slower than anticipated improvement in credit metrics relative to S&P's base case. On March 5, 2025, Moody's Investors Service Inc. followed S&P's lead and also downgraded Ascend's credit rating, with a negative outlook, further into junk territory.

70.     On the heels of such credit downgrades, Ascend's vendors increased pressure on the Company, making additional demands for cash-in-advance, requests for letters-of-credit and other forms of security, and threats to stop supplying or servicing Ascend altogether. The acceleration of its trade terms has further constricted the Company's cash balance and increased the risk of severe operational disruption.

71.     At this juncture, a substantial portion of the Company's overdue accounts payables were owed to providers of essential goods and services, including utility providers, raw material suppliers, and labor suppliers who ensure the health, safety, and environmental compliance of the Company's facilities.  If such vendors decided to stop supplying or servicing Ascend on account of its significant past-due obligations, Ascend would have been forced to halt plant operations. Thus, the Company required a near-term liquidity infusion to avoid a value-destructive facility shutdown.

**C.     Retention of Professionals & Enhanced Corporate Governance.**

72.     Against this backdrop of macroeconomic headwinds, declining liquidity, and near-term maturities, on January 27, 2025 and January 31, 2025, the Company engaged Kirkland and PJT, respectively, to evaluate potential refinancing and restructuring options.  Additionally, on February 7, 2025, the Company engaged FTI to support its liquidity management measures, refine its cash-flow forecast, and assist with the evaluation of strategic alternatives.

73.     In order to ensure a thorough and fair process with respect to the Company's assessment of available strategic alternatives, on January 27, 2025, two experienced and disinterested directors—Mr. Todd W. Arden and Mr. Charles T. Piper (collectively, the "Independent Directors")—were appointed as independent directors to the board (the "Board") of Ascend Performance Materials Holdings Inc.  In connection with the Bridge Facility, on March 7, 2025, the Company also appointed Mr. Michael J. Wartell to the Special Committee.

The Board, in consultation with the Advisors, also reviewed the Company's existing corporate governance infrastructure and determined that it was advisable and in the best interests of the Company and its stakeholders to establish a special committee of the Board comprising the Independent Directors (the "Special Committee").

74.     The Board delegated to the Special Committee certain rights, authority, and powers in connection with any matters in which a conflict of interest exists or is reasonably likely to exist (the "Conflict Matters") between the Company, on the one hand, and any of its related parties, including current and former directors, managers, officers, equityholders, employees, advisors, affiliates, or other stakeholders, on the other hand (each, a "Related Party").

75.     The Special Committee retained Katten Muchin Rosenman LLP as independent counsel on March 18, 2025 to assist in discharging its duties, including to assist it in conducting an independent investigation into the Conflict Matters, including potential claims and causes of action that the Company may hold against Related Parties.  The investigation remains ongoing as of the date hereof.

**D.     Engagement with Key Stakeholders.**

76.     In light of the Company's escalating liquidity situation and since all liquidity levers had already been pulled over the previous two and a half years, Ascend began, in January 2025, to explore all strategic alternatives to alleviate pressure on its business.  In connection with such efforts and as discussed above, Ascend and its Advisors initiated discussions regarding a potential financing solution with several of the Company's stakeholders.  Ultimately, the Ad Hoc Group of Term Loan Lenders were the only stakeholders that agreed to provide the Company with the quantum of capital needed, and also on the expedited timeline required, by the Company to avoid a value-destructive plant shutdown.

77.     As discussed in greater detail herein, on March 7, 2025, the Company obtained access to $40 million in liquidity pursuant to the Bridge Facility provided by the Ad Hoc Group of Term Loan Lenders, which bridge financing was subsequently upsized during the following four-week period to $120 million.  This cash infusion provided the Company with the necessary additional time to prepare for an orderly and value-maximizing chapter 11 filing, which would not have been otherwise possible given the Company's then-present liquidity situation and vendor headwinds.  Further, to buy additional time to negotiate the terms of the DIP Facilities and to ensure that the Company would have an orderly chapter 11 filing, the ABL Lenders agreed to reduce the minimum excess availability requirement by $15 million, allowing the Company to draw an incremental $15 million on April 16, 2025.

