**EXHIBIT 2**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCEND PERFORMANCE MATERIALS HOLDINGS INC., *et al.*,[1] | ) ) ) | Case No. 25-90127 (CML) |
| | ) | |
| Debtors. | ) ) | (Joint Administration Requested) (Emergency Hearing Requested) |

**DECLARATION OF MATTHEW O'CONNELL
IN SUPPORT OF THE DEBTORS' EMERGENCY
MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH
SUPERPRIORITY ADMINISTARTIVE EXPENSE STATUS, (III) AUTHORIZING
THE USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Matthew O'Connell, hereby declare under penalty of perjury:

1. I am a Managing Director in the Restructuring & Special Situations Group at PJT Partners LP ("PJT"), a global investment banking firm listed on the New York Stock Exchange with its principal offices located at 280 Park Avenue, New York, New York 10017. PJT is the proposed investment banker for the above captioned debtors and debtors in possession (the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases").[2]

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Ascend. The location of Debtor Ascend Performance Materials Holdings Inc.'s principal place of business is 1010 Travis St., Suite 900, Houston, Texas 77002.

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of Robert Del Genio, Chief Restructuring Officer of Each of the Debtors, In Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

1

2. I submit this declaration (this "Declaration") in support of the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Motion").[3] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to such terms in the Motion or the Interim Order (as defined in the Motion), as applicable.

3. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon: (a) my personal knowledge of the Debtors' operations, finances, and restructuring initiatives; (b) my review of relevant documents; (c) information provided to me by PJT professionals involved in advising the Debtors in these Chapter 11 Cases; (d) information provided to me by the Debtors, the Debtors' management and/or their other advisors; or (e) my opinions based on my experience as a restructuring professional. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors, and, if called to testify as a witness, I could and would testify competently to the statements set forth herein.

4. I am not being compensated separately for this Declaration or any related testimony.[4]

---

[3] For the avoidance of doubt, any description of the proposed terms of the DIP Facilities herein or in the Motion is qualified in its entirety by the terms of the DIP Credit Agreements, the DIP Orders, and the other DIP Documents. To the extent anything in this Declaration is inconsistent with such documents, the terms of the applicable documents shall control.

[4] Pursuant to PJT's engagement letter with the Debtors, subject to approval by the Court, PJT will be entitled to be paid certain fees in connection with the transaction described in this Declaration.

**Background and Qualifications**

5.      PJT is a leading global financial advisory firm with more than 1,000 employees in fifteen offices in the U.S., Europe, and Asia. The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, fund placement, and shareholder engagement. PJT is an industry leader and has advised companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including the representation of both debtors and lenders in the procurement and provision of postpetition financing. PJT is a registered broker-dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

6.      Since joining PJT in 2016, I have worked on a broad range of restructuring and reorganization assignments for companies and various creditor groups. I have approximately ten years of investment banking and restructuring experience. Over the course of my career, I have advised senior management, boards of directors of companies, creditors, and other financial stakeholders in a wide variety of industries in connection with restructurings and financing transactions, both outside of court and within chapter 11 proceedings. In particular, I have been involved in the following publicly disclosed restructurings, among others: Aceto Corporation; Avaya Inc.; Belk Inc.; ExGen Texas Power LLC; Endo International plc; FirstEnergy Solutions Corp.; Frontera Energy Corporation; Garrett Motion Inc.; Genon Mid-Atlantic Development LLC; J.Crew Group, Inc.; SVB Financial Group; Talen Energy Corp.; and Ultra Petroleum Corp.

7.      I hold a Bachelor of Arts degree from the University of Connecticut, where I graduated from the Honors Program, and an MBA from the UCLA Anderson School of Management, where I was a Fink Fellow. Prior to joining PJT, I served as an Associate at Bank of

3

America Merrill Lynch and as an Associate Consultant at Greenwich Associates. In these capacities, I helped advise companies across several industries on a variety of types of financial transactions as well as general business strategy.

