**EXHIBIT 3**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ASCEND PERFORMANCE MATERIALS HOLDINGS INC., *et al.*,[1] | ) ) ) ) | Case No. 25-90127 (CML) |
| Debtors. | ) ) ) | (Joint Administration Requested) (Emergency Hearing Requested) |

### DECLARATION OF ROBERT DEL GENIO IN SUPPORT OF THE DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

I, Robert Del Genio, hereby declare under penalty of perjury:

1. I am the Chief Restructuring Officer of the Debtors and the co-leader of the Corporate Finance and Restructuring segment of the New York Metro Region at FTI Consulting, LLP ("FTI"),[2] the proposed financial advisor to the above captioned debtors and debtors in possession (the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases").[3]

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Ascend. The location of Debtor Ascend Performance Materials Holdings Inc.'s principal place of business is 1010 Travis St., Suite 900, Houston, Texas 77002.

[2] FTI Consulting, LLP is a wholly owned subsidiary of FTI Consulting, Inc.

[3] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of Robert Del Genio, Chief Restructuring Officer of Each of the Debtors, In Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

2. I submit this declaration (this "Declaration") in support of the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Motion").[4] The Motion seeks authorization for the Debtors to (a) enter into the DIP Facilities, comprising a DIP Term Loan Facility and a DIP ABL Facility and (b) continue to use cash collateral and other Prepetition Collateral subject to the terms and conditions set forth in the DIP Documents and DIP Orders.[5]

3. Although FTI is expected to be compensated for its work as the Debtors' proposed financial advisor in these Chapter 11 Cases, I am not being compensated separately for this Declaration or testimony in connection therewith. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, information provided by members of the Debtors' management team and the Debtors' other advisors, and my review of the relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives. I am above 18 years of age, and I am competent to testify. If called upon to testify, I could and would testify to the facts set forth herein.

**Background and Qualifications**

4. FTI is a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. FTI has

---

[4] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Interim Order (as defined in the Motion), as applicable.

[5] The material terms of the DIP Facilities are set forth in detail in the Motion. For the avoidance of doubt, any description of the DIP Facilities herein or in the Motion is qualified in its entirety by reference to the DIP Documents.

assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in prior cases. Its debtor advisory experience has involved a wide range of activities targeted at stabilizing and improving a company's financial position such as developing or validating forecasts and business plans, and monitoring and managing cash, cash flow, and supplier relationships.

5. I have over forty years of experience in restructuring and mergers and acquisitions and have served as a financial advisor to both public and private companies, specializing in advising companies, lenders, creditors, corporate boards, and equity sponsors across a wide range of industries, both domestically and international. I have undertaken both advisory and executive roles, including Interim Chief Executive Officer, Chief Strategic Officer, Strategic Planning Officer, and Chief Restructuring Officer. I joined FTI in 2017 when it acquired CDG Group plc, where I was a co-founder and managing member. Prior to that, I was a Corporate Finance Partner and a National Director of Ernst & Young LLP.

6. I have played a key role in many successful chapter 11 restructurings, including, but not limited to, serving as the financial advisor to Audacy Inc., Waypoint Leasing Holdings Ltd., TPC Group, Inc., GNC Holdings Inc., Catalina Marketing Corporation, Frontier Communications Corporation, OSG Group Holding, Inc., Mobileum Inc., Altera Infrastructure, LP, ESSAR Steel, Algoma Steel Inc., Reichhold Holdings US, Inc., Milacron, Inc., Bowflex Inc., Caraustar Industries, Inc., MicroAge, Inc., CST Industries, Inc., Dan River, Inc., Wheeling-Pittsburgh Steel Corp., US Internetworking, Factory Card Outlet, Malden Mills, and Metal Forming Technologies. I have also acted as the Chief Restructuring Officer or Strategic Planning Officer, as applicable, of the following entities during their chapter 11 proceedings: Voyager Aviation Holdings, LLC, CHC Group Ltd., RHI Entertainment, Inc., The Weinstein Company Holdings LLC, PHI, Inc., F

& W Media, Inc., and Western Global Airlines LLC. In addition, I previously served as the Chief Strategic Officer of Production Resources Group, L.L.C. and the interim Chief Executive Officer of Panavision Inc. and was a member of the boards of Panavision Inc., Voyager Aviation Management Ireland, CHC Group Ltd., Washington Group International, Inc., Lazare Kaplan International, Inc., and Buffets, Inc.

