**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>ASCEND PERFORMANCE MATERIALS<br>HOLDINGS INC., *et al.*,<br><br>           Debtors. | Chapter 11<br><br>Case No. 25-90127 (CML)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 426, 491, 560, 561**<br><br>**Hearing Date:  July 17, 2025 at 3:00 pm (ET)** |

**REPLY IN SUPPORT OF APPLICATION**
**OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**OF ASCEND PERFORMANCE MATERIALS HOLDINGS INC., ET AL., FOR**
**ENTRY OF AN ORDER (I) AUTHORIZING THE RETENTION AND**
**EMPLOYMENT OF DUCERA PARTNERS LLC AS INVESTMENT BANKER**
**EFFECTIVE AS OF MAY 9, 2025, AND (II) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Chapter 11 cases of Ascend Performance Materials Holdings Inc. and its affiliated debtors (collectively, the "**Debtors**") submits this Reply in support of the *Application of the Official Committee of Unsecured Creditors of Ascend Performance Materials Holdings Inc., et al., for Entry of an Order (I) Authorizing the Retention and Employment of Ducera Partners LLC as Investment Banker Effective as of May 9, 2025, and (II) Granting Related Relief* [Dkt. No. 426] (the "**Ducera Application**").[1]  In support of this Reply, the Committee states as follows:

**PRELIMINARY STATEMENT**

1.      This is a large, complicated bankruptcy case.  The Debtors are a significant "old economy" manufacturer, producing an industrial product that is widely-used across the globe.  The company's sprawling operations encompass eleven manufacturing facilities across the

---

[1]    Capitalized terms used in this Reply but not otherwise defined herein shall have the meaning ascribed to them in the Ducera Application.

United States, Mexico, Europe, and Asia, including flagship chemical compound facilities in Pensacola, Florida and Chocolate Bayou, Texas; approximately 1,700 employees worldwide (with non-debtor affiliates employing an additional 500 individuals); over $2 billion in prepetition funded debt obligations; numerous long-term, take-or-pay contracts; "voluminous" and "complex" books and records; and complex sale and leaseback arrangements.[2]  And, the Debtors' business has recently been beset by a number of challenges, including onerous contractual arrangements and operational setbacks (*e.g.*, a fire at one facility, a once-in-a-generation Texas "big freeze" affecting another, and temporary logistical bottlenecks at a third).

2.      Unlike most companies with a large and complex case profile, the Debtors filed as a "free-fall" bankruptcy—*i.e.*, without a restructuring support agreement, stalking horse agreement, or other pre-arranged case exit.  Instead, the Debtors intend to implement an in-court "comprehensive reorganization" of their business.  That process (funded by the Ad Hoc Group) will entail, among other things, ascertaining the root causes of the Debtors' financial distress, leveraging the many bankruptcy tools available to debtors to address those causes, and negotiating with stakeholders on a Chapter 11 plan of reorganization, which, under the DIP loan, must be satisfactory to the Ad Hoc Group.  A key component of this process will be scrutinizing the Debtors' long-term business plan (which also must be acceptable to the Ad Hoc Group) and ascertaining the reorganized Debtors' enterprise value and debt capacity, which will, in turn, determine value entitlements under any plan and, ultimately, whether a plan is confirmable.  In many ways, valuation of the Debtors' reorganized business (after many of the issues that historically have hobbled the company have been fixed)—and the Committee's ability to test

---

[2]      *See Declaration of Robert Del Genio, Chief Restructuring Officer of Each of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Dkt. No. 24] (the "**First Day Decl.**"), ¶¶ 1-5, 24-26, 40; Ex. A, ¶¶ 4, 9.

and, if appropriate, challenge the Debtors' and Ad Hoc Group's valuation thesis—will be among the Committee's most important responsibilities in this case.[3]

3.      These are complex issues with serious implications. Examining and comprehensively addressing them will require careful, diligent analysis by experienced restructuring professionals.  And that entails certain costs.  The Ad Hoc Group knows this (and knew it before the cases were filed).  For example, the Debtors' professional fee statements through just the case's first 6 weeks total over $10.7 million.  The Ad Hoc Group's counsel just submitted an invoice for one month (June) for nearly $1.4 million.[4]  The most recent DIP budget estimates total post-petition Debtor professional fees of ███████████████████████ ███████████ and about ███████████ in Ad Hoc Group professional fees (pre- and post-petition).  Embedded within these fees is compensation for two investment bankers who will presumptively be testifying as to the reorganized Debtors' enterprise value at any confirmation hearing: (i) PJT Partners LP ("**PJT**"), the Debtors' investment banker, whose compensation includes a $12 million restructuring fee that, notably, has already been approved under Section 328(a), and (ii) Evercore Group L.L.C. ("**Evercore**"), the Ad Hoc Group's investment banker, whose compensation includes a ███████████ transaction fee[5] (both of these transaction fees far exceed the compensation sought under the Ducera Application).

4.      It is through this lens that the Court should scrutinize the lone objection to Ducera's retention filed by the Ad Hoc Group.[6]  The Ad Hoc Group concedes that the

---

[3]   To be sure, valuation is not the only significant issue in this case.  The Committee is also undertaking an investigation into potential estate claims and causes of action, including as may exist against the Debtors' equity sponsor, SK Capital Investments II, LLC and affiliates, and the Debtors' prepetition lenders (including potential lien challenges).

[4]   Gibson, Dunn & Crutcher LLP's June 2025 summary invoice is attached hereto as **Exhibit A**.

[5]   At the request of the Ad Hoc Group, the amount of the Evercore transaction fee has been redacted.

[6]   *See Objection of the Ad Hoc Group to the Application of the Official Committee of Unsecured Creditors for an Order Authorizing the Retention and Employment of Ducera Partners LLC as Investment Banker* [Dkt. No.

Committee is entitled to retain qualified advisors to assist it in satisfying its fiduciary duties. AHG Obj. ¶ 1. The Ad Hoc Group does **not** argue that Ducera is unqualified to advise the Committee in these cases. Nor does it contend that the core economic terms of Ducera's retention are excessive or off-market. Rather, the Objection focuses principally on whether the Committee has satisfied its burden to retain Ducera under Section 328(a), and ostensible concerns about potential duplication of efforts. The Committee has a job to do, and the Ad Hoc Group's objection gambit, seemingly aimed at disabling the Committee from doing that job, is both legally and factually meritless and should be overruled.

5.        The Objection is largely premised on the Ad Hoc Group's *ipse dixit* assertion that unsecured creditors are "out-of-the-money" and, therefore, the Committee's retention of an investment banker will not benefit the estates. The Ad Hoc Group misconstrues both the statute and applicable jurisprudence. Section 328(a) permits the Committee to retain an advisor on "any reasonable terms and conditions of employment." Pertinent jurisprudence supplies a non-exhaustive list of considerations when analyzing whether a proposed retention is "reasonable" under Section 328(a). The overarching focus is whether the retention terms are "market" and comparable to prevailing terms for similar engagements. Here, the record at trial will amply demonstrate that Ducera's proposed engagement terms are well within market norms, were negotiated at arm's length and in good faith, and are a valid exercise of the Committee's business judgment. Moreover, Ducera's retention will substantially benefit the estate by ensuring that the Committee is able to adequately represent the interests of unsecured creditors (including, critically, in respect of the plan process), satisfy its fiduciary duties, and serve the appropriate "checks and balances" role required of it in a properly functioning bankruptcy case.

