**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ASCEND PERFORMANCE MATERIALS HOLDINGS INC., *et al.*,[1] | ) ) ) | Case No. 25-90127 (CML) |
| Debtors. | ) ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MEMORANDUM OF LAW**
**IN SUPPORT OF CONFIRMATION OF THE THIRD**
**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ASCEND**
**PERFORMANCE MATERIALS HOLDINGS INC. AND ITS DEBTOR AFFILIATES**

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Ascend.  The location of Debtor Ascend Performance Materials Holdings Inc.'s principal place of business is 1010 Travis St., Suite 900, Houston, Texas 77002.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................2

PROCEDURAL BACKGROUND AND VOTING RESULTS ......................................4

I.      Procedural History of the Chapter 11 and Plan Filing..................................4

      A.      The Chapter 11 Filing. .....................................................................4

II.     Settlements and the Development of the Chapter 11 Plan..............................5

      A.      Negotiations and Settlements with Key Stakeholders. ............................5

      B.      The Solicitation and Voting Process.....................................................8

III.    Resolution of Confirmation Objections. .....................................................14

ARGUMENT.................................................................................................14

I.      The Revisions to the Plan Do Not Require Resolicitation and Should be Approved. .................................................................................................15

II.     The Debtors Complied with Applicable Notice Requirements and Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.............................17

III.    The Plan Satisfies Each Requirement for Confirmation.................................18

      A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1))....................................................18

            1.      The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ............................................18

            2.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code...........................................23

                  a.      Designation of Classes of Claims and Equity Interests (Section 1123(a)(1)).............................................23

                  b.      Specification of Unimpaired Classes (Section 1123(a)(2)). ..........23

                  c.      Treatment of Impaired Classes (Section 1123(a)(3))......................23

                  d.      Equal Treatment within Classes (Section 1123(a)(4))...................24

                  e.      Means for Implementation (Section 1123(a)(5)). ..........................24

                  f.      Issuance of Non-voting Securities (Section 1123(a)(6)). .............25

ii

**Page**

        g.      Directors and Officers (Section 1123(a)(7)). ...............................26

    3.      The Plan Complies with the Discretionary Provisions of
Section 1123(b) of the Bankruptcy Code....................................................26

    4.      The Plan Complies with Section 1123(d) of the Bankruptcy
Code. ...........................................................................................................28

B.     The Debtors Complied with the Applicable Provisions of the
Bankruptcy Code (Section 1129(a)(2))....................................................................29

    1.      The Debtors Complied with Section 1125 of the
Bankruptcy Code. .......................................................................................30

    2.      The Debtors Complied with Section 1126 of the
Bankruptcy Code. .......................................................................................31

C.     The Plan Was Proposed in Good Faith and Not by Any Means
Forbidden by Law (Section 1129(a)(3)). .................................................................33

D.     The Plan Provides that the Debtors' Payment of Professional Fees
and Expenses Are Subject to Court Approval (Section 1129(a)(4)).........................34

E.     The Debtors Have Complied with the Bankruptcy Code's
Governance Disclosure Requirement (Section 1129(a)(5))......................................36

F.     The Plan Does Not Require Governmental Regulatory Approval
(Section 1129(a)(6))..................................................................................................37

G.     The Plan Is in the Best Interests of All the Debtors' Creditors
(Section 1129(a)(7))..................................................................................................38

H.     The Plan Is Confirmable Notwithstanding the Requirements of
Section 1129(a)(8) of the Bankruptcy Code. ...........................................................39

I.      The Plan Provides for Payment in Full of All Allowed Priority
Claims (Section 1129(a)(9)). ...................................................................................40

J.      At Least One Class of Impaired, Non-Insider Claims Accepted the
Plan (Section 1129(a)(10)).......................................................................................41

K.     The Plan Is Feasible (Section 1129(a)(11)). ............................................................42

L.     All Statutory Fees Have Been or Will Be Paid
(Section 1129(a)(12))................................................................................................44

M.    All Retiree Benefits Will Continue Post-Confirmation
(Section 1129(a)(13)).................................................................................................44

iii

**Page**

N.      Sections 1129(a)(14) Through 1129(a)(16) Do Not Apply to the
        Plan. ............................................................................................................45

O.      The Plan Satisfies the "Cram Down" Requirements of
        Section 1129(b) of the Bankruptcy Code..................................................45

        1.      The Plan Is Fair and Equitable (Sections 1129(b)(2)(B)(ii)
                and (C)(ii)). ...................................................................................46

        2.      The Plan Does Not Unfairly Discriminate with Respect to
                the Impaired Classes that Have Not Voted to Accept the
                Plan (Section 1129(b)(1)). .............................................................47

P.      The Plan Complies with the Other Provisions of Section 1129 of
        the Bankruptcy Code (Sections 1129(c)–(e)). ..........................................49

V.      The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and
        Comply with the Bankruptcy Code..................................................................50

A.      The Plan Appropriately Incorporates the Committee Settlement ..........................51

B.      The Debtor Release Is Appropriate and Complies with the
        Bankruptcy Code. ....................................................................................53

C.      The Third-Party Release Is Appropriate and Complies with the
        Bankruptcy Code. ....................................................................................59

        1.      The Third-Party Release Should be Approved and the U.S.
                Trustee's Objection With Respect Thereto Should be
                Overruled .......................................................................................65

D.      The Exculpation Provision Is Appropriate and Complies with the
        Bankruptcy Code. ....................................................................................68

E.      The Injunction Provision Is Appropriate and Complies with the
        Bankruptcy Code .....................................................................................71

        1.      The Injunction Provision Should be Approved and the U.S.
                Trustee's Objection With Respect Thereto Should Be
                Overruled. ......................................................................................72

VI.     Good Cause Exists to Waive the Stay of the Confirmation Order. ...................................74

A.      Waiver of the 3020(e) Stay is Appropriate and the U.S. Trustee's
        Objection With Respect Thereto Should Be Overruled..........................................75

**Page**

VII.     The Remaining Objections Should be Overruled. ..............................................................76

CONCLUSION...................................................................................................................................76

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair Co.)*,
   203 F.3d 914 (5th Cir. 2000) ...................................................................................59

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.)*,
   701 F.2d 1071 (2d Cir. 1983)....................................................................................34

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)...........................................................................................38, 46

*Berkeley Fed. Bank & Tr. v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*,
   195 B.R. 294 (D.N.J. 1996) ......................................................................................42

*Commodity Futures Trading Comm'n v. Weintraub*,
   471 U.S. 343 (1985)..................................................................................................70

*DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
   634 F.3d 79 (2d Cir. 2011).......................................................................................47

*FOM Puerto Rico, S.E. v. Dr. Barnes Eyecenter, Inc.*,
   255 Fed. App'x 909 (5th Cir. 2007) .........................................................................59

*Harrington v. Purdue Pharma, L.P.*,
   603 U.S. 204 (2024) ......................................................................................60, 61, 67

*Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*,
   994 F.2d 1160 (5th Cir. 1993) ............................................................................19, 21

*Hernandez v. Larry Miller Roofing, Inc.*,
   628 Fed. App'x 281 (5th Cir. 2016); ........................................................................59

*Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt. L.P. (In re Highland Cap. Mgmt, L.P.)*,
   132 F.4th 353 (5th Cir. 2025) ........................................................................72, 73, 74

*In re 203 N. LaSalle St. Ltd. P'ship*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *203 N. LaSalle*,
   526 U.S. 434 (1999).................................................................................................48

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007)......................................................................38

**Page(s)**

*In re Aegerion Pharm., Inc.*,
   605 B.R. 22 (Bankr. S.D.N.Y. 2019) ...............................................................................21, 49

*In re Age Ref. Inc.*,
   801 F.3d 530 (5th Cir. 2015) .................................................................................................52

*In re A.H. Robins Co.*,
   88 B.R. 742 (Bankr. E.D. Va. 1988) *aff'd*, 880 F.2d 694 (4th Cir. 1989) ..............................15

*In re Aleris Int'l, Inc.*,
   No. 09-10478 2010 WL 3492664 (Bankr. D. Del. May 13, 2010).........................................48

*In re Altera Infrastructure L.P.*
   No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) ......................................................63, 73

*In re Am. Solar King Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988)....................................................................................16

*In re Ameriforge Grp., Inc.*,
   No. 17-32660 (Bankr. S.D. Tex. May 24, 2017) ....................................................................60

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006)..............................................................................................14, 48

*In re Armstrong World Indus., Inc.*,
   432 F.3d 507 (3d Cir. 2005)....................................................................................................47

*In re AWECO, Inc.*,
   725 F.2d 293 (5th Cir. 1984) ..................................................................................................51

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................................................48

*In re Bashas' Inc.*,
   437 B.R. 874, 904 (Bankr. D. Ariz. 2010) .............................................................................49

*In re Bernhard Steiner Pianos USA, Inc.*,
   292 B.R. 109, 114 (Bankr. N.D. Tex. 2002) ..........................................................................21

*In re Bigler LP*,
   442 B.R. 537 (Bankr. S.D. Tex. 2010) ...................................................................................54

*In re Block Shim Dev. Company-Irving*,
   939 F.2d 289 (5th Cir. 1991) ..................................................................................................33

*In re Camp Arrowhead, Ltd.*,
   451 B.R. 678 (Bankr. W.D. Tex. 2011)..............................................................................65, 72

**Page(s)**

*In re Capmark Fin. Grp. Inc.*,
No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ...............................42

*In re CareMax, Inc.*,
No. 24-80093 (Bankr. N.D. Tex. Jan. 31, 2025) ....................................................................61

*In re Carlson Travel, Inc.*,
No. 21-90017 (MI) (Bankr. S.D. Tex. Nov. 12, 2021) ...........................................................63

*In re Century Glove*,
Nos. 90–400–SLR, 90–401–SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993)..................34, 38

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986)......................................................................................35

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ....................................................................................21

*In re CJ Holding Co.*,
597 B.R. 597 (S.D. Tex. 2019) ...............................................................................................72

*In re Container Store Grp., Inc.*,
No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 28, 2025).................................................. *passim*

*In re Container Store Grp., Inc.*,
No. 24-90627 (ARP) (Bankr. S.D. Tex. Apr. 7, 2025)......................................................66, 73

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D.N.Y. 2009) ....................................................................................15

*In re Diamond Sports Grp. LLC*,
No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024) .......................................................61

*In re Diamond Sports Grp. LLC*,
No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 18, 2024) .......................................................67

*In re Dig. Media Sols., Inc.*,
No. 24-90468 (ARP) (Bankr. S.D. Tex. Jan. 15, 2025)..........................................................73

*In re Dow Corning Corp.*,
237 B.R. 374 (Bankr. E.D. Mich. 1999)..................................................................................15

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 714, (Bankr. S.D.N.Y. 1992) ...................................................................................21

*In re DRF Logistics, LLC*,
No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) .......................................................67

**Page(s)**

*In re Energy & Expl. Partners, Inc.*,
No. 15 44931 (Bankr. N.D. Tex. Apr. 21, 2016) ...................................................60

*In re Envision Healthcare Corp.*,
No. 23-90342 (CML) (Bankr. S.D. Tex. Oct. 11, 2023) ........................................73

*In re Flintkote Co.*,
486 B.R. 99 (Bankr. D. Del. 2012) ......................................................................42

*In re Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995) ............................................................................51, 52

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ..............................................................48

*In re Gen. Homes Corp.*,
134 B.R. 853 (Bankr. S.D. Tex. 1991) .....................................................51, 54, 55

*In re Genon Energy*, Inc.,
No. 17-33695 (Bankr. S.D. Tex. Dec. 12, 2017) ..................................................63

*In re Greystone III Joint Venture*,
995 F.2d 1274 (5th Cir. 1991) ............................................................................21

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007)........................................................19, 21, 54

*In re Hornbeck Offshore Servs., Inc.*,
No. 20-32679 (Bankr. S.D. Tex. June 19, 2020) ..................................................60

*In re Hous. Reg'l Sports Network, L.P.*
505 B.R. 468 (Bankr. S.D. Tex. 2014) ................................................................70

*In re Idearc Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009)..................................................................48

*In re Indep. Cont. Drilling, Inc.*,
No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025)...........................................72

*In re Intrum AB*,
No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024)........................................67

*In re Invacare Corp.*,
No. 23-90068 (CML) (Bankr. S.D. Tex. May 18, 2023)........................................73

*In re Ion Media Networks, Inc.*,
419 B.R. 585 (Bankr. S.D.N.Y. 2009)..................................................................46

**Page(s)**

*In re Jackson Brewing Co.*,
    624 F.2d 599 (5th Cir. 1980) ...............................................................................51, 52

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ........................................................................48

*In re KidKraft, Inc.*,
    No. 24-80045 (Bankr. N.D. Tex. June 24, 2024) ....................................................61

*In re Lack's Stores, Inc.*,
    No. 10-60149, 2012 WL 2375825 (Bankr. S.D. Tex. June 21, 2012) ....................15

*In re Lakeside Glob. II, Ltd.*,
    116 B.R. 499 (Bankr. S.D. Tex. 1989) ...............................................................14, 42

*In re Landing Assocs.*,
    157 B.R. 791 (Bankr. W.D. Tex. 1993) ....................................................................36

*In re Lapworth*,
    No. 97-34529 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ...........................29

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003) ........................................................................48

*In re Lone Star Utils., LLC*,
    No. 13-34302-SGJ-11, 2014 WL 4629129 (Bankr. N.D. Tex. Sept. 15, 2014) ......14

*In re M & S Assocs. Ltd.*,
    138 B.R. 845 (Bankr. W.D. Tex. 1992) ....................................................................43

*In re MCorp Fin., Inc.*,
    160 B.R. 941 (Bankr. S.D. Tex. 1993) .....................................................................51

*In re Mirant Corp.*,
    348 B.R. 725 (Bankr. N.D. Tex. 2006)..........................................................41, 54, 55

*In re Mortg. Inv. Co. of El Paso, Tex.*,
    11 B.R. 604 (Bankr. W.D. Tex. 1990) ......................................................................49

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ........................................................................18

*In re Nuverra Env't Sols., Inc.*,
    590 B.R. 75 (Bankr. D. Del. 2018) ..........................................................................49

*In re Pac. Lumber Corp.*,
    584 F.3d 229 (5th Cir. 2009) .............................................................................61, 72

x

**Page(s)**

*In re Performance Nutrition, Inc.*,
239 B.R. 93 (Bankr. N.D. Tex. 1999)......................................................................70

*In re Pilgrim's Pride Corp.*,
No. 08-45664-DML-11, 2010 WL 200000 (Bankr. N.D. Tex. Jan. 14, 2010) ......................61

*In re Pipeline Health Sys., LLC*,
No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023) ......................................................63, 73

*In re Pisces Energy, LLC*,
No. 09-36591-H5-11, 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) ........................19

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ......................................................................42

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)......................................................................69

*In re Qualtek Servs. Inc.*,
No. 23-90584 (CML) (Bankr. S.D. Tex. June 30, 2023) ......................................................63, 73

*In re Robertshaw US Holding Corp.*,
662 B.R. 300 (Bankr. S.D. Tex. 2024) ..................................................49, 50, 61, 68

*In re Robertshaw US Holding Corp.*,
No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) ......................................................67

*In re Roqumore*,
393 B.R. 474 (Bankr. S.D. Tex. 2008) ......................................................................52

*In re S & W Enter.*,
37 B.R. 153 (Bankr. N.D. Ill. 1984) ......................................................................18

*In re Save our Spring (S.O.S.) All., Inc.*,
632 F.3d 168 (5th Cir. 2011) ......................................................................21

*In re Schepps Food Stores, Inc.*,
160 B.R. 792 (Bankr. S.D. Tex. 1993) ......................................................................70

*In re Sentinel Mgmt. Grp., Inc.*,
398 B.R. 281 (Bankr. N.D. Ill. 2008) ......................................................................16

*In re Sentry Operating Co. of Tex., Inc.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ..................................................15, 18, 49

*In re Southcross Holdings, LP*,
No. 16-20111 (MI) (Bankr. S.D. Tex. April 11, 2016)......................................................................60

**Page(s)**

*In re Sun Country Dev., Inc.*,
764 F.2d 406 (5th Cir. 1985) ...............................................................................33, 34

*In re Sunnova Energy Int'l Inc.*,
No. 25-90160 (ARP) (Bankr. S.D. Tex. 2025) ....................................................60, 73

*In re T-H New Orleans Ltd. P'ship*,
116 F.3d 790 (5th Cir. 1997) ...............................................................................34, 42

*In re Tex. Star Refreshments, LLC*,
494 B.R. 684 (Bankr. N.D. Tex.) ...............................................................................48

*In re Trib. Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) ..........................................................................42

*In re Union Cnty. Wholesale Tobacco & Candy Co.*,
8 B.R. 442 (Bankr. D.N.J. 1981) ...............................................................................30