78.     Following entry into the Bridge Facility, the Company, with the assistance of its Advisors, worked tirelessly to engage with their key stakeholders to chart a value-maximizing path forward and ensure an orderly chapter 11 filing.  As discussed herein, Ascend enters chapter 11 with the support of its key stakeholders to implement a value-maximizing restructuring transaction which will deleverage the Company's balance sheet and enable Ascend to emerge from chapter 11 stronger than ever, with a leaner balance sheet and more competitive business.

79.     Further, to ensure that the Company has sufficient liquidity to sustain operations during the chapter 11 cases, the Company reached an agreement with certain of the ABL Lenders, Bridge Lenders, and Term Loan Lenders regarding debtor-in-possession financing facilities. Pursuant to the *Debtors' _Emergency_ Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final*

*Hearing, and (VI) Granting Related Relief*, filed contemporaneously herewith, the Company seeks approval of: (a) debtor-in-possession financing facilities in the form of (a) an approximately $400 million super-priority senior secured term loan facility (the "<u>DIP Term Loan Facility</u>," and the lenders thereunder, the "<u>DIP Term Loan Lenders</u>"), composed of (i) $250 million in new-money loans, $150 million of which will be available upon entry of the Court order approving the DIP Facilities on an interim basis (the "<u>Interim DIP Order</u>") and (ii) a "roll-up" of approximately $150 million of the obligations under the Bridge Facility upon entry of the Interim DIP Order, and (b) a $500 million senior secured superpriority asset-based financing facility (the "<u>DIP ABL Facility</u>," and the agent thereunder, the "<u>DIP ABL Agent</u>," and the DIP ABL Facility together with the DIP Term Loan Facility, the "<u>DIP Facilities</u>"), composed of (i) postpetition access to all of the commitments under the ABL Facility, (ii) a creeping "roll-up" of all prepetition ABL obligations upon entry of the Interim DIP Order, and (iii) a full "roll-up" of all remaining prepetition ABL obligations upon entry of the Court order approving the DIP Facilities on a final basis.

80.     The DIP Facilities contemplate certain case milestones (the "<u>DIP Facilities Milestones</u>") to ensure that the chapter 11 cases proceed at an appropriate and efficient pace, thereby avoiding an unnecessarily prolonged stay in chapter 11. The DIP Facilities Milestones are set forth in the below table.

| Date | DIP Milestones | Interval |
|---|---|---|
| Petition Date | April 21, 2025 | P |
| Entry of Interim DIP Order | April 24, 2025 | P+3 Business Days |
| Deadline to File Bar Date Motion | May 5, 2025 | P+10 Business Days |
| Entry of Final DIP Order | May 27, 2025 | P+36 Calendar Days |
| Deadline to File Plan and Disclosure Statement | June 5, 2025 | P+45 Calendar Days |
| Entry of Disclosure Statement Order | July 15, 2025 | P+85 Calendar Days |
| Entry of Confirmation Order | August 19, 2025 | P+120 Calendar Days |
| Plan Effective Date | August 29, 2025 | P+130 Calendar Days |

81.     Additionally, the DIP Facilities are the culmination of extensive prepetition, arms'-length negotiations between the Company, on the one hand, and certain of the Company's lenders, on the other hand, and is the best, and only actionable, proposal that the Debtors received. I believe that the terms of the DIP Facilities are fair and appropriate under the circumstances and that the DIP Facilities are in the best interest of the Debtors' estates.

V.      **Evidentiary Basis for Relief Requested in the First Day Motions.**

82.     Contemporaneously with the filing of this declaration, the Debtors have filed a number of First Day Motions seeking relief to minimize the adverse effects of the commencement of these chapter 11 cases on their business and to ensure that their reorganization strategy can be implemented with limited disruptions to operations.  Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue operating their business with minimal disruption and thereby preserving value for the Debtors' estates and various stakeholders.