8. In January 2025, the Debtors engaged PJT as their investment banker in connection with their review of strategic alternatives to address their capital structure and liquidity needs. In March 2025, the Debtors amended their engagement with PJT in contemplation of the Debtors' current restructuring initiatives and preparation for these Chapter 11 Cases. In that capacity, I, along with other members of the PJT team, have been directly involved in the matters leading up to the Debtors' chapter 11 filings, including the negotiations regarding debtor-in-possession financing. Based on PJT's work for the Debtors over the past four months, I am familiar with the Debtors' day-to-day operations, business affairs, financial performance, and restructuring efforts.

9. Since PJT's initial engagement by the Debtors, PJT has worked with the Debtors' management, financial staff, and other professionals, including Kirkland & Ellis, LLP, the Debtors' legal counsel, and FTI Consulting, LLP ("FTI"), the Debtors' restructuring advisor, to assist the Debtors in evaluating strategic and restructuring alternatives. PJT's work has included, among other things, (a) analyzing the Debtors' liquidity and projected cash flows; (b) understanding the Debtors' businesses, operations, properties, and finances; (c) reviewing and analyzing the Debtors' balance sheet and capital structure alternatives; (d) providing strategic advice to the Debtors' board of directors and management; (e) participating in negotiations with the Debtors' existing lenders and other parties in interest; (f) evaluating and implementing out-of-court financing transactions; (g) soliciting, negotiating, and analyzing debtor-in-possession financing proposals; and (h) assisting the Debtors in connection with preparations for commencement of these Chapter 11 Cases, including work relating to the proposed DIP Facilities.

4

## The Debtors' Need for
## DIP Financing and Access to Cash Collateral

10. As further described in the First Day Declaration and the Del Genio Declaration,[5] the Debtors are in urgent need of liquidity to operate their business and administer their estates in the ordinary course. Based on my professional experience, the Debtors' existing cash balance, and cash flow forecasts prepared by FTI, I do not believe the Debtors can prudently operate their businesses or fund the costs of these Chapter 11 Cases solely with the use of existing cash collateral. I also believe, based on PJT's prepetition marketing efforts, that the DIP Facilities, taken as a whole, are the best source of new-money postpetition financing currently available to the Debtors. Accordingly, I believe entry into the proposed DIP Facilities is necessary, value-maximizing, and will provide the Debtors with sufficient liquidity to continue to operate their businesses in the ordinary course during these Chapter 11 Cases.

## The Debtors' Efforts to Obtain Financing

11. As described in greater detail in the First Day Declaration, the Debtors took various cost-saving and liquidity management measures from 2022 through 2024 in response to the headwinds faced by the business; however, those measures alone did not ultimately provide sufficient liquidity. Beginning in January 2025, the Debtors, with the assistance of its Advisors, began to explore all strategic alternatives to alleviate pressure on its business, including seeking a capital infusion from several of its existing stakeholders, including certain of its lenders, sale leaseback counterparties, and equityholders. The Debtors' equityholders conducted significant diligence regarding a potential capital solution, but ultimately, they determined that they would be

---

[5] As used herein, "Del Genio Declaration" means the *Declaration of Robert Del Genio in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* filed contemporaneously herewith.

5

unable to provide the Debtors with the necessary liquidity on the expedited timeline required by the Debtors. As part of these efforts, the Debtors and their Advisors also engaged with an ad hoc group of term loan lenders (the "Ad Hoc Group of Term Loan Lenders"), represented by Gibson, Dunn & Crutcher LLP as legal counsel and Evercore, Inc. as investment banker, regarding a potential bridge financing facility and a value-maximizing path forward. Following good faith, arm's length negotiations with the Ad Hoc Group of Term Loan Lenders, on March 7, 2025, the parties entered into an agreement whereby the Ad Hoc Group of Term Loan Lenders provided the Debtors with a $40 million new money, super senior term loan facility (the "Bridge Facility"). The Bridge Facility provided much-needed liquidity, which allowed the Debtors to fund operations and provided breathing space for the Debtors and the Advisors to evaluate potential long-term restructuring options. Nevertheless, the Debtors' liquidity issues persisted, and the Ad Hoc Group of Term Loan Lenders provided incremental new-money financing under the Bridge Facility, including a $35 million tranche on March 25, 2025, and a $45 million tranche on April 1, 2025.