7. The Debtors engaged FTI in early 2025 to provide services in connection with the evaluation of various strategic alternatives for improving their liquidity and overall financial situation and has since engaged FTI in connection with these Chapter 11 Cases. Over the course of its engagement, FTI has evaluated the Debtors' operations and cash requirements to operate their business during these Chapter 11 Cases, including by assisting in the development of the Debtors' near-term cashflow forecasts. More recently, FTI has (a) assisted the Debtors in the development of a longer-range business plan, (b) conducted a thorough analysis of the Debtors' executory contracts, potential general unsecured claims, and cost-saving strategies; (c) supported the Debtors in their assessment of strategic alternatives, (d) provided compensation and strategic communication advice, and (e) provided as-needed resources in support of financing-related workstreams and contingency preparation.

8. Immediately following its engagement, FTI began obtaining diligence from the Debtors and evaluating the Debtors' operations and near-term liquidity requirements for potential strategic alternatives and, subsequently, for the debtor-in-possession financing process. FTI, under my supervision, has worked with the Debtors' restructuring professionals and key members of the Debtors' business—including, but not limited to, members of the treasury, finance, marketing, and operations leadership teams—to evaluate and understand the Debtors' cashflows, financial

reporting, and general operations, and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

## The Debtors' Prepetition Capital Structure

9. As of the Petition Date, the Debtors, together with certain of their non-Debtor affiliates, had approximately $2.0 billion in aggregate principal and accrued interest and fees outstanding for their funded debt obligations, approximately $1.8 billion of which is held by Debtor entities. The following table sets forth the Debtors' prepetition capital structure:

| Funded Debt | Maturity | Approximate Principal | Approximate Accrued and Unpaid Interest, Premiums, and Other Fees | Approximate Outstanding Amount |
|---|---|---|---|---|
| **ABL Facility** | May 28, 2026[6] | $346 million | $2 million | $348 million |
| **Bridge Facility** | March 7, 2026 | $120 million | $30 million | $150 million |
| **Term Loan Facility** | August 27, 2026 | $1,043 million | $29 million | $1,072 million |
| *Total US Debt* | | *$1,509 million* | *$61 million* | *$1,570 million* |
| **Capital Leases and Sale Leasebacks** | Various | $348 million | $2 million | $350 million |
| *Total US Debt and Capital Leases* | | *$1,857 million* | *$63 million* | *$1,920 million* |
| **China Debt** | Various | $157 million | $1 million | $158 million |
| *Total Funded Debt Obligations* | | *$2,014 million* | *$64 million* | *$2,078 million* |

10. After several rounds of extensive, hard-fought negotiations with the Ad Hoc Group of Term Loan Lenders and the Prepetition ABL Lenders, the Debtors reached agreements with both lender groups to provide the DIP Facilities. The DIP Facilities provide the Debtors access to: (a) a $400 million senior secured superpriority term loan facility (the "DIP Term Loan Facility"), comprised of (i) $250 million in new money, $150 million of which will be available

---

[6] The maturity date of the Prepetition ABL Facility is the earlier to occur of (a) October 28, 2027, and (b) the date that is 91 days before the maturity date of the Prepetition Term Loan Facility.

5

upon entry of the Interim Order, and (ii) a "roll-up" of approximately $150 million of Super Priority Term Loan Obligations upon entry of the Interim Order (the "DIP Term Loan Roll-Up"); and (b) a $500 million senior secured superpriority asset-based financing facility (the "DIP ABL Facility"),[7] composed of (i) postpetition access to all of the commitments under the Prepetition ABL Facility, (ii) a "creeping roll-up," where, upon entry of the Interim Order and consistent with the DIP ABL Documents, all postpetition cash, collections, and proceeds of DIP ABL Priority Collateral will be used to pay down Prepetition ABL Obligations, and (iii) a full roll-up of all remaining Prepetition ABL Obligations upon entry of the Final Order ((ii) and (iii) together, the "DIP ABL Roll-Up" and, together with the DIP Term Loan Roll-Up, the "Roll-Ups").

## The Debtors Have an Immediate Need to Access the DIP Facilities and Use Cash Collateral

11. I am familiar with the DIP Facilities, the material terms thereof, and the Debtors' immediate liquidity needs. The Debtors require immediate access to liquidity to fund their ongoing operations, working capital needs, and the projected costs of these Chapter 11 Cases. Based on my experience in the restructuring industry generally and my experience with the Debtors in particular, I believe that approval of the proposed DIP Facilities and continued use of cash collateral is essential for the Debtors to stabilize operations, fund these Chapter 11 Cases, and pursue ongoing restructuring efforts.