---

560] (the "**Objection**" or "**AHG Obj.**"). The Committee also received informal comments from the U.S. Trustee, which have been consensually resolved through revisions to the proposed order approving Ducera's retention.

6.      The Committee plainly requires Ducera's services.  Indeed, the Ad Hoc Group does not seriously contend otherwise; rather, it suggests that the Committee's need for certain critical services (*e.g.*, valuation) is "months away" or can be provided by AlixPartners, and, consequently, approval of Ducera's retention should, at a minimum, be deferred. These assertions are wrong.  First, Ducera's services are needed now, not months from now.  Indeed, as described below, Ducera has already committed considerable time and effort on this matter.  The Committee just received the Debtors' long-term business plan, and the Ad Hoc Group acknowledges that plan formulation is well underway and advancing quickly, with disclosure statement (August 2025) and plan confirmation milestones (September 2025) rapidly approaching.  The Committee requires Ducera's analysis and advice in connection with the currently underway plan process.  Time is already tight, and these critical workstreams cannot be delayed to the eve of confirmation.  Second, as detailed herein, Ducera was selected to provide the specific services outlined in its engagement letter based on its unique expertise and qualifications.  AlixPartners is providing distinct services to the Committee based on its own expertise and qualifications.  The Committee's retentions of an investment banker and financial advisor—a common occurrence in large, complex cases such as this—are designed to be complementary, enabling the Committee to leverage the unique capabilities of both firms to satisfy its fiduciary duties to unsecured creditors.[7]

7.      The Ad Hoc Group's concern about "duplicate efforts" is misplaced.  The Ad Hoc Group concedes that retention of both an investment banker and financial advisor is appropriate if "each has a meaningful and distinct role within a case."  The Committee will not quibble with

---

[7]     It also bears observing that AlixPartners' engagement does not contemplate the services being provided by Ducera, and any material modification to the scope of AlixPartners' retention would necessarily require a revised compensation package that would presumptively reflect market rates for such expanded services (*i.e.*, not materially better than Ducera's market terms).

the appropriateness of this standard, as it is plainly met.  As detailed herein, Ducera's and AlixPartners' retention applications set forth the distinct services to be provided by each firm, along with commitments from both firms not to duplicate services.  In furtherance of this commitment, the Committee, its counsel, Ducera, and AlixPartners have refined the workstreams among the firms and, as described below, implemented a carefully structured delineation of workflows to ensure that:  (i) each firm focuses on those areas where its particular expertise is best served; and (ii) there is no duplication of effort.

8.    The Ad Hoc Group's other contentions lack merit.  Its suggestion that Ducera's Restructuring Fee should be conditioned on satisfying some "benchmark" fails.  The structure of the Restructuring Fee is common in the marketplace; substantially similar to (although much less than) PJT's and Evercore's transaction fees, which do not contain any benchmarks; and ensures that Ducera's analysis, advice, and testimony will be free from any alleged or perceived conflicts.  The Ad Hoc Group's quip that Ducera's retention should be subject to their "oversight" is precisely the type of aggressive lender overreach that bankruptcy jurisprudence cautions against.  The Ad Hoc Group's questioning of the May 9, 2025 effective date ignores that Ducera has already expended considerable time and resources analyzing issues pertinent to these cases and advising the Committee.  The Ad Hoc Group's request to add language to Ducera's retention order prohibiting certain fees is premature, unsupported, and should be denied.  Moreover, Ducera has already agreed to add language to its retention order addressing concerns raised by the U.S. Trustee related to certain fee requests.  And, the Ad Hoc Group's complaint about the "tail" provision is misguided, as such provisions are, again, standard terms in investment banker engagements and common in the restructuring space.

9.      Finally, the Ad Hoc Group also filed an "Omnibus Statement and Reservation of Rights" respecting the Committee's other professional retentions.[8]  The Committee has little quarrel with the general assertion contained in that pleading, to wit: All professional fees should be reasonable and consistent with the Bankruptcy Code.  But, as the old saw goes, those living in glass houses should think hard before throwing stones: The professional team retained by the Ad Hoc Group is big and expensive and, so far at least, has submitted enormous invoices without any time detail or other backup respecting the fees demanded.  And, while the "adequate protection" package benefitting the Ad Hoc Group  may obviate detailed professional time records (in the first instance), questions about "reasonableness" permeate us all.  The Debtors' Chapter 11 cases are, to be sure, sizeable and complex, and everyone—the Ad Hoc Group *and* the Committee—has a job to do.  This sort of quick jab pleading, here in the form of a "Reservations of Rights," does little to advance anything interesting or important.  Perhaps the Ad Hoc Group's counsel might, next time a fee issue pops up, instead just pick up the phone and call opposing counsel to talk about it, instead of a surprise filing that only invites a tit-for-tat counter (and even more professional costs).

**PERTINENT FACTUAL BACKGROUND**

**I.      General Case Background.**

10.      On April 21, 2025 (the "**Petition Date**"), the Debtors commenced their voluntary cases under Chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their assets as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.  No trustee or examiner has been appointed in these cases.

---

[8]      *See Omnibus Statement and Reservation of Rights of the Ad Hoc Group Regarding the Applications of the Official Committee of Unsecured Creditors for Orders Authorizing the Retention of AlixPartners, Brown Rudnick, and Parkins & Rubio* [Dkt. No. 561].

11.     On May 5, 2025, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed the Committee pursuant to Bankruptcy Code Section 1102.  The Committee presently consists of the following nine members: (i) SDI, Inc.; (ii) Turner Industries Group, LLC; (iii) Veolia WTS USA, Inc.; (iv) Optimal Field Services, LLC; (v) Sulzer Chemtech USA Inc.; (vi) Gulf Coast Water Authority; (vii) the Pension Benefit Guaranty Corporation; (viii) Clariant Corporation; and (ix) MHBA CB, L.L.P.  [Dkt. No. 223].

12.     The Debtors entered bankruptcy without a clear path to exit.  They are not parties to a restructuring support agreement or stalking horse purchase agreement.  Rather, the Debtors filed these cases to consummate a comprehensive in-court restructuring through a Chapter 11 plan of reorganization.  *See* First Day Decl. ¶ 13.

13.     The Debtors' cases are being funded through DIP financing provided by the Ad Hoc Group.[9]  A key component of the Debtors' case strategy (and a condition to continued access to DIP financing) is developing a go-forward business plan acceptable to the Ad Hoc Group, including obtaining agreements with respect to certain near-term strategic transactions.  *See* Superpriority Senior Secured Debtor-in-Possession Term Loan Credit Agreement (the "**DIP Credit Agreement**"), § 6.21(g).

14.     As noted by the Ad Hoc Group, the Chapter 11 plan process is moving forward "expeditiously."  AHG Obj. ¶ 14.  Pursuant to the DIP financing milestones, the Debtors must secure: (i) an order approving a disclosure statement by August 19, 2025, (ii) an order confirming a Chapter 11 plan by September 23, 2025, and (iii) consummation of such Chapter 11 plan by October 3, 2025.  *See* DIP Credit Agreement § 6.21(h)-(j).