*In re Venator Materials PLC*,
No. 23-90301 (Bankr. S.D. Tex. July 25, 2023) .......................................................73

*In re Vertex Energy*, *Inc.*,
No. 24-90507 (CML) (Bankr. S.D. Tex. Dec. 20, 2024)...........................................73

*In re Vitro Asset Corp.*,
No. 11-32600-HDH, 2013 WL 6044453 (Bankr. N.D. Tex. Nov. 14, 2013)...........19

*In re W. Tex. Mktg. Corp.*,
54 F.3d 1194 (5th Cir. 1995) .....................................................................................67

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012).................................................................................34, 42

*In re Wesco Aircraft Holdings, Inc.*,
No. 23-90611 (MI) (Bankr. S.D. Tex. Dec. 14, 2024)..............................................68

*In re Wesco Aircraft Holdings, Inc.*,
No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025)..................................................67

*In re Wool Growers*,
371 B.R. 768 (N.D. Tex. 2007)..................................................................................60

*In re WorldCom, Inc.*,
No. 02-13533 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .......................29

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
987 F.2d 154 (3d Cir. 1993)................................................................................19, 46

**Page(s)**

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)......................................................................................42

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'Ship (In re Ambanc La Mesa Ltd. P'ship)*,
    115 F.3d 650 (9th Cir. 1997) ....................................................................................46

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt, L.P. (In re Highland Cap. Mgmt. L.P.)*,
    48 F.4th 419 (5th Cir. 2022) ................................................................................69, 72

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984)..................................................................................................34

*Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*,
    119 F.3d 349 (5th Cir. 1997) ............................................................................ *passim*

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
    761 F.2d 1374 (9th Cir. 1985) ..................................................................................42

*Republic Supply Co. v. Shoaf*,
    815 F.2d 1046 (5th Cir. 1987) ............................................................................59, 60

*Stern v. Marshall*,
    564 U.S. 462 (2011)..................................................................................................72

**Page(s)**

**Statutes**

11 U.S.C. § 101(51D)(B) ................................................................................................50

11 U.S.C. § 157(b)(2)(L) ...............................................................................................69

11 U.S.C. § 328(a) .........................................................................................................35

11 U.S.C. § 330(a)(1)(A) ...............................................................................................35

11 U.S.C. § 365 ........................................................................................................27, 29

11 U.S.C. § 365(f) ..........................................................................................................74

11 U.S.C. § 503(b) .........................................................................................................39

11 U.S.C. § 507(a) .............................................................................................23, 40, 44

11 U.S.C. § 1114 ............................................................................................................44

11 U.S.C. § 1122 ................................................................................................15, 18, 19

11 U.S.C. § 1122(a) ............................................................................................18, 21, 22

11 U.S.C. § 1123 ..................................................................................................... *passim*

11 U.S.C. § 1123(a) ................................................................................................. *passim*

11 U.S.C. § 1123(b) ................................................................................................. *passim*

11 U.S.C. § 1123(d) .......................................................................................................28

11 U.S.C. § 1125 ..................................................................................................... *passim*

11 U.S.C. § 1125(e) .......................................................................................................17

11 U.S.C. § 1126 ......................................................................................................29, 31

11 U.S.C. § 1126(a) .......................................................................................................32

11 U.S.C. § 1126(c) ..................................................................................................32, 33

11 U.S.C. § 1126(d) .......................................................................................................32

11 U.S.C. § 1126(f) .............................................................................................10, 31, 32

11 U.S.C. § 1126(g) ..................................................................................................10, 32

11 U.S.C. § 1127(a) .......................................................................................................15

**Page(s)**

11 U.S.C. § 1129(a) ............................................................................................... *passim*

11 U.S.C. § 1129(b) ............................................................................................... *passim*

11 U.S.C. § 1129(c) ...........................................................................................................49

11 U.S.C. § 1129(d) ..........................................................................................................50

11 U.S.C. § 1129(e) ..........................................................................................................50

28 U.S.C. § 157(b)(2) .......................................................................................................72

28 U.S.C. § 1334 ..............................................................................................................72

**Rules**

Fed. R. Bankr. P. 3019(a) .................................................................................................14

Fed. R. Bankr. P. 3020(e) ...........................................................................................74, 75

**Other Authorities**

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) ....................................18, 29

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C. C.A.N. 5787 (1978)........................................18, 29

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of confirmation of the *Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1157] (as modified, amended, or supplemented from time to time, the "Plan") pursuant to sections 1125, 1126, and 1129, respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").[2]   In further support of confirmation of the Plan, contemporaneously herewith, the Debtors have filed:  (i) the *Declaration of Emily Young, on Behalf of Epiq Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1189], (the "Voting Report"); (ii) the *Declaration of Robert Del Genio, Chief Restructuring Officer, in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1185] (the "Del Genio Declaration"); (iii) the *Declaration of Matthew O'Connell in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1187] (the "PJT Declaration"); (iv) the *Declaration of David Rush, Debtors' Associate Chief Restructuring Officer and Senior Managing Director of FTI Consulting, Inc., in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket

---

[2]   Capitalized terms used but not defined in this Memorandum shall have the meanings ascribed to such terms in the Plan, the Disclosure Statement, the Del Genio Declaration, the PJT Declaration, the FTI Declaration, the Piper Declaration, or the Voting Report, as applicable.

A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases (the "Chapter 11 Cases") are set forth in greater detail in the *Declaration of Robert Del Genio, Chief Restructuring Officer of Each of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 24].

No. 1186] (the "FTI Declaration"); and (v) the *Declaration of Charles T. Piper in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1188] (the "Piper Declaration").

The Debtors received five formal objections and numerous informal objections to confirmation of the Plan (each, an "Objection" and, collectively, the "Objections").[3] Since December 3, 2025, (the "Confirmation Objection Deadline"), the Debtors have worked extensively with parties in interest to resolve all Objections. As of the filing of this Memorandum, nearly all informal Objections have been resolved, three formal Objections have been resolved, and two formal Objections remain outstanding, including the objection filed by the United States Trustee for the Southern District of Texas (the "U.S. Trustee" and the objection, the "U.S. Trustee Objection") [Docket No. 1147]. The Debtors will continue to work to resolve the remaining Objections through agreed language in the Plan or Confirmation Order or otherwise prior to the Confirmation Hearing. As explained in detail herein, to the extent not resolved prior to the Confirmation Hearing, the Bankruptcy Court should overrule these Objections and confirm the Plan to bring the Chapter 11 Cases to a conclusion. In support of confirmation of the Plan and in response to the Objections thereto, the Debtors respectfully state as follows.

**PRELIMINARY STATEMENT**

1.      The Plan is a remarkable achievement and should be confirmed. In addition to satisfying the applicable standards under the Bankruptcy Code, the Plan embodies a

---

[3]    The Debtors also received seven objections to proposed cure amounts, all of which are reserved for after confirmation [Docket Nos. 1148, 1149, 1155, 1156, 1166, 1176, 1184]. The Debtors have extended the Voting Deadline and the Confirmation Objection Deadline with respect to MHBA CB, L.L.L.P. ("Novus") as the parties continue to negotiate a potential arrangement governing the Debtors' motion to reject that certain Supply and Operating Agreement dated October 1, 2014 by and between Novus and Debtor Ascend Performance Materials Texas Inc. and related issues.

value-maximizing transaction that represents extraordinary consensus between the Debtors, the constituents of the Debtors' prepetition capital structure, the Committee, certain of the Debtors' litigation counterparties, and the counterparties to the Asset Financing Agreements. Notably, the Plan substantially deleverages the Debtors' balance sheet by equitizing approximately $450 million of debtor-in-possession financing and eliminating the Debtors' approximately $1.1 billion prepetition term loan, accounts for the payment of administrative and priority claims in full, provides treatment for critical asset financing leases, and establishes a litigation trust that will fund distributions to the DIP Term Loan Claims, the Term Loan Claims, and the General Unsecured Claims. Further, the Plan transactions will include a debt rights offering that will raise up to an additional $235 million in cash and a $335 million Exit ABL Facility to fund the Reorganized Debtors' operations after the Effective Date. The Plan enables the Debtors to emerge from chapter 11 as a stronger, better-capitalized enterprise and provides global closure to the Debtors and all stakeholders.

2.      The Plan also embodies several important settlements and compromises. After hard fought negotiations, the Debtors agreed to the Committee Settlement, which provides for meaningful distributions to certain Holders of General Unsecured Claims, resolves the Committee's Claims and Causes of Action against the Debtors, and secures the support of the Committee for the Plan. The Plan also embodies several other settlements and compromises with certain other litigation counterparties and with the counterparties to the Company's Asset Financing Arrangements (as defined herein), all of which are either being treated through the Plan consensually, assumed, or amended and assumed.

3.      Importantly, the Plan is supported by the overwhelming majority of holders of billions of dollars in prepetition Claims. The Plan has been accepted by 89.30% of Class 3

(Term Loan Claims), 100% of Class 4A (36th Street Financing Agreement Claims), 100% of Class 4B (Ansley Park Financing Agreement Claims), 100% of Class 4C (Citizens CoGen Financing Agreement Claims), 93.67% of Class 5A (Go-Forward Vendor Claims), and 88.49% of Class 5B (General Unsecured Claims) (collectively, the "Impaired Accepting Classes"). The support of the Plan by the Impaired Accepting Classes is a testament to the confidence that the Debtors' stakeholders have not only in the Debtors' Plan but in the Debtors' go-forward operations outside of chapter 11. The Debtors are now positioned to move forward with confirmation of a Plan that is the best alternative for the Debtors to emerge promptly from chapter 11 and continue to provide industry-leading products and services to their customers.

4. The Plan satisfies the applicable requirements of the Bankruptcy Code, achieves an extraordinary result that is in the best interest if the Debtors and all of their stakeholders, and should be confirmed. Accordingly, the Debtors request that the Bankruptcy Court enter the Confirmation Order.

## PROCEDURAL BACKGROUND AND VOTING RESULTS

I. **Procedural History of the Chapter 11 and Plan Filing.**

A. **The Chapter 11 Filing.**

5. Despite its history as one of the world's largest fully integrated producers of nylon, Ascend has faced significant headwinds since mid-2022 due to global economic malaise and reduced demand, each of which has acutely impacted Ascend's performance across its business segments. As a result, beginning in the fourth quarter of 2024, the Company, with the assistance of its Advisors, began to explore all strategic alternatives to alleviate pressure on its business. After good-faith, arms' length negotiations with the ABL Lenders, Bridge Lenders, and Term Loan Lenders, the parties reached an agreement in principle for the DIP Lenders to provide approximately $900 million in debtor-in-possession financing, including $250 million in new-

4

money term loans and continued access to the Debtors' ABL Facility on a postpetition basis. Armed with an agreement on the terms of the DIP Facilities, the Debtors commenced these Chapter 11 Cases on April 21, 2025 (the "Petition Date") with the support of the Bridge Lenders, the Term Loan Lenders, and the ABL Lenders and with approximately $350 million in trade liabilities, certain asset financing arrangements (the "Asset Financing Arrangements") in need of renegotiation, and the potential for multiple complex litigation proceedings threatening their path forward.

6.      Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On the Petition Date, the Bankruptcy Court entered an order [Docket No. 60] authorizing the joint administration and procedural consolidation of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  On May 5, 2025, the U.S. Trustee appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 223].  On July 17, 2025, the U.S. Trustee filed *The United States Trustee's Notice of Reconstitution of the Official Committee of Unsecured Creditors* [Docket No. 664] to reflect the resignation of Optimal Field Services, LLC as a member of the Committee.

II.      **Settlements and the Development of the Chapter 11 Plan.**

A.      **Negotiations and Settlements with Key Stakeholders.**

7.      Immediately after the formation of the Committee and periodically throughout these Chapter 11 Cases, the Debtors, the Ad Hoc Group, the ABL Lenders, and the DIP ABL Lenders have engaged with the Committee's advisors to discuss, among other things, the Committee's Claims and Causes of Action.

8.      Following good-faith, arm's-length negotiations, the Debtors, the Required DIP Term Loan Lenders, the DIP ABL Agent, the Required DIP ABL Lenders, and the Committee

5

agreed to the terms of the Committee Settlement that provides for meaningful distributions to certain Holders of the General Unsecured Claims and resolves the Committee's Claims and Causes of Action against the Debtors and other stakeholders while maximizing the value of the Debtors' Estates. The resolution with the Committee is reflected in the Plan, and the specific terms of the Committee Settlement are discussed in further detail in the Disclosure Statement and herein. The Committee Settlement secures the support of the Committee for the Plan and allows the Debtors to emerge from these Chapter 11 Cases without further delay.

9.      Over the course of the Chapter 11 Cases, the Debtors have also been engaging with the counterparties to the Asset Financing Arrangements. With the assistance of Hilco Real Estate, LLC, the Debtors and their Advisors engaged in extensive negotiations and were able to reach agreements with respect to three of the counterparties to the Asset Financing Arrangements, each of which materially improves the Debtors' go-forward capital structure. Overall, the Debtors were able to achieve a resolution to all of the other Asset Financing Arrangements through either assumption or amendment and assumption.

10.      Additionally, the Debtors entered these Chapter 11 Cases embroiled in a contractual dispute with MasTec Industrial Corporation ("MasTec"). On May 25, 2025, the Debtors initiated an adversary proceeding against MasTec with the Bankruptcy Court seeking declaratory judgements with respect to the secured status of MasTec's prepetition Claim and the legal ownership of certain letter-of-credit proceeds.[4] At the Bankruptcy Court's recommendation, the Debtors and MasTec commenced mediation on September 26, 2025, conducted by a mediator authorized and appointed by the Bankruptcy Court. On October 17, 2025, the Debtors and MasTec

---

[4]    Case No. 25-90127 [Docket No. 375], Adv. Pro. No. 25-03407, *Ascend Performance Materials Operations LLC v. MasTec Industrial Corporation f/k/a MasTec Power Corporation*.

reached a mediated settlement agreement to resolve all Claims and Causes of Action between both parties.  On November 24, 2025, the Bankruptcy Court approved the *Order (I) Authorizing and Approving the Settlement By and Among Ascend and MasTec, and (II) Granting Related Relief* [Docket No. 1107] (the "MasTec 9019 Order").  The MasTec settlement, as approved by the MasTec 9019 Order, will maximize the value of the Debtors' Estates for the benefit of all stakeholders by resolving a highly contested dispute that has consumed Ascend's time and resources for nearly three years.  By finalizing the settlement, the Debtors can now continue to focus on consummating the Restructuring Transactions contemplated under the Plan, as they work with all stakeholders to bring these Chapter 11 Cases to a successful resolution.

11.    Furthermore, as set out more specifically below, in the Piper Declaration, and in the Disclosure Statement, beginning in late March 2025 the Special Committee, with the assistance of Katten Muchin Rosenman LLP ("Katten") and Province, LLC ("Province"), conducted the Independent Investigation into Conflicts Matters, including potential Claims and Causes of Action that could be asserted by the Debtors' Estates against the Debtors' Related Parties regarding certain prepetition transactions.  Over the course of the Independent Investigation, the Disinterested Directors, working with Katten and Province, conducted extensive diligence into the matters subject to the Independent Investigation, including reviews of voluminous documents and information and interviews with key parties.  The Special Committee has investigated everything within its mandate and concluded that the Plan should preserve any potential Estate Causes of Action relating to the Investigation Topics against certain Entities identified on the Schedule of Excluded Parties, if not otherwise resolved in the Chapter 11 Cases.  Based on the Independent Investigation and consideration of the factors discussed herein and expanded on in the Piper

7

Declaration, the Special Committee concluded that the Plan, including its provisions for the releases and exculpation, is in the best interest of the Debtors, their Estates, and their stakeholders.

### B.    The Solicitation and Voting Process

12.    On August 12, 2025, the Debtors filed an Initial Plan and Initial Disclosure Statement.[5]  On August 14, 2025, the Debtors filed the Disclosure Statement Motion.[6]

13.    On October 19, 2025, the Debtors filed the Disclosure Statement and Second Amended Plan.[7]  On October 20, 2025, the Bankruptcy Court entered the Disclosure Statement Order.[8]  The Disclosure Statement Order approved, among other things:  (i) the adequacy of the Disclosure Statement; (ii) the procedures for solicitation of the Plan (the "Solicitation Procedures"); (iii) the Solicitation Materials; and (iv) certain dates and deadlines with respect to the Plan and solicitation (the "Confirmation Schedule").

14.    Pursuant to the Disclosure Statement Order, the Debtors instructed the Claims and Noticing Agent to distribute the Solicitation Materials to all Holders of Claims and Interests

---

[5]    As used herein, the "Initial Plan" means the *Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 731] and the "Initial Disclosure Statement" means the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 732].

[6]    As used herein, the "Disclosure Statement Motion" means the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 744].

[7]    As used herein, the "Disclosure Statement" means, as may be amended or modified from time to time, the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1002] and the "Second Amended Plan" means the *Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 991].