83.     The First Day Motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and to their estates.

84.     I am familiar with the contents and substance of each First Day Motion, and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge.  I believe that the relief sought therein (a) is necessary to permit an effective transition into chapter 11, (b) constitutes a critical element for the Debtors to successfully implement a chapter 11 strategy and is a sound exercise of business judgment, and (c) best serves the Debtors' estates and creditors' interests.  I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to make certain essential payments and otherwise continue their business operations as sought in the First Day Motions.  The evidentiary support for the First Day Motions is set forth on **Exhibit A** attached hereto.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

*  *  *  *  *  *

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 21, 2025

/s/ Robert Del Genio
Name:  Robert Del Genio
Title:   Chief Restructuring Officer

**Exhibit A**

**Evidentiary Support for First Day Motions**[1]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

## Evidentiary Support for First Day Motions[2]

1.    ***Joint Administration Motion.***  The *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* seeks joint administration of the Debtors' cases for procedural purposes only, given the integrated nature of the Debtors' operations.  Joint administration of these chapter 11 cases for procedural purposes only will provide significant administrative convenience without harming the substantive rights of any party in interest.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

2.    ***156(c) Retention.***  The *Debtors' Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent* seeks authority to employ Epiq as claims, noticing, and solicitation agent for the Debtors.  Epiq's employment is in the best interest of the estates in light of the number of parties in interest and the complexity of the Debtors' businesses because it will provide the most efficient and effective means for noticing and administering claims and soliciting and tabulating votes.  Further, Epiq has the expertise required for complex chapter 11 cases.

3.    ***Creditor Matrix Motion.***  The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix and (B) Redact Certain Personally Identifiable Information of Natural Persons, (II) Approving the Form and Manner of*

---

[2]    To the extent there is any conflict or inconsistency between the relief described herein and the relief requested in the applicable First Day Motion, the relief requested in the applicable First Day Motion shall govern.

*Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief* seeks a court order (a) authorizing the Debtors to (i) file a consolidated creditor matrix and (ii) redact certain personally identifiable information of natural persons, and (b) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases and other information. Bankruptcy Rule 1007(a)(1) requires a debtor to file "a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H[.]" Fed. R. Bankr. P. 1007(a)(1). Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors should be authorized to file one Consolidated Creditor Matrix for all Debtors. Additionally, the redaction of certain personally identifiable information of individuals is necessary due to the privacy and safety concerns that would arise if such information were disclosed in the Debtors' court filings and to help the Debtors comply with applicable privacy laws. Approving the form and manner of the notice of commencement is necessary to avoid confusion among creditors as well as to prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Consolidated Creditor Matrix.

4. **Schedules/SOFA Motion.** The *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules and Statements and (B) Rule 2015.3 Financial Reports, (II) Modifying the Requirements of Bankruptcy Local Rule 2015-3, and (III) Granting Related Relief* seeks authority to (a) extend the deadline by which the Debtors must file their Schedules and Statements and 2015.3 Reports to fifty-nine days from the Petition Date and (b) modify the requirements of rule 2015.3 of the Bankruptcy Local Rules to allow the Debtors to file the 2015.3 reports every six months, rather than monthly. The ordinary operation of the Debtors' business

requires the Debtors to maintain voluminous books, records, and complex accounting systems. To prepare their Schedules and Statements and 2015.3 Reports, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, and contracts from each Debtor entity. This information is extensive and located in numerous places throughout the Debtors' organization. The Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, but resources are strained. Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist with stabilizing business operations during the initial postpetition period, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these Chapter 11 Cases, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period. Moreover, collecting the necessary information for the 2015.3 Reports requires an enormous expenditure of time and efforts on the part of the Debtors, their employees, and their professional advisors on a consistent, monthly basis when these resources would be best used to restructure the Debtors' business. As such, ample cause exists to extend the time by which the Debtors must prepare their Schedules and Statements and 2015.3 Reports and modify rule 2015-3 of the Bankruptcy Code to allow the Debtors to file the 2015.3 Reports every six months. Finally, the relief requested will not prejudice any party in interest.