12. Throughout this process, the Ad Hoc Group of Term Loan Lenders made clear to the Debtors that they were unwilling to indefinitely fund the Debtors' operations outside of chapter 11. Accordingly, on or around March 24, 2025, the Debtors began to explore potential third-party sources of debtor-in-possession financing. In parallel, the Debtors pivoted to discussing the provision of debtor-in-possession financing facilities by the Ad Hoc Group of Term Loan Lenders and the Debtors' Prepetition ABL Lenders.

I. **The Prepetition Marketing Process.**

13. On April 1, 2025, PJT reached out to a total of sixteen sophisticated third-party financial institutions that are experienced in providing emergency debtor-in-possession financings in special situations. Of the lenders contacted, seven signed non-disclosure agreements and

received financial diligence from the Debtors but none submitted an actionable proposal. Based on my participation in the process and my experience, these efforts were unsuccessful because the Prepetition Secured Parties hold liens on substantially all of the Debtors' assets and have made clear to the Debtors that they are unwilling to agree to third-party DIP financing on either a *pari passu* or priming basis. This view is consistent with the feedback we received from the third parties who declined the opportunity. Specifically, third parties contacted by PJT were not interested in providing DIP financing because, among other reasons, they (a) did not wish to provide a DIP facility on a junior basis, (b) were not interested in providing a priming facility on a nonconsensual basis and risking a value-destructive "priming fight," (c) did not want to lend against the Debtors' pool of unencumbered assets, and/or (d) they did not expect to be able to achieve a competitive refinancing of the Prepetition ABL Facility.

14. In parallel with the solicitation of additional proposals, PJT and the Debtors' other Advisors continued to engage with the Prepetition ABL Lenders (in their capacity as lenders under the DIP ABL Facility, the "DIP ABL Lenders") and the Ad Hoc Group of Term Loan Lenders (in their capacity as lenders under the DIP Term Loan Facility, the "DIP Term Loan Lenders") regarding the terms on which the Debtors could obtain asset-backed and term loan DIP financing from the Prepetition Secured Parties. Those negotiations were successful and resulted in the DIP Facilities.

**II.    The Proposed DIP Facilities.**

15. My team and I, along with the Debtors' other Advisors, actively negotiated the terms and provisions of the DIP Facilities on behalf of the Debtors over the last three weeks. The DIP Facilities comprise: (a) an approximately $400 million senior secured superpriority term loan facility (the "DIP Term Loan Facility"), composed of (i) $250 million in new money, fully

7

backstopped by the DIP Term Loan Lenders, $150 million of which will be available upon entry of the Interim Order, and (ii) a "roll-up" of approximately $150 million of Super Priority Term Loan Obligations upon entry of the Interim Order ((ii), the "DIP Term Loan Roll-Up"); and (b) a $500 million senior secured superpriority asset-based financing facility (the "DIP ABL Facility" and, together with the DIP Term Loan Facility, the "DIP Facilities"), composed of (i) postpetition access to all of the commitments under the Prepetition ABL Facility, (ii) a "creeping roll-up," where, upon entry of the Interim Order and consistent with the DIP ABL Documents, all postpetition cash, collections, and proceeds of DIP ABL Priority Collateral will be used to pay down Prepetition ABL Obligations, and (iii) a full roll-up of all remaining Prepetition ABL Obligations upon entry of the Final Order ((ii) and (iii) together, the "DIP ABL Roll-Up" and, together with the DIP Term Loan Roll-Up, the "Roll-Ups").