12. As detailed in the First Day Declaration, years of macroeconomic headwinds compressed margins and softened demand across the Debtors' industry. These headwinds, increased competition, and uneconomic long-term contracts hampered the Debtors' cash

---

[7] The DIP ABL Facility Fee Letter, attached to the Interim Order as Exhibit D, contains sensitive information that could be damaging to the Debtors and certain stakeholders if made public. Therefore, the DIP ABL fee letter is being filed under seal contemporaneously herewith.

collections, reduced accounts receivable, and compressed the Debtors' borrowing base, severely impacting their liquidity reserves. The Debtors pursued several strategies to stabilize the their financial condition and improve their liquidity in the face of these challenges, but ultimately such initiatives proved unavailing and certain recent events, including a fire at the Pensacola facility, a Texas freeze impacting the Chocolate Bayou facility, and a logistics delay at the Wilson Lock inland barge, created an acute liquidity deficit for the Debtors. As a result, the Debtors enter these Chapter 11 Cases with approximately $3.7 million in cash on hand, which is insufficient to support their global, cash-intensive operations for more than a few days. Absent the ability to access the funds available under the DIP Facilities and cash collateral, the Debtors would likely face a value-destructive and immediate interruption to their operations and lose support from key stakeholders on which the Debtors' business depends, including critical vendors, customers, and employees.

13. Accordingly, FTI, under my supervision, advised and assisted the Debtors in evaluating the postpetition financing needs that would be required to operate the Debtors' business and fund the administrative costs of these Chapter 11 Cases. As part of this evaluation, FTI assisted in the development of the Debtors' 13-week cash-flow forecasts (the "Initial DIP Budget," attached as Schedule 1 to the Interim Order). The Initial DIP Budget anticipates, among other things, cash receipts and disbursements during the projected period, fees and interest expenses associated with the DIP Facilities, professional fees, customer contracts, workforce and vendor obligations, and the Debtors' sale leaseback obligations. The Initial DIP Budget also makes certain assumptions, including adjustments to account for the effect of the chapter 11 filing on the Debtors' vendors and customers. Based on this analysis, FTI and the Debtors determined that the Debtors would require continued access to an asset-based lending facility and approximately $250 million

in new-money financing under a term loan facility to continue operations in the ordinary course on a postpetition basis and to fund their restructuring process.

14. Based on my experience in numerous restructuring engagements, my familiarity with the Debtors, and extensive discussions with the Debtors' management team and advisors, including a team from FTI acting under my supervision, I believe that: (a) the Initial DIP Budget presents a reasonable estimate of the Debtors' cash sources and needs during the Chapter 11 Cases; (b) the DIP Facilities are essential to the preservation of the Debtors' estates and will provide the Debtors with sufficient liquidity to stabilize their operations, fund the administration of these Chapter 11 Cases, and position the Debtors to emerge from chapter 11 as a stronger and healthier enterprise; (c) the proposed DIP Facilities and the use of cash collateral are in the best interest of the Debtors; (d) without access to the DIP Facilities, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these Chapter 11 Cases; (e) the DIP Facilities represent the best—and only viable—source of postpetition financing available to the Debtors; and (f) based on the foregoing, entry into the DIP Facilities is a sound exercise of the Debtors business judgment.

15. The milestones set forth in the DIP Documents are the product of good-faith, arm's-length negotiations between the Debtors and the DIP Lenders and are an integral component of the DIP Facility and the Debtors' restructuring efforts. Based on my industry experience and knowledge of the Debtors' operations, I believe that these milestones establish an appropriate timeline to negotiate and implement a value-maximizing restructuring.

16. Access to the liquidity provided through the DIP Facilities and cash collateral will provide a strong, clear message to the Debtors' customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the Debtors are able to (a) continue

meeting the needs of their customers, (b) compensate their employees in the ordinary course, (c) pay certain vendors postpetition in the ordinary course, and (d) pay critical vendors for court-approved prepetition amounts.  As a result, the Debtors will be well positioned to maintain favorable trade terms with vendors and assure their other key constituencies, including landlords, customers, and employees, that the Debtors' business is on the path to improved operational results, encouraging them to work cooperatively with the Debtors through the restructuring.

## Conclusion

17. In light of the Debtors' circumstances, I believe that the Debtors will materially benefit from the availability of the DIP Facilities and that entry into the DIP Facilities is a sound exercise of the Debtors' business judgment.  Obtaining this financing will, in my view, provide the necessary financing for a successful reorganization of the Debtors' estates, which in turn will maximize the value of the Debtors for the benefit of creditors, employees, vendors, customers, and other stakeholders.  In addition to providing necessary liquidity, the DIP Facilities and the assurance they will provide to the Debtors' workforce and vendors will help stabilize the Debtors' operations at the outset of these Chapter 11 Cases.  Accordingly, I believe the relief requested in the Motion is necessary and appropriate to avoid immediate and irreparable harm to the Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 22, 2025

/s/ *Robert Del Genio*
Name: Robert Del Genio
Title: Chief Restructuring Officer