---

[9]     *See Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Dkt. No. 389].

II.     **The Committee's Need For An Investment Banker And Selection Of Ducera.**

15.     On May 7, 2025, the Committee retained Brown Rudnick LLP ("**Brown Rudnick**") as counsel.   Thereafter, the Committee engaged in discussions respecting the professional advisory services required in these cases in order for the Committee to satisfy its fiduciary duties to unsecured creditors.

16.     Because the Debtors and Ad Hoc Group intended to undertake an in-court operational and financial restructuring, with advice from the Debtors' management team, counsel, and FTI Consulting as financial advisor, the Committee determined that it required the services of a financial advisor to thoroughly analyze, among other things, the Debtors' business operations, cash flows, internal functions (*e.g.*, accounting, cash management, tax), material contractual arrangements, and related matters, and engage with the Debtors' and Ad Hoc Group's advisors respecting the same.

17.     In addition, because the Debtors and Ad Hoc Group intended to proceed through a Chapter 11 plan of reorganization (or, potentially, a sale process), with advice from PJT, as the Debtors' investment banker, and Evercore, as the Ad Hoc Group's investment banker, the Committee determined that it required investment banking services to analyze and, if appropriate, opine as to, among other things, the Debtors' debt capacity, total enterprise value, and the proper allocation of value under a Chapter 11 plan, and engage with the Debtors' and Ad Hoc Group's advisors respecting the same.

18.     On May 8 – 9, 2025, the Committee conducted interviews with respect to investment bankers and financial advisors.  In total, the Committee interviewed three investment banking firms, six financial advisory firms, and one joint proposal from a financial advisor and investment banker acting in concert.

19.     Following the investment banker interviews on May 8, 2025, the Committee indicated a preference for a certain investment banking firm based on its qualifications, but was concerned about the relatively high cost of such advisor.  During the interviews, this particular firm had proposed a transaction fee of approximately $5 million, which it was unwilling to negotiate down.  This fee was materially higher than the transaction fee proposed by the other investment banker interviewed that day, which was closer to approximately $3 million.

20.     Thereafter, on May 9, 2025, the Committee interviewed Ducera.  Prior to the Committee interview, Ducera and Committee counsel discussed the opportunity, Ducera's qualifications, and its proposed compensation.  Ducera advised Committee counsel that, based on its knowledge of the situation, the complexity of the case, and the market for investment banking services, it intended to propose a fee structure consisting of a $175,000 monthly fee and a $5 million restructuring fee.  Committee counsel responded that the proposed transaction fee was too high.  Following negotiations, Ducera agreed to propose a reduced compensation structure consisting of a $175,000 monthly fee and a $3 million restructuring fee.  With that commitment in hand, Ducera advanced to the interview phase with the Committee.

21.     During the interview, Ducera detailed its extensive experience representing official creditors' committees in significant Chapter 11 restructuring proceedings.  *See* Ducera Application ¶¶ 7-9.

22.     Ducera presented its team of advisors who would lead the engagement.  The seasoned Ducera team would be led by: (i) Mike Genereux (Partner), a leading restructuring banker with decades of experience advising official creditors' committees and other major stakeholders in complex bankruptcy proceedings, and (ii) John Vaske (Vice Chairman and Partner), one of the preeminent investment bankers in the industrial and natural resources spaces.

23.     Mr. Genereux detailed his extensive experience representing official creditors'
committees and other major stakeholders in complex bankruptcy cases, including, notably, his
experience serving as an expert testifying witness in large, complex Chapter 11 cases, such as:

- *In re Enviva Inc.* (Case No. 24-10453, Bankr. E.D. Va. 2024)
- *In re Global Eagle Ent. Inc.* (Case No. 20-11835, Bankr. D. Del. 2020)
- *In re CHC Group Ltd.* (Case No. 16-31854, Bankr. N.D. Tex. 2016)
- *In re Harry & David Holdings* (Case No. 11-10884, Bankr. D. Del. 2011)
- *In re Hawkeye Renewables* (Case No. 09-14461, Bankr. D. Del. 2009)
- *In re Hercules Offshore* (Case No. 16-11385, Bankr. D. Del. 2016)
- *In re PHI, Inc.* (Case No. 19-30923, Bankr. N.D. Tex. 2019)
- *In re Quicksilver, Inc.* (Case No. 15-10585, Bankr. D. Del. 2015)
- *In re Spansion, Inc.* (Case No. 09-10690, Bankr. D. Del. 2009)
- *In re Station Casinos Inc.* (Case No. 09-52477, Bankr. D. Nev. 2009)
- *In re Vitro America, LLC* (Case No. 10-47473, Bankr. N.D. Tex. 2010)

24.     Ducera also presented Mr. Vaske's industry-leading experience, which included:
(i) advising DuPont on the $4.4 billion sale of Invista to Koch Industries (2003), including
DuPont's nylon, polyester, and spandex fiber businesses, and creating, as a result, one of the
world's largest integrated fibers and resins platforms; (ii) advising DuPont on its $120 billion
merger with Dow Chemicals (2013); (iii) advising Basell on its $19 billion acquisition of
Lyondell (2007); and (iv) advising BP on its $9 billion sale of Innovene to INEOS (2005).

25.     Ducera further outlined its detailed knowledge of the Debtors' business,
operations, and capital structure, and Ducera's industry-specific experience in the global nylon 6
and nylon 6,6 space.

26.     During the interview, Ducera proposed compensation terms consisting of a
$175,000 monthly fee and a $3 million restructuring fee.  Ducera also offered to credit 50% of its
monthly fees after six months against any restructuring fee.

27.     Following Ducera's presentation to the Committee, the Committee deliberated
with respect to the investment banker selection.   The Committee determined that Ducera's

extensive industry and restructuring experience, top-notch team, and competitive fee structure represented the best choice for the Committee.  The Committee thereafter advised Ducera of its selection as investment banker to the Committee.

### III.    The Committee's Efforts To Ensure No Duplication Of Services.

28.    Following the Committee's decision to retain Ducera, Committee counsel, Ducera, and AlixPartners met and conferred respecting a division of labor among the advisors, to ensure that the Committee was getting the best advice practicable from its advisors without duplication of effort.  Such efforts culminated in the below Delineation of Workstreams.