[8]    As used herein, the "Disclosure Statement Order" means the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Second Amended Joint Chapter 11 Plan, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 999].

entitled to vote on the Plan—*i.e.*, Term Loan Claims, 36th Street Financing Agreement Claims, Ansley Park Financing Agreement Claims, Citizens CoGen Financing Agreement Claims, Go-Forward Vendor Claims, General Unsecured Claims, and Interests in Ascend Parent—by October 22, 2025, the solicitation deadline.[9]  The Debtors also caused the Publication Notice (as defined in the Disclosure Statement Order) to be published in *The New York Times* (national edition) and *The Financial Times* (global edition) on October 24, 2025 and October 27, 2025, respectively, in accordance with the Disclosure Statement Order.[10]

15.     On November 25, 2025, the Debtors filed the Initial Plan Supplement.[11]  The next day, on November 26, 2025, the Debtors filed the Initial Disclosure Statement Supplement, providing notice of certain revisions to the terms of the Debtors' exit capital structure.[12]  On November 28, 2025, the Debtors filed the First Amended Plan Supplement.[13]  On December 2, 2025, the Debtors filed the Second Disclosure Statement Supplement, providing notice of certain further revisions to the terms of the Debtors' exit capital structure, and the Second Amended Plan

---

[9]     *See Certificate of Service of Solicitation Materials* [Docket No. 1042].

[10]    *See Affidavits of Publication* [Docket Nos. 1024 and 1025].

[11]    As used herein, the "<u>Initial Plan Supplement</u>" means, as modified, amended, or supplemented from time to time, the *Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1117].

[12]    As used herein, the "<u>Initial Disclosure Statement Supplement</u>" means the *Notice of Filing of Amended Exhibits to the Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1120].

[13]    As used herein, the "<u>First Amended Plan Supplement</u>" means the *First Amended Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1136].

Supplement.[14]   On December 3, 2025, the Debtors filed the Third Amended Plan.[15]   On December 7, 2025, the Debtors filed the Third Amended Plan Supplement.[16]   On December 8, 2025, the Debtors filed the Fourth Amended Plan Supplement.[17]

16.    In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims and Interests in Impaired Classes entitled to receive or retain property on account of such Claims and Interests were permitted to vote to accept or reject the Plan.[18]   Holders of Claims and Interests were not entitled to vote if their rights are (a) Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code) or (b) Impaired and such Holders are not entitled to receive any distribution under the Plan (in which case such Holders were conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).   The following classes of Claims and Interests were ***not*** entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims and Interests:

---

[14]   As used herein, the "Second Disclosure Statement Supplement" means the *Notice of Filing of Further Amended Exhibits to the Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1150] (together with the Initial Disclosure Statement Supplement, the "Disclosure Statement Supplements") and the "Second Amended Plan Supplement" means the *Notice of Filing of Second Amended Plan Supplement* [Docket No. 1152].

[15]   As used herein, the "Third Amended Plan" means the *Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1157].

[16]   As used herein, the "Third Amended Plan Supplement" means the *Third Amended Plan Supplement for the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1172].

[17]   As used herein, the "Fourth Amended Plan Supplement" means the *Notice of Filing Fourth Amended Plan Supplement* [Docket No. 1175] (together, with the Initial Plan Supplement, the First Amended Plan Supplement, the Second Amended Plan Supplement, and the Third Amended Plan Supplement, the "Plan Supplements").

[18]   *See* 11 U.S.C. § 1126.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| Class 9 | Interests in APM Disc | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

17.      Pursuant to the Disclosure Statement Order, the Confirmation Schedule was subject to modification by the Debtors.   On November 12, 2025, the Debtors filed the *Notice of Adjournment of Confirmation Hearing to December 9, 2025, at 1:00 P.M. (Prevailing Central Time) and Related Dates and Deadlines* [Docket No. 1070] (the "Revised Confirmation Hearing Notice") extending, among other key dates and deadlines, (i) the voting deadline from November 18, 2025, to December 2, 2025, at 4:00 p.m., prevailing Central Time and (ii) the hearing to confirm the Plan (the "Confirmation Hearing") from November 24, 2025, at 3:00 p.m., prevailing Central Time to December 9, 2025, at 1:00 p.m., prevailing Central Time. Subsequently, on November 19, 2025, the Debtors filed the *Notice of Adjournment of Certain Dates and Deadlines Related to Confirmation Timeline* [Docket No. 1085] (the "Revised Confirmation Timeline Notice"), which further extended the voting and objection deadlines from December 2, 2025, at 4:00 p.m., prevailing Central Time to December 3, 2025, at 4:00 p.m., prevailing Central Time (the "Voting Deadline").  On December 8, 2025, the Debtors filed the

11

Voting Report, which is summarized below.  On December 8, 2025, the Debtors filed a proposed order confirming the Plan.[19]

18.     As set forth above and in the Voting Report, Holders of Claims in Class 3 (Term Loan Claims), Class 4A (36th Street Financing Agreement Claims), Class 4B (Ansley Park Financing Agreement Claims), Class 4C (Citizens CoGen Financing Agreement Claims), Class 5A (Go-Forward Vendor Claims), Class 5B (General Unsecured Claims), and Class 8 (Interests in Ascend Parent) were entitled to vote to accept or reject the Plan (each, a "Voting Class" and collectively, the "Voting Classes").[20]  The voting results, as reflected in the Voting Report, are summarized as follows:[21]

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
| | Accept | | Reject | |
| | AMOUNT (% of Amount/ Shares Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount/ Shares Voting) | NUMBER (% of Number Voting) |
|---|---|---|---|---|
| Class 3 – Term Loan Claims | $39,300,443.14 (93.95%) | 217 (89.30%) | $2,531,083.52 (6.05%) | 26 (10.70%) |
| Class 4A – 36th Street Financing Agreement Claims | $9,113,783.00 (100.00%) | 1 (100.00%) | $0.00 (0.00%) | 0 (0.00%) |
| Class 4B – Ansley Park Financing Agreement Claims | $39,349,800.00 (100.00%) | 1 (100.00%) | $0.00 (0.00%) | 0 (0.00%) |
| Class 4C – Citizens CoGen Financing Agreement Claims | $114,399,976.35 (100.00%) | 1 (100.00%) | $0.00 (0.00%) | 0 (0.00%) |

---

[19]   *See Proposed Findings of Fact, Conclusions of Law, and Order (I) Confirming the [Fourth] Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates and (II) Granting Related Relief* [Docket No. 1173].

[20]   *See* Voting Report ¶ 5.

[21]   *See* Voting Report, Exhibit A.

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
| --- | --- | --- | --- | --- |
| | Accept | | Reject | |
| | AMOUNT (% of Amount/ Shares Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount/ Shares Voting) | NUMBER (% of Number Voting) |
| Class 5A – Go-Forward Vendor Claims | $30,350,078.04 (96.49%) | 74 (93.67%) | $1,104,928.31 (3.51%) | 5 (6.33%) |
| Class 5B – General Unsecured Claims | $919,507,891.19 (93.94%) | 223 (88.49%) | $59,277,157.53 (6.06%) | 29 (11.51%) |
| Class 8 – Interests in Ascend Parent | 0 shares (0.00%) | N/A | 1,400 shares (100.00)% | N/A |

19.     Stakeholders in the Voting Classes had notice and opportunity to "opt out" of the Third-Party Release (as defined herein).   All non-voting stakeholders were also given the opportunity to opt out of the Third-Party Release and received notice and instructions for doing so in their applicable Non-Voting Status Notice (as defined in the Disclosure Statement Motion). Such stakeholders could opt out by checking the appropriate box on the Non-Voting Status Notice or objecting.   In accordance with the Revised Confirmation Hearing Notice and the Revised Confirmation Timeline Notice, the deadline for all stakeholders to opt out and the deadline to file objections to confirmation of the Plan was extended from November 18, 2025, at 4:00 p.m., prevailing Central Time to December 3, 2025, at 4:00 p.m., prevailing Central Time.  As set forth in the Voting Report, the Debtors received fifty-six validly submitted opt out elections.[22]

---

[22]    *See* Voting Report ¶ 16, n.6.

**III.     Resolution of Confirmation Objections.**

20.     The Debtors received five formal Objections and numerous informal Objections to confirmation of the Plan.  Despite the Debtors' efforts to resolve all of the Objections prior to the Confirmation Hearing, one informal Objection and two formal Objections, including the U.S. Trustee Objection, remain outstanding.  A detailed response to the outstanding Objections is set forth in this Memorandum.  To the extent such outstanding Objections are not resolved before the Confirmation Hearing, however, they should be overruled for the reasons stated herein and as the Debtors will establish at the Confirmation Hearing.

## ARGUMENT

21.     This Memorandum is divided into four parts.  *First*, the Debtors request approval of modifications made to the Plan since solicitation, as all modifications are merely technical and/or do not negatively impact any party's recovery under the Plan.  *Second*, the Debtors request a finding that the Debtors have satisfied all notice requirements approved in the Disclosure Statement Order.   *Third*, the Debtors present their "case in chief" that the Plan satisfies section 1129 of the Bankruptcy Code and, accordingly, request that the Bankruptcy Court confirm the Plan.[23]  *Fourth*, as part of the Debtors' "case in chief," the Debtors set forth how the release, exculpation, and injunction provisions comply with the Bankruptcy Code, prevailing law, and are in the best interests of the Debtors' Estates.

---

[23]   *See In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 505 (Bankr. S.D. Tex. 1989) ("In order to confirm a reorganization plan, the bankruptcy court must be satisfied that the plan complies with all of the requirements of § 1129(a) of the Bankruptcy Code."); *In re Lone Star Utils., LLC*, No. 13-34302-SGJ-11, 2014 WL 4629129, at *2 (Bankr. N.D. Tex. Sept. 15, 2014) ("The Debtor has the burden of proving the elements of Bankruptcy Code section 1129(a) by a preponderance of the evidence."); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119–20 (D. Del. 2006) ("To confirm the Plan, the Court must determine whether it meets the specific requirements of Section 1129.").

**I.      The Revisions to the Plan Do Not Require Resolicitation and Should be Approved.**

22.      A plan proponent may modify its plan at any time before confirmation if the modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[24]  Once filed, "the plan as modified becomes the plan."[25]  Bankruptcy Rule 3019(a) implements section 1127(d) of the Bankruptcy Code by providing that such modifications do not require resolicitation where (a) the modifications do not adversely affect the treatment of any claim under the plan by any accepting creditor or (b) any materially adverse modifications are accepted in writing by any creditor who previously voted in favor of the plan and whose treatment is materially and adversely affected by the modification.  In keeping with Bankruptcy Rule 3019, courts have consistently held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material and does not adversely affect how creditors and stakeholders are treated.[26]

23.      Accordingly, only those modifications that are "material" require resolicitation.  A plan modification is not material unless it so affects a creditor or interest holder who accepted the

---

[24]   11 U.S.C. § 1127(a).

[25]   11 U.S.C. § 1127(a).

[26]   *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 857 (Bankr. S.D. Tex. 2001) (finding that nonmaterial modifications that do not adversely impact parties who have previously voted on the plan do not require additional disclosure or re-solicitation); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 440–41 (Bankr. S.D. Tex. 2009) (holding that non-material modifications that do not adversely impact parties who previously voted on the plan do not require "adhere[nce] to the strict requirements of 11 U.S.C. § 1125"); *In re Lack's Stores, Inc.*, No. 10-60149, 2012 WL 2375825, at *8 (Bankr. S.D. Tex. June 21, 2012) (confirming a plan with post-solicitation modifications that were not materially adverse to holders of claims or interests); *see also In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are deemed to accept the modified plan); *In re A.H. Robins Co.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan. The Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan."), *aff'd*, 880 F.2d 694 (4th Cir. 1989).

15

plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.[27] Here, the Plan revisions in the Third Amended Plan do not negatively impact any party's recovery under the Plan.  Instead, the revisions merely optimize the Company's go-forward capital structure, reflect negotiations among the Company's exit financing parties, address technical aspects of the Plan, or resolve various objections to confirmation.  The modifications to the Plan are not material changes; each change either improves or does not affect recoveries of each affected Class.  Rather, they are permissible, technical modifications to the Plan, each of which either improve or do not reflect material differences to recoveries of each affected class—*i.e.*, no holder is "likely" to reconsider its acceptance.

24.     As detailed above, the Disclosure Statement Supplements were filed to provide notice of certain revisions to the Debtors' go-forward capital structure.  Specifically, the Second Disclosure Statement Supplement was filed to provide notice of, among other things, the increased amount of the Debt Rights Offering and the decision to not enter into a previously-contemplated first-in-last-out exit facility.  These changes to the Company's exit capital structure resulted from good-faith, arm's-length negotiations, maximize the value of the Debtors' Estates, and ensure a smooth transition from the Chapter 11 Cases.  While the Disclosure Statement Order approved of the Disclosure Statement, and the Plan modifications are not material and do not require resolicitation, in light of the filing of the Disclosure Statement Supplements, the Debtors request that the Bankruptcy Court reaffirm that the Disclosure Statement, to the extent modified by the

---

[27]    *See In re Am. Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) ("[T]he statute permits modifications that might technically have a negative impact on claimants where the modifications are not substantial."); *see also In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 302 (Bankr. N.D. Ill. 2008) (holding that a one percent reduction of one class's distribution was not sufficiently material to require re-solicitation).

Disclosure Statement Supplements, and the Disclosure Statement Supplements satisfy the requirements of section 1125 of the Bankruptcy Code.

**II.      The Debtors Complied with Applicable Notice Requirements and Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

25.      As detailed above, the Disclosure Statement Order approved the Disclosure Statement, the Solicitation Procedures, the Solicitation Materials, and the proposed timeline for Confirmation. The Debtors complied with the Solicitation Procedures and timeline of events approved by the Disclosure Statement Order. The Debtors also filed the Disclosure Statement Supplements to augment the Disclosure Statement and provide notice of certain changes to the Company's exit capital structure that are immaterial to recoveries under the Plan.

26.      Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan. As set forth in the Disclosure Statement and Disclosure Statement Motion, and as demonstrated by the Debtors' compliance with the Disclosure Statement Order, the Debtors at all times engaged in arm's-length, good-faith negotiations and took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code. Therefore, the Debtors request that the Bankruptcy Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

17

**III.    The Plan Satisfies Each Requirement for Confirmation.**

> **A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

27.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[28]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[29]  As explained below, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code, as well as other applicable provisions.

> > **1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

28.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[30]

29.    For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[31]  Rather, claims or

---

28    11 U.S.C. § 1129(a)(1).

29    S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were Sections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) (noting that a plan must comply with Sections 1122 and 1123).

30    11 U.S.C. § 1122(a).

31    *See Sentry Operating Co. of Tex.*, 264 B.R. at 860 (recognizing that section 1122 is broadly "permissive of any classification scheme that is not proscribed, and that substantially similar claims may be separately classified").

18

interests assigned to a particular class must be substantially similar to each other.[32]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes provided there is a rational basis to do so.[33]

30.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into thirteen separate Classes, with the Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual nature or based on other relevant criteria.[34] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.     Class 1:  Other Secured Claims;

b.     Class 2:  Other Priority Claims;

c.     Class 3:  Term Loan Claims;

d.     Class 4A:  36th Street Financing Agreement Claims;

e.     Class 4B:  Ansley Park Financing Agreement Claims;

---

[32]  *In re Vitro Asset Corp.*, No. 11-32600-HDH, 2013 WL 6044453, at *5 (Bankr. N.D. Tex. Nov. 14, 2013) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class.").

[33]  Courts have identified grounds justifying separate classification, including:  (a) where there are good business reasons for separate classification, and (b) where members of a class possess different legal rights.  *Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1167 (5th Cir. 1993) (recognizing that "there may be good business reasons to support separate classification"); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that a classification scheme is proper as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed"); *see also In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *8 (Bankr. S.D. Tex. Dec. 21, 2009) ("[A] plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan.").

[34]  Plan, Art. III.

f.      Class 4C: Citizens CoGen Financing Agreement Claims;

g.      Class 5A: Go-Forward Vendor Claims;

h.      Class 5B: General Unsecured Claims;

i.      Class 6: Intercompany Claims;

j.      Class 7: Intercompany Interests;

k.      Class 8: Interests in Ascend Parent;

l.      Class 9: Interests in APM Disc; and

m.      Class 10: Section 510(b) Claims.

31.    Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class. The Plan's classification scheme generally corresponds to the Debtors' corporate and capital structure, thereby taking into account the relative priority among Claims and Interests, including the relative priority between secured and unsecured claims.[35] In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan.[36] Specifically, the Plan separately classifies the Claims because each holder of such Claims or Interests may hold (or may have held) rights in the Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.[37] For example, Claims (rights to payment) are classified separately from Interests (representing ownership in the business), and Term Loan Claims, 36th Street Financing Agreement Claims, Ansley Park Financing Agreement Claims, and Citizens CoGen Financing Agreement

---

[35]   *See* Del Genio Decl. ¶ 24.