5.     ***Taxes Motion.***   The *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* seeks authority to (a) negotiate, remit, and pay (or use tax credits to offset) Taxes and Fees in the ordinary course of business that are payable as of the Petition Date or become payable during these

chapter 11 cases including any obligations arising on account of any Assessment, without regard to whether such obligations accrued or arose before, or, or after the Petition Date, and (b) undertake Tax Planning Activities, as necessary. Failure to pay Taxes and Fees could materially disrupt the Debtors' business operations. Further, claims on account of certain of the Taxes and Fees may be priority claims entitled to payment before general unsecured claims, and certain of those claims may be entitled to secured status. Finally, the Debtors' failure to pay the prepetition Taxes and Fees as they come due may ultimately increase the Debtors' tax liability and result in personal liability for the Debtors' directors and officers, which would distract from the Debtors' restructuring efforts.

6. ***Insurance Motion.*** The Debtors' *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreements Entered into Prepetition, (C) Continue to Pay Certain Brokerage Fees, (D) Renew, Amend, Supplement, Extend, Purchase, and Enter into New Insurance Policies and Surety Bonds, and (E) Maintain the Surety Bond Program, and (II) Granting Related Relief* seeks authority to (a) maintain insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business, (b) honor and renew the Debtors' Premium Financing Agreements and satisfy obligations related thereto, and enter into new premium financing agreements in the ordinary course of business, (c) satisfy payment of prepetition obligations on account of, and continue to pay, Brokerage Fees in the ordinary course of business, (d) renew, amend, supplement, modify, extend, purchase, and enter into new insurance policies and surety bonds in the ordinary course of business on a postpetition basis, and (e) maintain the Debtors' Surety Bond Program without interruption. The continuation and

renewal of the Debtors' Insurance Policies, Premium Financing Agreements, and Surety Bond Program are essential to preserving the value of the Debtors' business, properties, and assets.

7.   **Utilities Motion.**  The *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* seeks a court order (a) determining that the Adequate Assurance Procedures provide the Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, and (c) approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Proposed Adequate Assurance.  Should any Utility Provider refuse, alter, or discontinue any Utility Service, even for a brief period, the Debtors' entire business would be disrupted, and facilities and operations could be damaged, which would jeopardize the Debtors' ability to successfully reorganize.  Therefore, ensuring uninterrupted utility services is essential to operating in the ordinary course.

8.   **Cash Management Motion**.  The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, and (C) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief* seeks a court order (a) authorizing the Debtors to (i) continue using their Cash Management System, including honoring certain prepetition obligations related thereto, (ii) maintain their existing bank accounts, business forms, and books and records, and (iii) continue to perform Intercompany Transactions

and funding consistent with the Debtors' historical practices; (b) granting administrative expense status to the Intercompany Transactions among the Debtors and between the Debtors and their Non-Debtor Affiliates; and (c) granting related relief.  Because of the nature and operational scale of the Debtors' business, any disruption to the Cash Management System would have an immediate and material adverse effect on the Debtors' business and operations to the detriment of their estates and stakeholders.