16. In addition, the DIP Facilities contemplate the interest and fees as set out below.

| | *DIP Term Loan Facility and DIP ABL Facility* |
|---|---|
| **Interest Rate** | **DIP Term Loan Facility:** <br><br> (a) Term SOFR + 10.00% per annum *with* 1.50% per annum, payable in cash monthly *and* 8.50% per annum, payable in kind monthly; or <br><br> (b) Base Rate + 9.00% per annum, *with* 0.50% per annum, payable in cash monthly *and* 8.50% per annum, payable in kind monthly. <br><br> (c) Default Rate equal to 2.00%, payable in cash monthly (if applicable) <br><br> *See* DIP Term Loan Credit Agreement, § 1.01 "Applicable Rate," 2.08 <br><br> **DIP ABL Facility:** <br><br> (a) Term SOFR / SONIA + Credit Support Adjustment + 3.50% per annum, payable in cash monthly, or <br><br> (b) Base Rate / EURIBOR + Credit Support Adjustment + 2.50% per annum, payable in cash monthly. <br><br> (c) Default Rate equal to 2.00%, payable in cash monthly (if applicable) <br><br> *See* DIP ABL Credit Agreement, §§ 1.01 "Applicable Margin," 2.06(a) |

| Fees | **DIP Term Loan Facility:** |
|---|---|
| | (a) <u>Backstop Premium</u>: 10.00% of the aggregate principal amount of the DIP Term Loan Proceeds, payable in kind, due and payable upon entry of the Interim Order |
| | (b) <u>Closing Fee</u>: 0.75%, payable in kind, due and payable upon entry of the Interim Order |
| | *See* Term Loan DIP Credit Agreement, §§ 1.01 "Backstop Premium," "Closing Fee"; 2.09(a) and (e) |
| | The **DIP ABL Facility** provides for fees that are usual and customary for credit facilities of that type. |
| | *See* DIP ABL Credit Agreement, §§ 1.01 "Applicable Unused Line Percentage," 2.10(b); Fourth Amended and Restated Fee Letter. |

17. The DIP Documents also contain certain milestones that the Debtors must meet throughout the Chapter 11 Cases. The milestones were negotiated by the DIP Term Loan Lenders and the DIP ABL Lenders as a condition to providing the DIP Facilities and are anticipated by the Debtors to provide the Debtors with adequate time to negotiate and implement a value-maximizing restructuring. Under the circumstances, I believe that agreeing to include these milestones in the DIP Facilities is reasonable and in the Debtors' best interests.

**The DIP Facilities are the Best
Postpetition Financing Arrangements Available to the Debtors**

18. Based on my experience with DIP financing transactions, as well as my involvement in the negotiation of the DIP Facilities and the Debtors' pursuit of alternative financing proposals, the DIP Facilities, taken as a whole, are the best financing option currently available to the Debtors under the circumstances. In addition to providing the Debtors with liquidity at the outset of these Chapter 11 Cases necessary to avoid immediate and irreparable harm, the DIP Facilities will provide the Debtors with access to the use of cash collateral on a fully consensual basis. Such liquidity will allow the Debtors to fund their businesses in the ordinary course during these Chapter 11 Cases, ensure uninterrupted operations, and preserve the value of the Debtors' estates for the benefit of all stakeholders.

9

**I.      No Alternative Sources of Financing Are Available.**

19.     As discussed above, the Debtors, with the assistance of their Advisors, solicited interest from third-party investors to determine whether the Debtors could obtain financing on better terms.  Ultimately, the Debtors did not receive any actionable proposals from third parties to provide DIP financing on a junior or unsecured basis.  Accordingly, the DIP Facilities are the result of the Debtors' reasonable and informed determination that no alternative sources of postpetition financing are currently available to the Debtors (whether unsecured or secured) on terms better than the DIP Facilities.

**II.     The DIP Facilities Were Negotiated at Arm's Length.**

20.     The DIP Facilities, including the fees and interest rates thereunder, were the product of good faith, arm's-length negotiation among the Debtors, the DIP ABL Lenders, and the DIP Term Loan Lenders.  As a result of several rounds of extensive, hard-fought negotiations and the exchange of several drafts of term sheets, the Interim Order, and other DIP Documents, the Debtors were able to achieve more favorable terms, including reduced fees, more favorable milestones, and less restrictive covenants.  Under the current circumstances, I believe that the fees, interest rates, and other economics provided for in the DIP Facilities, taken as a whole, are reasonable and in the Debtors' best interests, particularly in light of the absence of any more favorable alternatives.