**Delineation of Workstreams**

| Workstream/Deliverable | Alix Partners | Ducera |
| --- | --- | --- |
| Analysis of and reporting on the 13-week cash flow forecast and actuals | X | |
| Assessment of the Company's cash management, tax sharing and intercompany accounting systems, practices and procedures | X | |
| Review and investigate: (i) related party transactions, including those between the Company and its non-debtor subsidiaries and affiliates (including, but not limited to, shared services expenses and tax allocations) and (ii) selected other prepetition transactions. | X | |
| Review and evaluate: (i) proposed KEIP and KERP; (ii) critical vendor program; (iii) potential preference payments, fraudulent conveyances and other causes of action; (iv) rejection, assumption, and renegotiation of contracts and leases | X | |
| Assist in the development and/or review of the Company's plan of reorganization and disclosure statement | X | |
| Render litigation support services, including e-Discovery services, as requested from time to time by the Committee and its counsel | X | |
| Testimony regarding operations, feasibility of the plan, and any open investigations | X | |
| Business plan diligence | X (Industry Evaluation) | X (Valuation Analysis) |
| Review and asses the Company's capital structure as well ensure that the Company's pro forma liquidity profile and cash flows are adequate following any restructuring transaction | | X |
| Provide financial advice and assistance to the Committee in connection with Exit Financing proposals and conduct due diligence on debt capacity | | X |
| Provide financial advice and assistance to the Committee in connection with any proposed sale of the Debtors' assets | | X |
| Determine a range of values for the Debtors and any securities that the Debtors offer or propose to offer in connection with a transaction | | X |
| Testimony regarding valuation and any sale process | | X |
| Analyze different restructuring scenarios and the impact of those scenarios on the recoveries of the stakeholders involved in the transaction | | X |
| Assist with such other matters as may be requested but not duplicative of any services provided by other Committee professionals | X | X |

Ducera   **Alix**Partners        1

29.    As shown above, Ducera's services focus primarily on analyzing and advising the Committee in respect of, among other things: (i) a comprehensive valuation of the Debtors'

business, including in connection with a Chapter 11 plan confirmation hearing; (ii) the Debtors' capital structure and liquidity profile, including potential sources and uses of financing; (iii) the Debtors' debt capacity; (iv) any proposed Chapter 11 plan or restructuring proposals, and the treatment afforded unsecured creditors thereunder; (v) structuring and valuing potential instruments or other recoveries under any Chapter 11 plan; (vi) engaging with the Debtors, their advisors, and other key case constituents in connection with the negotiation of a Chapter 11 plan; (vii) any potential sale transaction involving substantially all or any of the Debtors' assets; and (viii) providing expert witness testimony as needed with respect to any of the foregoing. *See* Ducera Application ¶ 10.

30.    AlixPartners' services, in contrast, focus primarily on analyzing and advising the Committee in respect of, among other things: (i) the company's operations and restructuring options respecting the same; (ii) cash flows and forecasts; (iii) internal accounting, cash management, and tax functions; (iv) intercompany issues; (v) critical vendor matters; (vi) employee matters (*e.g.*, KEIP/KERP proposal (if any)); (vii) potential avoidance actions and other estate claims; (viii) contract rejections, assumptions, and negotiations; (ix) investigations into prepetition transactions; (x) plan feasibility; (xi) litigation support, as may be requested by counsel; and (xii) providing expert witness testimony as needed with respect to any of the foregoing.[10]

31.    Ducera and AlixPartners have committed to ensuring no duplication of effort between the firms.  Their engagements are designed to be complementary to each other, enabling the Committee to leverage the unique expertise and qualification of each firm throughout these cases.  Although certain significant matters will require the work of both firms (*e.g.*, analyzing

---

[10]    *See Application of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Employment and Retention of AlixPartners, LLP as its Financial Advisor Effective as of May 8, 2025* ¶ 14 [Dkt No. 424].

the Debtors' business plan), such work will be performed by each firm with their respective focus and scope of services in mind, with the Committee then integrating the efforts of both firms into a cohesive case strategy.

## IV.   **Market Comparison Of Fees And Compensation Terms**.

32.      At the Committee's direction, Ducera has performed a review and analysis of investment banker retentions by official creditors' committees in comparable Chapter 11 cases, which is set forth on **Exhibit B** (the "**Market Comparison**") to this Reply.  Such analysis shows that the Restructuring Fee is on the low end of the range of transaction fees approved for investment bankers in comparable cases (both in absolute amount and as a percentage of prepetition debt), and also on the lower range of transactions fees approved where Ducera served as the investment banker for the official creditors' committee.

33.      The reasonableness of Ducera's compensation is further demonstrated by comparing it to the compensation of the other investment banking firms in this case.  For example, the compensation for the Debtors' investment banker, PJT, includes the same monthly fee (with less generous crediting), a financing fee, and a **$12 million** "Restructuring Fee" that is earned in substantially the same manner as Ducera's Restructuring Fee—*i.e.*, upon consummation of a transaction, without benchmarks or thresholds.[11]  The compensation for the Ad Hoc Group's investment banker, Evercore, includes a ▮▮▮▮ monthly fee (with a capped crediting mechanic) and a ▮▮▮▮ "Transaction Fee" that is earned in substantially the same manner as Ducera's Restructuring Fee—*i.e.*, upon consummation of a transaction, without benchmarks or thresholds.

---

[11]   *See Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of PJT Partners LP as Investment Banker to the Debtors Effective as of April 21, 2025, and (II) Granting Related Relief* ¶ 17(c) [Dkt No. 340] (the "**PJT Retention Application**").

34.     Finally, the terms of Ducera's proposed engagement in this case, including its retention under Bankruptcy Code Section 328(a), are consistent with customary terms for engagements of this nature.   The pertinent retentions orders for the case cited in the Market Comparison, approving committee investment banker retentions under Section 328(a), are attached hereto as **Exhibit C**.   Moreover, the engagements of both Ducera and PJT Partners, the Debtors' investment banker, are subject to approval under Section 328(a), which, in PJT's case, has already been granted.   *See Order (I) Authorizing the Retention and Employment of PJT Partners LP as Investment Banker to the Debtors, Effective as of April 21, 2025, and (II) Granting Related Relief* [Dkt. No 489].

## ARGUMENT

### I.     The Committee's Determination To Retain Ducera Was Necessary To Satisfy Its Fiduciary Duties And An Appropriate Exercise Of Its Business Judgment.

35.     Bankruptcy Code Section 1103(c) vests the Committee with certain rights and fiduciary duties.   11 U.S.C. § 1103(c); *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (observing that Section 1103(c) implies that official creditors' committees owe fiduciary duties to general unsecured creditors).   Bankruptcy Code Section 1103(a) authorizes the Committee to retain professionals to assist it in exercising its rights and satisfying its fiduciary duties.   11 U.S.C. § 1103(a) ("[W]ith the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents, to represent or perform services for such committee.").

36.     Courts have held that a Committee's decision to employ professionals should be afforded deference akin to a "business judgment" standard.   *See, e.g.*, *Exco Resources, Inc. v. Milbank, Tweed, Hadley & McCloy LLP (In re Enron Corp.)*, No. 02 Civ. 5638(BSJ), 2003 WL 223455, at *4 (S.D.N.Y. Feb. 3, 2003) (observing that a committee's decision to employ a

professional under Section 1103 should be afforded deference); *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 233 (3d Cir. 2003) (finding the business judgment rule "well suited" to considering professional retentions in bankruptcy); *In re Caldor, Inc*., 193 B.R. 165, 170 (Bankr. S.D.N.Y. 1996) ("Public policy favors permitting parties to retain professionals of their choice.").

37.    The Debtors' business is highly complex.[12]   *See* First Day Decl., Ex. A, ¶ 9.  They produce and sell a specialized type of nylon, nylon 6,6 or "PA66," and the chemical intermediates and downstream outputs of PA66, which is commonly used in everyday appliances and essentials such as heating and cooling systems, air bags, batteries, and athletic apparel.  *See* First Day Decl. ¶ 9.  The Debtors have a sprawling manufacturing footprint, large employee base, and complex contractual arrangements. *See* First Day Decl. ¶¶ 1-5, 24-26; First Day Decl., Ex. A, ¶¶ 4, 9.