[36]   *See* Del Genio Decl. ¶ 24.

[37]   *See* Del Genio Decl. ¶ 24.

Claims are separately classified because of differing priorities of payment, because they arise under separate debt instruments and/or contractual arrangements, and because they are secured by different pools of collateral.[38]

32.    The Fifth Circuit recognized in *Greystone* that the separate classification of "substantially similar" claims is permissible if it is "undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, dissenting class of claims."[39]  Courts accept various independent reasons as the basis of separate classification, including the preservation of business relationships between a debtor and a class of claimants,[40] or otherwise similarly situated creditors,    possessing    different    legal    rights,[41]    or    a    debtor's    consideration    of "non-creditor interests."[42]

33.    The Plan's classification scheme satisfies the standard set in *Greystone* because it is based on sound business and economic reasons, including as it relates to the separate

---

[38]    *See* Del Genio Decl. ¶ 24.

[39]    *See In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991) (holding that section 1122(a) of the Bankruptcy Code permits classification of "substantially similar" claims in different classes if undertaken for reasons other than to secure the vote of an impaired, assenting class of claims); *In re Heritage Org., LLC*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan.").

[40]    *See, e.g., In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1167 (5th Cir. 1993) (approving the separate classification of an unsecured creditor where "the relationship with the [creditor was] essential to the continued operation" of the debtor); *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 114 (Bankr. N.D. Tex. 2002) (overruling an objection to the separate classification of unsecured creditors where the debtor showed evidence that improving relationships and perceptions amongst those creditors was important to the success of the reorganization); *In re Aegerion Pharm., Inc*., 605 B.R. 22, 31–32 (Bankr. S.D.N.Y. 2019) (confirming a plan "that separately classif[ied] trade creditors and other general unsecured creditors where . . . trade creditors [were] vital to the debtors' ongoing, post-emergence business").

[41]    *See In re Charter Commc'ns*, 419 B.R. 221, 264 (Bankr. S.D.N.Y. 2009); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992).

[42]    *See In re Save our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 174 (5th Cir. 2011) (holding that a non-creditor interest may justify separate classification if one creditor has "a different stake in the future viability" of the debtor's business that may cause it to vote for reasons other than its economic interest in the claim) (internal citation omitted).

21

classification of Class 5A (Go-Forward Vendor Claims) and Class 5B (General Unsecured Claims).[43]  The Plan classifies the Class 5A (Go-Forward Vendor Claims) separately from other Class 5B (General Unsecured Claims) based on the different value that the Holders of such Claims will provide to the reorganized Company.[44]  Specifically, Class 5A (Go-Forward Vendor Claims) arise from the provision of ordinary course trade, vendor, professional, or other goods and services provided to the Debtors that the Debtors expect to continue after the Effective Date.[45]  Holders of Class 5B Claims (General Unsecured Claims) generally hold such claims on account of rejected Executory Contracts and Unexpired Leases, litigation against one or more of the Debtors, or various other Claims.[46]  Separate classification allows the Debtors to prioritize and preserve business relationships with vendors critical to the Company's operations post-emergence and maximize the value of the Debtors' estates for the benefit of all parties in interest.[47]  Without this separate classification and the preservation of these critical relationships, the Debtors' post-emergence operations could face severe service and supply shortages.[48]  Accordingly, the Plan satisfies section 1122(a) of the Bankruptcy Code.

---

[43]   *See Greystone*, 995 F.2d at 1279.

[44]   *See* Del Genio Decl. ¶ 24.

[45]   *See* Plan, Art. I, ¶ 152.

[46]   *See* Plan, Art. I, ¶ 150.

[47]   *See* Del Genio Decl., ¶ 24.

[48]   *See* Del Genio Decl., ¶ 24.

**2.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

34.      Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.[49]  The Plan satisfies each of these requirements.

> a.      ***Designation of Classes of Claims and Equity Interests (Section 1123(a)(1)).***

35.      Section 1123(a)(1) of the Bankruptcy Code requires that the Plan designate "classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests."[50]  For the reasons set forth above, Article III of the Plan properly designates Classes of Claims and Interests and thus satisfies this requirement of the Bankruptcy Code.

> b.      ***Specification of Unimpaired Classes (Section 1123(a)(2)).***

36.      Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."[51]  The Plan meets this requirement by identifying each Class in Article III that is Unimpaired.

> c.      ***Treatment of Impaired Classes (Section 1123(a)(3)).***

37.      Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."[52]  The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.

---

[49]   *See* 11 U.S.C. § 1123(a).

[50]   11 U.S.C § 1123(a)(1).

[51]   11 U.S.C.  § 1123(a)(2).

[52]   11 U.S.C. § 1123(a)(3).

23

d.      ***Equal Treatment within Classes (Section 1123(a)(4)).***

38.      Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[53]  The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.[54] Thus, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

e.      ***Means for Implementation (Section 1123(a)(5)).***

39.      Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[55]  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions that underlie the Plan.

40.      Article IV of the Plan, in particular, sets forth the means for implementation of the Plan and the transactions underlying the Plan, including:  (a) execution and delivery of all agreements and documents required for the effectuation of the Restructuring Transactions, including the execution and delivery of any appropriate agreements or other documents pursuant to the Plan and the Plan Supplements, including the New Organizational Documents, and rejection, assumption, or assumption and assignment of Executory Contracts and Unexpired Leases; (b) the issuance of the New Interests; (c) the execution, delivery, and implementation of the Exit ABL Facility, the Exit Term Loan Facility, and any filings and documents related thereto; (d) the

---

[53]   11 U.S.C. § 1123(a)(4).

[54]   *See* Plan, Art. III.B; Del Genio Decl. ¶ 28.

[55]   *See* 11 U.S.C. § 1123(a)(5).

implementation of the Debt Rights Offering pursuant to the Debt Rights Offering Procedures; (e) the establishment of the Litigation Trust and the execution and delivery of the Litigation Trust Documents; (f) the implementation of the Committee Settlement; (g) the issuance of the Asset Financing Takeback Debt and entry into the Asset Financing Takeback Debt Documents; and (h) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.[56] In addition to these core transactions, the Plan sets forth the other critical mechanics of the Debtors' emergence, such as the cancellation of existing securities, the establishment of certain agreements, and the settlement of Claims and Interests.[57]

41.     The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents or forms of agreements included in the Plan Supplements.[58]  Thus, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

f.     ***Issuance of Non-voting Securities (Section 1123(a)(6)).***

42.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.[59]  Article IV.K of the Plan provides that the New Organizational Documents shall contain a provision prohibiting the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.[60]  In accordance with Article IV.K of the Plan, on or immediately prior to the

---

[56]   *See* Plan, Art. IV.

[57]   *See* Del Genio Decl. ¶ 29; Plan, Art. IV.

[58]   *See* Plan Supplements.

[59]   *See* 11 U.S.C. § 1123(a)(6).

[60]   *See* Plan, Art. IV.K.

Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors and will prohibit the issuance of non-voting equity securities. Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

> g.     ***Directors and Officers (Section 1123(a)(7)).***

43.     Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[61] The Plan satisfies this requirement by providing that, as of the Effective Date, the terms of the current members of the board of directors of Ascend Parent shall expire and the new directors and officers of Reorganized Ascend shall be appointed.[62]   Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

> **3.     The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

44.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[63]

---

[61]   11 U.S.C. § 1123(a)(7).

[62]   *See* Plan, Art. IV.M.

[63]   *See* 11 U.S.C. §§ 1123(b)(1)–(3), (6).

45.     The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes.[64]   On the other hand, Class 3 (Term Loan Claims), Class 4A (36th Street Financing Agreement Claims), Class 4B (Ansley Park Financing Agreement Claims), Class 4C (Citizens CoGen Financing Agreement Claims), Class 5A (Go-Forward Vendor Claims), Class 5B (General Unsecured Claims), Class 8 (Interests in Ascend Parent), Class 9 (Interests in APM Disc) and Class 10 (Section 510(b) Claims), are Impaired because the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[65]   Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) may be Impaired (to the extent canceled or released) or Unimpaired (to the extent Reinstated) under the Plan at the option of the Debtors.

46.     In addition and under section 1123(b)(2) of the Bankruptcy Code, Article V of the Plan provides that, on the Effective Date, except as otherwise provided in Article V.I.1 of the Plan, all Executory Contracts or Unexpired Leases will be deemed automatically rejected by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (a) is identified on the Assumed Executory Contracts and Unexpired Leases Schedule as of the Effective Date; (b) previously expired or terminated pursuant to their own terms; (c) has been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) is the subject of a motion to assume that is pending on the Effective Date; (e) has an ordered or requested effective date of

---

[64]   *See* Plan, Art. III.

[65]   *See* Plan, Art. III.

rejection that is after the Effective Date; (f) is an employment agreement that was not disclosed by the Required DIP Term Loan Lenders to the Debtors' counsel on or before October 15, 2025, none of which shall be rejected; (g) is a D&O Liability Insurance Policy, which shall be deemed automatically assumed; (h) is one or more Indemnification Provisions, which shall be assumed or rejected in accordance with Article IV.L of the Plan; or (i) is a confidentiality agreement with one or more of the Debtors.

47.     Furthermore, the Plan provides for a general settlement of all Claims and Interests, including the Committee Settlement.  The Plan's general settlement of all Claims and Interests is consistent with section 1123 of the Bankruptcy Code for the reasons set forth in Article IV.A of the Plan.

48.     Finally, the Plan contains release, exculpation, and injunction provisions, which for the reasons set forth below in section V below, are consistent with section 1123(b) of the Bankruptcy Code.

**4.     The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

49.     Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[66]

50.     The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of Cures under each Executory Contract and Unexpired Lease to be assumed under the Plan by payment of the Cure, if any, on the Effective Date or as soon as reasonably practicable thereafter, after the dispute over the Cure is resolved, or on other terms as

---

[66]   11 U.S.C. § 1123(d).

the parties to such Executory Contracts or Unexpired Leases may agree.[67] In accordance with Article V of the Plan and section 365 of the Bankruptcy Code, undisputed monetary amounts required to Cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) to be assumed will be satisfied by the Debtors or Reorganized Debtors, as applicable. To the extent there is a dispute related to any such Cure, the Debtors or the Reorganized Debtors, as applicable, may reconcile and settle any disputes related to Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court.

**B.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

51.      The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.[68] The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[69] As discussed below, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

---

[67]     *See* Plan, Art. V.C.

[68]     *See* 11 U.S.C. § 1129(a)(2).

[69]     S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re Lapworth*, No. 97-34529, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126").

### 1. The Debtors Complied with Section 1125 of the Bankruptcy Code.

52.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[70] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[71]

53.     Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Bankruptcy Court approved the Disclosure Statement.[72]  The Bankruptcy Court also approved the Solicitation Materials provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[73]  As stated in the Voting Report, the Debtors, through the Claims and Noticing Agent, complied with the content and delivery requirements of the Disclosure Statement Order, satisfying sections 1125(a) and (b) of the Bankruptcy Code.[74]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.  Here, the Debtors caused

---

[70]   11 U.S.C. § 1125(b).

[71]   *See Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Co-op., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998) (holding that section 1125 includes "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."); *see also In re Union Cnty. Wholesale Tobacco & Candy Co.*, 8 B.R. 442, 443 (Bankr. D.N.J. 1981) (holding that the standards of section 1125 "essentially require information sufficient to enable a hypothetical reasonable investor to make an informed judgment re acceptance or rejection of the plan").

[72]   *See* Disclosure Statement Order.

[73]   *See generally* Disclosure Statement Order.

[74]   *See generally* Voting Report; *see also Certificate of Service of Solicitation Materials* [Docket No. 1042].

the same Disclosure Statement to be transmitted to all parties entitled to vote on the Plan and all parties deemed to accept or reject the Plan.[75]

54.     Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

### 2.     The Debtors Complied with Section 1126 of the Bankruptcy Code.

55.     Section 1126 of the Bankruptcy Code specifies that only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.[76]

56.     As set forth above, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Claims in Class 3 (Term Loan Claims, Class 4A (36th Street Financing Agreement Claims), Class 4B (Ansley Park Financing Agreement Claims), Class 4C (Citizens CoGen Financing Agreement Claims), Class 5A (Go-Forward Vendor Claims), Class 5B (General Unsecured Claims) and Class 8 (Interests in Ascend Parent)—the only Classes entitled to vote on the Plan.  As noted in the Voting Report, the Debtors did not solicit votes from Holders of Claims in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) as these classes are Unimpaired under the Plan (the "Unimpaired Classes").  Pursuant to section 1126(f) of the Bankruptcy Code, the Unimpaired Classes are presumed to have accepted the Plan, were not entitled to vote on the Plan, and therefore,

---

[75]    *See* Voting Report ¶ 8; *see also Certificate of Service of Solicitation Materials* [Docket No. 1042]; *Certificate of Service* [Docket No. 1048].

[76]    *See* 11 U.S.C. § 1126.

31

the Debtors did not solicit their votes.[77]   Additionally, the Debtors did not solicit votes from Holders of Claims and Interests in Class 9 (Interests In APM Disc) and Class 10 (Section 510(b) Claims) (the "Deemed Rejecting Classes").[78]   Pursuant to 1126(g), the Deemed Rejecting Classes are deemed to have rejected the Plan and therefore, were not entitled to vote on the Plan.  Further, the Debtors did not solicit votes from Holders of Claims and Interests in Class 6 (Intercompany Claims) or Class 7 (Intercompany Interests) because Holders of such Claims and Interests are either Unimpaired and presumed to accept the Plan under section 1126(f) or Impaired and conclusively deemed to have rejected the Plan under section 1126(g), and therefore not entitled to vote. [79]   Thus, pursuant to section 1126(a) of the Bankruptcy Code, only Holders of Claims in Class 3 (Term Loan Claims), Class 4A (36th Street Financing Agreement Claims), Class 4B (Ansley Park Financing Agreement Claims), Class 4C (Citizens CoGen Financing Agreement Claims), Class 5A (Go-Forward Vendor Claims), Class 5B (General Unsecured Claims), and Class 8 (Interests in Ascend Parent) were entitled to vote to accept or reject the Plan.

57.     Sections 1126(c) and 1126(d) of the Bankruptcy Code specify the requirements for acceptance of a plan by classes of claims and interests:

> (c)     A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

> (d)     A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity

---

[77]   Voting Report ¶ 5.

[78]   Voting Report ¶¶ 5, 8.

[79]   Voting Report ¶ 8, n. 3.

designated under subsection (e) or this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.[80]

58.     As described above and in the Voting Report, the Holders of Claims in each of the Impaired Accepting Classes voted to accept the Plan in sufficient number and in sufficient amount to constitute an acceptance under the Bankruptcy Code.[81]   The Holders of Interests in Class 8 (Interest in Ascend Parent) voted to reject the Plan.[82]   Based upon the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

> **C.     The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

59.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[83]   In assessing good faith, courts in the Fifth Circuit consider whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[84]   A plan must also achieve a result consistent with the Bankruptcy Code.[85]   The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job losses and the adverse economic effects associated

---

[80]   11 U.S.C. §§ 1126(c)–(d).

[81]   *See* Voting Report, Exhibit A.

[82]   *See* Voting Report, Exhibit A.

[83]   *See* 11 U.S.C. § 1129(a)(3).

[84]   *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

[85]   *See In re Block Shim Dev. Company-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

with disposing of assets at liquidation value.[86]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[87]

60.     The Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  Here, the Plan and the accompanying Restructuring Transactions will allow the Debtors to substantially deleverage their balance sheet, optimize their operations, and put the Company in strong financial position to maximize stakeholder value going forward.[88]  The Plan, and all the related documents were negotiated, proposed, and entered into by the Debtors and the respective parties thereto in good faith and from arm's-length bargaining positions.[89]  The support for the Plan from the Impaired Accepting Classes is strong evidence that the Plan has a proper purpose and is likely to succeed.[90] Finally, as set forth herein, the Plan complies with bankruptcy and applicable nonbankruptcy law. Accordingly, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

**D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).**

61.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under

---

[86]  *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) ("[T]he two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start.").

[87]  *E.g.*, *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *In re Century Glove*, Nos. 90-400-SLR, 90-401-SLR, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993).

[88]  *See* Del Genio Decl. ¶ 47.

[89]  *See* Del Genio Decl. ¶¶ 35–36.

[90]  *See* Voting Report, Exhibit A.

the plan, be subject to approval by the court as reasonable.[91]  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the court as to their reasonableness.[92]  The Fifth Circuit has held this is a "relatively open-ended standard" that involves a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.[93]  As to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[94]

62.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  Payment of Professional Claims is the only category of payments that fall within the ambit of section 1129(a)(4) of the Bankruptcy Code in these Chapter 11 Cases, and the Debtors may not pay Professional Claims absent Bankruptcy Court approval.[95]  Further, all such Professional Claims and corresponding payments are subject to prior Bankruptcy Court approval and the reasonableness requirements under sections 328 and/or 330 of the Bankruptcy Code.[96] Article II.C.1 of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Claims no later than forty-five days after the Effective Date, thereby

---

[91]   11 U.S.C. § 1129(a)(4).