9.     ***Wages Motion.***     The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* seeks authority to pay prepetition wages, salaries, other compensation, and reimbursable expenses and continue employee benefits programs in the ordinary course.  The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Compensation and Benefits, including, among other things, Employee Obligations, Commissions, Staffing Agency Fees and Independent Contractor Obligations, Payroll Deductions and Payroll Taxes, Payroll Processing Fees, Non-Insider Bonus Program, Non-Employee Director Compensation, Reimbursable Expenses, Health and Welfare Coverage and Benefits, Workers' Compensation Program, Retirement Programs, Paid Leave Benefits, Severance Payments, Additional Benefit Programs, and certain other benefits that the Debtors provide in the ordinary course.  The Debtors' employ approximately 1,700 full-time employees spread across multiple states and three legal entities, as well as twenty-five independent contractors, who perform a wide variety of job functions that are critical to the Debtors' continued operations and efficient administration of these chapter 11 cases.  Importantly, the workforce cannot be easily replaced, especially given the specialized and technical nature of the industries in which Ascend operates and the corresponding

sophistication of Ascend's customers and partners. For example, given the complexity of the Debtors' chemical manufacturing process, some positions at the Company require training and certification that can take three to five years to obtain. The Debtors believe that absent payment of the Compensation and Benefits owed to their employees, the Debtors may experience employee turnover and instability at this critical time in these chapter 11 cases. Further, the vast majority of the Debtors' Workforce rely exclusively or primarily on the Compensation and Benefits to pay their daily living expenses and support themselves and/or their families. Thus, the Workforce will face significant financial consequences if the Debtors are not permitted to continue the Compensation and Benefits in the ordinary course of business. Consequently, the relief requested is necessary and appropriate.

10. **NOL Motion.** The *Debtors' Emergency Motion for Entry of an Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief* seeks (a) approval of certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to Debtor Ascend Performance Materials Holdings Inc.'s existing classes of Common Stock or any Beneficial Ownership thereof and (b) direction that any purchase, sale, other transfer of, or declaration of worthlessness with respect to such common stock in violation of the procedures is null and void *ab initio*. The Debtors estimate that, as of December 31, 2024, they had approximately $231 million of U.S. federal NOLs approximately $237 million of 163(j) Carryforwards, approximately $5 million of federal foreign tax credits, approximately $25 million of general business credits, and subject to further analysis may have a "net unrealized built-in losses," and certain other Tax Attributes. The Debtors may generate additional Tax Attributes in the 2025 tax year, including during the pendency of these chapter 11

cases.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Tax Attributes may offset U.S. federal taxable income or U.S. federal tax liability in future years.  In addition, the Debtors may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases.  The implementation of the Procedures is necessary and appropriate to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  The Tax Attributes may provide the potential for material future tax savings (including in post-emergence years) or other potential tax structuring opportunities in these chapter 11 cases.  Conversely, the elimination or limitation of the Tax Attributes could, therefore, be materially detrimental to all parties in interest, including by potentially limiting the Debtors' ability to utilize certain structures to consummate the Plan.  The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest.

11.   ***Critical Vendors Motion.***  The *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(B)(9) Claimants, (B) Lien Claimants, (C) Critical Vendors, and (D) Foreign Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* seeks authority to pay in the ordinary course of business certain prepetition amounts owing on account of 503(b)(9) Claims, Lien Claims, Critical Vendor Claims, and Foreign Claims, confirmation of the administrative expense priority of Outstanding Orders, and authorization to pay such obligations in the ordinary course of business.  The Debtors' businesses rely on continued access to, and relationships with, the Trade Claimants, which include highly specialized vendors, suppliers, and other business partners that provide the Debtors with essential goods and services. The Trade Claimants are difficult to replace due to the specialized nature of the goods and services they provide and the expertise and institutional knowledge they possess regarding the Debtors'

operations and facilities. If the Debtors are unable to pay the Trade Claims, the Trade Claimants may refuse to provide goods and services essential to the Debtors' operations. Finding replacements for Trade Claimants that refuse to deal with the Debtors would require significant expenditure in time and resources that the Debtors cannot afford. Accordingly, authorizing the Debtors to use their business judgment to pay the Trade Claims subject to the limitations in the Interim Order and Final Order is essential to allow the Debtors to maintain the going concern value of the Debtors' enterprise and minimize degradation of operations as the Debtors work to implement a comprehensive reorganization.