**III.    The Fees and Premiums Are Reasonable Under the Circumstances.**

21.     The DIP ABL Lenders and DIP Term Loan Lenders have committed a substantial amount of capital to ensure successful execution of the DIP Facilities.  These commitments were conditioned on, among other things, the payment of fees under the DIP Credit Agreements, including the Closing Fee and Backstop Premium (each as defined in the DIP Credit Agreements). The Backstop Parties (comprising certain of the DIP Term Loan Lenders) are seeking, upon entry

of the Interim Order, a Backstop Premium that is reasonable under the circumstances and compensates them for an upfront commitment to provide the full amount of the DIP Term Loan Facility (including of the Interim and Final Draws). The Backstop Parties and the broader DIP Term Loan Lenders agreed that the payment of the Backstop Premium and Closing Fee would be paid in kind and not as a current cash obligation, despite both being earned and payable upon entry of the Interim Order. I believe that this agreement on the economics of the overall deal appropriately compensates the DIP Term Loan Lenders, including the Backstop Parties, and recognizes their willingness to work constructively to maximize the value of the estate and be responsive to the acute needs of the Debtors' business.

22. In view of the lack of postpetition financing alternatives available to the Debtors, and the circumstances of these cases, including the magnitude of the Debtors' Chapter 11 Cases and the tangible benefit to the estates of having a substantial postpetition financing commitment, I believe that the consideration being provided to the DIP Term Loan Lenders and DIP ABL Lenders for such commitment is reasonable under the circumstances, appropriately compensates those parties for their costs and the assurances they are providing to the process, and are necessary for the Debtors to continue operating their businesses in the ordinary course and to maximize the value of their estates.

**IV.  The Roll-Ups Are Reasonable Under the Circumstances.**

23. The DIP ABL Lenders and the DIP Term Loan Lenders expressly conditioned their DIP financing proposals on, among other things, customary forms of adequate protection, including replacement liens and superpriority status for adequate protection claims, the payment of fees under the DIP Credit Agreements, including the Closing Fee and Backstop Premium, and the Roll-Ups. Based on my participation in the process and my experience, the Roll-Ups are

reasonable because, among other things, both the DIP ABL Lenders and the DIP Term Loan Lenders provided the Debtors with critical incremental liquidity that bridged the Debtors to an orderly and smooth transition into these Chapter 11 Cases and, viewed holistically, no superior alternative is currently available to the Debtors under the circumstance.

24. **The DIP Term Loan Roll-Up.** In addition to the proposed DIP Term Loans, as more fully set out herein and in the First Day Declaration, the DIP Term Loan Lenders provided a total of $120 million in new-money financing through three fundings under the Bridge Facility in the weeks before these Chapter 11 Cases to bridge the Debtors to an orderly filing. These Super Priority Term Loans gave the Debtors and their stakeholders time to negotiate a consensual path forward and avoid a free-fall into chapter 11, which likely would have prolonged these Chapter 11 Cases, required significantly more postpetition financing commitments, and put the Debtors' ability to emerge from chapter 11 in jeopardy. As such, the Super Priority Term Loans were indispensable to the Debtors' prepetition restructuring efforts and enabled the Debtors to reach this orderly filing. A key negotiating point in the DIP Term Loan Lenders' willingness to provide the Super Priority Term Loans at a time when the Debtors were in severe financial distress and heading towards an eventual chapter 11 filing was the Debtors agreement to seek a "roll-up" of the Super Priority Term Loans into a subsequent DIP financing facility upon entry of an interim order. Despite diligent negotiation, the DIP Term Loan Lenders were insistent that the Debtors' agreement to seek such a roll-up upon entry of an interim order was a condition to their funding of the Super Priority Term Loans. Based on the circumstances and the Debtors' prepetition negotiations, I believe that the DIP Term Loan Roll-Up is an essential condition for the DIP Term Loan Lenders to provide the DIP Term Loan Facility.