38.    The ultimate outcome of these cases is uncertain.  The Debtors intend to propose a Chapter 11 plan of reorganization.  That plan will include a proposed enterprise valuation of the Debtors' reorganized business.  It is essential for the Committee to retain an investment banker to guide it through these complicated case issues and help it maximize value for unsecured creditors.  In order to properly analyze any Chapter 11 plan and proposed valuation and, if appropriate, contest or otherwise respond to the same, in accordance with its fiduciary duties, the Committee requires the services of a qualified investment banker.  The Committee would be at a significant disadvantage if, unlike the Debtors and Ad Hoc Group, it lacks an expert capable of supporting its positions throughout these cases.  Additionally, the Committee requires an investment banker to represent it in discussions and negotiations with the Debtors

---

[12]    Indeed, these cases have been designated as such and are being administered pursuant to the Procedures for Complex Chapter 11 Cases in the Southern District of Texas.  *See* Order Granting Complex Chapter 11 Bankruptcy Treatment [Dkt. No. 66].

and the Ad Hoc Group, both of whom will be represented by investment bankers and financial advisors of their own choosing.

## II.     The Terms Of Ducera's Retention Are Reasonable And Satisfy The Requirements Of Section 328(a).

39.     Section 328(a) authorizes the Committee to employ a professional "on any reasonable terms and conditions of employment[.]"   11 U.S.C. § 328(a).   Such terms may include, among other things, a "fixed or percentage fee basis," or a "contingent fee basis."   *Id.*

40.     The Fifth Circuit has explained the rationale behind Section 328(a).   "Prior to [the enactment of the Bankruptcy Code], the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done."   *Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 123 F.3d 861, 862 (5th Cir. 1997).

41.     In order to retain "the most competent professionals … for complicated capital restructuring and the development of successful corporate reorganization," such professionals "must know what they will receive for their expertise and commitment."   *Nat'l Gypsum*, 123 F.3d at 862-63; *In re Relativity Fashion, LLC*, Case No. 15-11989, 2016 WL 8607005, at *3 (Bankr. S.D.N.Y. Dec. 16, 2016) ("In other words, Section 328(a) reflects the view that professionals are entitled to know what they are likely to be paid for their work.   If you agree to hire someone on a flat fee or percentage-fee basis, there should be some comfort that the compensation will be paid and that a court will not simply impose a new and different deal after all the work has been done.").

42.     It bears observing that Section 328(a) represents a "tradeoff" for the professional. The "certainty and predictability" of Section 328(a) comes at the cost of "flexibility."   *Asarco, L.L.C. v. Barclays Cap. (In re ASARCO, L.L.C.)*, 702 F.3d 250, 261 (5th Cir. 2012).

Professionals retained under Section 328(a) "would be underpaid if their engagements should require more work than they had initially expected." *Id.*

43.     Courts analyzing the terms of a proposed retention under Section 328(a) typically consider the following factors:

(i)     Do the proposed terms reflect the marketplace for these types of services?

(ii)    Are the fees reasonable given the size and circumstances of the case?

(iii)   Did the parties engage in arms-length negotiations?

(iv)    Is the retention in the best interests of the estate?

(v)     Do creditors oppose the retention or the proposed fees?

*In re Frontier Commc'ns Corp.*, 623 B.R. 358, 363-64 (Bankr. S.D.N.Y. 2020); *see In re Energy Partners Ltd.*, 409 B.R. 211, 226 (Bankr. S.D. Tex. 2009).

44.     Some Courts have observed that the first factor—*i.e.*, whether the proposed terms reflect the marketplace of such services—is paramount, and, indeed, that "the other factors can be seen as indirect ways to establish whether the [engagement] is at market, or not." *Frontier Commc'ns*, 623 B.R. at 364. The terms of Ducera's retention easily satisfy the foregoing factors and the standard for Section 328(a) approval.

### A.     The Terms Of Ducera's Retention Are Market.

45.     The gravamen of the Objection is that Section 328(a) approval of the Committee's investment banker is not "reasonable." Of course, as noted in paragraph 72 *infra*, official committees routinely retain investment bankers pursuant to Section 328(a) in large and complex cases such as this. And, the structure of Ducera's compensation—a monthly fee plus a transaction fee—is standard in the market. *See In re Relativity Fashion, LLC*, 2016 WL 8607005, at *3 ("[I]t is common that an investment banker retention includes a provision for payment of monthly fees as well as transaction fees…. Transaction fees are not unique to

bankruptcy.  It has long been the practice of investment bankers to charge for their services in this exact same way outside of bankruptcy."); *Frontier Commc'ns*, 623 B.R. at 363 ("More recent decisions recognize that task-based, as opposed to hourly-based, compensation for investment bankers is a normal fee structure outside of bankruptcy cases, indeed that transaction fees have long been the market practice of investment bankers in non-bankruptcy settings as well as proposed in bankruptcy cases...").  It is, in fact, the same basic structure that the Court approved in connection with the Debtors' investment banker, and the same basic structure that the Ad Hoc Group agreed to with its banker.

46.     So, why would Section 328(a) approval not be reasonable for the Committee's investment banker here?  The Ad Hoc Group offers a smattering of rationales.  First, the Ad Hoc Group contends that "all parties are expeditiously moving towards negotiating a plan that will likely consensually equitize the Company's secured debt, but no disclosure statement exhibits or plan has yet been filed.  Therefore, any recovery to general unsecured creditors is speculative, at best."  AHG Obj. ¶ 14.  But, the fact that plan negotiations are moving forward "expeditiously" underscores the importance of the Committee retaining a competent banker promptly so that it may be properly advised in connection with plan negotiations.  And, the Ad Hoc Group's assertion that unsecured creditor recoveries are too "speculative" to support Section 328(a) approval simply begs the question.  The impetus for Ducera's retention is to assist the Committee in ascertaining the extent of unsecured creditors' value entitlement in this case.  The Ad Hoc Group's *ipse dixit* contentions that unsecured creditors are "out-of-the-money" cannot form legitimate grounds for limiting or conditioning the terms of the Committee's professional retentions.  *See, e.g., In re Fed. Mogul-Global, Inc.*, 348 F.3d 390, 406 (3d Cir. 2003) (vacating bankruptcy court order imposing cap on compensation of equity committee's financial advisor;

imposition of cap predicated in part on unsupported arguments that the debtors "were probably insolvent," which did "not supply a sufficient basis for the imposition of the fee cap").  If anything, the uncertain outcome in these cases militates in favor of the Committee's retention of Ducera.  *See, e.g., In re Southland Royalty Co., LLC,* No. 20-10158 (KBO) (Bankr. D. Del. May 8, 2020), (approving committee retentions of both investment banker and financial advisor as proper exercise of fiduciary duty given, among other things, "uncertainty" about case conclusion and fiduciary obligations of committee);[13] Order Authorizing the Official Committee of Unsecured Creditors to Retain and Employ Jefferies LLC as Investment Banker Pursuant to 11 U.S.C. §§ 328(a) and 1103(a), *nunc pro tunc* to March 30, 2018, *In re iHeartMedia, Inc.*, No. 18-31274 (Bankr. S.D. Tex. May 30, 2018), Dkt. No. 864 (approving committee investment banker retention after initial objection by secured lenders).