[92]   *See Cajun Elec.*, 150 F.3d at 518 ("Section 1129(a)(4) by its terms requires court approval of any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case.") (emphasis omitted) (citations omitted); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[93]   *Cajun Elec.*, 150 F.3d at 517 ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

[94]   *Id*.

[95]   *See* Plan, Arts. I.A, ¶ 209, II.C.1.

[96]   11 U.S.C. §§ 328(a), 330(a)(1)(A).

providing an adequate period of time for interested parties to review such Professional Claims.[97]

Accordingly, the Plan fully complies with the requirements of section 1129(a)(4).

>       **E.     The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)).**

63.     Section 1129(a)(5)(A) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors, to the extent known, of the reorganized debtors.[98]  It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[99]  Lastly, it requires that the plan proponent have disclosed the identity of insiders to be retained by the reorganized debtor and the nature of any compensation for such insider.[100] Courts have held that these provisions ensure that the post-confirmation governance of a reorganized debtor is in good hands.[101]

64.     The Debtors have satisfied section 1129(a)(5) of the Bankruptcy Code.  The Plan provides that, as of the Effective Date, the terms of the current members of the board of directors of Ascend Parent shall expire, and the new directors and officers of Reorganized Ascend shall be appointed; *provided* that the Disinterested Directors shall retain their authority following the Effective Date solely with respect to matters relating to Professional Claim requests by

---

[97]   Plan, <u>Art. II.C.I</u>.

[98]   11 U.S.C. § 1129(a)(5)(A)(i).

[99]   11 U.S.C. § 1129(a)(5)(A)(ii).

[100]  11 U.S.C. § 1129(a)(5)(B).

[101]  *See In re Landing Assocs.,* 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors.").

Professionals acting at their authority and direction in accordance with the terms of the Plan.[102] Corporate governance for Reorganized Ascend, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.[103]   The identities of officers and members of the New Board have also been disclosed in the Plan Supplements, to the extent known. Where specific individuals are not yet known, the Debtors have disclosed the process by which the applicable directors will be selected.  The Debtors believe control of Reorganized Ascend by the individuals to be appointed in accordance with the Plan and New Organizational Documents will be consistent with public policy.  Therefore, the requirements under section 1129(a)(5)(A)(ii) of the Bankruptcy Code are satisfied.

> **F.     The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)).**

65.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.[104]  No such rate changes are provided for in the Plan.[105]   Section 1129(a)(6) of the Bankruptcy Code is therefore inapplicable to these Chapter 11 Cases.

---

[102]  Plan, Art. IV.M.

[103]  Plan, Art. IV.M.

[104]  11 U.S.C. § 1129(a)(6).

[105]  *See* Del Genio Decl. ¶ 39.

**G.      The Plan Is in the Best Interests of All the Debtors' Creditors (Section 1129(a)(7)).**

66.      Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)      each holder of a claim or interest of such class—
>
>> (i)      has accepted the plan; or
>>
>> (ii)      will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .[106]

67.      The best interests test applies to individual dissenting holders of impaired claims and interests—rather than classes—and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[107]

68.      As set forth in Exhibit C of the Disclosure Statement,[108] the Debtors, with the assistance of their advisors, prepared a liquidation analysis that estimates recoveries for members of each Class under the Plan.  The projected recoveries under the Plan are equal to or in excess of

---

[106]  11 U.S.C. § 1129(a)(7).

[107]  *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Century Glove*, Nos. 90–400–SLR, 90–401–SLR, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[108]  Disclosure Statement, Exhibit C.

the recoveries estimated in a hypothetical chapter 7 liquidation.[109]  Accordingly, the Plan complies with section 1129(a)(7).[110]

> **H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

69.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[111]  If not, the plan must satisfy the "cram down" requirements of section 1129(b) with respect to the claims or interests in that class.[112]

70.     Of the Impaired Classes of Claims and Interests under the Plan, each of the Impaired Accepting Classes voted to accept the Plan.[113]  Holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) are presumed to accept or deemed to reject the Plan, as applicable, and are proponents of the Plan.  Holders of Claims and Interests in Class 9 (Interests in APM Disc) and Class 10 (Section 510(b) Claims) are Impaired under the Plan and are deemed to have rejected the Plan and thus were not entitled to vote.  The Holders of Interests in Class 8 (Interest in Ascend Parent) voted to reject the Plan.[114]  Notwithstanding such rejections, the Plan is confirmable nonetheless because it satisfies 1129(b) of the Bankruptcy Code, as discussed below.

---

[109]  Disclosure Statement, Exhibit C; FTI Decl. ¶ 16.  Liquidation Analysis chart includes associated notes that provided further detail and information with respect to the estimated recoveries presented therein.  The full text of these notes is included in Exhibit C of the Disclosure Statement.

[110]  *See* FTI Decl. ¶ 17.

[111]  11 U.S.C. § 1129(a)(8).

[112]  11 U.S.C. § 1129(b).

[113]  *See* Voting Report, Exhibit A.

[114]  *See* Voting Report, Exhibit A.

### I.   The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9)).

71.   Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[115]   In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[116]   Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[117]   Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.[118]

72.   The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each

---

[115]   *See* 11 U.S.C. § 1129(a)(9).

[116]   11 U.S.C. § 1129(a)(9)(A).

[117]   11 U.S.C. § 1129(a)(9)(B).

[118]   11 U.S.C. § 1129(a)(9)(C).

holder of Allowed Administrative Claims receives Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time defined in Article II.A of the Plan. *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by section 1129(a)(9)(B) are Impaired under the Plan. *Third*, Article II.D of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. Thus, the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

**J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (Section 1129(a)(10)).**

73.      Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider."[119]

74.      As set forth above, Holders of Claims, none of whom are Insiders, in the Impaired Accepting Classes—which are Impaired Classes under the Plan—voted to accept the Plan independent of any Insiders' votes.[120]   The Plan thus satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

---

[119]  11 U.S.C. § 1129(a)(10).

[120]  *See* Voting Report, Exhibit A.

### K.    The Plan Is Feasible (Section 1129(a)(11)).

75.    Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Bankruptcy Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[121]

To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[122] Rather, a debtor must provide only a reasonable assurance of success.[123] There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[124] As demonstrated below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

76.    In determining standards of feasibility, courts have identified the following probative factors:

    a.    the adequacy of the capital structure;

---

[121]  11 U.S.C. § 1129(a)(11).

[122]  *In re T-H New Orleans Ltd. P'ship,* 116 F.3d 790, 801 (5th Cir. 1997) (citations omitted) ("[T]he [bankruptcy] court need not require a guarantee of success . . . , [o]nly a reasonable assurance of commercial viability is required."); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (noting that the feasibility standard "has been slightly broadened and contemplates whether the debtor can realistically carry out its plan").

[123]  *Kane*, 843 F.2d at 649; *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012); *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted) ("The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684, 2011 WL 6013718, at *32 (Bankr. D. Del. Aug. 24, 2011) (same).

[124]  *E.g., In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (citations omitted) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility"); *Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea Garden Motel & Apartments)*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Trib. Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011).

42

b.      the earning power of the business;

c.      the economic conditions;

d.      the ability of management;

e.      the probability of the continuation of the same management; and

f.      any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[125]

77.      The Plan is feasible.  Upon the Effective Date, the Debtors expect to have sufficient funds and proceeds from:  (a) Cash on hand, including Cash from operations, the DIP Facilities, and the proceeds of the Debt Rights Offering; (b) the New Interests; (c) the Exit ABL Facility; and (d) the Exit Term Loan Facility.  Following emergence, the Debtors' Financial Projections demonstrate that the Reorganized Debtors will be well positioned to execute their business plan, service their significantly reduced debt obligations, and successfully operate their businesses.[126] The financial and operational restructuring, as well as the deleveraging of the Debtors' balance sheet, effectuated by the Plan provides the Reorganized Debtors with a strengthened capital structure and more efficient operations that will give the Reorganized Debtors a significantly improved liquidity profile and an improved ability to hit their operational targets and achieve the financial results contemplated in the Financial Projections.[127]   Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

---

[125] *In re M & S Assocs. Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992).

[126] *See* Disclosure Statement, Exhibit D; Del Genio Decl., ¶¶ 45–47.

[127] *See* Del Genio Decl., ¶¶ 45–47.

**L.      All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)).**

78.      Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[128]  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority status.

79.      The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XII.C of the Plan provides that all fees due and payable before the Effective Date shall be paid in full in Cash on the Effective Date and the Reorganized Debtors and the Distribution Agent shall remain obligated to pay such fees until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**M.      All Retiree Benefits Will Continue Post-Confirmation (Section 1129(a)(13)).**

80.      Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[129]

81.      The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code because Articles IV.R and V.I of the Plan provide that from and after the Effective Date, all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will be paid in accordance with applicable law.

---

[128]  11 U.S.C. § 1129(a)(12).

[129]  11 U.S.C. § 1129(a)(13).

**N.      Sections 1129(a)(14) Through 1129(a)(16) Do Not Apply to the Plan.**

82.      Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.[130]  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.

83.      Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.[131]  Since the Debtors are not individuals, the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.

84.      Finally, each of the Debtors is a moneyed, business, or commercial corporation, and therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of nonbankruptcy law,[132] is not applicable to these Chapter 11 Cases.

**O.      The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

85.      Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[133]  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy

---

[130]  11 U.S.C. § 1129(a)(14).

[131]  11 U.S.C. § 1129(a)(15).

[132]  *See* 11 U.S.C. § 1129(a)(16).

[133]  11 U.S.C. § 1129(b)(1).

Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[134]

86.     The Plan satisfies section 1129(b) of the Bankruptcy Code.  While the Impaired Accepting Classes voted to accept the Plan, the Holders of Interest in Class 8 (Interests in Ascend Parent) voted to reject the Plan.[135]  Further, Class 9 (Interests in APM Disc) (which consists of out-of-the-money equityholders) and Class 10 (Section 510(b) Claims) are deemed to reject the Plan.[136]

87.     Notwithstanding the fact that certain Impaired Classes voted to reject or are deemed to have rejected the Plan, the Plan is confirmable as set forth below.

### 1.     The Plan Is Fair and Equitable (Sections 1129(b)(2)(B)(ii) and (C)(ii)).

88.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[137]  The

---

[134] *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'Ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997) ("[T]he Plan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the Plan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the Plan.").

[135] *See* Voting Report, Exhibit A.

[136] To the extent Reinstated under the Plan, distributions on account of Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) are not being received by Holders of such Claims and Interests "on account of" their Claims or Interests within the meaning of section 1129(b)(2)(B)(ii) of the Bankruptcy Code.  Rather, Reinstatement of the Intercompany Claims or Intercompany Interests, if at all, will merely be a technical preservation of such Claims or Interests for the purposes of administrative convenience and to avoid the unnecessary cost of reinstituting the Debtors' prepetition corporate structure, for the ultimate benefit of all parties in interest.  Any Reinstatement of Intercompany Claims or Intercompany Interests will thus have no economic substance and will not enable any junior creditor or interest holder to retain or recover any value under the Plan. *See* Plan, Art. III.F; *see also In re Ion Media Networks, Inc.*, 419 B.R. 585, 600–01 (Bankr. S.D.N.Y. 2009) (overruling an objection that reinstatement of an intercompany interest violates the absolute priority rule because "the . . . retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure").

[137] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999) ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or

46

absolute priority rule provides that a junior stakeholder (*e.g.*, an equity holder) may not receive or retain property under a plan of reorganization "on account of" its junior interests unless all senior classes either (a) are paid in full or (b) vote in favor of the plan.[138]

89.     The rejecting Impaired Classes that are deemed to have rejected the Plan are Class 9 (Interests in APM Disc) and Class 10 (Section 510(b) Claims).  The Plan satisfies the absolute priority rule (and is fair and equitable) as to Classes 9 and 10 because no Class that is junior to these Classes will receive or retain any property on account of the Claims or Interests in such Class.[139]  Likewise, with respect to Class 8 (Interests in Ascend Parent), the Plan satisfies the absolute priority rule because no Class that is junior to Class 8 will receive or retain any property on account of the Claims or Interests in such Class.[140]

### 2.     The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (Section 1129(b)(1)).

90.     To confirm a plan over the objection of a dissenting class of creditors or interest holders, among other requirements, a plan cannot discriminate unfairly as to any dissenting class.[141]     The Bankruptcy Code does not prohibit discrimination, but rather "unfair

---

interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[138]  *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii); *see also DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 88 (2d Cir. 2011) (citations omitted) (the absolute priority rule "provides that a reorganization plan may not give 'property' to the holders of any junior claims or interests 'on account of' those claims or interests, unless all classes of senior claims either receive the full value of their claims or give their consent"); *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) (citations omitted) ("Under the statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan 'on account of' such claims or interests.").

[139]  *See* Plan, Art. III; Del Genio Decl. ¶ 53.

[140]  *See* Del Genio Decl. ¶ 53.

[141]  *See* 11 U.S.C. § 1129(b)(1).

47

discrimination."[142]  Although the Bankruptcy Code does not provide a standard for determining

when "unfair discrimination" exists, courts typically examine the facts and circumstances of the

particular case to make the determination.[143]  A threshold inquiry to assessing whether a proposed

plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting

class is equally situated to a class allegedly receiving more favorable treatment.[144]  In general,

courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy

Code only if it provides materially different treatment for creditors and interest holders with similar

legal rights without compelling justifications for doing so.[145]  The text of section 1129 of the

Bankruptcy Code requires a plan not to *unfairly* discriminate against an impaired non-accepting

class.[146]  Accordingly, for payment to be preferred to one class over others, there must be an

---

[142]  11 U.S.C. § 1129(b)(1).

[143]  *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *203 N. LaSalle*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[144]  *See In re Tex. Star Refreshments, LLC*, 494 B.R. 684, 698 (Bankr. N.D. Tex. 2013) (noting that "unfair" discrimination works only among claimants of nonequal bankruptcy priority); *In re Aleris Int'l, Inc.*, No. 09-10478, 2010 WL 3492664, at *31 (Bankr. D. Del. May 13, 2010) (citing *In re Armstrong World Indus.*, 348 B.R. at 121).

[145]  *See In re Idearc Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009) ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (finding no unfair discrimination where the interests of objecting class were not similar or comparable to those of any other class).

[146]  11 U.S.C. § 1129(b) (emphasis added).

48

articulable basis for the preference.[147]  A sound and rational business reason for discrimination is one such basis.[148]  Further, discrimination may not be unfair where the party being discriminated against is not entitled to a recovery greater than what they would receive outside of bankruptcy.[149]

91.     Here, the Plan's treatment of all other non-accepting Impaired Classes is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment, and the Plan's classification scheme rests on a legally acceptable rationale.[150] Accordingly, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code, and the Plan may be confirmed notwithstanding the deemed rejection by the Impaired Classes.

### P.     The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).

92.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans,[151] is not implicated because there is only one proposed Plan.

---

[147]  *See In re Mortg. Inv. Co. of El Paso, Tex.*, 111 B.R. 604, 614–15 (Bankr. W.D. Tex. 1990).

[148]  *See In re Robertshaw US Holding Corp.*, 662 B.R. 300, 319–20 (Bankr. S.D. Tex. 2024) (finding that a plan did not discriminate unfairly against any dissenting class where there was evidence of "a business justification for the discrimination"); *In re Bashas' Inc.*, 437 B.R. 874, 904 (Bankr. D. Ariz. 2010); *see also In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 90–91 (D. Del. 2018) (affirming the Bankruptcy Court's decision that the plan did not discriminate unfairly where the court found, among other things, that the "treatment of other unsecured creditors [fostered] a reorganization of [the] debtors" (internal quotations omitted)); *Aegerion Pharm.*, 605 B.R. at 34–35 (rejecting an argument for unfair discrimination and noting that other courts have made similar findings where the separate treatment of trade creditors was justified by good business reasons, including successful reorganizations and ongoing relationships).

[149]  *See Sentry Operating Co. of Texas,* 264 B.R. at 864.

[150]  Claims in the other non-accepting Impaired Classes—*i.e.*, potentially Classes 6, 7, and Classes 8, 9, and 10—are not similarly situated to any other classes, given their distinctly different legal character relative to all other Claims and Interests.  The Holders of Interests populating Classes 8 and 9 are equityholders in Ascend Parent and APM Disc, respectively, and Class 10 is Section 510(b) Claims.  Class 6 and Class 7 are Intercompany Claims and Intercompany Interests, respectively.

[151]  *See* 11 U.S.C. § 1129(c).