12. ***Customer Programs Motion.*** The *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer their Customer and Partner Programs and (B) Honor Certain Prepetition Business Practices Related Thereto and (II) Granting Related Relief* seeks authority to (a) maintain and administer their Customer and Partner Programs and (b) honor certain prepetition obligations related thereto on a postpetition basis in the ordinary course. The Debtors believe that their ability to continue the Customer and Partner Programs, while honoring any customer and partner-related prepetition business practices thereunder in the ordinary course of business, is necessary to meet competitive market pressures, ensure customer satisfaction, and maintain strategic relationships. Continuing these Customer and Partner Programs will allow the Debtors to maintain goodwill and enhance revenue and profitability for the benefit of all the Debtors' stakeholders. Pursuant to the Customer Programs, the Debtors provide volume-based Rebates to incentivize and reward customer loyalty, provide Warranties to maintain positive relationships with customers, and operate a Guest Program which results in significant revenue and cost recovery for the Debtors. These programs are standard in the Debtors' industry. Maintaining the goodwill of their customers is critical to the Debtors'

ongoing operations in these chapter 11 cases and is necessary to maximize value for the benefit of all the Debtors' stakeholders.

13.  **Hedging Motion.** The *Debtors Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Perform Under Existing Derivatives Contracts, (B) Enter Into New Derivatives Contracts, (C) Grant Superpriority Claims, Provide Other Credit Support, and Honor Obligations Under Derivatives Contracts, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* seeks authority to (a) continue performing under existing Derivatives Contracts, including paying any prepetition amounts owed thereunder, and, as necessary, adjusting, modifying, terminating, and otherwise engaging in transactions thereunder in the ordinary course of business, (b) enter into, and perform under, new Derivatives Contracts, including paying any amounts owed thereunder, and, as necessary, adjusting, modifying, terminating, and otherwise engaging in transactions thereunder in the ordinary course of business, (c) grant superpriority administrative expense claims and provide Credit Support, as may be necessary and (c) modify the automatic stay.  In the ordinary course of business and to minimize the risk to their business operations caused by energy, interest rates, and commodities, the Debtors, like many of their peers, have historically entered into Derivatives Contracts, which may fall under a safe harbor from the automatic stay.  As a result, any prepetition Derivatives Contract could be terminated by a Derivatives Contract Counterparty upon the Debtors' chapter 11 filing absent an agreement between the Debtors and such counterparty that would provide the counterparty with protections that are the same or similar to those that the counterparty would be entitled to under the Derivatives Contracts.  It is therefore critical that the Debtors are granted authority to perform under, and grant superpriority claims to counterparties in respect of, their prepetition Derivatives Contracts.

14.   **Receivables Motion.**   The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Continuation of Certain Receivables Arrangements and (II) Granting Related Relief* seeks authority for the Debtors to continue their accounts receivables arrangement in the ordinary course of business including, without limitation, the sale of receivables generated from customer Honeywell International Inc. free and clear to the receivables counterparty JPMorgan Chase Bank, N.A., as investor agent.   The Receivables Agreement provides an important source of liquidity and operational flexibility for the Debtors and therefore the continuation of this arrangement is a sound exercise of the Debtors' business judgment.   The Receivables Agreement is a net positive for the Debtors in these chapter 11 cases as the Debtors are able to access a source of short-term liquidity as a result of the sale of receivables.   Likewise, the purchase price of the receivables adequately compensates the Debtors by appropriately discounting for the risk that such receivables may not be collected.   Accordingly, the Debtors should be authorized to continue to perform under the Receivables Agreement in the ordinary course of business.   Contemporaneously with the filing of the Receivables Motion, the Debtors filed the *Debtors' Emergency Motion Seeking Entry of an Order Authorizing the Debtors to Redact and File the Unredacted Confidential Receivables Agreement Under Seal* which seeks authorization to redact and file under seal the confidential Receivables Agreement.   The relief requested therein is necessary because the Receivables Agreement contains competitively sensitive information that could harm the Debtors if public.