25. Absent the funding provided by the DIP Term Loan Lenders in the lead up to these Chapter 11 Cases, my understanding is that the Debtors would have been required to file immediate chapter 11 proceedings that would have risked liquidation of the Debtors, to the clear detriment of the Debtors and all stakeholders. I believe it is only with the continued support of the DIP Term Loan Lenders, in both quantum of support coupled with speed and willingness to fund amidst ongoing diligence and negotiations, that the Debtors could commence an orderly filing. Further, the Backstop Parties negotiated for the provision of the DIP Term Loan Roll-Up on a pro rata basis for all lenders under the Bridge Facility and did not seek any requirement that the DIP Term Loan Roll-Up be conditioned on participation in syndication or on a non-pro rata basis, thus avoiding the prospect of a costly and value-destructive fight with the any minority lenders and/or a substantially more costly adequate protection package. Accordingly, I believe the proposed DIP Term Loan Roll-Up upon entry of the Interim Order to be reasonable and appropriate in light of the circumstances.

26. ***The DIP ABL Roll-Up.*** In addition to providing the Debtors with access to essential prepetition and postpetition asset-based loans, the DIP ABL Lenders provided emergency incremental liquidity in the lead up to the Chapter 11 Cases. In the week preceding the Petition Date, the Debtors had exhausted the Super Priority Term Loans and required $15 million of incremental liquidity to ensure an orderly filing. The DIP ABL Lenders agreed to provide this incremental liquidity by lowering the minimum excess availability requirement under the Prepetition ABL Credit Agreement by $15 million. Absent these additional funds from the DIP ABL Lenders, the Debtors would have been required to file prematurely to the detriment of the Debtors and all stakeholders. The DIP ABL Lenders also agreed to (a) reduce the minimum excess availability requirement from 10%, the ordinary-course cap under the Prepetition ABL Facility, to

13

7.5% under the DIP ABL Facility, resulting in increased postpetition borrowing capacity; (b) provide the Debtors with continued access to letters of credit on a postpetition basis; and (c) allow the Debtors to maintain their prepetition commercial banking products[6] in the ordinary course of business. In addition, the DIP ABL Lenders have specifically permitted the use of certain Intercompany Transactions (as defined in the Cash Management Motion) to allow indirect access by the Debtors to additional borrowing base maintained at non-Debtor affiliate Ascend Performance Materials European Limited, effectively increasing Debtors postpetition borrowing capacity.

27. A key negotiating point in the DIP ABL Lender's willingness to provide such favorable postpetition terms was the Debtors agreement to seek a "creeping roll-up" of the Prepetition ABL Obligations into a subsequent DIP financing upon entry of an interim order and a full roll-up of the remaining Prepetition ABL Obligations upon entry of a final order. Based on my understanding, the DIP ABL Lenders' willingness to provide incremental liquidity in the lead up to these Chapter 11 Cases and favorable postpetition DIP ABL Facility terms was conditioned on the Debtors' agreement to seek the DIP ABL Roll-Up.

28. Based on the circumstances, I believe that the DIP ABL Roll-Up is an essential condition for the DIP ABL Lenders to provide the DIP ABL Facility, which is the best available

---

[6] The prepetition commercial banking products include, among other things, the Corporate Credit Program (as defined in the *Debtors <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, and (C) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief* (the "<u>Cash Management Motion</u>") filed contemporaneously herewith), certain treasury services, and the transactions contemplated under (a) that certain Master Metal Agreement dated as of December 20, 2019, by and between Ascend Performance Materials Operations LLC and Wells Fargo Commodities LLC; and (b) that certain Master Metal Agreement dated as of February 14, 2023, by and between Ascend Performance Materials Operations LLC and Wells Fargo Bank, N.A.

14

form of asset-based financing currently available to the Debtors. Accordingly, I believe the proposed DIP ABL Roll-Up to be reasonable and appropriate.

## Conclusion

29. I believe that the proposed DIP Facilities, taken as a whole, are the best source of financing currently available to address the Debtors' liquidity needs while preserving value for the benefit of all stakeholders. In my professional opinion, the terms of the DIP Facilities, including the Roll-Ups, are reasonable under the circumstances, were the product of good faith, arm's-length negotiations, and will maximize the value of the Debtors for the benefit all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 22, 2025

Respectfully submitted,

*/s/ Matthew O'Connell*

Matthew O'Connell
Managing Director, PJT Partners LP
*Proposed Investment Banker to the Debtors*