47.     Next, the Ad Hoc Group asserts that the Committee's need for Ducera's valuation services is "months away."  AHG Obj. ¶ 15.  This is frankly disingenuous.  In one breath, the Ad Hoc Group contends that "all parties" are quickly advancing plan negotiations—an exercise that requires the active participation of a properly-advised Committee.  In the next, the Ad Hoc Group dismisses the Committee's need for valuation advice as "months away."  It is also plainly wrong.  The plan process compelled under the DIP milestones requires entry of a disclosure statement order in a little over a month and entry of a confirmation order in September.  *See* DIP Credit Agreement § 6.21(h)-(j) (as amended).  The Committee requires Ducera's assistance now.

48.     Next, the Ad Hoc Group laments that Ducera's Restructuring Fee is not contingent on any "benchmark" recovery to unsecured creditors; rather, it is earned upon consummation of a Chapter 11 plan or other transaction.  AHG Obj. ¶ 16.  The Ad Hoc Group

---

[13]   Now Chief Bankruptcy Judge Owens's May 8, 2020 bench ruling is excerpted and attached hereto as **Exhibit D**.

appears to suggest that Ducera's Restructuring Fee should be contingent on obtaining a specified outcome for unsecured creditors in this case. This suggestion is wholly without merit.

49. First, the structure of the Restructuring Fee (*i.e.*, vesting upon consummation of a transaction, without any threshold) is standard in the market. *See In re Relativity Fashion, LLC*, 2016 WL 8607005, at *3 ("Investment bankers' main compensation is through transaction fees. Those fees usually are contingent on the consummation of a transaction so that they are not paid if a transaction does not occur. But apart from that condition, they often have no other requirements. They often merely require that the transaction occur with no other conditions whatsoever."); s*ee also* Order Authorizing the Official Committee of Unsecured Creditors of Yellow Corporation, *et al.* to Retain and Employ Miller Buckfire as Investment Banker, *nunc pro tunc* to August 21, 2023, *In re Yellow Corporation*, No. 23-11069 (CTG) (Bankr. D. Del. Oct. 4, 2023), Dkt. No. 764 (order approving $3.75 million transaction fee for investment banker upon transaction consummation); Order Pursuant to 11 U.S.C. §§ 328(a) and 1103, Fed. R. Bankr. P. 2014 and 5002, and Local Rules 2014-1 and 2016-2 Authorizing Retention and Employment of Houlihan Lokey Capital, Inc. as Investment Banker to the Official Committee of Unsecured Creditors *nunc pro tunc* to May 31, 2023, *In re Kidde-Fenwal, Inc*., No. 23-10638 (LSS) (Bankr. D. Del. Aug. 22, 2023), Dkt. No. 363 (order approving $4 million deferred fee payable upon confirmation of structuring plan or liquidation); Order Authorizing the Retention and Employment of Perella Weinberg Partners LP as Investment Banker to the Official Committee of Unsecured Creditors, *In re Cineworld Group PLC*, No 22-90168 (MI) (Bankr. S.D. Tex. Oct. 28, 2022), Dkt. Nos. 661, 1045 (order approving a $6.25 million deferred fee payable upon achievement of transaction).

50.     Second, the materially higher transactions fees payable to the Debtors' and Ad Hoc Group's investment bankers are earned in substantially the same manner—*i.e.*, upon consummation of a transaction, without benchmarks or thresholds.  PJT Retention Application ¶ 17(c).

51.     Finally, Ducera's industry-standard fee structure ensures that Ducera's analysis, advice, and testimony will be free from perceived conflicts that could potentially undermine its credibility and effectiveness.  *See, e.g.*, *In re Oneida Ltd.*, 351 B.R. 79, 92 (Bankr. S.D.N.Y. 2006) (finding a witness's expert testimony was "seriously undermine[d]" by the fact that the witness's firm had been hired by the equity committee with a success fee of 1% of any equity recovery); *In re Granite Broad. Corp.,* 369 B.R. 120, 142 (Bankr. S.D.N.Y. 2007) (expert's testimony "was seriously undermined by the fact that his compensation from the Preferred Holders is contingent on the total consideration to be received by the Preferred Holders under a confirmed plan").

## B.     <u>Ducera's Compensation Is Reasonable</u>.

52.     The Ad Hoc Group does not seriously contend that Ducera's $175,000 Monthly Fee, or $3 million Restructuring Fee, are off-market or economically unreasonable.  Instead, the Ad Hoc Group asserts that the proposed compensation is supported only by "conclusory statements" about its reasonableness in comparison to the market.  AHG Obj. ¶ 18.

53.     The Ad Hoc Group cannot credibly argue that the economic terms of Ducera's retention are unreasonable.  As shown in the Market Comparison annexed hereto, both the Monthly Fee and the Restructuring Fee are well within market norms for cases of this size—for both committee investment bankers generally, and Ducera-led committee assignments specifically.  Indeed, the Restructuring Fee falls within the lower range of transaction fees.

54.     The selection process undertaken by the Committee in selecting Ducera confirms this conclusion.  As discussed below, the Committee interviewed three investment banking firms and Ducera's compensation structure was at the low end of that cohort (materially lower than one firm's proposal, and substantially comparable to another one's proposal).

55.     Reviewing the fees sought by the Debtors' and Evercore's investment bankers provides further evidence as to the reasonableness of Ducera's fees.  PJT will earn the same monthly fee (albeit with less generous crediting), and a restructuring fee ($12 million) that is **4 times** Ducera's fee ($3 million); Evercore's transaction fee is ██ larger ██████).

56.     The Ad Hoc Group's reliance on *In re Frontier Commc'ns Corp.*, 623 B.R. 358 (Bankr. S.D.N.Y. 2020) and *In re UDC Homes, Inc.*, 203 B.R. 218 (Bankr. D. Del. 1996) is misplaced.  In the $17.5 billion restructuring of Frontier, Judge Drain reviewed the available market data and, based on such market evidence, approved approximately $48.2 million in aggregate fees to Evercore, including: (i) upholding a $22 million sale fee, (ii) modifying an $8.9 million financing fee, and (iii) reducing a restructuring fee to $24.5 million (from the requested $28 million) to be more consistent with comparable cases.  *Frontier Commc'ns*, 623 B.R. at 368-71 (modifying restructuring fee from 0.16% of prepetition debt to 0.14% of prepetition debt based on market comparisons).  Here, in contrast, there is no separate sale or financing fee, and the Restructuring Fee, reflecting approximately 0.14% of prepetition debt, is well below market norms for committee bankers in similarly-sized cases.  *See* **Exhibit B**, Market Comparison.

57.     In *UDC Homes* (which, it bears noting, did not involve a Section 328(a) analysis), the court approved a restructuring fee for the debtor's investment banker based on market evidence of the reasonableness of such fee (*i.e.*, it was "consistent with the industry average over the past five years"), but modified the compensation for the equity committee's financial advisor

due to the lack of supporting market data regarding the reasonableness of the fees and the court's determination that the advisor's work did not materially benefit the estate in the context of the pre-planned bankruptcy case, where the debtor entered bankruptcy with an executed transaction with the plan sponsor. *UDC Homes, Inc.*, 203 B.R. at 223-25.