93.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[152]  Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.[153]  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

94.     Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' Chapter 11 Cases is a "small business case."[154]

95.     In sum, the Plan satisfies all of the Bankruptcy Code's mandatory chapter 11 plan confirmation requirements.

## V.     The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code.

96.     The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[155]  Among other discretionary provisions, the Plan contains the Committee Settlement, as well as a debtor release, consensual third-party releases, an exculpation provision, and an injunction provision.[156]  These provisions are the product of extensive good faith, arm's-length negotiations, comply with the Bankruptcy Code and prevailing Fifth Circuit law, and should be approved.

---

[152]   *See* Del Genio Decl. ¶ 55.

[153]   *See* Del Genio Decl. ¶ 55.

[154]   *See* 11 U.S.C. § 1129(e); *see also* 11 U.S.C.  § 101(51D)(B) ("[A]ny member of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than [$3,424,000] (excluding debt owed to 1 or more affiliates or insiders)" is not a small business debtor).

[155]   11 U.S.C. §§ 1123(b)(1)–(6).

[156]   Plan, Art. VIII.

A. **The Plan Appropriately Incorporates the Committee Settlement**

97.     Section 1123(b)(3) of the Bankruptcy Code states that a plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate,"[157] and the standards for approval of a settlement under section 1123 are generally the same as those under Bankruptcy Rule 9019.[158]  Compromises are favored in bankruptcy, and whether to approve a proposed settlement is committed to the discretion of the bankruptcy court, which must consider whether the settlement is (a) "fair and equitable" and (b) "in the best interests of the estate."[159] The "fair and equitable" requirement generally is interpreted, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule.[160]  In determining whether a settlement meets the best interests requirement under Bankruptcy Rule 9019, the Fifth Circuit has stated that courts should consider: "(1) the

---

[157]  11 U.S.C. § 1123(b)(3)(A).

[158]  *See Robertshaw*, 662 B.R. at 314 ("The legal test [under Section 1123(b)(3)(A) of the Bankruptcy Code] is the same one used to consider settlements under Bankruptcy Rule 9019."); *In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 715, 751 n.101 (Bankr. E.D. La. 1999) ("The standard under 11 U.S.C. § 1123(b)(3) is the same as the standard for approval of settlements under Rule 9019.").

[159]  *See In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) ("[T]he court should approve the settlement only when the settlement is fair and equitable and in the best interest of the estate."); see also *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that the language contained in the plan purports to release any causes of action against the [creditor] which the Debtor could assert, such provision is authorized by § 1123(b)(3)(A), subject to compliance with provisions of the code requiring that the plan be fair and equitable as to creditors and that the plan be proposed in good faith."); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (stating that settlements are considered "a normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated[,] and costly.") (quotations and citations omitted).

[160]  *See In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006) ("Because 'fair and equitable' translates to the absolute priority rule, in order for a settlement to meet that test it must be consistent with the requirement that dissenting classes of creditors must be fully satisfied before any junior creditor receives anything on account of its claim.") (internal citations omitted); *see also In re MCorp Fin., Inc.*, 160 B.R. 941, 960 (Bankr. S.D. Tex. 1993) (approving a gifting settlement as meeting the "fair and equitable" test, reasoning that "[senior creditors] may share their proceeds with creditors junior to the [junior creditors], as long as the [junior creditors] continue to receive as least as much as what they would without the sharing."); *cf. In re AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984) (holding that a settlement must comply with the absolute priority rule).

51

probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise."[161] The Fifth Circuit imposes two additional factors that bear on the decision to approve a proposed settlement: (a) "the paramount interest of creditors with proper deference to their reasonable views;" and (b) "the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion."[162] The proponent of the settlement need not demonstrate that the settlement is the best one possible—the settlement need only be "within the 'range of reasonable litigation alternatives.'"[163]

98.     The Committee Settlement provides for: (a) the bifurcation of Class 5A (Go-Forward Vendor Claims) and Class 5B (General Unsecured Claims); (b) a cash recovery for Holder of Claims in Class 5A in an amount equal to the lesser of (i) $13.7 million or (ii) a 25% of the aggregate amount of Allowed Go-Forward Vendor Claims; (c) payment of fees accrued by the Committee Advisors as of the filing of the Amended Plan to be capped at approximately $18 million; and (d) payment of certain amounts budgeted for the Committee's go-forward advisor fees and an ombudsman to assist in the resolution of remaining general unsecured claims. The Committee Settlement secures the support of the Committee for the Plan and resolves all of the Committee's Claims and Causes of Action against the Debtors. The Debtors believe the

---

[161] *In re Roqumore*, 393 B.R. 474, 479–80 (Bankr. S.D. Tex. 2008) (citing the factors set forth by the court in *Jackson Brewing Co.*, 624 F.2d at 602); *see also In re Age Ref., Inc.*, 801 F.3d 530, 540 (5th Cir. 2015) (same).

[162] *Foster Mortg.*, 68 F.3d at 918–19 (citations omitted).

[163] *Roqumore*, 393 B.R. at 480 (internal citations omitted).

52

Committee Settlement strikes a reasonable balance between delivering a meaningful recovery to unsecured creditors and preserving value for the Debtor's go-forward business.

99.     The factors stated above weigh in favor of approval of the Committee Settlement, which is a fair and equitable compromise that is in the best interests of the Debtors' Estates.  It is undeniable that litigating chapter 11 case disputes would have been complex and time-consuming and could unnecessarily extend the Debtors' stay in chapter 11 and drive additional administrative expenses.[164]  Factoring in the costs and risks of litigation (and the associated fights over which party would bear such costs and risks), the Debtors, after careful review with the assistance of their advisors, determined in their sound business judgment that the value of prevailing on the merits in cost-intensive litigation with the Committee and other released parties would not exceed the consideration received under the Plan.[165]  As reflected by the creditor support for the Plan, the compromises and settlement under the Plan are the successful result of hard-fought, pre- and postpetition negotiations.  The Debtors contend that, in their sound business judgment, the Committee Settlement is in the best interest of their estates, preserves the going concern value of the Company, and is value-maximizing for all stakeholders.[166]  Therefore, the Committee Settlement is appropriate, satisfies the requirements of section 1123 of the Bankruptcy Code, is in the best interests of the Debtors' Estates, and should be approved.

**B.     The Debtor Release Is Appropriate and Complies with the Bankruptcy Code.**

100.     Article VIII.C of the Plan sets forth the Debtor releases (the "Debtor Release"). The Debtor Release releases, among others, the Debtors, the Reorganized Debtors, the DIP ABL

---

[164]  *See* Del Genio Decl. ¶ 59.

[165]  *See* Del Genio Decl. ¶ 59.

[166]  *See* Del Genio Decl. ¶ 59.

Lenders, the ABL Lenders, each member of the Ad Hoc Group (including in their capacity as DIP Term Loan Lenders, Bridge Lenders, Term Loan Lenders, and Debt Backstop Parties, as applicable), and the Committee and each of its members, MasTec, the Releasing Parties that are not Excluded Parties, the Agents, and current and former Affiliates of the foregoing and certain Related Parties of the foregoing; *provided*, that, as set forth in the Plan, any Entity that opts out of the releases or that objects to the releases in the Plan (and does not withdraw such objection before the Confirmation Hearing or such objection is not resolved before the Confirmation Hearing) shall not be a Released Party.[167]  For the avoidance of doubt, no Excluded Party, shall be a Released Party.[168]

101.    As detailed above, Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may "provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[169]  Accordingly, pursuant to section 1123(b)(3)(A), the Debtors may release Estate Causes of Action as consideration for concessions made by various stakeholders pursuant to the Plan.[170]  In considering the appropriateness of such releases, courts in the Fifth Circuit generally consider whether the release is (a) "fair and equitable" and (b) "in the best interests of the estate."[171]  Courts in the Fifth Circuit generally interpret the "fair and

---

[167]  *See* Plan, Art. VIII.C, Art. I, ¶ 216. The foregoing description is meant as a summary of the operative Plan provisions only.  To the extent there is any conflict between the foregoing summary and the Plan, the Plan shall control.

[168]  *See* Plan, Art. I, ¶ 216.

[169]  11 U.S.C. § 1123(b)(3).

[170]  *See, e.g.*, *In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (finding that plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the Debtors and the Estate are releasing claims that are property of the Estate in consideration for funding of the Plan"); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *Mirant*, 348 B.R. at 737–39; *Gen. Homes*, 134 B.R. at 861.

[171]  *Mirant,* 348 B.R. at 738; *see also Heritage Org.*, 375 B.R. at 259.

equitable" prong, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule.[172]   Courts generally determine whether a release is "in the best interest of the estate" by reference to the following factors:

> a.   the probability of success of litigation;
>
> b.   the complexity and likely duration of the litigation, any attendant expense, inconvenience, or delay, and possible problems collecting a judgment;
>
> c.   the interest of creditors with proper deference to their reasonable views; and
>
> d.   the extent to which the settlement is truly the product of arm's-length negotiations.[173]

Ultimately, courts afford the Debtors discretion to determine for themselves whether to release estate causes of action through a plan.[174]

102.   The Debtor Release meets the controlling standard.  As an initial matter, the terms of the Debtor Release comply with the Bankruptcy Code's absolute priority rule as discussed in paragraphs 88–89 herein.  While certain Classes have rejected the Plan, the Debtor Release and settlements embodied therein do not result in any Classes junior to any rejecting Classes receiving or retaining any property on account of junior Claims or Interests.   Thus, the Debtor Release is fair and equitable in line with Fifth Circuit precedent.

103.   In addition to being fair and equitable, the Debtor Release is in the best interest of the Estates.  ***First***, key stakeholders were extensively involved in the negotiation process that led

---

[172]   *Mirant*, 348 B.R. at 738.

[173]   *Id.* at 739–40 (citing *Cajun Elec.,* 119 F.3d at 355–56).

[174]   *See Gen. Homes Corp.*, 134 B.R. at 861 ("The court concludes that such a release is within the discretion of the Debtor.").

to the Committee Settlement and the extensive support for the Plan among the Debtors' major stakeholders.[175]   In particular, the restructuring embodied in the Plan (including the Debtor Release) was negotiated by sophisticated parties and counsel, including months of postpetition negotiations among the Debtors, the Ad Hoc Group, the ABL Lenders, the DIP ABL Lenders, the Committee, and the counterparties to the Asset Financing Agreements.[176]

104.   ***Second***, the Debtor Release is an essential *quid pro quo* for the Released Parties' contributions to and support of the Debtors' restructuring as the Released Parties were unwilling to support the Plan without the assurance that they would not be subject to post-emergence litigation or other disputes related to these Chapter 11 Cases.[177]

105.   ***Third***, the Plan, including the Debtor Release contained therein, is supported by, among other parties, the Ad Hoc Group, the DIP Lenders, and the Committee.[178]

106.   ***Fourth***, as further detailed in the Piper Declaration, the Special Committee determined that the Debtor Release was fair, reasonable, and in the best interests of the Debtors' estates.[179]   Specifically, prior to the Petition Date, and as detailed further in Article VI.C of the Disclosure Statement, the Boards established the Special Committee at each Board and appointed the Disinterested Directors to the Boards and the Special Committee. [180]   As part of its delegated authority, the Special Committee: (a) was authorized to investigate and determine whether any

---

[175]   *See* Del Genio Decl. ¶ 15; Piper Decl. ¶ 9.

[176]   *See* Piper Decl. ¶ 22.

[177]   *See* Piper Decl. ¶ 22.

[178]   *See* Disclosure Statement Art. III.EE.

[179]   *See* Piper Decl. ¶ 21.

[180]   *See* Disclosure Statement Art. VII.N.

matter arising in or related to a restructuring transaction constitutes a Conflicts Matter; and (b) had exclusive authority and power to review, discuss, consider, negotiate, approve, and authorize the Debtors' entry into, and consummation of, a restructuring transaction, solely to the extent that all or a portion of the transaction constitutes a Conflicts Matter.[181] The Special Committee was also given the authority to conduct the Independent Investigation of the Conflicts Matters, including potential Claims and Causes of Action that could be asserted by the Debtors' Estates against Related Parties regarding certain prepetition transactions involving the Related Parties.[182]

107.    With respect to the Independent Investigation, the Disinterested Directors, working with assistance of Katten and Province, issued numerous document and information requests to the Debtors and SK Capital Partners LP and its direct and indirect affiliates, subsidiaries, and managed funds (collectively, "SK Capital") seeking, among other things, documents and information relevant to the Independent Investigation.[183] The full breadth of materials requested and reviewed by the Disinterested Directors, working in tandem with Katten and Province, is detailed further in the Disclosure Statement,[184] but overall Katten and/or Province reviewed tens of thousands of documents and electronic communications produced by the Debtors and SK Capital in response to the Disinterested Directors' requests and/or requests from the Committee and also received access to a virtual data room maintained by the Company for various lender and

---

[181]  Piper Decl. ¶ 6.

[182]  Piper Decl. ¶¶ 6, 12.

[183]  Piper Decl. ¶ 13.

[184]  *See* Disclosure Statement Art. VII.N.

creditor groups. In addition, Katten interviewed certain current and former officers of Ascend, a principal of SK Capital, and a representative of Ascend's financial advisor, FTI Consulting, Inc.[185]

108.     After thorough analysis and consultation with their advisors, the Special Committee concluded that any potential Estate Causes of Action relating to the Investigation Topics against certain Entities identified on the Schedule of Excluded Parties should be preserved under the Plan if not otherwise resolved in the Chapter 11 Cases.[186] The Excluded Parties will not be "Released Parties" under the Plan, and all potential Claims and Causes of Action against the Excluded Parties will be preserved under the Plan, regardless of whether such potential Claims and Causes of Action relate to the Investigation Topics.[187]

109.     Beyond the aforementioned Claims and Causes of Action, the Special Committee determined that the Debtor Release was fair, reasonable, and in the best interests of the Debtors' Estates as the Debtor Release (a) reflects a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes and allowing the Debtors to exit chapter 11 expeditiously, on the other hand; (b) is a good-faith settlement and compromise of the Claims and Causes of Action released by the Debtor Release, which bore a substantial likelihood of complex and protracted litigation, with attendant expense, inconvenience, and delay that may have impeded the Debtors' efforts to reorganize; (c) is provided in exchange for the good and valuable consideration, including the Released Parties' contributions to facilitating the Restructuring

---

[185] Piper Decl. ¶ 15.

[186] Piper Decl. ¶ 19.

[187] *See* Plan Art. I, ¶¶ 215–15, Art. IV.S.

Transactions contemplated in the Plan; and (d) is given, and made, after due notice, opportunity for hearing, and robust investigation by the Special Committee.[188]

110.    Accordingly, the Debtor Release, including the Committee Settlement, is fair, equitable, and in the best interest of their Estates, is justified under the controlling Fifth Circuit standard, and should be approved.

> **C.    The Third-Party Release Is Appropriate and Complies with the Bankruptcy Code.**

111.    Article VIII.D of the Plan contains a third-party release provision (the "Third-Party Release," and together with the Debtor Release, the "Release Provisions").  It provides that each Releasing Party—including all Holders of Claims and Interests who do not specifically opt out to their inclusion as a Releasing Party—and Related Parties shall release any and all Causes of Action (including a list of specifically enumerated claims) such parties could assert against the Debtors, the Reorganized Debtors, and the Released Parties.[189]

112.    While the Fifth Circuit has not directly addressed what constitutes a consensual third-party release, the *Republic Supply*[190] court found that the Bankruptcy Code does not preclude a third-party release provision where "it has been accepted and confirmed as an integral part of a plan of reorganization."[191]  *Republic Supply* and its progeny[192] ultimately stand for the proposition

---

[188]  Piper Decl. ¶¶ 21–24.

[189]  The foregoing description is meant as a summary of the operative plan provisions only.  Certain of the Releasing Parties are defined as such in multiple capacities.  To the extent there is any conflict between the foregoing summary and the definition of "Releasing Party" contained in Article I of the Plan, the Plan shall control.

[190]  *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987).

[191]  *Id.*

[192]  *See,* e.g., *Hernandez v. Larry Miller Roofing, Inc.*, 628 Fed. App'x 281, 286–88 (5th Cir. 2016); *FOM Puerto Rico, S.E. v. Dr. Barnes Eyecenter, Inc.*, 255 Fed. App'x 909, 911–12 (5th Cir. 2007); *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 919 (5th Cir. 2000).

that "[c]onsensual nondebtor releases that are specific in language, integral to the plan, a condition of settlement, and given for consideration do not violate" the Bankruptcy Code.[193]  At the core of the analysis is whether the third-party release is consensual.