### C.      The Parties Engaged In Arm's Length Negotiations.

58.      The Ad Hoc Group asserts that the Ducera Application lacks "adequate detail surrounding how Ducera was selected, and whether the engagement was a result of a rigorous process and an arm's length negotiation." AHG Obj. ¶ 18. As set forth above and as will be shown at trial, the Committee undertook a competitive process for the selection of an investment banker. The Committee interviewed three separate investment banking firms, and another banker working jointly with a financial advisor. After obtaining material concessions from Ducera on its compensation (*e.g.*, significantly reduced transaction fee, crediting of monthly fees) and due deliberation, the Committee determined that Ducera—with its unique qualifications, substantial experience in both restructuring and the pertinent chemical industrial space, and market compensation proposal—represented the best choice for investment banker.

### D.      Ducera's Retention Is In The Best Interests Of The Estate.

59.      Ducera's retention is in the best interests of the estates. First, it will ensure that the Committee is able to adequately represent the interests of unsecured creditors throughout the cases, including in connection with the current plan process and near-term plan confirmation hearing, and maximize unsecured creditor recoveries. Second, it will enable the Committee to satisfy its fiduciary duties to unsecured creditors under the Bankruptcy Code. The Committee is the only estate fiduciary with fiduciary duties owing only to unsecured creditors, and it is critical that it be enabled to satisfy such duties. Finally, it will ensure the integrity of the bankruptcy

process.  Bankruptcy requires an adversary process of "checks and balances" to function properly.  These cases require an effective fiduciary counterweight to the Debtors and Ad Hoc Group.  The Court and all parties-in-interest benefit when the bankruptcy process contains the standard "checks and balances," thereby ensuring process integrity.  *See, e.g., In re Oneida Ltd.*, No. 06-10489, 2006 WL 1288576, at *3 (Bankr. S.D.N.Y. May 4, 2006) (observing that all parties in interest and the public interest would benefit from proper estate fiduciary providing appropriate "checks and balances" in case).

### E. No Unsecured Creditors Oppose Ducera's Retention; The Lone Objection By The Ad Hoc Group Should Be Overruled.

60.   No unsecured creditor objected to the Committee's retention of Ducera.  The Debtors did not object.  The U.S. Trustee did not object.[14]  Only one party objected—the Ad Hoc Group.  And, for the reasons described above, that objection is meritless.

61.   The Ad Hoc Group's suggestion that approval of Ducera's retention be conditioned on "oversight" by the Ad Hoc Group finds no support in the statute or applicable jurisprudence.  AHG Obj. ¶ 4.  Rather, bankruptcy jurisprudence has a long history of cautioning against such lender overreach.  See *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (secured lenders cannot "run[] roughshod over numerous sections of the Bankruptcy Code" and "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit"); *In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) ("[B]ankruptcy courts do not allow terms in financing arrangements which convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender.").

---

[14]   The U.S. Trustee provided informal comments on the form of order approving Ducera's retention, which have been consensually resolved.

62.     The Ad Hoc Group questions whether Ducera's retention should be approved effective to May 9, 2025.  AHG Obj. ¶¶ 15, 18.  Promptly upon selection in early May, Ducera commenced work on this matter, expending considerable time and resources.  Ducera's work thus far has consisted of, among other things: (i) advising the Committee on the reasonableness of the economic terms and plan milestones associated with the DIP financing; (ii) analyzing the Debtors' investment banker fees relative to market comparables; (iii) working in conjunction with AlixPartners to analyze preliminary iterations of the Debtors' business plan from a valuation standpoint; (iv) testing the viability of the business plan through financial modeling and scenario analysis; (v) preparing preliminary analyses with respect to determining a range of enterprise values for the Debtors; (vi) continuing to provide the Committee with financial advice and assistance in connection with the case; and (vii) regularly coordinating with Committee advisors on case strategy from a financial and valuation perspective.

63.     The Ad Hoc Group objects to the tail provision under the Ducera engagement agreement.  AHG Obj. ¶ 17.  However, this is another standard term in the industry, is routinely approved in bankruptcy, and is substantially similar to provisions contained in both the PJT and Evercore engagement agreements.

64.     The case law cited by the Ad Hoc Group respecting Section 328(a) approval is easily distinguishable.  In *Energy Partners*, the court denied Section 328(a) approval for both the creditors' committee and the equity committee's investment banker, finding that there was no market evidence supporting the terms of the retention (in fact, the debtor's investment banker was charging substantially *less* for the same services), no evidence of arm's length negotiations, and no evidence of cognizable benefit to the estate, particularly given that: (i) the committee had already publicly indicated an intent to support the debtor's proposed plan and valuation; and (ii)

another equity holder had already conducted a valuation of the debtors that would inure to the benefit of equity holders.  *See* 409 B.R. at 226-30.

65.    Similarly, in *In re High Voltage Eng'g Corp.*, the court declined Section 328(a) approval of the debtor's investment banker based on the absence of any evidence respecting, among other things: (i) the scope of the services to be performed, (ii) prevailing industry fees for comparable engagements, and (iii) the selection process for the banker.  *See* 311 B.R. 320, 335 (Bankr. D. Mass. 2004).

66.    None of these factors exist here.  As will be shown at trial, there is ample evidence as to the services Ducera will be providing, the market for comparable services, and the arm's length negotiations supporting the Committee's decision to retain Ducera.  Further, unlike in *Energy Partners*, there is no alternative analysis of the company's enterprise value that will serve to counterbalance or test the Debtor's and Ad Hoc Group's valuation thesis.

67.    The other cases cited by the Ad Hoc Group do not support its objection.  In *In re Insilco Tech.*, Judge Carey approved "evergreen retainers" under Section 328(a) because, among other things, they were "common in the market place" and there was no genuine dispute that the retention terms were negotiated in good faith and at arm's length.  *See* 291 B.R. 628, 634-36 (Bankr. D. Del. 2003).

68.    *In re Thermadyne Holdings Corp.* involved the narrow question of whether a particular indemnification and exculpation provision that the U.S. Trustee objected to was reasonable under Section 328(a).  *See* 283 B.R. 749, 752-54 (B.AP. 8th Cir. 2002).  The standard investment banking fees in that case (a monthly fee plus transaction fee) had been approved and were not the subject of the appeal.  *See id.*

69.     In *In re Computer Learning Ctrs., Inc.*, the court denied a Chapter 7 trustee's request to employ a sixth law firm as special counsel for insurance matters because the Chapter 7 trustee neither explained why the law firm was needed, nor defined the services to be provided. *See* 272 B.R. 897, 903 (Bankr. E.D. Va. 2001).

70.     The Ad Hoc Group's reference to the consensual arrangement that Ducera agreed to pre-petition in a previous and separate bankruptcy proceeding is of no moment.  *See, e.g.*, Order Authorizing the Employment and Retention of Ducera Partners LLC and Johnson Rice & Company, L.L.C. as Investment Bankers to the Debtors, Effective as of the Petition Date, *In re Superior Energy Servs., Inc.*, No. 20-35812 (DRJ) (Bankr. S.D. Tex. Feb. 2, 2021), Dkt. No. 316. There, the debtors sought to retain two investment bankers (plus a separate financial advisor), and there was a pre-prepetition consensual agreement with the secured lenders to enable Section 330 review rights.  The bankruptcy court did not impose this relief or in any way set a "standard" for investment banker compensation.