113.  Bankruptcy courts in Texas have applied this standard in recent chapter 11 bankruptcies when approving third-party releases similar to this Third-Party Release.[194]  In doing so, these courts have focused on *process*—*i.e.*, whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look it over, [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."[195]  Ultimately, these courts acknowledge that parties in interest waive their rights with respect to a third-party release if they vote to accept the Plan or do not opt out of the releases.[196]  *Purdue* does not change this analysis.[197]

114.  In *Purdue*, the United States Supreme Court held "only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under

---

[193]  *In re Wool Growers*, 371 B.R. 768, 776 (N.D. Tex. 2007) (citing *Republic Supply*, 815 F.2d at 1050); *see also Dr. Barnes Eyecenter*, 255 Fed. App'x at 911–12.

[194]  *See e.g.*, Confirmation Hearing Tr. at 59:1–3, *In re Sunnova Energy Int'l, Inc.*, No. 25-90160 (ARP) (Bankr. S.D. Tex. Nov. 10, 2025); Confirmation Hearing Tr. at 32:10–16, *In re Ameriforge Grp., Inc.*, No. 17-32660 (Bankr. S.D. Tex. May 24, 2017) [Docket No. 144]; Confirmation Hearing Tr. at 19–20, 33, *In re Hornbeck Offshore Servs., Inc.*, No. 20-32679 (Bankr. S.D. Tex. Jun. 19, 2020) [Docket No. 227].

[195]  Confirmation Hearing Tr. at 47: 7–11, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (Bankr. N.D. Tex. Apr. 21, 2016) [Docket No. 730] (hereinafter "ENXP Tr."); *see also id*.

[196]  ENXP Tr. at 47:2–15 ("[T]he [*Republic Supply*] case being that the Debtor is authorized, I think, I don't think there's anything that's necessarily bad faith about the Debtor putting release provisions like this into a plan.  And if we assume that the Debtor has otherwise satisfied procedural due process . . . and then they choose not to participate one way or the other, can they be bound by it?  I would say that this is one of those situations where [*Republic Supply*] says those people can waive substantive rights by not affirmatively participating in the case."); Confirmation Hearing Tr. at 42, *In re Southcross Holdings, LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. April 11, 2016) [Docket No. 191] (approving as consensual a third-party release provision in favor of the debtors' prepetition equity sponsors that bound all holders of claims and interest).

[197]  *See, e.g., Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204 (2024) (hereinafter "*Purdue*").

chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants."[198]  The Supreme Court's holding only applies to nonconsensual releases and does not address consensual releases.[199]  The Fifth Circuit already limited the availability of non-consensual third-party releases prior to *Purdue*.[200]  Unsurprisingly then, bankruptcy courts in this district and others have continued to approve opt-out third-party releases post-*Purdue*, explicitly articulating that "*Purdue* did not change the law in [the Fifth] Circuit" and that "[h]undreds of chapter 11 cases have been confirmed in [the Southern] District with consensual third-party releases with an opt-out."[201]

115.    The Third-Party Release meets this standard.  As a threshold matter, the Third-Party Release is ***consensual***.  Parties in interest were provided extensive notice of these chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan.[202]  Holders of prepetition Claims and Interest were  provided notice, which expressly apprised such parties of the

---

[198]  *Purdue*, 603 U.S. at 206–07.

[199]  *Id.* at 206.

[200]  *See, e.g., In re Pilgrim's Pride Corp.*, No. 08-45664-DML-11, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010) (finding that, under *In re Pac. Lumber Co.*, 584 F.3d 229, 253 (5th Cir. 2009), "the court may not, *over objection*, approve through confirmation of the Plan third-party protections") (emphasis added).

[201]  *See Robertshaw*, 662 B.R. at 323 ("There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan . . . . Hundreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out . . . . *Purdue* did not change the law in this Circuit."); *see also In re CareMax, Inc.*, No. 24-80093 (Bankr. N.D. Tex. Jan. 31, 2025) [Docket No. 587] (confirming chapter 11 plan's opt-out third-party releases as consensual); *In re KidKraft, Inc.*, No. 24-80045 (Bankr. N.D. Tex. June 24, 2024) [Docket No. 231] (same); *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024) [Docket No. 2671] (same).

[202]  *See* Disclosure Statement Order; *Affidavits of Publication* [Docket Nos. 1024 and 1025]; *Certificate of Service of Solicitation Materials* [Docket No. 1042].

existence of the Third-Party Release and their ability to opt out of the release or object to the release if they did not wish to be bound.[203]

116.    In particular, the Disclosure Statement included a detailed description of the Third-Party Release and the opt-out mechanism.[204] Ballots (as defined in the Disclosure Statement Order) were served on the Voting Classes, and Non-Voting Status Notices[205] and Opt-Out Forms (as defined in the Disclosure Statement Order) were served on Non-Voting Classes (as defined in the Disclosure Statement Order), such that all Holders of prepetition Claims and Interests had the opportunity to opt out.[206] The Ballots each quoted the entirety of the Third-Party Release in bold, conspicuous font and clearly informed Holders in the Voting Classes that they could opt out of the Third-Party Release by checking the appropriate box.[207] The Ballots clearly instructed Holders that if they do not consent to the Third-Party Release, they should opt out of the releases, and included a pre-addressed postage-paid return envelope.[208] Similarly, the Opt-Out Form included with the Non-Voting Status Notices quoted the Third-Party Release and included an option to check a box to opt out of the Third-Party Release. Parties in Non-Voting Classes who received a Non-Voting Status Notice were able to submit their Opt-Out Form online.[209] The Debtors also

---

[203] *See Certificate of Service of Solicitation Materials* [Docket No. 1042].

[204] *See* Disclosure Statement, Art. IV.D.4, Art. III.V.

[205] As used herein, the "Non-Voting Status Notices" mean the notices sent to Holders of Claims and Interests in the Non-Voting Classes (other than Classes 6 and 7) substantially in the form attached as Exhibits 7 and 8 to the Disclosure Statement Order.

[206] *See Certificate of Service of Solicitation Materials* [Docket No. 1042]; Voting Report ¶ 8, 15.

[207] *See* Disclosure Statement Order, Exhibits 3–6.

[208] *See* Disclosure Statement Order, ¶ 7(d), Exhibits 3–6.

[209] *See* Disclosure Statement Order, Exhibits 7–8.

caused the Third-Party Release language to be published in *The New York Times* (U.S. national edition) and the *Financial Times* (global edition).[210]  As such, all Holders of prepetition Claims or Interests were actually served with the means by which such stakeholder could opt-out of the Third-Party Release.[211]

117.   The Voting Report demonstrates that the opportunity to opt out of the Third-Party Release was effectively communicated and clearly understood by Holders of Claims and Interests.[212]  As evidenced by the notice procedures detailed herein and meaningful Holder participation in the solicitation process, the notice and opportunity to opt-out of the Third-Party Releases provided by the Debtors was unambiguous and effective.  Courts have approved similar release provisions when parties received sufficient notice of their ability to opt out or object to the release.[213]

118.   In addition to being consensual, the Third-Party Release is sufficiently specific, integral to the plan, a condition of settlement, and given for consideration, satisfying the other

---

[210]  *See Affidavits of Publication* [Docket Nos. 1024 and 1025].

[211]  *See* Disclosure Statement Order, <u>Exhibit 8</u>; *Certificate of Service of Solicitation Materials* [Docket No. 1042].

[212]  *See* Voting Report ¶¶ 15–16.

[213]  *See In re Carlson Travel, Inc.*, No. 21-90017 (MI) (Bankr. S.D. Tex. Nov. 12, 2021) [Docket No. 106] at 20 ("[T]he Third-Party Release was integral to the formulation of the Plan . . . The Combined Hearing Notices sent to Holders of Claims and Interests, the Publication Notices, the Ballots sent to all Holders of Claims and Interests entitled to vote on the Plan, and the Opt-Out Notices served on all Holders of Claims in the Unimpaired Classes and on the Supplemental Solicitation Noteholders, in each case, unambiguously stated that the Plan contains the Third-Party Release and informed parties in interest of their ability to opt out of the Third-Party Release."); *In re Genon Energy*, Inc., No. 17-33695 (S.D. Tex. Dec. 12, 2017) [Docket No. 1955] at 21 (approving the Third-Party Release because it allowed opt-out and "the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, . . . and the applicable notices"); *see also In re QualTek Servs. Inc.*, No. 23-90584 (CML) (Bankr. S.D. Tex. June 30, 2023) [Docket No. 234] at 11 (approving a chapter 11 plan with a consensual third-party release in the style of an opt-out provision); *In re Pipeline Health Sys., LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023) [Docket No. 1041] at 23 (same); *In re Altera Infrastructure L.P.,* No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) [Docket No. 533] at 9 (same).

factors referenced in *Republic Supply* and its progeny. ***First***, the Third-Party Release is sufficiently specific—listing potential Causes of Action to be released—so as to put the Releasing Parties on notice of the released claims.[214] ***Second***, the Third-Party Release is integral to the Plan and a condition of the comprehensive settlement embodied therein.[215] The provisions of the Plan were heavily negotiated postpetition. The Third-Party Release (together with the Debtor Release) are key components of the Debtors' restructuring and key inducement to bring stakeholder groups to the bargaining table.[216] Put simply, the Debtors' key stakeholders are unwilling to support the Plan without the assurance that they and their collateral would not be subject to post-emergence litigation or other disputes related to restructuring.[217] The Third-Party Release therefore not only benefits the non-Debtor Released Parties but also the Debtors' post-emergence enterprise as a whole.

119. ***Third***, the Third-Party Release was given for consideration. The significant consideration provided by the Released Parties inured not only to the benefit of the Debtors as described above, but also to the benefit of all stakeholders by allowing the Chapter 11 Cases to efficiently proceed and, thus, maximize the value of the Debtors' business. All parties in interest benefit from the restructuring transactions contemplated by the Plan, which will greatly improve the Debtors' liquidity profile and position them for future success. The *quid pro quo* for the

---

[214] Plan, Art. VIII.D (specifically describing the nature and type of claims released), Art. I.A, ¶ 216 (specifically describing the parties released).

[215] *See* Del Genio Decl. ¶¶ 63, 67; Piper Decl. ¶ 27.

[216] *See* Del Genio Decl. ¶ 64; Piper Decl. ¶ 27.

[217] *See* Del Genio Decl. ¶ 64; Piper Decl. ¶ 22.

64

contributions, concessions, and support offered by the Released Parties under the Plan is the Third-Party Release.

> **1.    The Third-Party Release Should be Approved and the U.S. Trustee's Objection With Respect Thereto Should be Overruled**

120.    Despite the Third-Party Release's compliance with *Republic Supply* and its progeny, the U.S. Trustee objects to the Third-Party Release as impermissible, in line with its institutional opposition to opt-out releases.[218]   The U.S. Trustee is the only party in interest that objected to the Third-Party Release.  Specifically, the U.S. Trustee asserts multiple arguments that silence or a failure to opt out are insufficient to confer consent and contends that state law, rather than bankruptcy law, should govern any issues regarding release of third parties. [219]   The U.S. Trustee's arguments regarding the Third-Party Release are unsupported by relevant legal precedent and should be overruled.

121.    The U.S. Trustee presents multiple arguments in support of its primary argument that an opt-out third-party release is nonconsensual and therefore prohibited under *Purdue*.[220]   The basis for the contention that the Third-Party Release is not consensual is that consent "cannot be inferred from silence."[221]   However, courts in the Fifth Circuit are clear that silence and/or failing to opt out of a third-party release is sufficient to confer consent.[222]   Failing to opt out constitutes

---

[218]   *See* U.S. Trustee Obj. ¶¶ 1, 14–51.

[219]   *See* U.S. Trustee Obj. ¶¶ 1, 14–51.  The U.S. Trustee further objects to the release of claims by governmental entities under the Plan.  U.S. Trustee Obj. ¶ 1.  The Debtors believe that the U.S. Trustee's objection regarding the release of claims by governmental entities has been resolved by inclusion of the U.S. Trustee's requested language in the Confirmation Order.

[220]   *See* U.S. Trustee Obj. ¶¶ 14–51.

[221]   U.S. Trustee Obj. ¶ 40.

[222]   *See In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701–02 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent*.  Without an objection, this court was entitled to rely on [a creditor's] silence to infer consent at the confirmation hearing . . . .") (emphasis in original) (citation omitted); Confirmation Hearing Tr. at 41:19–24, 42:15–17, *In re Container Store Grp., Inc.*, No. 24-90627 (ARP) (Bankr.

affirmative consent, particularly given the Debtors' extensive communication with Holders of Claims and Interests throughout these Chapter 11 Cases.  Over the last eight months, Holders have received consistent engagement and notice, including the notice of commencement of the Chapter 11 Cases,[223] the Bar Date Order and relevant proof of claim form,[224] the Disclosure Statement Order,[225] notification of the commencement of the solicitation process,[226] and notice of the Confirmation Hearing.[227]  To suggest that parties in interest are unaware of their right and opportunity to opt-out due to a lack of response fails to acknowledge the effectiveness of the bankruptcy process as a whole.

122.    Although the U.S. Trustee suggests that a creditor must sign an agreement for a release to be consensual,[228] this Court has ruled that is not the case.  Rather, "[i]n determining whether a release is consensual, this Court must look to factors like notice, the deadline to object, the voting deadline, the opportunity to opt-out, and whether the releases are narrowly tailored and core to the proceeding."[229]  As detailed in paragraphs 111–119, the Debtors meet this standard, and the Third-Party Release is consensual.  Further, nothing in *Purdue* now requires courts in the

---

S.D. Tex. Jan. 28, 2025) [Docket No. 201] ("So we have developed and refined a way to determine whether the releases that are included in the plan are consensual, and we've done that by the use of an opt-out mechanism that allows for notice to the parties, actual notice to the parties, and then allows them the opportunity to opt out. . . . And giving the opportunity for the [creditors] to opt out is consistent with having consensual third-party releases.").

223  *See Certificate of Service* [Docket No. 190]; *Supplemental Certificate of Service* [Docket No. 208].

224  *See Certificates of Service* [Docket Nos. 413, 585].

225  *See Certificates of Service* [Docket Nos. 1027, 1028].

226  *See Certificate of Service of Solicitation Materials* [Docket No. 1042].

227  *See Certificates of Service* [Docket Nos. 1048, 1103].

228  *See* U.S. Trustee Obj. ¶38.

229  *Container Store*, No. 24-90627 (ARP) (Bankr. S.D. Tex. Apr. 7, 2025) [Docket No. 280] at 9.

Fifth Circuit to alter their approach or revisit what qualifies as a consensual release.[230]  Indeed, post-*Purdue*, courts in the Fifth Circuit, including this Bankruptcy Court, continue to find that opt out releases are consensual. [231]

123.     The U.S. Trustee in its objection also erroneously contends that courts should look to state contract law, rather than bankruptcy or federal law, when evaluating releases.[232] Specifically, the U.S. Trustee states "[a]bsent express authority in the Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims."[233]  The Fifth Circuit, however, has discussed this issue in *W. Texas Mktg. Corp.* where it recognized that "[o]nce the petition is filed, federal law controls."[234]  Further, this Court has held

---

[230]  The Supreme Court expressly did not "call into question *consensual* third-party releases" nor "express a view on what qualifies as a consensual release."  *Purdue*, 603 U.S. at 226 (emphasis in original).

[231]  *See, e.g.*, Tr. of Oral Ruling at 32:18–35:9, *In re Intrum AB*, No. 24-90575 (CML) (Bankr. S.D. Tex. Dec. 31, 2024) [Docket No. 275] (approving third party releases for which consent was confirmed through opt outs); Confirmation Hearing Tr. at 66:3-6, *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 18, 2024) [Docket No. 2680] ("When I look at everything, I'm going to approve the Plan under the law. I think it complies with every provision under the law. I think the opt-outs worked."); *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) (Bankr. S.D. Tex. Jan. 6, 2025) [Docket No. 2550]; *In re Robertshaw US Holding Corp.*, No. 24-90052 (CML) (Bankr. S.D. Tex Aug. 16, 2024) [Docket No. 959] at 28 ("[T]he consensual third-party releases in the Plan are appropriate, afforded affected parties constitutional due process, and a meaningful opportunity to opt out.  There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan . . . . And, again, *Purdue* did not change the law in this Circuit."); *In re DRF Logistics, LLC*, No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) [Docket No. 530] at ¶ P ("The releases granted by non-Debtors . . . are consensual because all Releasing Parties have either affirmatively consented to such releases or were given due and adequate notice thereof and sufficient opportunity and instruction to elect to opt out of such releases.").

[232]  U.S. Trustee Obj. ¶ 40.

[233]  U.S. Trustee Obj. ¶ 22.

[234]  *Container Store,* No. 24-90627 (ARP) [Docket No. 201] at 13 (citing *In re W. Tex. Mktg. Corp.*, 54 F.3d 1194, 1196 (5th Cir. 1995)).

that there is no "requirement that the bankruptcy court must look to state law" to resolve issues regarding third-party releases.[235]

124.     By satisfying the requirements in *Republic Supply*, the Third-Party Release meets the standard for approval by this Court and is consistent with Fifth Circuit law.  Indeed, the consensual Third-Party Release in the Plan is "appropriate, [and] afford[s] affected parties constitutional due process, and a meaningful opportunity to opt out."[236]  Accordingly, the Debtors submit that the U.S. Trustee Objection regarding Third-Party Release fails, and the Third-Party Release should be approved.