71.     Finally, the Ad Hoc Group's request that the Court include language in Ducera's retention order excluding certain fees should be overruled.  AHG Obj. ¶ 22.  Fee objection matters are not properly before the court and should be reserved for the appropriate time (*i.e.*, after a fee request has been submitted).  Further, the cases cited by the Ad Hoc Group are inapposite.  They address whether fees incurred by professionals in connection with defending their own fee applications are compensable.  *See Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 122 (2015); *In re Boomerang Tube, Inc.*, 548 B.R. 69, 75 (Bankr. D. Del. 2016).  That issue is not before the Court.  Rather, the issue before the Court is the Committee's application to retain Ducera.  Moreover, in response to informal comments received from the U.S. Trustee, Ducera has agreed to add the following language requested by the U.S. Trustee to its retention

order:   "[A]bsent further order of the Court, Ducera shall not seek reimbursement from the Debtors' estates for any fees or expenses incurred in defending any of Ducera's fee applications in these chapter 11 cases."

### III.    Ducera's Retention As Investment Banker Is Not Duplicative Of Other Committee Professionals.

72.    The Ad Hoc Group professes concern about the potential duplication of effort between Ducera and AlixPartners, asserting that, although not "unheard of," it is purportedly "less common" for committees to retain both a financial advisor and an investment banker. AHG Obj ¶ 20.  In fact, official creditors' committees routinely retain both an investment banker and separate financial advisor, particularly in cases of this size and complexity.  Recent examples include:  *In re Northvolt AB*, Case No. 24-90577 (Bankr. S.D. Tex.); *In re Nikola Corp.*, Case No. 25-10258 (Bankr. D. Del.); *In re AIO US, Inc. (Avon Prods.)*, Case No. 24-11836 (Bankr. D. Del.); *In re Enviva Inc.*, Case No. 24-10453 (Bankr. E.D. Va.); *In re Franchise Grp., Inc.*, Case No. 24-12480 (Bankr. D. Del.); *In re Invitae Corp.*, Case No. 24-11362 (Bankr. D.N.J.); *In re Amyris, Inc.*, Case No. 23-11131 (Bankr. D. Del.); *In re Genesis Glob. Holdco, LLC*, Case No. 23-10063 (Bankr. S.D.N.Y.); *In re Yellow Corporation*, Case No. 23-11069 (Bankr. D. Del.); and *In re SAS AB*, Case No. 22-10925 (Bankr. S.D.N.Y.).

73.    The Ad Hoc Group suggests that a committee's engagement of both an investment banker and financial advisor would be appropriate if "each [professional] has a meaningful and distinct role within a case."  AHG Obj ¶ 20.  Putting aside whether this is an appropriate legal standard, it is nevertheless plainly satisfied here.  The Ducera and AlixPartners applications provide a clear demarcation of services and responsibilities among the firms. Those distinct services are outlined in paragraphs 28 through 30, *supra*.

74.     Further, consistent with commitments in both the Ducera (Dkt. No. 426, ¶ 16) and AlixPartners retention applications (Dkt. No. 424, ¶ 16), the Committee, its counsel, Ducera, and AlixPartners have worked closely to further refine and formalize a carefully structured delineation of workflows, which is detailed in paragraph 28, *supra*.  This delineation is designed to enable Ducera and AlixPartners to complement, not duplicate, their respective efforts for the benefit of the Committee, and maximize the value of the unique experience and qualifications that each firm brings to bear.

75.     The jurisprudence cited by the Ad Hoc Group is easily distinguishable because here, unlike there, Ducera and AlixPartners are providing distinct and precisely contoured services.  *See, e.g.*, *In re Wang Laboratories Inc*., 143 B.R. 794 (Bankr. D. Mass. 1992) (denying retention of financial consultant where previously retained counsel and financial advisor were already providing the same services).

76.     The Ad Hoc Group contends that AlixPartners can simply provide the Committee with Ducera's services; therefore, there is no need to retain Ducera.  AHG Obj. ¶ 20.  First, whether AlixPartners can provide investment banking services is a red herring.  It is irrelevant to whether the Committee's decision to retain Ducera, based on Ducera's experience and qualifications, is reasonable and whether the proposed retention terms satisfy Section 328(a).

77.     Second, the Committee, in an exercise of its business judgment, determined that the services of both Ducera and AlixPartners—and the unique expertise and qualifications that each firm brings to bear on their particular mandates—would materially benefit the Committee in satisfying its fiduciary duties.  Adequate measures have been taken to ensure that the engagements are complementary, efficient, and non-duplicative.

78.     Third, the Ad Hoc Group ignores the practical reality that, if the Committee were to seek investment banking services from AlixPartners, then such services—which are not contemplated under AlixPartners' current engagement—would require additional compensation, presumptively at market rates for such services—*i.e.*, not materially better than Ducera's terms.

79.     Finally, the Ad Hoc Group asserts that "any potential, nonduplicative work for an investment banker, if any at all, is still months away."  AHG Obj. ¶ 21.  As noted above, this argument is factually wrong and pretextual.  The Debtors and Ad Hoc Group are hurtling towards a plan confirmation hearing, and the Committee must be prepared to protect, advance, and maximize unsecured creditor interests and recoveries in connection with the process.  That work has already commenced and will continue in the ensuing weeks and months.

[*Remainder of page intentionally left blank.*]

## CONCLUSION

**WHEREFORE**, the Committee requests that the Court: (i) overrule the Objection, (ii) grant the relief sought under the Ducera Application, and (iii) grant to the Committee any other appropriate relief.

Dated: July 11, 2025
Houston, Texas

**PARKINS & RUBIO LLP**

*/s/ Charles M. Rubio*
Lenard M. Parkins (TX Bar No. 15518200)
Charles M. Rubio (TX Bar No. 24083768)
Asiya T. Khan (TX Bar No. 24139763)
708 Main Street, 10th Floor
Houston, TX 77002
Telephone: (713) 715-1660
Facsimile: (713) 715-1699
Email: lparkins@parkinsrubio.com
         crubio@parkinsrubio.com
         akhan@parkinsrubio.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark (admitted pro hac vice)
Jeffrey L. Jonas (admitted pro hac vice)
Bennett S. Silverberg (admitted pro hac vice)
Kenneth J. Aulet (admitted pro hac vice)
Seven Times Square, 47th Floor
New York, NY 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
         jjonas@brownrudnick.com
         bsilverberg@brownrudnick.com
         kaulet@brownrudnick.com

*Co-Counsel for the*
*Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2025, a true and correct copy of the Reply in support of the *Application of the Official Committee of Unsecured Creditors of Ascend Performance Materials Holdings Inc., et al., for Entry of an Order (I) Authorizing the Retention and Employment of Ducera Partners LLC as Investment Banker Effective as of May 9, 2025, and (II) Granting Related Relief* was served on all parties registered to receive electronic notice of filings in this case through the Court's CM/ECF system and on the following parties by email:

<u>Counsel to the Ad Hoc Group</u>:
tom@howley-law.com
eric@howley-law.com
AGains@gibsondunn.com

<u>Office of the United States Trustee</u>:
jana.whitworth@usdoj.gov

<u>Counsel to the Debtors</u>:
cmarcus@kirkland.com
derek.hunter@kirkland.com
oliver.pare@kirkland.com
jason.cohen@bracewell.com

*/s/ Charles M. Rubio*