**D.      The Exculpation Provision Is Appropriate and Complies with the Bankruptcy Code.**

125.     Article VIII.E of the Plan provides that each Exculpated Party—*i.e.*, (a) each of the Debtors; (b) each of the Disinterested Directors of the Debtors; and (c) the Committee and each of its members, solely in their respective capacities as such—shall be released and exculpated from any Claim or Cause of Action arising out of acts or omissions prior to the Effective Date in connection with these Chapter 11 Cases and certain related transactions, except for acts or omissions that are found to have been the product of actual fraud or willful misconduct (the "Exculpation Provision").[237]

126.     At the outset, it is important to underscore the difference between the Third-Party Release and the Exculpation Provision.  Unlike the Third-Party Release, the Exculpation Provision

---

[235] *Container Store,* No. 24-90627 (ARP) [Docket No. 201] at 13 (citing Hearing Tr. at 105:11–14, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) (Bankr. S.D. Tex. December 14, 2024) [Docket No. 2502]).

[236] *Robertshaw*, 662 B.R. at 323.

[237] The foregoing description is meant as a summary of the operative plan provisions only.  To the extent there is any conflict between the forgoing summary and the definition of "Exculpated Parties" contained in Article I of the Plan, the Plan shall control.

does not affect the liability of third parties *per se*, but rather sets a standard of care of willful misconduct or actual fraud in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.[238]  A bankruptcy court has the power to approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[239]  As such, an exculpation provision represents a legal conclusion that flows inevitably from several different findings a bankruptcy court must reach in confirming a plan.[240]  Once the court makes its good faith finding, it is appropriate to set the standard of care of the fiduciaries involved in the formulation of that chapter 11 plan.[241]  Exculpation provisions, therefore, appropriately prevent future collateral attacks against fiduciaries of the Debtors' Estates.

127.    Here, the Exculpation Provision satisfies the governing standards in the Fifth Circuit, and in particular *Highland I*, where the court expressly adopted and applied prior Fifth Circuit precedent providing qualified immunity to "creditors' committee members for actions within the scope of their statutory duties" and "bankruptcy trustees," which extends to a debtor in possession under section 1107 of the Bankruptcy Code, unless they act with "gross negligence."[242] Caselaw in this circuit and others is clear that where a bankruptcy trustee is not appointed, a debtor

---

[238]   *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code").

[239]   *See* 11 U.S.C. § 1129(a)(3).

[240]   *See* 11 U.S.C. § 157(b)(2)(L).

[241]   *See PWS Holding Corp.*, 228 F.3d at 246 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties").

[242]   *See NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 437–38 (5th Cir. 2022) (hereinafter "*Highland I*").

in possession's directors are considered fiduciaries both to the debtor in possession and to the creditors, just as a trustee would be if one were appointed.[243] The Plan therefore appropriately includes the Debtors, each of the Disinterested Directors of the Debtors, and the Committee and its members as Exculpated Parties,[244] consistent with *Highland I* and this Bankruptcy Court's precedent, for actions taken prior to the Effective Date.[245]

128.    Per the U.S. Trustee Objection, the U.S. Trustee took issue with multiple aspects of the Exculpation Provision, including, among other things, the definition of "Exculpated Parties" including "Reorganized Debtors."[246] To resolve certain of the U.S. Trustee's concerns, the Debtors narrowed the definition of "Exculpated Parties" and removed "Reorganized Debtors."[247] Accordingly, the Debtors and the U.S. Trustee consider the U.S. Trustee Objection with respect to the Exculpation Provision resolved.

129.    The Exculpation Provision in the Plan is an integral piece of the overall settlement embodied by the Plan.[248] It is limited to parties who have performed valuable services in

---

[243] *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[I]f a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession."); *see also In re Hous. Reg'l Sports Network, L.P.*, 505 B.R. 468, 481 (Bankr. S.D. Tex. 2014) ("'[T]he willingness of courts to leave debtors in possession' is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee."); *In re Schepps Food Stores, Inc.*, 160 B.R. 792, 797 (Bankr. S.D. Tex. 1993) ("Section 1107(a) of the [Bankruptcy] Code enables a debtor to take the place of the trustee, with a few exceptions, as a [d]ebtor-in-[p]ossession . . . . Recognizing that corporations are in reality legal fictions, in such instances it is the debtor's management which takes on the heightened fiduciary obligations of the trustee."); *In re Performance Nutrition, Inc.*, 239 B.R. 93, 111 (Bankr. N.D. Tex. 1999) ("The officers and directors of a debtor in possession owe the same fiduciary duties as a trustee in bankruptcy.").

[244] *See* Plan Art. I.A, ¶ 130.

[245] *See* Plan Art. VIII.E.

[246] *See* U.S. Trustee Obj. ¶¶ 1, 52–54.

[247] *See* Plan Art. I.A, ¶ 130.

[248] *See* Del Genio Decl. ¶ 68; Piper Decl. ¶ 29.

70

connection with the Debtors' restructuring, and is the product of good faith, arm's-length negotiations.[249]  The Exculpation Provision is narrowly tailored to exclude acts of actual fraud or willful misconduct and relates only to acts or omissions in connection with, or arising out, of the Debtors' restructuring.[250]  As such, the Exculpation Provision is a critical component of the Plan, and along with the Debtor Release, forms an integral piece of the overall settlement embodied in the Plan.[251]

### E.   The Injunction Provision Is Appropriate and Complies with the Bankruptcy Code

130.   The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") is a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions that are critically important to the Plan.[252]  The Injunction Provision affords the Debtors and their stakeholders (including, among others, the Released Parties and the Exculpated Parties) a greater degree of certainty with respect to the Chapter 11 Cases and the Restructuring Transactions by requiring the Bankruptcy Court's authorization for parties to commence or pursue Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Release, the Third-Party Release, or the Exculpation.[253]   Finally, the Injunction Provision is consensual as to any party who did not specifically object to it.[254]  As such,

---

[249]  *See* Del Genio Decl. ¶ 68.

[250]  *See* Del Genio Decl. ¶ 68; Piper Decl. ¶ 29.

[251]  *See* Del Genio Decl. ¶ 68; Piper Decl. ¶ 29.

[252]  *See* Del Genio Decl. ¶ 69; Piper Decl. ¶ 30.

[253]  *See* Del Genio Decl. ¶ 69; Piper Decl. ¶ 30.

[254]  *See* Piper Decl. ¶ 30.

to the extent the Bankruptcy Court finds that the Plan's Exculpation and Release Provisions are appropriate, the Bankruptcy Court should approve the Injunction Provision.[255]

### 1. The Injunction Provision Should be Approved and the U.S. Trustee's Objection With Respect Thereto Should Be Overruled.

131.    The U.S. Trustee objects to the Injunction Provisions as being inconsistent with Fifth Circuit law.[256]  However, as this Court has noted "[c]ase law in the Fifth Circuit allows the use of injunctions in consensual third party releases,"[257] and nothing in the Fifth Circuit's decision in *Highland II*, on which the U.S. Trustee bases its objection, changes that fact.[258]  Additionally, contrary to what the U.S. Trustee Objection suggests,[259] the Bankruptcy Court has authority to approve the Plan and its provisions, including the Third-Party Release, and can properly approve the Injunction Provisions to enforce the Plan's terms.[260]  The Fifth Circuit in *Highland I* approved a gatekeeping provision related to claims that were being exculpated under the plan,[261] and while

---

[255] *See, e.g.*, *Camp Arrowhead*, 451 B.R. at 701–02 ("[T]he Fifth Circuit does allow permanent injunctions *so long as there is consent*.  Without an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing . . . ." (citing *Pac. Lumber*, 584 F.3d at 253)).

[256] *See* U.S Trustee Obj. ¶¶ 55–66.

[257] Confirmation Hearing Tr. at 32:3–4, *In re Indep. Cont. Drilling, Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) [Docket No. 127]; *see also CJ Holding Co.*, 597 B.R. 597,608 (S.D. Tex. 2019 ("The Fifth Circuit does not preclude bankruptcy courts from approving a 'consensual non-debtor release.'"); *see also Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt. L.P. (In re Highland Cap. Mgmt., L.P.)*, 132 F.4th 353 (5th Cir. 2025) (hereinafter "*Highland II*") (finding that the Fifth Circuit does not allow for non-consensual permanent injunctions) (citing *Pac. Lumber*, 584 F.3d at 252).

[258] *See generally Highland II*.

[259] *See* U.S Trustee Obj. ¶63.

[260] *See* 28 U.S.C. §§ 157(b)(2), 1334; *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011);  *see also* Confirmation Hearing Tr. at 43:11–16, *Container Store*, No. 24-90627 (APR) [Docket No. 201] (confirming a plan of reorganization and noting that the injunction contemplated therein is a manner of enforcement).

[261] *See Highland I* at 439 ("We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.").

the U.S. Trustee points to injunction provision limitations cited in *Purdue*[262] and *Highland II,*[263] both of these cases are distinguishable from the present case as those courts analyzed provisions relating to non-consensual releases.[264]   Importantly, this Court has recently evaluated the application of *Purdue* and *Highland II* to a case with consensual releases similar to the Releases Provisions, and clearly held that they do not apply.[265]   In particular, in *Container Store*, this Court reasoned "the use of the injunction to support a consensual release is [not] in any way prohibited by the case law, either by *Purdue* or in the Fifth Circuit."[266]   Further, the Injunction Provision is consistent with many others contained in recent plans confirmed in this Court.[267]   Consistent with *Container Store*—the most recent, applicable precedent from this Court—the Release Provisions,

---

[262]   *See* U.S Trustee Obj. ¶58.

[263]   *See* U.S Trustee Obj. ¶56-57.

[264]   *See Highland II* at 358 ("Even before *Purdue Pharma*, this court had held the same: that any provision that **non-consensually releases** non-debtors from liability for debts and/or conduct, and any injunction that acts to shield non-debtors from such liability, must be struck from a bankruptcy confirmation plan.") (emphasis added).

[265]   *See Container Store*, No. 24-90627 (APR) [Docket No. 280] at 15-16 ("To the extent the releases in the present case are consensual, the *Purdue* holding has no application here. . . .the [*Highland II*] holding that the injunction be narrowed to include the same parties as the exculpation clause, should not have an impact on this case, where the parties entered a consensual release.").

[266]   Confirmation Hearing Tr. at 43:13–16, *Container Store,* No. 24-90627 (APR) [Docket No. 201].

[267]   *See In re Sunnova Energy Int'l Inc.*, No. 25-90160 (ARP) (Bankr. S.D. Tex. Nov. 10, 2025) [Docket No. 1205] (entering an order confirming debtors' chapter 11 plan under which the injunction provision applied to the released parties); *In re Dig. Media Sols., Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Jan. 15, 2025) [Docket No. 649] (entering an order confirming debtors' chapter 11 plan under which the injunction provision applied to the wind-down debtors and the released parties); *In re Vertex Energy, Inc.*, No. 24-90507 (CML) (Bankr. S.D. Tex. Dec. 20, 2024) [Docket No. 577] (entering an order confirming debtors' chapter 11 plan under which the injunction provision applied to the reorganized debtors and the released parties); *In re Envision Healthcare Corp.*, No. 23-90342 (CML) (Bankr. S.D. Tex. Oct. 11, 2023) [Docket No. 1687] (same); *In re Venator Materials PLC*, No. 23-90301 (Bankr. S.D. Tex. July 25, 2023) [Docket No. 344] (same); *In re Qualtek Servs. Inc.*, No. 23-90584 (CML) (Bankr. S.D. Tex. June 30, 2023) [Docket No. 234] (same); *In re Invacare Corp.*, No. 23-90068 (CML) (Bankr. S.D. Tex. May 18, 2023) [Docket No. 576] (same); *In re Pipeline Health Sys., LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023) [Docket No. 1041] (same); *In re Altera Infrastructure L.P.*, No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) [Docket No. 533] (same).

73

the Exculpation Provision, and the Injunction Provisions are linked and only apply to claims that this Court has the power to enjoin because they have been released on a *consensual* basis.[268]

132.   The value-maximizing outcome set forth in the Plan is a direct result of the efforts of the Debtors and the Released Parties.  Accordingly, the Injunction Provisions are appropriate and should be approved, and the U.S. Trustee Objection should be overruled.

**VI.    Good Cause Exists to Waive the Stay of the Confirmation Order.**

133.   Bankruptcy Rule 3020(e) provides that "[u]nless the court orders otherwise, a confirmation order is stayed for 14 day after its entry."[269]  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

134.   To implement the Plan, the Debtors seek a waiver of the 14-day stay of an order confirming a chapter 11 plan under Bankruptcy Rule 3020(e).  The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.  As further detailed in the Del Genio Declaration, these Chapter 11 Cases and the Restructuring Transactions contemplated in the Plan have been negotiated in good faith, implemented with a high degree of transparency, and premised on preserving the value of the

---

[268]  *Highland II* at 350–61 (linking its "treatment of the Exculpation Provision and the Injunction Provision and its Gatekeeper Clause").

[269]  Fed. R. Bankr. P. 3020(e).

Debtors as a going concern.[270]  The Debtors' swift emergence from chapter 11 is an important component of their restructuring, and requiring the Debtors to pause before confirmation would be prejudicial to all parties in interest that continue to incur the cost and expense of the Chapter 11 Cases.[271]  For these reasons, the Debtors request a waiver of stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

A.   **Waiver of the 3020(e) Stay is Appropriate and the U.S. Trustee's Objection With Respect Thereto Should Be Overruled**

135.   The U.S. Trustee argues that a waiver of the 14-day stay imposed by Rule 3020(e) is not appropriate in these Chapter 11 Cases.  However, as set out above, the Debtors argue that waiver of the Rule 3020(e) is appropriate.  The Debtors and their stakeholders have worked tirelessly throughout these cases to build consensus around a value-maximizing plan of reorganization and bring these Chapter 11 Cases to as swift a resolution as possible, given the complexities involved.[272]  With each additional day in chapter 11 generating administrative expense, it is critical that the Debtors emerge from these cases as soon as possible to preserve remaining value for all stakeholders.  A waiver of the Rule 3020(e) stay is necessary to (a) provide all stakeholders with certainty, (b) curtail the costs of administering these Chapter 11 Cases to preserve the value of the Debtors' Estates, and (c) ensure that the Plan is implemented in a timely manner, including the distributions to Holders of Claims that are contemplated thereunder. Therefore, the U.S. Trustee's objection to the waiver of the Rule 3020(e) stay should be overruled.

---

[270]  *See* Del Genio Decl. ¶¶ 35–36, 55, 84.

[271]  *See* Del Genio Decl. ¶ 84.

[272]  *See* Del Genio Decl. ¶ 84.

**VII.    The Remaining Objections Should be Overruled.**

136.    Other than the U.S. Trustee Objection, the Debtors received four limited objections and reservations of rights, in addition to several informal Objections to Confirmation of the Plan or objections to cure amounts.  The Debtors worked with each objecting party in an attempt to resolve each Objection prior to the commencement of the Confirmation Hearing.  The Debtors successfully resolved three of the limited Objections and nearly all informal Objections prior to the filing of this Memorandum.  The Debtors expect to consensually resolve the remaining informal Objection and limited Objection prior to the Confirmation Hearing.

## CONCLUSION

137.    For all of the reasons set forth herein, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Bankruptcy Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order and granting such other and further relief as is just and proper.

Houston, Texas
Dated: December 8, 2025

*/s/ Jason G. Cohen*

| | |
|---|---|
| **BRACEWELL LLP** | **KIRKLAND & ELLIS LLP** |
| Jason G. Cohen (TX Bar No. 24050435) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Jonathan L. Lozano (TX Bar No. 24121570) | Christopher Marcus, P.C. (admitted *pro hac vice*) |
| 711 Louisiana Street, Suite 2300 | Derek I. Hunter (admitted *pro hac vice*) |
| Houston, Texas 77002 | 601 Lexington Avenue |

BRACEWELL LLP
Jason G. Cohen (TX Bar No. 24050435)
Jonathan L. Lozano (TX Bar No. 24121570)
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:     (713) 223-2300
Facsimile:     (800) 404-3970
Email:          jason.cohen@bracewell.com
                jonathan.lozano@bracewell.com


KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          cmarcus@kirkland.com
                derek.hunter@kirkland.com

*Co-Counsel for the Debtors*
*and Debtors in Possession*

*Co-Counsel for the Debtors*
*and Debtors in Possession*

**Certificate of Service**

I certify that on December 8, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Jason G. Cohen*
Jason G. Cohen