United States Bankruptcy Court
Southern District of Texas

**ENTERED**
December 09, 2025
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ASCEND PERFORMANCE MATERIALS HOLDINGS INC., *et al.*,[1] | Case No. 25-90127 (CML) |
| Debtors. | (Jointly Administered) |

**FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER (I) CONFIRMING
THE FOURTH AMENDED JOINT
CHAPTER 11 PLAN OF REORGANIZATION
OF ASCEND PERFORMANCE MATERIALS HOLDINGS INC.
AND ITS DEBTOR AFFILIATES AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") having:

a. commenced these chapter 11 cases (these "Chapter 11 Cases") on April 21, 2025 (the "Petition Date") by Filing[2] voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules");

b. Filed, on April 21, 2025, the *Declaration of Robert Del Genio, Chief Restructuring Officer of Each of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 24], detailing the facts and circumstances of these Chapter 11 Cases;

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Ascend.  The location of Debtor Ascend Performance Materials Holdings Inc.'s principal place of business is 1010 Travis St., Suite 900, Houston, Texas 77002.

[2]     Capitalized terms used but not immediately or otherwise, as applicable, defined herein (this "Confirmation Order") shall have the meanings ascribed to them elsewhere in this Confirmation Order, the Plan, or the Confirmation Brief, as applicable.  The rules of interpretation set forth in Article I.B of the Plan shall apply.

c.     continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

d.     Filed, on August 12, 2025, (i) the *Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 731] and (ii) the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 732];

e.     Filed, on August 24, 2025, the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 744] (the "Disclosure Statement Motion");

f.     Filed, on October 15, 2025, (i) the *First Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 974] and (ii) the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 975];

g.     Filed, on October 20, 2025, (i) the *Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 991], (ii) the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 992], and (iii) the Revised Proposed *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 993] (the "Disclosure Statement Order");

h.     obtained, on October 20, 2025, entry of the Disclosure Statement Order [Docket No. 999] approving (i) the Disclosure Statement and the related solicitation procedures (the "Solicitation Procedures"), (ii) the notices of (A) the hearing to consider Confirmation of the Plan (the "Confirmation Hearing," and such notice, the "First Confirmation Hearing Notice") and (B) non-voting status, which are attached to the Disclosure Statement Order as Exhibit 7 and Exhibit 8 (together, the "Non-Voting Status Notices"), (iii) the ballots for voting on the Plan, the forms of which are attached to the Disclosure Statement Order as Exhibit 3, Exhibit 4, Exhibit 5A, Exhibit 5B, and Exhibit 6 (the "Ballots"), (iv) the solicitation cover letter, which is attached to the Disclosure Statement Order as Exhibit 12 (the "Solicitation Cover Letter"), (v) the Official Committee of Unsecured Creditors of Ascend Performance Materials Holdings Inc., *et al.*'s Final Recommendation Letter [Docket No. 998] (the "Committee Letter"), and (vi) the other forms related to the

Disclosure Statement (the foregoing materials, collectively, the "Solicitation Packages");

i.    Filed, on October 20, 2025, the solicitation version of the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1002] (as modified, amended, or supplemented from time to time, the "Solicitation Disclosure Statement");

j.    caused the Solicitation Packages, including the First Confirmation Hearing Notice, to be distributed on or about October 21, 2025, in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the *Procedures for Complex Chapter 11 Bankruptcy Cases* for the U.S. Bankruptcy Court for the Bankruptcy Court, the Disclosure Statement Order, and the Solicitation Statement Procedures, as evidenced by the certificates of service with respect to solicitation [Docket No. 1028] (together with all the exhibits thereto, the "Solicitation Materials Affidavits");

k.    caused the First Confirmation Hearing Notice to be published in *The New York Times* (national edition) on October 24, 2025, as evidenced by the *Affidavit of Publication Regarding Notice of Hearing to Consider (I) Confirmation of the Second Amended Joint Chapter 11 Plan Filed by the Debtors and (II) Related Voting and Objection Procedures* [Docket No. 1025] (the "New York Times Publication Affidavit"), and in the *Financial Times* (global edition) on October 27, 2025, as evidenced by the *Affidavit of Publication Regarding Notice of Hearing to Consider (I) Confirmation of the Second Amended Joint Chapter 11 Plan Filed by the Debtors and (II) Related Voting and Objection Procedures* [Docket No. 1024] (the "Financial Times Publication Affidavit," and together with the New York Times Publication Affidavit, the "Publication Affidavits");

l.    Filed, on November 12, 2025, the *Notice of Adjournment of Confirmation Hearing to December 9, 2025 at 1:00 P.M. (Prevailing Central Time) and Related Dates and Deadlines* [Docket No. 1070] (the "Confirmation Hearing Adjournment Notice");

m.    Filed, on November 19, 2025, the *Notice of Adjournment of Certain Dates and Deadlines Related to Confirmation Timeline* [Docket No. 1085] (the "Key Dates Adjournment Notice");

n.    Filed on November 25, 2025, (i) the *Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1117] (as modified, amended, or supplemented from time to time, including by the *First Amended Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1126], the *Second Amended Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its*

*Debtor Affiliates* [Docket No. 1152], the *Third Amended Plan Supplement for the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1172], the *Fourth Amended Plan Supplement for the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1175], and the *Fifth Amended Plan Supplement for the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1191], the "<u>Plan Supplement</u>," and which, for the purposes of the Plan and this Confirmation Order, is included in the definition of the "Plan") and (ii) the *Notice of Filing of Amended Exhibits to the Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1120] (the "<u>First Disclosure Statement Supplement</u>");

o.    Filed, on December 2, 2025, the *Notice of Filing of Further Amended Exhibits to the Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1150] (together with the First Disclosure Statement Supplement, the "<u>Disclosure Statement Supplement</u>," and collectively with the Solicitation Disclosure Statement, the "<u>Disclosure Statement</u>");

p.    Filed, on December 3, 2025, the *Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1157];

q.    Filed, on December 8, 2025, the *Declaration of Robert Del Genio, Chief Restructuring Officer, in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1185] (the "<u>Company Declaration</u>");

r.    Filed, on December 8, 2025, the *Declaration of David Rush, Debtors' Associate Chief Restructuring Officer and Senior Managing Director of FTI Consulting, Inc., in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1186] (the "<u>FTI Declaration</u>");

s.    Filed, on December 8, 2025, the *Declaration of Matthew O'Connell in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No.1187] (the "<u>PJT Declaration</u>");

t.    Filed, on December 8, 2025, the *Declaration of Charlie Piper in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1188] (the "<u>Piper Declaration</u>," and together with the Company Declaration, the PJT Declaration, and the FTI Declaration, the "<u>Confirmation Declarations</u>");

u.  Filed, on December 8, 2025, the *Declaration of Emily Young on Behalf of Epic Corporate Restructuring, LLC, Regarding the Solicitation and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1189], which accounts for Ballots received up to the Voting Deadline (the "Voting Report");

v.  Filed, on December 8, 2025, the *Debtors' Memorandum of Law in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1190] (the "Confirmation Brief"); and

w.  Filed, on December 9, 2025, the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1192] (as modified, amended, or supplemented from time to time, the "Plan"), attached hereto as **Exhibit A**.

The Bankruptcy Court having:

a.  reviewed the Solicitation Procedures regarding votes to accept or reject the Plan and elections to opt out of the Third-Party Release, as applicable;

b.  entered, on October 20, 2025, the Disclosure Statement Order, among other things, approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

c.  set November 18, 2025, at 4:00 p.m. (prevailing Central Time), which date has been subsequently extended to December 3, 2025, at 4:00 p.m. (prevailing Central Time), as the deadline for voting on the Plan and opting out of the releases contained in the Plan (the "Voting Deadline");

d.  set November 18, 2025, at 4:00 p.m. (prevailing Central Time), which date has been subsequently extended to December 3, 2025, at 4:00 p.m. (prevailing Central Time), as the deadline for Filing objections to Confirmation (the "Objection Deadline");

e.  set November 24, 2025, at 3:00 p.m. (prevailing Central Time), which date has been subsequently adjusted to December 9, 2025, at 1:00 p.m. (prevailing Central Time), as the date and time for the Confirmation Hearing, pursuant to sections 1125, 1126, 1128, and 1129 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018, as set forth in the Disclosure Statement Order;

f.  reviewed the Plan, the Disclosure Statement, the Disclosure Statement Motion, the Disclosure Statement Order, the Plan Supplement, the Confirmation Brief, the Confirmation Declarations, the Solicitation Materials Affidavits, the Solicitation Cover Letter, the Ballots, the Non-Voting Status Notice, the Publication Affidavits, the Voting Report, the First Confirmation Hearing Notice, the Confirmation Hearing Adjournment Notice, the Committee Letter, the Disclosure Statement

Supplement, the Key Dates Adjournment Notice, and all other Filed pleadings, exhibits, statements, responses, affidavits, declarations, and comments regarding Confirmation of the Plan and reaffirmation of the Disclosure Statement, including all objections, joinders, statements, and reservations of rights, as applicable;

g.     reviewed the discharge, compromises, settlements, releases, exculpations, and injunctions set forth in Article VIII of the Plan;

h.     considered the Restructuring Transactions incorporated and described in the Plan, including in the Plan Supplement;

i.     held the Confirmation Hearing on December 9, 2025 at 1:00 p.m. (prevailing Central Time);

j.     heard the statements and arguments made by counsel in respect of Confirmation and reaffirmation of the Disclosure Statement;

k.     considered all oral representations, live testimony, written direct testimony, documents, filings, exhibits, and other evidence regarding Confirmation;

l.     made rulings on the record at the Confirmation Hearing;

m.     overruled (i) any objections to the Plan and to Confirmation, except as otherwise stated herein or indicated on the record, and (ii) all statements, joinders, and reservations of rights not consensually resolved, agreed to, adjourned, or withdrawn unless otherwise indicated herein; and

n.     taken judicial notice of all pleadings and other documents Filed, all orders entered, and all evidence and arguments presented in these Chapter 11 Cases.

NOW, THEREFORE, it appearing to the Bankruptcy Court that the First Confirmation Hearing Notice, the Confirmation Hearing Adjournment Notice, the Key Dates Adjournment Notice, and the opportunity for any party in interest to object to Confirmation of the Plan have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the record of these Chapter 11 Cases, and that the legal and factual bases set forth in the documents Filed in support of Confirmation of the Plan and reaffirmation of the Disclosure Statement and that the arguments and other evidence presented at the Confirmation Hearing, including, without limitation, the Declarations in support thereof, establish just cause for the relief granted herein, and after due deliberation thereon and good cause

6

appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of Law, and orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.** **Findings of Fact and Conclusions of Law.**

1.      The findings of fact and conclusions of Law set forth herein and in the record of the Confirmation Hearing, and as may be supplemented in a memorandum opinion, constitute the Bankruptcy Court's findings of fact and conclusions of Law under rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  All findings of fact and conclusions of Law announced by the Bankruptcy Court at the Confirmation Hearing in relation to Confirmation, including any rulings made on the record at the Confirmation Hearings, and as may be supplemented in a memorandum opinion, are hereby incorporated into this Confirmation Order.  To the extent any of the following conclusions of Law constitute findings of fact, or vice versa, they are adopted as such.

**B.** **Jurisdiction, Venue, and Core Proceeding.**

2.      The Bankruptcy Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. § 1334, which was referred to the Bankruptcy Court under 28 U.S.C. § 157 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered on May 24, 2012.  Consideration of whether the Disclosure Statement and the Plan comply with the applicable provisions of the Bankruptcy Code constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).  The Bankruptcy Court may enter a Final Order consistent with Article III of the United States Constitution.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**C.      Eligibility for Relief.**

3.      Each of the Debtors were and are Entities eligible for relief under chapter 11 pursuant to section 109 of the Bankruptcy Code.

**D.      Commencement and Joint Administration of these Chapter 11 Cases.**

4.      On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.   In accordance with the *Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 60], these Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).   Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

**E.      Appointment of the Committee.**

5.      On May 5, 2025, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") to represent the interests of the unsecured creditors of the Debtors in the Chapter 11 Cases [Docket No. 233].[3]

**F.      The Bar Dates.**

On May 29, 2025, the Bankruptcy Court entered the *Order (I) Establishing Deadlines for the Filing of Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof, (III) Approving the Form and Manner for Filing Proofs of Claim, and (IV) Granting Related Relief* [Docket No. 386] (the "Bar Date Order").   The Bar Date Order set (a) July 23, 2025, at 4:00 p.m.,

---

[3]      On July 17, 2025, the U.S. Trustee filed *The United States Trustee's Notice of Reconstitution of the Official Committee of Unsecured Creditors* [Docket No. 664] to reflect the resignation of Optimal Field Services, LLC as a member of the Committee.

prevailing Central Time, as the deadline to File Proofs of Claim (including Proofs of Claim for Claims arising under section 503(b)(9) of the Bankruptcy Code) against the Debtors that arose prior to the Petition Date and (b) October 20, 2025, at 4:00 p.m., prevailing Central Time, as the deadline to File Proofs of Claim of a Governmental Unit that arose prior to the Petition Date.

**G.     Plan Supplement.**

6.     On November 25, 2025, the Debtors Filed the Plan Supplement[4] [Docket No. 1117].   The Plan Supplement (including as subsequently amended, supplemented, or otherwise modified from time to time in accordance with the Plan) complies with the Bankruptcy Code and the terms of the Plan, and the Debtors provided good and proper notice of the filing of the Plan Supplement in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable rules, Laws, and requirements.   No other or further notice is necessary or will be required with respect to the Plan Supplement or any of the documents contained therein or related thereto.   All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.   Subject to the terms of the Plan, the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement and any of the documents contained therein or related thereto before the Effective Date.

---

[4]   As modified, amended, or supplemented from time to time, including by the *First Amended Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1126], the *Second Amended Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1152], the *Third Amended Plan Supplement for the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1172], the *Fourth Amended Plan Supplement for the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1175], and the *Fifth Amended Plan Supplement for the Third Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. 1191].

**H.      Modifications to the Plan.**

7.      Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan described or set forth in this Confirmation Order constitute technical or clarifying changes, changes with respect to particular Claims or Interests by agreement with Holders of such Claims or Interests, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest under the Plan.  These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement, the Disclosure Statement Supplement, and the Solicitation Packages served pursuant to the Disclosure Statement Order, and notice of these modifications was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases.  In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes on the Plan under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims or Interests be afforded an opportunity to change previously cast votes accepting or rejecting the Plan.  Accordingly, the Plan is properly before the Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.  The Plan, as modified, shall constitute the Plan submitted for Confirmation.

**I.      Objections Overruled.**

8.      The Bankruptcy Court takes judicial notice of the docket in these Chapter 11 Cases. Any resolution or disposition of objections to Confirmation of the Plan explained or otherwise ruled upon by the Bankruptcy Court on the record at the Confirmation Hearing, and as may be supplemented in a memorandum opinion, is hereby incorporated by reference.  All unresolved objections, statements, joinders, informal objections, and reservations of rights, if any, related to the Confirmation of the Plan are hereby overruled on the merits.

**J.     Disclosure Statement Order.**

9.      On October 20, 2025, the Bankruptcy Court entered the Disclosure Statement Order, scheduling November 24, 2025, at 3:00 p.m. (prevailing Central Time), as the date and time of the Confirmation Hearing and November 18, 2025, at 4:00 p.m. (prevailing Central Time), as the Voting Deadline, which dates were subject to modification as necessary by the Debtors pursuant to paragraph 4 of the Disclosure Statement Order.  On November 12, 2025, the Debtors Filed the Confirmation Hearing Adjournment Notice, which adjusted the date and time of the Confirmation Hearing to December 9, 2025, at 1:00 p.m. (prevailing Central Time) and extended the Voting Deadline to December 2, 2025, at 4:00 p.m. (prevailing Central Time).  On November 19, 2025, the Debtors Filed the Key Dates Adjournment Notice which further extended the Voting Deadline to December 3, 2025, at 4:00 p.m. (prevailing Central Time).

**K.     Disclosure Statement.**

10.     The Disclosure Statement, including the Disclosure Statement Supplement, contains (a) sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable non-bankruptcy Laws, rules, and regulations, including the Securities Act, and (b) "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein.  The Filing of the Disclosure Statement with the clerk of the Court satisfied Bankruptcy Rule 3016(b).

**L.     Burden of Proof—Confirmation of the Plan.**

11.     The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.  In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard.

Each witness who testified on behalf of the Debtors in connection with Confirmation, including those witnesses who testified via the Confirmation Declarations, was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

**M.     Notice.**

12.     As evidenced by the Solicitation Materials Affidavits and the Voting Report, the Debtors provided due, adequate, and sufficient notice of the commencement of these Chapter 11 Cases, the Plan (and the opportunity to opt out of the third-party release contained in the Plan), the Disclosure Statement, the Debt Rights Offering, the Confirmation Hearing, the Plan Supplement, the Voting Deadline, the Objection Deadline, and all other materials distributed by the Debtors in connection with Confirmation of the Plan in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b), the Bankruptcy Local Rules, the procedures set forth in the Disclosure Statement Order, including the Solicitation Procedures, and any other applicable rules, Laws, and regulations.  Further, the First Confirmation Hearing Notice was published in *The New York Times* on October 24, 2025, and in the *Financial Times* on October 27, 2025, as evidenced by the Publication Affidavits and in compliance with Bankruptcy Rule 2002(i).   In addition, both the Confirmation Hearing Adjournment Notice and the Key Dates Adjournment Notice were distributed to all Holders of Claims and Interests.  Such notice was adequate and sufficient under the facts and circumstances of these Chapter 11 Cases in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Disclosure Statement Order.  No other or further notice shall be required.

**N.     Voting Report.**

13.     Before the Confirmation Hearing, the Debtors Filed the Voting Report.  The Voting Report was admitted into evidence during the Confirmation Hearing.  The procedures used to

solicit and tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement Order, and all other applicable non-bankruptcy rules, Laws, and regulations.

14.     As set forth in the Plan and the Disclosure Statement, Holders of Claims and Interests, as applicable, in Class 3 (Term Loan Claims), Class 4A (36th Street Financing Agreement Claims), Class 4B (Ansley Park Financing Agreement Claims), Class 4C (Citizens CoGen Financing Agreement Claims), Class 5A (Go-Forward Vendor Claims), Class 5B (General Unsecured Claims), and Class 8 (Interests in Ascend Parent) (collectively, the "Voting Classes") were eligible to vote to accept or reject the Plan in accordance with the Solicitation Procedures. The Ballots used to solicit votes to accept or reject the Plan from Holders of Claims and Interests in the Voting Classes adequately addressed the particular needs of these Chapter 11 Cases and were appropriate for the Holders of Claims and Interests in the Voting Classes to vote to accept or reject the Plan.

15.     The Holders of Claims in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) (together, the "Presumed Accepting Classes") are Unimpaired and conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote to accept or reject the Plan.  The Holders of Claims and Interests in Class 9 (Interests in APM Disc) and Class 10 (Section 510(b) Claims) (together, the "Deemed Rejecting Classes") are Impaired, are entitled to no recovery under the Plan, and are deemed to have rejected the Plan and, therefore, were not entitled to vote to accept or reject the Plan.  The Holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 7 (Intercompany Interests) (the "Deemed Accepting/Rejecting Classes," and together with the Presumed Accepting Classes and the Deemed Rejecting Classes,

the "Non-Voting Classes") are either Unimpaired and conclusively presumed to have accepted the Plan (to the extent Reinstated) or are Impaired and deemed to reject the Plan (to the extent cancelled and released), and, in either event, were not entitled to vote to accept or reject the Plan.

16.     As evidenced by the Voting Report, Class 3, Class 4A, Class 4B, Class 4C, Class 5A, and Class 5B voted to accept the Plan at each Debtor and Class 8 voted to reject the Plan at Ascend Parent (together with the Deemed Rejecting Classes, the "Rejecting Classes").

**O.     Solicitation.**

17.     As described in the Voting Report and the Solicitation Materials Affidavits, the Debtors solicited votes for the acceptance or rejection of the Plan in good faith, and the Solicitation Packages provided the Holders of Claims and Interests in the Voting Classes with the opportunity to opt out of the Third-Party Release unless such Holders voted to accept the Plan.  The solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable rules, Laws, and regulations, including the registration requirements under the Securities Act.

18.     As described in the Voting Report and the Solicitation Materials Affidavits, as applicable, the Solicitation Packages were transmitted and served, including to all Holders of Claims and Interests in the Voting Classes, in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017, 3018, and 3019, the Bankruptcy Local Rules, the Disclosure Statement Order, and any applicable non-bankruptcy rules, Laws, and regulations.  Transmission and service of the Solicitation Packages was timely, adequate, and sufficient under the facts and circumstances of these Chapter 11 Cases. No further notice is necessary or will be required.

19.     As set forth in the Voting Report and the Solicitation Materials Affidavits, the Solicitation Packages were distributed and transmitted to Holders of Claims and Interests in the Voting Classes that held a Claim or Interest as of September 22, 2025 (the "Voting Record Date"). The establishment and notice of the Voting Record Date were reasonable and sufficient under the facts and circumstances of these Chapter 11 Cases.

20.     The period during which the Debtors solicited acceptances of or rejections to the Plan was a reasonable and sufficient period of time for each Holder of Claims and Interests in the Voting Classes to make an informed decision to accept or reject the Plan.

**P.      Service of the Opt-Out Form.**

21.     Under section 1126(f) and 1126(g) of the Bankruptcy Code, the Debtors were not required to solicit votes from the Holders of Claims or Interests in the Non-Voting Classes, each of which is conclusively presumed to have accepted or deemed to have rejected the Plan. Nevertheless, the Debtors served the First Confirmation Hearing Notice, the Confirmation Hearing Adjournment Notice, the Key Dates Adjournment Notice, and the Non-Voting Status Notice on the Holders of Claims and Interests in the Non-Voting Classes.  The First Confirmation Hearing Notice adequately summarized the material terms of the Plan, including the classification and treatment of Claims and Interests and the release, exculpation, and injunction provisions of the Plan.  Further, because the form enabling stakeholders to opt out of the Third-Party Release (the "Opt-Out Form") was included in both the Ballots and the Notices of Non-Voting Status, every known stakeholder was provided with the means by which the stakeholders could opt out of the Third-Party Release, including pre-addressed prepaid return envelopes.  For the avoidance of doubt, any party that validly elected in the Opt-Out Form to opt out of the Third-Party Release prior to the applicable deadline to submit an Opt-Out Form, shall be neither a Released Party nor a Releasing Party under the Plan.

15

**Q.     Voting.**

22.     As evidenced by the Voting Report, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement, the Disclosure Statement Order, and any applicable non-bankruptcy Law, rule, or regulation.

**R.     Committee Settlement.**

23.     The Committee Settlement constitutes a good-faith compromise and settlement of all claims, Causes of Action, disputes, and controversies among the Debtors, the DIP Lenders, the Bridge Lenders, the Term Loan Lenders, the ABL Lenders, and the Agents, on the one hand, and the Committee and each of its members, on the other hand.  The Committee Settlement is the result of arm's-length negotiations among numerous parties.  The compromises and settlements included in the Committee Settlement are each (a) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (b) necessary and integral to the Plan and the success of these Chapter 11 Cases.  The Committee Settlement is fair, equitable, reasonable, and an essential element of the Plan and is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  The entry of this Confirmation Order constitutes the Bankruptcy Court's finding that the applicable terms of the Committee Settlement incorporated in the Plan and the Plan Supplement are (i) in the best interests of Holders of General Unsecured Claims, the Holders of Go-Forward Vendor Claims, the Debtors, and their Estates, (ii) on account of value provided to the Estates, including through resolution of the Committees' Standing Motion and potential objections to the Disclosure Statement, the Plan, and Confirmation, and (iii) given and made with adequate and appropriate notice.

**S.      MasTec Settlement.**

24.      In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the provisions of the settlement by and between APM Ops and MasTec Industrial Corporation (f/k/a MasTec Power Corporation) ("MasTec," and together with APM Ops, the "MasTec Settlement Parties"), as approved by the *Order (I) Authorizing and Approving the Settlement By and Among Ascend and MasTec, and (II) Granting Related Relief* [Docket No. 1107] (the "9019 Order"), constitute a good-faith compromise of the settled claims and disputes held by the MasTec Settlement Parties.  Such compromise and settlement are reaffirmed by this Confirmation Order, fair, equitable, and reasonable, and in the best interests of the Debtors, the Reorganized Debtors, and their Estates.

**T.      Debt Rights Offering.**

25.      On November 25, 2025, the Debtors commenced the Debt Rights Offering, in connection with the Plan and the Disclosure Statement, as applicable, through which the Debtors offered the Debt Subscription Rights to each Debt Rights Offering Eligible Offeree.  The Debtors solicited subscriptions to the Debt Rights Offering in good faith pursuant to the Debt Rights Offering Documents, applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any applicable non-bankruptcy Laws, rules, or regulations.

26.      The Debt Rights Offering Documents provide sufficient information to enable each Debt Rights Offering Eligible Offeree to duly participate in the Debt Rights Offering and fund the Exit Term Loan Facility (including the disclosure of any issuance of New Interests (or similar Securities) that may be issued pursuant to the Exit Term Loan Facility from time to time following the Effective Date).  Prior to or on the Effective Date, as applicable, all obligations contained in the documents that are necessary or desirable to effectuate the Debt Rights Offering and to obtain funding for the Exit Term Loan Facility (including, without limitation, the Debt Rights Offering

Procedures) shall constitute legal, valid, and binding obligations of the applicable Reorganized Debtors and be enforceable in accordance with the respective terms of such documents. The Debt Rights Offering Documents and all related forms, agreements, and notices are fair, equitable, and reasonable and provide for the Debt Rights Offering to be conducted in a manner that is in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests.

U. **Issuance of New Interests.**

27. The issuance of the New Interests, and any other Securities derivative thereof, is an essential element of the Plan and is in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests.

V. **Exit ABL Facility, Exit Term Loan Facility, and Asset Financing Takeback Debt.**

28. The Exit ABL Facility, the Exit Term Loan Facility, and the Asset Financing Takeback Debt are each an essential element of the Plan, necessary for Consummation, and critical to the overall success and feasibility of the Plan. Entry into, and/or issuance of, the Exit ABL Facility, the Exit Term Loan Facility, and the Asset Financing Takeback Debt is approved in all respects. Entry into the Exit ABL Facility, the Exit Term Loan Facility, and the Asset Financing Takeback Debt is in the best interests of the Debtors and their Estates. The Debtors have exercised reasonable business judgment in determining to enter into the Exit ABL Facility, the Exit Term Loan Facility, and the Asset Financing Takeback Debt and have provided sufficient and adequate notice of the material terms of the Exit ABL Facility, the Exit Term Loan Facility, and the Asset Financing Takeback Debt, which material terms were Filed as part of the Plan (including through the Plan Supplement) prior to the Effective Date. The terms and conditions of the Exit ABL Facility, the Exit Term Loan Facility, the Asset Financing Takeback Debt are fair and reasonable and were negotiated in good faith and at arm's length, and any credit extended and loans made

pursuant to the Exit ABL Facility, the Exit Term Loan Facility, and the Asset Financing Takeback Debt, if and as applicable, shall be deemed to have been extended, issued, or made, as applicable, in good faith, for legitimate business purposes, without the intent to hinder, delay, or defraud any creditor of the Debtors, for reasonably equivalent value, and such incurrences by the Debtors shall not be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

29.     The guarantees, mortgages, pledges, Liens, and other security interests, if any, granted to secure the obligations arising under the Exit ABL Facility Documents, the Exit Term Loan Documents, and the Asset Financing Takeback Debt Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall not be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law, and the priorities of such Liens and security interests, if any, shall be as set forth in the Exit ABL Facility Documents, the Exit Term Loan Documents, and the Asset Financing Takeback Debt Documents.

30.     Upon the effectiveness of each of the Exit Term Loan Documents and the Asset Financing Takeback Debt Documents in accordance with their terms (and any documents related thereto and as may be amended from time to time in accordance with the terms thereof), all Holders under each of the Exit Term Loan Facility and the Asset Financing Takeback Debt were and hereby shall be deemed to be a party to, and bound by, the applicable documents, regardless of whether such Holder has executed a signature page thereto.

**W.**      **Litigation Trust.**

31.      The establishment of the Litigation Trust and entry into the Litigation Trust Documents is an essential element of the Plan and is in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests.  The vesting, transfer, receipt, and acceptance of the Permitted Litigation Claims in the Litigation Trust is a sound exercise of the Debtors' business judgment.

**X.**      **Compliance with Bankruptcy Code Requirements—Section 1129(a)(1).**

32.      The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code.  In addition, the Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).

(i)      *Proper Classification—Sections 1122 and 1123.*

33.      The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into ten (10) Classes based on differences in the legal nature or priority of such Claims and Interests (other than the DIP Term Loan Claims, the DIP ABL Claims, Administrative Claims, Professional Claims, and Priority Tax Claims, which are addressed in Article II of the Plan and which are not required to be designated as separate classes pursuant to section 1123(a)(1) of the Bankruptcy Code).  Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests.  The classifications reflect no improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests.  In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are

substantially similar to the other Claims or Interests within that Class. Accordingly, the Plan satisfies the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

(ii)     *Specified Unimpaired Classes—Section 1123(a)(2).*

34.     Article III of the Plan specifies that Claims, as applicable, in the following Classes are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code:

| Class | Claims and Interests |
|-------|----------------------|
| 1 | Other Secured Claims |
| 2 | Other Priority Claims |

35.     Holders of Intercompany Claims in Class 6 and Holders of Intercompany Interests in Class 7 are either Unimpaired and conclusively presumed to have accepted the Plan, or are Impaired and deemed to have rejected the Plan, and, in either event, are not entitled to vote to accept or reject the Plan. Additionally, Article II of the Plan specifies that Allowed Administrative Claims, DIP ABL Claims, Professional Claims, and Priority Tax Claims will be indefeasibly paid in full in Cash or otherwise Unimpaired in accordance with the terms of the Plan, although these Claims are not classified under the Plan. While not classified Claims, Article II.B.2 of the Plan further specifies that each Holder of an Allowed DIP Term Loan Claim shall receive its Pro Rata share of: (a) the DIP Equity Recovery; and (b) the Litigation Trust Class A Interests, as set forth in the Litigation Trust Documents, and each Holder of an Allowed DIP Term Loan Claim shall also have the option to participate, up to its Pro Rata share of the Debt Rights Offering. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

(iii)     *Specified Treatment of Impaired Classes—Section 1123(a)(3).*

36.     The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code. Article III of the Plan specifies that Claims and Interests, as applicable, in the following Classes

(the "Impaired Classes") are Impaired under the Plan within the meaning of section 1124 of the

Bankruptcy Code, and describes the treatment of such Classes:

| Class | Claims and Interests |
|-------|----------------------|
| 3 | Term Loan Claims |
| 4A | 36th Street Financing Agreement Claims |
| 4B | Ansley Park Financing Agreement Claims |
| 4C | Citizens CoGen Financing Agreement Claims |
| 5A | Go-Forward Vendor Claims |
| 5B | General Unsecured Claims |
| 8 | Interests in Ascend Parent |
| 9 | Interests in APM Disc |
| 10 | Section 510(b) Claims |

    (iv)    *No Discrimination—Section 1123(a)(4).*

37.    The Plan provides for the same treatment by the Debtors for each Claim or Interest

within a specific Class unless the Holder of a particular Claim or Interest has agreed to less

favorable treatment with respect to such Claim or Interest.  Accordingly, the Plan satisfies the

requirements of section 1123(a)(4) of the Bankruptcy Code.

    (v)    *Adequate Means for Plan Implementation—Section 1123(a)(5).*

38.    The provisions of the Plan, including Article IV thereof, together with the exhibits

and attachments to the Plan (including the Plan Supplement) and the Disclosure Statement,

provide, in detail, adequate and proper means for the Plan's implementation, including, among

other provisions:  (a) the good faith compromise and general settlement of Claims and Interests;

(b) the authorization for the Debtors and/or the Reorganized Debtors, as applicable, to take all

actions necessary or appropriate to effectuate the Plan, including those actions necessary or

appropriate to effectuate the Restructuring Transactions and any and all actions set forth in the

Restructuring Transactions Memorandum; (c) the execution of the Definitive Documents; (d) the

adoption, authorization, and entry of the New Organizational Documents; (e) the funding and

sources of consideration for the Plan distributions; (f) the consummation of the Debt Rights Offering, in each case, in accordance with the Debt Rights Offering Procedures; (g) the reservation of Interests for future distribution in accordance with the terms and conditions of the Management Incentive Plan; (h) the vesting of assets of the Debtors' estates in the Reorganized Debtors; (i) except as otherwise provided in the Plan and this Confirmation Order, the cancellation of all notes, instruments, certificates, and other documents evidencing Claims or Interests; (j) except as otherwise provided in the Plan and this Confirmation Order, the cancellation of existing securities and agreements; (k) the authorization and approval of the Exit ABL Facility, the Exit Term Loan Facility, and the Asset Financing Takeback Debt and entry into any agreements related to the same as set forth in the Plan or the Plan Supplement; (l) the authorization and approval of the issuance and distribution of the New Interests and entry into any agreements related to the same as set forth in the Plan or the Plan Supplement; (m) the authorization, approval, and entry into the corporate actions contemplated under the Plan; (n) the creation of the Professional Fee Escrow Account; (o) the appointment of the New Board; (p) the granting of new Liens and security interests to secure the Exit ABL Facility, the Exit Term Loan Facility, and the Asset Financing Takeback Debt, as applicable; (q) the preservation of the D&O Liability Insurance Policies in accordance with the terms of the Plan; (r) the adoption, authorization, and entry into the Litigation Trust Documents and all actions contemplated thereby, including the appointment of Litigation Trustee and the creation of, and vesting of the Litigation Trust Assets in, the Litigation Trust; (s) the preservation and vesting of certain Causes of Action not released pursuant to the Plan; (t) except as otherwise set forth in the Plan, the continued corporate existence of the Debtors; and (u) the effectuation and implementation of documents and further transactions.  Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

(vi)    *Voting Power of Equity Securities—Section 1123(a)(6).*

39.    The New Organizational Documents and the Plan prohibit the issuance of non-voting equity Securities to the extent required to comply with section 1123(a)(6) of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

(vii)    *Directors and Officers—Section 1123(a)(7).*

40.    The appointment, employment, and manner of selection of any of the officers, directors, or trustees (or any successor of any officer, director, or trustee) of the Reorganized Debtors, including the New Board, will be determined in accordance with the New Organizational Documents, which is consistent with the interests of creditors and equityholders and with public policy.  In addition, the manner and selection of the Litigation Trustee and the SteerCo Committee (as defined in the Litigation Trust Agreement) is set forth in the Litigation Trust Agreement Filed as part of the Plan Supplement, which is consistent with the interests of creditors and equityholders and with public policy.    Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

(viii)    *Impairment / Unimpairment of Classes—Section 1123(b)(1).*

41.    Article III of the Plan impairs or leaves Unimpaired, as applicable, each Class of Claims and Interests, as contemplated by section 1123(b)(1) of the Bankruptcy Code. Accordingly, the Plan satisfied section 1123(b)(1) of the Bankruptcy Code.

(ix)    *Assumption—Section 1123(b)(2).*

42.    Article V of the Plan provides that all Executory Contracts and Unexpired Leases not otherwise assumed will be deemed automatically rejected by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that:    (a) are

identified on the Assumed Executory Contracts and Unexpired Leases Schedule on or before the Effective Date; (b) previously expired or terminated pursuant to their own terms; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) are the subject of a motion to assume that is pending on the Effective Date; (e) have an ordered or requested effective date of rejection that is after the Effective Date; (f) are employment agreements that are not disclosed by the Required DIP Term Loan Lenders to the Debtors' counsel on or before October 15, 2025, none of which shall be rejected; (g) is a D&O Liability Insurance Policy, which shall be deemed automatically assumed; or (h) are Indemnification Provisions, which shall be assumed or rejected in accordance with Article IV.L of the Plan. The assumption of Executory Contracts and Unexpired Leases may include the assignment of certain of such contracts and leases as set forth in the Plan Supplement. Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code. The Debtors' determinations regarding the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the Debtors, are necessary to the implementation of the Plan and are in the best interests of the Debtors, their Estates, Holders of Claims or Interests, and other parties in interest in these Chapter 11 Cases.

> (x)     *Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action—Section 1123(b)(3).*

43.     The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code. Article VIII.C of the Plan describes certain releases granted by the Debtors (the "Debtor Release"), Article VIII.D of the Plan describes certain releases of the Released Parties by the Releasing Parties (the "Third-Party Release"), Article VIII.E of the Plan provides for the exculpation of the Exculpated Parties (the "Exculpation"), and Article VIII.F of the Plan provides for an injunction (the "Injunction"). In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and

Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  The compromises and settlements embodied in the Plan:  (a) are the result of extensive, arm's-length, good faith negotiations that, in addition to the Plan; (b) were given in exchange for good, valuable, and adequate considerations after due notice and opportunity for hearing; (c) preserve value for the Debtors, their Estates, and all their stakeholders, avoid extended, uncertain, time-consuming, and value-destructive litigation; (d) are appropriately tailored under the facts and circumstances of these Chapter 11 Cases; (e) were integral to the agreements and settlements among the various parties in interest and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code; and (f) represent a fair, equitable, and reasonable compromise of all Claims, Interests, and controversies and entry into which represented a sound exercise of the Debtors' business judgment.  The compromises and settlements in the Plan are fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and all other parties in interest and satisfy the requirements of applicable Law for approval pursuant to Bankruptcy Rule 9019.

44.     **Debtor Release**.  The Debtors have satisfied the business judgment standard under Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code with respect to the propriety of the Debtor Release.  The Debtor Release is a necessary and integral element of the Plan, including the Committee Settlement, the 9019 Order, and the DIP Facilities, and is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests.  The Debtor Release is fair and equitable and complies with the absolute priority rule.

45.     Also, including for the reasons set forth in the Piper Declaration, the Debtor Release:  (a) reflects a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes and allowing the Debtors to exit chapter 11 expeditiously, on the other hand; (b) is a good-faith settlement and compromise of the claims and Causes of Action released by the Debtor Release, which bore a substantial likelihood of complex and protracted litigation, with attendant expense, inconvenience, and delay that may have impeded the Debtors' efforts to reorganize; (c) is provided in exchange for the good and valuable consideration, including the Released Parties' contributions to facilitating the Restructuring Transactions contemplated in the Plan; (d) is given, and made, after due notice, opportunity for hearing, and robust investigation by the Special Committee; and (e) serves as a bar to any of the Debtors, Reorganized Debtors, or the Debtors' Estates asserting any claim or Cause of Action released by the Debtor Release.  The Debtors' or the Reorganized Debtors' pursuit of any such claims or Causes of Action against the Released Parties is not in the best interests of the Estates or the Debtors' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such claims or Causes of Action.

46.     The Debtor Release appropriately offers protection to parties that participated in the Debtors' restructuring process.  Specifically, each of the Released Parties under the Plan— including:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the DIP ABL Lenders; (d) each of the ABL Lenders; (e) each member of the Ad Hoc Group (including in their capacity as DIP Term Loan Lenders, Bridge Lenders, Term Loan Lenders, and Debt Backstop Parties, as applicable); (f) the Committee and each of its members (exclusively in their capacities as Committee members); (g) each of the Releasing Parties that is not an Excluded Party; (h) each

of the Agents; (i) MasTec; (j) each current and former Affiliate of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clauses (a) through (k)— made significant concessions and contributions to these Chapter 11 Cases, including, as applicable, (i) negotiating and actively supporting the Plan and the Chapter 11 Cases, (ii) providing necessary liquidity for the Debtors before and during the Chapter 11 Cases, (iii) settling and compromising substantial rights and Claims against the Debtors under the Plan, (iv) agreeing to equitize their Claims to substantially deleverage the Debtors' prepetition capital structure, and (v) proposing, negotiating in good faith, and ultimately consummating the value-maximizing Restructuring Transactions contemplated in the Plan for the benefit of the Debtors, their Estates, and all parties in interest.

47.     The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.  In addition, as described in the Piper Declaration, the Debtors' Special Committee conducted an independent investigation into certain historical transactions and concluded that certain Causes of Action against certain Entities identified on the Schedule of Excluded Parties should be preserved under the Plan if not otherwise resolved in the Chapter 11 Cases.  The Special Committee also determined that the Debtors did not have any colorable claims or Causes of Action against the Released Parties (which, for the avoidance of doubt, do not include the Excluded Parties) that would be in the best interests of the Debtors or their Estates to pursue.  Consistent with the Special Committee's determinations, the Excluded Parties are not Released Parties under the Plan, and all potential Claims and Causes of Action against the Excluded Parties will be preserved under the Plan.  Accordingly, the Debtor Release is appropriate in light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Release to the Plan.  For the avoidance of

doubt, the Excluded Parties shall not be released under the Debtor Release and <u>Article VIII.C</u> of the Plan.

48.     In light of the foregoing, the Debtor Release is approved in its entirety.

49.     **Third Party Release**.  The Third-Party Release is a necessary and integral element of the Plan, is fair, equitable, reasonable, and is in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests.   Also, the Third-Party Release is:   (a) consensual; (b) specific in language and scope; (c) essential to Confirmation; (d) given in exchange for the substantial contributions made and the good and valuable consideration provided by the Released Parties, which are integral to the success of the Plan, including, without limitation, the Released Parties' contributions to facilitating the restructuring process and implementing the Plan; (e) a condition to the good-faith settlement and compromise of the claims and Causes of Action released by the Third-Party Release; (f) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (g) fair, equitable, and reasonable; (h) given and made after adequate notice and opportunity for hearing; (i) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release against any of the Released Parties; and (j) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

50.     <u>Article VIII.D</u> of the Plan describes the Third-Party Release granted by the Releasing Parties.  The Third-Party Release is an integral part of the Plan, including the Committee Settlement, and the DIP Facilities.  Like the Debtor Release, the Third-Party Release was critical to incentivizing parties to support the Plan, facilitated participation in the Restructuring Transactions, and the chapter 11 process generally, and prevented significant, time-consuming, and value-destructive litigation.  The Third-Party Release is a core negotiation point and an integral

component of the Plan and was instrumental in developing a Plan that maximized value for all of the Debtors' stakeholders.  As such, the Third-Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process by, among other things, supporting the Plan.

51.     The Third-Party Release is consensual as to all relevant parties, including all Releasing Parties, because (a) the Releasing Parties were provided adequate notice of the Chapter 11 Cases, the Plan, and the deadline to object to confirmation of the Plan, (b) all Holders of Claims and Interests entitled to vote on the Plan were given the opportunity to opt out of the Third-Party Releases, (c) all Holders of Claims and Interests received the First Confirmation Hearing Notice, the Confirmation Hearing Adjournment Notice, or the Non-Voting Status Notices and were properly informed that the Holders of Claims against or Interests in the Debtors that did not check the "Opt Out" box on the applicable Ballot or Opt Out Form, returned in advance of the Voting Deadline, would be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties, and (d) the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, the Non-Voting Status Notices, the First Confirmation Hearing Notice, and the Confirmation Hearing Adjournment Notice.  Further, Holders in the Non-Voting Classes also received a pre-addressed prepaid return envelope to facilitate the submission of any opt-out election.

52.     There is an identity of interests between the Debtors and the entities that will benefit from the Third-Party Release.  Each of the Released Parties, as stakeholders and critical participants in the Debtors' Chapter 11 Cases and the Plan process, share a common goal with the Debtors in seeing the Plan succeed.  The Third-Party Release provides finality for the Debtors, the

Reorganized Debtors, and the Released Parties regarding the parties' respective obligations under the Plan and with respect to the Reorganized Debtors.  The Third-Party Release is specific in language, is integral to and a condition of the compromises and settlements embodied in the Plan, and is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.  Among other things, the Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are the subject of the Third-Party Release, and no other disclosure is necessary.  The First Confirmation Hearing Notice was sent to Holders of Claims and Interests and published in *The New York Times* on October 24, 2025 and the *Financial Times* on October 27, 2025, and the Ballots sent to all Holders of Claims and Interests entitled to vote on the Plan, in each case, unambiguously stated that the Plan contains the Third-Party Release.  The Releasing Parties were given due and adequate notice of the Third-Party Release, and thus the Third-Party Release is consensual under controlling precedent as to those Releasing Parties that did not elect to opt out of granting the Third-Party Release.  For the avoidance of doubt, the Excluded Parties shall not be released under the Third-Party Release and Article VIII.D of the Plan.

53.    In light of the foregoing, the Third-Party Release is approved in its entirety.

54.    **Exculpation**.  The Exculpation is appropriate under applicable Law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope to protect the Exculpated Parties from inappropriate litigation.  The Exculpation appropriately affords protection to those parties who are Estate fiduciaries and constructively participated in, and contributed to, the Debtors' Chapter 11 Cases consistent with their duties under the Bankruptcy Code.

55.    Without limiting anything in the Exculpation, each Exculpated Party has participated in these Chapter 11 Cases in good faith and is appropriately released and exculpated

31

from any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases prior to the Effective Date, including the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Plan Supplement, the Filing of the Chapter 11 Cases, the Restructuring Transactions, the DIP Term Loan Facility, the DIP ABL Facility, the ABL Facility, the Bridge Facility, the Term Loan Facility, the Exit ABL Facility, the Exit Term Loan Facility, the Debt Rights Offering, the Litigation Trust, the Management Incentive Plan, the Asset Financing Agreements, the Asset Financing Takeback Debt Documents, the Committee Settlement, any other Definitive Document, the pursuit of Confirmation, the pursuit of Consummation, and/or the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, the distribution of property under the Plan, or any other related agreement or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided* that the Exculpation does not exculpate (a) any claims or Causes of Action against the Excluded Parties or (b) any claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.  The Exculpation, including its carveout for actual fraud or willful misconduct, is consistent with established practice in this jurisdiction.

56.     **Injunction**.  The Injunction is essential to the Plan and are necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Release, the Third-Party Release, and the Exculpation.  The Injunction is appropriately tailored to achieve those purposes.  Notwithstanding anything to the contrary in this Confirmation Order, no Person or Entity may commence or pursue

a claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a claim or Cause of Action subject to Articles VIII.C, VIII.D, or VIII.E of the Plan, without the Bankruptcy Court (a) first determining, after notice and a hearing, that such claim or Cause of Action represents a colorable claim of any kind and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.

57.     **Preservation of Causes of Action**.  Pursuant to Article IV.S of the Plan and the allocation of duties and vesting of assets provided for herein and in the Litigation Trust Documents, but subject to Article VIII of the Plan, each Reorganized Debtor and the Litigation Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, including the Permitted Litigation Claims, whether arising before or after the Petition Date, including any actions specifically enumerated on the Schedule of Retained Causes of Action, and the Reorganized Debtors' and the Litigation Trust's rights to commence, prosecute, or settle such retained Causes of Action, including the Permitted Litigation Claims, shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released by the Debtors and the Reorganized Debtors as of the Effective Date.  For the avoidance of doubt, any and all Causes of Action against the Excluded Parties are preserved.

58.     The Plan and the Plan Supplement (including the Debt Rights Offering Documents) provide meaningful disclosure, and all parties in interest received adequate notice, with respect to

the retained Causes of Action.  The provisions regarding the preservation of Causes of Action in the Plan, including those contained in the Plan Supplement, are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.  For the avoidance of any doubt, Causes of Action released or exculpated under the Plan will not be retained by the Reorganized Debtors.

59.     **Lien Releases**.  The Lien Releases are essential to the Plan and necessary to implement the Plan.  The provisions of the Lien Releases are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests.

(xi)     *Additional Plan Provisions—Section 1123(b)(6)).*

60.     The other discretionary provisions of the Plan and the Plan Supplement, including, without limitation, the provision for the allowance of certain Claims and Interests, retention of jurisdiction, and the treatment of the D&O Liability Insurance Policies, are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

(xii)     *Cure of Defaults —Section 1123(d).*

61.     Article V.C of the Plan provides for the satisfaction of Cure Claims associated with each Executory Contract and Unexpired Lease to be assumed or assumed and assigned in accordance with section 365 of the Bankruptcy Code.  As part of the Plan Supplement, the Debtors Filed the Assumed Executory Contracts and Unexpired Leases Schedule, which listed a proposed Cure amount, based on the Debtors' books and records, for each Executory Contract and Unexpired Lease to be assumed.  The counterparties to such Executory Contracts and Unexpired Leases therefore received adequate notice of such proposed Cure amount, with an ability to dispute

and be heard in connection therewith.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

### Y.    Debtor Compliance with the Bankruptcy Code—Section 1129(a)(2).

62.    The Debtors, as proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code and, thus, satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

a.    is eligible to be a debtor under section 109 of the Bankruptcy Code, and a proper proponent of the Plan under section 1121(a), of the Bankruptcy Code;

b.    has complied with the applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court; and

c.    has complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, the Bankruptcy Local Rules, any applicable non-bankruptcy Law, rule and regulation, the Disclosure Statement Order, and all other applicable Law, in transmitting the Solicitation Packages and related documents and notices and in soliciting and tabulating the votes on the Plan.

63.    The Debtors and their agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with respect to the offering, issuance, and distribution of recoveries under the Plan and, therefore, are not and, on account of such distributions, will not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances and rejections of the Plan or distributions made pursuant to the Plan.

### Z.    Plan Proposed in Good Faith—Section 1129(a)(3).

64.    The Debtors have proposed the Plan in good faith and not by any means forbidden by Law.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the Filing of these Chapter 11 Cases, the

Plan, the Confirmation Declarations, the Disclosure Statement, the process leading to Confirmation, including the extensive, good-faith arm's-length negotiations among the Debtors and their stakeholders, including entry into the Committee Settlement, the overwhelming support of Holders of Claims for the Plan, and the transactions to be implemented pursuant thereto.  These Chapter 11 Cases were Filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to implement the Restructuring Transactions, reorganize, and emerge from these Chapter 11 Cases with a capital and organizational structure that will allow them to conduct their businesses and satisfy their obligations with sufficient liquidity and capital resources.

65.     The Plan and the contracts, instruments, releases, agreements, and other documents necessary and related to implementing, effectuating, and consummating the Plan, are the product of good faith, arm's-length negotiations by and among the Debtors, the DIP Lenders, and the Committee, among others.  The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' and such other parties' good faith, serve the public interest, and assure fair treatment of Holders of Claims and Interests.  Consistent with the overriding purpose of chapter 11, the Debtors Filed the Chapter 11 Cases with the belief that the Debtors were in need of reorganization, and the Plan was negotiated and proposed with the intention of accomplishing a successful reorganization and maximizing stakeholder value and for no ulterior purpose.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

**AA.     Payment for Services or Costs and Expenses—Section 1129(a)(4).**

66.     Any payment made or to be made by the Debtors or by a Person issuing Securities or acquiring property under the Plan for services or costs and expenses in connection with the Chapter 11 Cases or the Plan and incidental to the Chapter 11 Cases, as applicable, has been approved by or is subject to the approval of the Bankruptcy Court as reasonable.  Accordingly, the

procedures set forth in the Plan for the Bankruptcy Court's review and ultimate determination of the fees and expenses to be paid to Professionals by the Debtors in connection with these Chapter 11 Cases, or in connection with the Plan and incidental to these Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

### BB.   Directors, Officers, and Insiders—Section 1129(a)(5).

67.     Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors have disclosed in advance of the Confirmation Hearing the process by which individuals who will serve on the New Board will be chosen as provided in the New Equityholders' Term Sheet filed in the Plan Supplement.  The Plan sets forth the structure of the New Board, and the process for appointment of the New Board was disclosed in the Plan Supplement.  As set forth in the Plan, after the Confirmation Date and before the Effective Date, the Debtors' current directors, including its current Disinterested Directors, will continue to serve on the Debtors' boards of directors. Additionally, the Debtors Filed the Litigation Trust Agreement as part of the Plan Supplement. The Litigation Trustee shall administer the Litigation Trust Assets and may commence, prosecute, or settle retained Causes of Action, including the Permitted Litigation Claims, as appropriate.  The appointment to, or continuance in, the office of each applicable Person to the New Board is consistent with the interests of Holders of Claims and Interests and with public policy. Accordingly, the Debtors have sufficiently satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

### CC.   No Rate Changes—Section 1129(a)(6).

68.     Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases.  The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission.

**DD.    Best Interests of Creditors—Section 1129(a)(7).**

69.    The liquidation analysis attached to the Disclosure Statement and the other evidence related thereto in support of the Plan that was proffered at, prior to, or in connection with the Confirmation Hearing:  (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other persuasive evidence; and (d) establish that Holders of Allowed Claims and Interests in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such Holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.  As a result, the Debtors have demonstrated that the Plan is in the best interests of their creditors and equityholders, and the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**EE.    Acceptance by Certain Classes—Section 1129(a)(8).**

70.    The Deemed Accepting Classes are the Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.  The Voting Classes, each of which is entitled to vote on the Plan, are Impaired. As evidenced by the Voting Report, Classes 3, 4A, 4B, 4C, 5A, and 5B have voted to accept the Plan at each of the Debtors.  Holders of Intercompany Claims and Intercompany Interests in Classes 6 and 7 are Unimpaired and conclusively presumed to have accepted the Plan (to the extent Reinstated) or are Impaired and conclusively deemed to have rejected the Plan (to the extent cancelled and released), and, in either event, are not entitled to vote to accept or reject the Plan. Pursuant to the Plan, Holders of Claims and Interests in Classes 9 and 10 are Impaired, receive no recovery on account of their Claims and Interests, and are deemed to have rejected the Plan. Although the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the

Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code.

**FF.    Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code—Section 1129(a)(9).**

71.    The treatment of Allowed Administrative Claims, Professional Claims, Priority Tax Claims, the DIP Term Loan Claims, and the DIP ABL Claims under Article II of the Plan, and of the Other Priority Claims under <u>Article III</u> of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**GG.    Acceptance by at Least One Impaired Class—Section 1129(a)(10).**

72.    As evidenced by the Voting Report, multiple Impaired Classes that were entitled to vote on the Plan, including Classes 3, 4A, 4B, 4C, 5A, and 5B, voted to accept the Plan by the requisite numbers and amounts of Claims at each Debtor, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), as specified under the Bankruptcy Code.  As such, there is at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, without including any insiders' acceptance of the Plan.  Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code are satisfied.

**HH.    Feasibility—Section 1129(a)(11).**

73.    The financial projections attached to the Disclosure Statement and the other evidence supporting Confirmation of the Plan proffered or adduced by the Debtors at, prior to, or in the Confirmation Declarations Filed in connection with, the Confirmation Hearing:  (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and

assumptions; (c) have not been controverted by other persuasive evidence; (d) establish that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan, except as provided in the Plan; (e) establish that the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan; and (f) establish that the Reorganized Debtors will have the financial wherewithal to pay any Claims that accrue, become payable, or are allowed by Final Order following the Effective Date. Accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**II.      Payment of Statutory Fees—Section 1129(a)(12).**

74.      <u>Article XII.C</u> of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).  Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**JJ.      Continuation of Retiree Benefits—Section 1129(a)(13).**

75.      Except as otherwise specified in the Plan, <u>Articles IV.R</u> and <u>V.I</u> of the Plan provide that all retiree benefits, as defined in section 1114 of the Bankruptcy Code, if any, shall continue to be paid in accordance with applicable Law.  Accordingly, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**KK.      Non-Applicability of Certain Sections—Sections 1129(a)(14), (15), and (16).**

76.      Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases.  The Debtors do not owe any domestic support obligations, are not individuals, and are not nonprofit corporations.

**LL.      "Cram Down" Requirements—Section 1129(b).**

77.      Notwithstanding the fact that the Rejecting Classes have either been deemed to reject the Plan or voted to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(1)

of the Bankruptcy Code.  *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) of the Bankruptcy Code have been met.  *Second*, the Plan is fair and equitable with respect to the Rejecting Classes.  The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any impaired Claim or Interest that is junior to each such rejecting Class will receive or retain any property under the Plan on account of such junior Claim or Interest and (b) no Holder of a Claim or Interest in a Class senior to such Impaired Class is receiving more than 100% on account of its Claim.  While the Holders of Interests in Ascend Parent receive the Ascend Interest Distribution, the Holders of Claims of General Unsecured Claims against Ascend Parent voted to accept the Plan, so the fair and equitable requirement of section 1129(b) is met with respect to such Class.  Accordingly, the Plan is fair and equitable to all Holders of Claims and Interests in the Rejecting Classes.  *Third*, the Plan does not discriminate unfairly with respect to the Rejecting Classes because similarly situated creditors and interest Holders in such Classes that have not accepted the Plan will receive substantially similar treatment on account of their Claims and Interests irrespective of Class.  *Finally*, Holders of Claims in Classes 3, 4A, 4B, 4C, 5A, and 5B voted to accept the Plan in sufficient number and in sufficient amount to constitute accepting classes under the Bankruptcy Code.

78.     As a result, the Plan satisfied the requirements of section 1129(b) of the Bankruptcy Code and can be confirmed even though not all Impaired Classes have voted to accept the Plan and section 1129(a)(8) is not satisfied.  After entry of this Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding on the members of the Rejecting Classes.

**MM.    Only One Plan—Section 1129(c).**

79.    The Plan (including any previous versions thereof) is the only chapter 11 plan Filed in each of these Chapter 11 Cases and, accordingly, satisfies section 1129(c) of the Bankruptcy Code.

**NN.    Principal Purpose of the Plan—Section 1129(d).**

80.    No Governmental Unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.    As evidenced by its terms, the principal purpose of the Plan is not such avoidance.    Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

**OO.    Not Small Business Cases—Section 1129(e).**

81.    The Chapter 11 Cases are not small business cases, and accordingly, section 1129(e) of the Bankruptcy Code does not apply to these Chapter 11 Cases.

**PP.    Good Faith Solicitation—Section 1125(e).**

82.    The Debtors, along with the DIP Lenders, and with respect to each of the foregoing parties, each of such party's current and former predecessors, successors, affiliates (regardless of whether such interests are held directly or indirectly), and any and all Affiliates, agents, representatives, directors, officers, members, managers, principals, shareholders, partners, employees, attorneys, and advisors of each of the foregoing, as applicable, have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules in connection with all of their respective activities relating to the support of the Plan and Consummation, including, among other things, the issuance of the New Interests, the consummation of the Debt Rights Offering, the extension of financing under the DIP Facilities, the Exit ABL Facility, the Exit Term Loan Facility,

and the Asset Financing Agreement Takeback Debt, the formation and creation of the Litigation Trust, and the solicitation and tabulation of votes on the Plan, as applicable, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

**QQ.    Satisfaction of Confirmation Requirements.**

83.    Based on the foregoing and all other pleadings and evidence proffered or adduced at or prior to the Confirmation Hearing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

**RR.    Likelihood of Satisfaction of Conditions Precedent to the Effective Date.**

84.    Each of the conditions precedent to the Effective Date, as set forth in Article IX.B of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with Article IX.C of the Plan.

**SS.    Implementation.**

85.    All documents and agreements necessary to implement the Plan and the transactions contemplated thereby, including, without limitation, those contained or summarized in the Plan Supplement, and all other relevant and necessary or desirable documents (including the Debt Rights Offering Procedures, the Exit ABL Facility Documents, the Exit Term Loan Documents, Asset Financing Takeback Debt Documents, the Litigation Trust Documents, and the New Organizational Documents) is in the best interests of the Debtors and their Estates.  The Debtors have exercised their reasonable business judgment in determining to enter into these documents, and the documents have been negotiated in good faith and at arms' length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and documents, not avoidable, and not in conflict with any federal, state, or foreign Law.  The documents and agreements are essential elements of the Plan, and entry into and consummation of the transactions contemplated by each such document or

agreement are in the best interests of the Debtors, the Estates, and the Holders of Claims and Interests.   The Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements.

### TT.   Disclosure of Facts.

86.     The Debtors have disclosed all material facts regarding the Plan, including with respect to the consummation of the Debt Rights Offering and execution of the Exit ABL Facility Documents, the Exit Term Loan Documents, the Asset Financing Takeback Debt Documents, the Litigation Trust Documents, and the New Organizational Documents, the Filing of the Plan Supplement, and the fact that each applicable Debtor will emerge from its Chapter 11 Case as a validly existing corporation, limited liability company, partnership, or other form, as applicable, with separate assets, liabilities, and obligations, as set forth in the Plan.

### UU.   Good Faith.

87.     The Debtors and their respective directors, officers, management, counsel, advisors, and other agents have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders.   The Plan accomplishes this goal.   Accordingly, the Debtors or the Reorganized Debtors, as applicable, the DIP Lenders, and each of their respective officers, directors, and advisors, have been, are, and will continue to act in good faith if they proceed to:   (a) consummate or take, as applicable, the Plan, the Debt Rights Offering, the Exit ABL Facility, the Exit Term Loan Facility, the Litigation Trust Documents, the Restructuring Transactions, and all agreements, settlements, transactions, transfers, and other actions expressly authorized by this Confirmation Order; and (b) take the actions authorized and directed or contemplated by this Confirmation Order and the Plan to

reorganize the Debtors' businesses and effectuate the New Organizational Documents and the other Restructuring Transactions.

**VV.    Essential Element of the Plan.**

88.    The Debt Rights Offering Procedures, the Exit ABL Facility Documents, the Exit Term Loan Documents, the Asset Financing Takeback Debt Documents, the Litigation Trust Documents, and the New Organizational Documents are essential elements of the Plan, are necessary for Confirmation and Consummation of the Plan, and are critical to the overall success and feasibility of the Plan.  The execution, performance, and incurrence of all obligations by the Reorganized Debtors, and/or any successors, assigns, or transferees of the applicable Debtors or the Reorganized Debtors, including in connection with the Restructuring Transactions and the creation and perfection of the Liens in connection therewith, including the creation and perfection of Liens or the amendment and restatement of existing Liens to secure obligations under the Exit ABL Facility, the Exit Term Loan Facility, and the Asset Financing Takeback Debt, and the priority thereof, are necessary and appropriate for confirmation of the Plan and the operations of the Reorganized Debtors.  The Debtors have exercised sound business judgment in deciding to pursue and enter into the Debt Rights Offering, the Exit ABL Facility, the Exit Term Loan Facility, the Asset Financing Takeback Debt, the Litigation Trust Documents, the New Organizational Documents, and have provided adequate notice thereof.

89.    The Exit ABL Facility, the Exit Term Loan Facility, and the Asset Financing Takeback Debt were negotiated in good faith and at arm's length among the Debtors and the DIP Lenders, the lenders under the Exit ABL Facility, or the Holders of Asset Financing Agreement Claims, as applicable, without the intent to hinder, delay, or defraud any creditor of the Debtors, and any and all credit extended and loans made to the Reorganized Debtors, and/or any successors,

assigns, or transferees of the applicable Debtors or Reorganized Debtors, including in connection with the Restructuring Transactions, by the DIP Lenders, the lenders under the Exit ABL Facility, and the Holders of Asset Financing Agreement Claims, and any fees and expenses paid thereunder are deemed to have been extended, issued, and made in good faith. The Debtors have provided sufficient and adequate notice of the material terms of the Debt Rights Offering Procedures, the Exit ABL Facility Documents, the Exit Term Loan Documents, the Asset Financing Takeback Debt Documents, the Litigation Trust Documents, the New Organizational Documents to all parties in interest in these Chapter 11 Cases. The execution, delivery, or performance by the Debtors or the Reorganized Debtors, as applicable, of any of the Exit ABL Facility Documents, the Exit Term Loan Documents, the Asset Financing Takeback Debt Documents, the Litigation Trust Documents, the New Organizational Documents, and any agreements related thereto and compliance by the Debtors or the Reorganized Debtors, as applicable, with the terms thereof is authorized by, and will not conflict with, the terms of the Plan or this Confirmation Order.

### WW.  Valuation

90.     The evidence with respect to the valuation analysis of the Debtors set forth in the Disclosure Statement and introduced at the Confirmation Hearing and in the Confirmation Declarations provides the basis and support for the distributions and recoveries to Holders of Claims and Interests, as applicable, under the Plan:  is reasonable, persuasive, and credible; and uses reasonable and appropriate methodologies and assumptions. Given such valuation of the Debtors, pursuant to the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, the Plan's treatment of Claims and Interests is appropriate and reasonable as set forth herein.

## **ORDER**

IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

91.     **Findings of Fact and Conclusions of Law.**  The above-referenced findings of fact and conclusions of Law are hereby incorporated by reference as though fully set forth herein and constitute findings of fact and conclusions of Law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.  To the extent that any finding of fact is determined to be a conclusion of Law, it is deemed so, and vice versa.

92.     **Disclosure Statement.**   Approval of the Disclosure Statement, including the Disclosure Statement Supplement, the Solicitation Packages, and the Solicitation Procedures is hereby reaffirmed pursuant to section 1125 of the Bankruptcy Code.

93.     **Confirmation of the Plan.**  The Plan is approved in its entirety and **CONFIRMED** pursuant to section 1129 of the Bankruptcy Code.  The Debtors are authorized to enter into and execute all documents and agreements related to the Plan (including all exhibits and attachments thereto and documents referred to therein and herein), and the execution, delivery, and performance thereafter by the Reorganized Debtors, are hereby approved and authorized.

94.     This Confirmation Order approves the Plan Supplement, including the documents contained therein, as they may be amended or supplemented through and including the Effective Date in accordance with and as permitted by the Plan, subject to the consent rights set forth therein. The terms of the Plan (including the Plan Supplement), the Plan Supplement, and the exhibits thereto are incorporated herein by reference as set forth in paragraph 105 of this Confirmation Order and are an integral part of this Confirmation Order; *provided* that if there is any direct conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control solely to the extent of such conflict.

95. **MasTec Settlement**. The 9019 Order is incorporated herein and all transactions implemented in connection therewith are hereby reaffirmed and approved in their entirety.

96. **Novus Settlement.** This Confirmation Order approves the settlement agreement (the "Novus Settlement") by and between Ascend Performance Materials Texas Inc. ("APM Texas"), the other Debtors, and MHBA CB, L.L.L.P. ("MHBA," and together with its affiliates, successors in interest, and assigns, "Novus," and together with APM Texas or the applicable Reorganized Debtor ("Reorganized APM Texas") and the other Debtors and their applicable Reorganized Debtors, the "Novus Settlement Parties"), pursuant to which:

a. *Confirmation*. MHBA has agreed not to object to Confirmation of the Plan as part of the Novus Settlement.

b. *Mediation*. Unless otherwise agreed to in writing by MHBA and either APM Texas or Reorganized APM Texas, after the Effective Date and commencing on a date that is no earlier than January 12, 2026 and no later than March 12, 2026, Reorganized APM Texas and MHBA (together, the "Novus Mediating Parties") shall participate in good faith mediation (the "Mediation") regarding all commercial issues and disputes between the Novus Mediating Parties, including (i) further amendments to the Supply and Operating Agreement dated October 1, 2014 (together with all attachments, appendices, and exhibits, and as amended, amended and restated, supplemented, or otherwise modified from time to time, the "SOA," and together with all related agreements, including the Master Easement and License Agreement dated September 30, 2014, the Purchase and Sale Agreement dated September 30, 2014, and all referenced attachments, appendices, and exhibits to each of the foregoing, each as may be amended, amended and restated, supplemented or otherwise modified from time to time, the "Novus Agreements") and (ii) the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Rejection of the Novus Agreement and (II) Granting Related Relief* [Docket No. 1051] (the "Novus Rejection Motion"). The Mediation shall be conducted by a mediator that is reasonably acceptable to both of the Novus Mediating Parties (the "Mediator") and shall conclude upon the earliest of (A) the date that the Novus Mediating Parties reach a written agreement that is consented to by each Novus Mediating Party (a "Successful Mediation"), (B) the date that the Mediator determines that the Mediation has failed and notifies in writing (email being sufficient) the Novus Mediating Parties of such determination (an "Unsuccessful Mediation"), and (C) the date, on or after May 12, 2026, upon which either Novus Mediating Party elects in its sole discretion and for any reason to discontinue the Mediation and notifies the other Novus Mediating Party in writing (email being sufficient) of such election (a "Discontinued Mediation," and the earliest of such

dates set forth in the foregoing clauses (A) to (C), the "Mediation Conclusion Date");

c.    *Adjournment, Stay, and Potential Resolution of the Novus Rejection Motion*.  All claims, Causes of Action, disputes, discovery, and litigation with respect to the Novus Agreements or the Novus Rejection Motion shall be adjourned and stayed until the Mediation Conclusion Date.  If the Mediation Conclusion Date occurs because of a Successful Mediation, the Reorganized Debtors shall promptly withdraw the Novus Rejection Motion unless otherwise agreed by the Novus Mediation Parties.  If the Mediation Conclusion Date occurs because of an Unsuccessful Mediation or Discontinued Mediation, the Novus Rejection Motion shall be set for expeditious adjudication before the Bankruptcy Court. The objection deadline for the Novus Rejection Motion shall be no less than twenty-one (21) days after the Mediation Conclusion Date, and any Claims arising from the rejection of a Novus Agreement must be Filed within thirty (30) days after entry of any order approving rejection of such Novus Agreement (any such order approving rejection of the SOA, the "Novus Rejection Order").  Notwithstanding anything to the contrary in this Confirmation Order or the Plan, neither (a) the Plan, the Confirmation Order (including any factual finding or conclusion of law contained therein) or any related decision or ruling confirming the Plan, nor (b) MHBA's agreement not to object to confirmation of the Plan consistent with the Novus Settlement shall (i) preclude MHBA from arguing, or prejudice MHBA's arguments, that (A) rejection of the Novus Agreements is not a sound exercise of the Debtors' business judgment, (B) one or more of the Novus Agreements are not executory in nature, (C) one or more of the Novus Agreements constitute or contain covenants running with the land that prevent or survive rejection, or (D) other rights of MHBA survive rejection of the Novus Agreements or (ii) be deemed or construed as an admission or waiver by MHBA of such arguments;

d.    *Assumption*.  If (i), prior to  the Mediation Conclusion Date, the Debtors or Reorganized Debtors determine in their discretion to assume the Novus Agreements, (ii) at any time, MHBA and either the Debtors or Reorganized Debtors agree in writing to the assumption of the Novus Agreements, or (iii) the Rejection Motion is adjudicated and denied (following a final resolution, whether by the Bankruptcy Court or following any appeals), the Debtors or Reorganized Debtors shall File a motion requesting that the Bankruptcy Court approve the assumption of the Novus Agreements, which motion shall specify Cure costs, if any, paid or proposed to be paid by the Debtors or the Reorganized Debtors in accordance with section 365(b)(1) of the Bankruptcy Code.  Unless otherwise agreed upon in writing by the Novus Settlement Parties, objections to any such Cure costs must be Filed with the Bankruptcy Court within fourteen (14) days of the Filing of such motion. MHBA's rights with respect to such determination of Cure costs are expressly preserved notwithstanding MHBA's agreement to not object to confirmation of the Plan or anything to the contrary in this Confirmation Order or the Plan; *provided* that, any such objection that is not timely Filed in accordance with this paragraph 96 shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the

need for any objection by the Debtors or the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  The entry of an order by the Bankruptcy Court approving the Debtors or the Reorganized Debtors' assumption of the Novus Agreements (such order, the "Novus Assumption Order") shall not constitute a determination by the Bankruptcy Court of any claims, rights, remedies, or obligations (other than Cure costs) arising under or related to the Novus Agreements and, notwithstanding anything to the contrary in this Confirmation Order or the Plan, the Bankruptcy Court shall not retain jurisdiction over any future contractual disputes under the assumed Novus Agreements or claims in connection therewith (including any potential disputes regarding a "Persistent Failure" under the SOA and the Persistent Failure notice dated April 4, 2025 to the extent not resolved in Mediation), which shall be resolved pursuant to the dispute resolution provisions set forth in section 10.4 of the SOA;

e.   *Treatment of Novus Agreements.*  Unless otherwise agreed to in writing by MHBA and either APM Texas or Reorganized APM Texas, and notwithstanding any other provision of this Confirmation Order or the Plan, from the Effective Date until the date of entry of either the Novus Assumption Order or the Novus Rejection Order (such period, the "Interim Period"): (i) the Novus Agreements shall continue in full force and effect as they existed immediately prior to the Effective Date, with Reorganized APM Texas responsible for the obligations of APM Texas thereunder as if the Novus Agreements had been assumed; (ii) the terms of the Novus Agreements shall apply to MHBA and Reorganized APM Texas, without alteration or modification, including, without limitation, all indemnification provisions, MHBA's obligation to pay Reorganized APM Texas all amounts as and when due under the SOA and Reorganized APM Texas's obligations to supply hydrogen cyanide and other raw materials to MHBA and operate MHBA's facilities within the Chocolate Bayou plant, in each case as set forth therein and in accordance with the findings and rulings set forth in the *Partial Final Award* dated April 9, 2025; (iii) any disputes arising from, or relating to, performance or non-performance under the Novus Agreements during the Interim Period shall be heard and determined by the Bankruptcy Court; and (iv) all obligations of Reorganized APM Texas under the Novus Agreements during the Interim Period shall be enforceable against Reorganized APM Texas and all claims against Reorganized APM Texas arising during or related to the Interim Period shall be paid by the Reorganized APM Texas in the ordinary course of business and shall not constitute or be treated as claims arising from the rejection of an Executory Contract or Unexpired Lease or otherwise be subject to discharge.  In the event that the Bankruptcy Court enters the Novus Rejection Order, (A) rejection of the relevant Novus Agreement shall be deemed to have occurred upon the date of entry of the order rejecting such agreement, (B) all Claims of Novus arising from the Rejection Order (other than claims against Reorganized APM Texas arising during or related to the Interim Period) shall be treated as General Unsecured Claims against APM Texas, and (C) the rights, obligations and interests of the parties under the Novus Agreements shall otherwise be determined in accordance with applicable Law, notwithstanding anything to the contrary contained in the Plan or this Confirmation Order;

f.     *Releases.*  Notwithstanding anything to the contrary in this Confirmation Order, the Plan (including, without limitation, Article I and Article VIII of the Plan), or the Plan Supplement (including the Schedule of Retained Causes of Action), it is hereby provided and agreed that none of MHBA, Novus, their current or former Affiliates, or their current and former Related Parties (the "<u>Applicable Novus Entities</u>") shall be (i) a "Releasing Party" in any capacity, and rather the Applicable Novus Entities shall be deemed to have opted out of granting the releases contained in <u>Article VIII.D</u> of the Plan, or (ii) a "Released Party," *provided,* however that none of the Applicable Novus Entities shall be an "Excluded Party" and no Claim or Cause of Action retained under the Plan with respect to the Applicable Novus Entities, if any, shall be a Permitted Litigation Claim;

g.     *Preservation of Rights.* The Novus Settlement Parties reserve all rights, claims, remedies, affirmative defenses, objections, arguments, and counterclaims with respect to the assumption or rejection of any Novus Agreements (whether in connection with the Novus Rejection Motion or otherwise), including with respect to (i) whether rejection of the Novus Agreements is a sound exercise of the Debtors' business judgment, (ii) whether the Novus Agreements are executory in nature, (iii) whether the Novus Agreements constitute or contain covenants running with the land that prevent or survive rejection, (iv) whether other rights of MHBA survive rejection of the Novus Agreements, (v) the determination of any claim for damages arising from rejection of the Novus Agreements, and (vi) the determination of Cure costs in connection with assumption of the Novus Agreements; and

h.     *Interpretation.*  In the event of any inconsistency between this paragraph 96 and the terms of the Plan or other provisions of this Confirmation Order, this paragraph 96 shall control.

97.     **Solicitation.**  To the extent applicable, the solicitation of votes on the Plan complied with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and was appropriate and satisfactory and is approved in all respects.

98.     **Objections Overruled.**   To the extent that any objections (including any reservations of rights, joinders, or statements contained therein) pertaining to the Confirmation of the Plan that have not been withdrawn, waived, or settled before entry of this Confirmation Order, are not cured by the relief granted in this Confirmation Order, or have not otherwise been resolved as stated on the record at the Confirmation Hearing, all such objections (including any reservation of rights, joinders, or statements contained therein), except with respect to unresolved Cure

disputes and objections to the assumption or rejection of Executory Contracts and Unexpired Leases, if any, are hereby OVERRULED in their entirety and DENIED on the merits.

99.     All objections to Confirmation not Filed and served prior to the Objection Deadline set forth in the Disclosure Statement Order, and as amended by the Confirmation Hearing Adjournment Notice, if any, are deemed waived and shall not be considered by the Bankruptcy Court.

100.     **Deemed Acceptance of Plan as Modified.**  No additional solicitation or disclosure is required on account of any modifications made to the Plan after entry of the Disclosure Statement Order (the "Plan Modifications"), and all Holders of Claims and Interests who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan as modified, revised, supplemented, or otherwise amended.  The Debtors are not required, as a result of the Plan Modifications or otherwise, to resolicit the Plan under Bankruptcy Rule 3019.  No Holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Plan Modifications.

101.     **Plan Classifications Controlling.**  The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder.  The classifications set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan:  (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

102.    **No Action Required.**  Under section 1142(b) of the Bankruptcy Code and any other comparable provisions under applicable Law, no action of the respective directors, equityholders, managers, or members of any of the Debtors is required to authorize any of the Debtors to enter into, execute, deliver, File, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the Restructuring Transactions, or any contract, assignment, certificate, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including the Debt Rights Offering Procedures, the Exit ABL Facility Documents, the Exit Term Loan Documents, the Asset Financing Takeback Debt Documents, the Litigation Trust Documents, the New Organizational Documents, or the appointment and election of the New Board and the officers, directors, and/or managers of each of the Reorganized Debtors.

103.    Subject to <u>Article IV.E</u> of the Plan, the Debtors, the Reorganized Debtors, and the Litigation Trustee, as applicable, are also authorized from and after the date of entry of this Confirmation Order to negotiate, execute, issue, deliver, implement, File, or record any contract, instrument, release, or other agreement or document or take any action necessary or appropriate to implement the transactions contemplated by the Plan.

104.    **Binding Effect.**   Subject to <u>Article IX.A</u> of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the date of and after entry of this Confirmation Order (but subject to the occurrence of the Effective Date), the terms of the Plan and the Restructuring Transactions (and any documents related or ancillary thereto, including any Liens, Claims, and security interests and, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and not subject to avoidance or other challenge, legal or otherwise, and deemed binding upon the

Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests have, or are deemed to have accepted the Plan, or have or have not delivered a signature page to any applicable documents), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against, and Interest in, the Debtors shall be fixed, adjusted, or comprised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.  Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, upon the Effective Date, the provisions of this Confirmation Order and the Plan shall apply and be binding and enforceable notwithstanding any otherwise applicable non-bankruptcy Law.

105.    **Incorporation by Reference.**   The terms and provisions of the Plan, the Plan Supplement, and each of the foregoing schedules and exhibits are incorporated by reference and are an integral part of this Confirmation Order.  The terms of the Plan, the Plan Supplement, all exhibits thereto, this Confirmation Order, the Definitive Documents, and all other relevant and necessary documents shall, on and after the Effective Date, be binding in all respects upon, and shall inure to the benefit of, the Debtors, their Estates, the Reorganized Debtors, and their creditors and equityholders, and their respective successors and assigns, Non-Debtor Subsidiaries, any affected third parties, all Holders of Interests in the Debtors, all Holders of any Claims, whether known or unknown, against the Debtors, including, but not limited to all contract counterparties, leaseholders, Governmental Units, and any trustees, examiners, administrators, responsible officers, estate representatives, or similar Entities for the Debtors, if any, subsequently appointed

in any of these Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of these Chapter 11 Cases, and each of their respective affiliates, successors, and assigns.

106. **Vesting of Assets in the Reorganized Debtors.** Except as otherwise provided in this Confirmation Order or the Plan (including the Restructuring Transactions Memorandum and Article VIII and Article IV.E.2 of the Plan), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Plan Supplement, this Confirmation Order, or any agreement, instrument, or other document incorporated herein, including Article VIII of the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, (a) no Reorganized Debtor shall be treated as being liable on any Claim that is discharged pursuant to the Plan, and (b) no contract, agreement, instrument, or other document (including any and all Indemnification Provisions) or property of the Estate in favor of (i) the Sponsor or (ii) any other Excluded Party shall vest in the Reorganized Debtors.

107. **Release, Exculpation, Discharge, and Injunction Provisions.** The release, exculpation, discharge, and injunction provisions set forth in Article VIII of the Plan are incorporated herein, approved, and authorized in their entirety, and such provisions are immediately effective and binding on the Effective Date on all parties and Entities to the extent

provided therein.  Notwithstanding the release of claims and Causes of Action based, in whole or in part, on a theory of gross negligence or similar legal construct against any of the Debtors' current or former directors and/or officers that are not Excluded Parties, this Confirmation Order and the Plan do not release any claim or Causes of Action based, in whole or in part, on a theory of gross negligence or similar legal construct against the Excluded Parties, including any claims and Causes of Action that relate to any act or omission approved by a board of directors, the majority of whom are released from liability from or related to such action pursuant to the Debtor Release and the Third-Party Release.

108.    **Preservation of Causes of Action.**  Pursuant to Article IV.S of the Plan and the allocation of duties and vesting of assets provided for in the Plan and in the Litigation Trust Documents, but subject to Article VIII of the Plan, each Reorganized Debtor and the Litigation Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, including the Permitted Litigation Claims, whether arising before or after the Petition Date, including any actions specifically enumerated on the Schedule of Retained Causes of Action, and the Reorganized Debtors' and the Litigation Trust's rights to commence, prosecute, or settle such retained Causes of Action, including the Permitted Litigation Claims, shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors

and the Reorganized Debtors as of the Effective Date.  For the avoidance of doubt, any and all Causes of Action against the Excluded Parties are preserved.

109.    No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Litigation Trustee will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to the retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of the Plan.

110.    Notwithstanding anything to the contrary in the Plan, in the Plan Supplement, or in this Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, the Debtors shall execute the Litigation Trust Agreement, take all steps necessary to establish the Litigation Trust and the beneficial interest therein, and shall automatically preserve, transfer, and/or assign to the Litigation Trust all of theirs and the Estates' rights, title, and interest in and to all of the Litigation Trust Assets, free and clear of all Claims, Liens, charges, and other encumbrances, and in accordance with section 1141 of the Bankruptcy Code, including, without limitation, preserved and retained Causes of Action that are Permitted Litigation Claims and the right to commence, prosecute, and/or settle all Permitted Litigation Claims belonging to such Debtors or their Estates, subject to the occurrence of the Effective Date and the other terms and conditions set forth in the Plan; *provided* that:  (a) the Litigation Trust Assets shall automatically vest in the Litigation Trust without further action by any Person and shall be held by the Litigation Trust in trust for the benefit of the Litigation Trust Beneficiaries; (b) the Litigation Trust shall be the successor-in-interest to the Debtors' rights, title, and interest in any Permitted Litigation Claims; (c) the Litigation Trust shall have exclusive standing to pursue the Permitted Litigation Claims; and (d) the Litigation

Trust shall (i) retain and may exclusively enforce any and all Permitted Litigation Claims, and (ii) have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment all such Permitted Litigation Claims and to decline to do any of the foregoing in its discretion and without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Litigation Trust Agreement.  In pursuing any Permitted Litigation Claims, the Litigation Trust shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code and shall succeed to the Debtors' rights with respect to the time periods in which a Permitted Litigation Claims may be bought under section 546 of the Bankruptcy Code. The Litigation Trust shall be entitled to recover on any Permitted Litigation Claims any settlement or judgment with respect to the other Permitted Litigation Claims, and no consent shall be necessary for the Litigation Trust to transfer such proceeds of any such Permitted Litigation Claims once received from an insurer or other third-party.  For the avoidance of doubt, the Litigation Trust shall be solely responsible for effectuating all distributions on account of the Litigation Trust Assets.  As between the Reorganized Debtors and the Litigation Trust, any Claim or Cause of Action not otherwise released pursuant to the Plan that is not a Permitted Litigation Claim shall be preserved for the Reorganized Debtors.

111.    The provisions regarding the preservation of Causes of Action in the Plan, including those contained in the Plan Supplement, are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.   For the

avoidance of any doubt, Causes of Action released or exculpated under the Plan will not be retained by the Reorganized Debtors.

112.    **Executory Contracts and Unexpired Leases.**   The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in <u>Article V</u> of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption, assumption and assignment, Cure, or rejection, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.   For the avoidance of doubt, on the Effective Date, except as otherwise provided in the Plan or this Confirmation Order, each Executory Contract and Unexpired Lease (including those set forth in the Assumed Executory Contracts and Unexpired Leases Schedule) shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract of Unexpired Lease:  (a) is identified on the Assumed Executory Contracts and Unexpired Leases Schedule on or before the Effective Date; (b) previously expired or terminated pursuant to its own terms; (c) has been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) is the subject of a motion to assume that is pending on the Effective Date; (e) has an ordered or requested effective date of rejection that is after the Effective Date; (f) is an employment agreement that is not disclosed by the Required DIP Term Loan Lenders to the Debtors' counsel on or before October 15, 2025, none of which shall be rejected; (g) is a D&O Liability Insurance Policy, which shall be deemed automatically assumed; (h) is one or more Indemnification Provisions, which shall be assumed or rejected in accordance with <u>Article IV.L</u> of the Plan; or (i) is a confidentiality agreement with any Debtor.

113.    Unless a party to an Executory Contract or Unexpired Lease has objected to the Cure amounts and any assumption or assumption and assignment of such Executory Contract or

Unexpired Lease identified in the Plan Supplement and any amendments thereto, as applicable, the Debtors or Reorganized Debtors, as applicable, shall pay such Cure amounts in accordance with the terms of the Plan and the assumption or assumption and assignment of any Executory Contract or Unexpired Lease, pursuant to the Plan or otherwise, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including relating to such assumption and assignment, defaults of provisions relating to anti-assignment or restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment. Any disputed Cure amounts shall be determined in accordance with the procedures set forth in Article V.C of the Plan and applicable bankruptcy and non-bankruptcy Law. For the avoidance of doubt, any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan or otherwise may not be terminated on account of such assumption or assumption and assignment or on account of the Plan, the transactions contemplated therein, or any change of control or ownership interest composition that may occur at any time before or on the Effective Date. To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

114.     Each Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assumed and assigned in these Chapter 11 Cases, including pursuant to this Confirmation Order, shall be deemed disallowed and expunged as of the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (b) the effective date of such assumption, or (c) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

115.     This Confirmation Order shall constitute a Final Order approving the assumptions and assumptions and assignments of the Executory Contracts and Unexpired Leases as set forth in the Plan and the Assumed Executory Contracts and Unexpired Leases Schedule and the rejections of the Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

116.     Notwithstanding Bankruptcy Rule 3020(e), upon the entry of this Confirmation Order, the Debtors are immediately authorized to assume any Executory Contract or Unexpired Lease and pay any related Cure costs, pursuant to the Plan, including the Plan Supplement.

117.     **Plan Supplement**.  The Plan Supplement is hereby approved in its entirety, including, but not limited to:  (a) the New Equityholders' Agreement; (b) the New Equityholders' Term Sheet; (c) to the extent known, the identities of the members of the New Board; (d) the Assumed Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) the MIP Term Sheet (if applicable); (g) the Schedule of Excluded Parties;

(h) the Restructuring Transactions Memorandum; (i) the Exit ABL Credit Agreement; (j) the Exit ABL Term Sheet; (k) the Debt Rights Offering Documents; (l) the Asset Financing Agreement Schedule; (m) the Litigation Trust Agreement; (n) the Exit Term Loan Term Sheet; (o) the Exit Term Loan Credit Agreement; (p) the Claims Ombudsman Agreement; and (q) the Go-Forward Vendor Claim Schedule, with respect to each of the foregoing, to the extent applicable and available.  Notwithstanding anything to the contrary in this Confirmation Order, the Debtors reserve the right to alter, amend, modify, or supplement any document in the Plan Supplement in accordance with the Plan, including the consent rights set forth therein, at any time before the Effective Date or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

118.    **Restructuring Transactions**.  The Debtors or Reorganized Debtors, as applicable, are hereby authorized, immediately upon entry of this Confirmation Order (but subject to the occurrence of the Effective Date), to enter into and take all steps desirable or necessary to effectuate the Restructuring Transactions and enter into and consummate the transactions contemplated by the Plan, the Plan Supplement, the Debt Rights Offering Procedures, the Exit ABL Facility Documents, the Exit Term Loan Documents, the Asset Financing Takeback Debt Documents (which, for the avoidance of doubt, shall include the Second Modification Agreement by and between Ascend Performance Materials Texas Inc. and Ansley Park Capital LLC, including the granting of first priority liens as to the Additional Collateral (as defined therein)), the New Organizational Documents, and the Litigation Trust Documents as the same may be modified in accordance with the Plan, from time to time prior to the Effective Date (including, without limitation, any restructuring transaction steps set forth in the Restructuring Transactions Memorandum or other exhibits to or referred to in the Plan Supplement), and may take any actions

as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided in the Plan, which actions may include, as applicable:  (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable Law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable Law; (d) the execution, delivery, and implementation of the Exit ABL Facility and any filings and documents related thereto; (e) the issuance of the New Interests (except for certain specified New Interests to be issued after the Effective Date in accordance with the Plan, including certain New Interests issued as a result of the Ascend Interest Distribution, the Exit Term Loan Additional Equity Commitment (to the extent applicable), the Exit Term Loan Conversion (to the extent applicable), and the Management Incentive Plan); (f) the implementation of the Debt Rights Offering pursuant to the Debt Rights Offering Procedures; (g) the execution, delivery, and implementation of the Exit Term Loan Facility and any filings and documents related thereto; (h) the adoption of the Management Incentive Plan and the issuance of any New Interests or other Interests contemplated to be issued under the Management Incentive Plan, if applicable;

(i) the establishment of the Litigation Trust and the execution and delivery of the Litigation Trust Documents; (j) the implementation of the Committee Settlement; (k) the issuance of the Asset Financing Takeback Debt and entry into the Asset Financing Takeback Debt Documents; (l) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (m) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; and (n) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.

119.     Any transfers of assets, Claims, or Interests effected or any obligations incurred through the Restructuring Transactions (including the deemed contributions of Claims or the transfers of assets of and/or Claims and Liens against a Debtor or Reorganized Debtor or its property contemplated in the Restructuring Transactions Memorandum (including with respect to the New Interests)) are hereby approved and shall be deemed not to constitute a fraudulent conveyance, fraudulent transfer, or undervalue transaction or any similar avoidable or voidable transaction and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute an unfair preference or a preferential transfer, a fraudulent conveyance, or any similar avoidable or voidable transaction under the Bankruptcy Code or any applicable Law, whether federal, state, or foreign Law.  Except as otherwise provided in the Plan, each Reorganized Debtor, as applicable, shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case

may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, under the applicable Law in the jurisdiction in which such applicable Debtor is incorporated or formed.  The Debtors or the Reorganized Debtors, as applicable, are hereby authorized, immediately upon entry of this Confirmation Order, without the need to seek any third-party consents, corporate approvals, or further approvals of the Bankruptcy Court, to take any and all actions necessary to implement the Restructuring Transactions contemplated by the Restructuring Transactions Memorandum, including the transfers of assets of and/or Claims and Liens against a Debtor or Reorganized Debtor or its property.

120.    **Cancelation of Existing Securities and Agreements.**  On the Effective Date, except as otherwise provided in the Plan, the Definitive Documents (including the Plan Supplement), or this Confirmation Order, all notes, instruments, Securities (including equity Securities), certificates, credit agreements, indentures, security agreements, collateral agreements, and other documents evidencing (a) Claims against any of the Debtors or (b) Interests in Ascend Parent and APM Disc shall be canceled, and all present and future obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent), under or in connection with the ABL Credit Agreement, the Bridge Credit Agreement, the Term Loan Credit Agreement, the DIP ABL Credit Agreement, the DIP Term Loan Credit Agreement, and the Asset Financing Agreements of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Subsidiaries thereunder, or in any way related thereto, shall be deemed satisfied in full, canceled, released, discharged, and of no force or effect without the need for further action or approval of the Bankruptcy Court or for a Holder to take further action, and the Agents shall be discharged and released and shall not have any continuing duties or obligations thereunder. Holders of or parties to such canceled instruments, Securities, and other documentation will have

no rights arising from or relating to such instruments, Securities, and other documentation, or the cancelation thereof, except the rights, distributions, and treatment provided for or preserved pursuant to the Plan or this Confirmation Order.

121.    Subject to any applicable provisions of Article VI of the Plan and this Confirmation Order, the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the Bridge Credit Agreement, and the Asset Financing Agreements (including, in each case, all documents ancillary thereto), shall continue in effect to the extent necessary to:  (a) permit Holders of Claims under the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the Bridge Credit Agreement, and the Asset Financing Agreements to receive their respective Plan distributions, if any; (b) permit the Reorganized Debtors and the Distribution Agent, as applicable, to make Plan distributions on account of the Allowed Claims under the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the Bridge Credit Agreement, and the Asset Financing Agreements, as applicable; and (c) permit each of the Agents under the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the Bridge Credit Agreement, and the Asset Financing Agreements to seek indemnification, compensation, and/or reimbursement of fees and expenses through the exercise of charging Liens, solely to the extent provided for in the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the Bridge Credit Agreement, and the Asset Financing Agreements, respectively.  Except as provided in the Plan (including Article VI of the Plan) or this Confirmation Order, on the Effective Date, the Agents and their respective agents, successors, and assigns shall be automatically and fully discharged of

all of their duties and obligations associated with the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, and the Bridge Credit Agreement, as applicable.  The commitments and obligations (if any) of the Holders of the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, and the Bridge Credit Agreement to extend any further or future credit or financial accommodations to any of the Debtors, any of the Non-Debtor Subsidiaries, or any of their respective successors or assigns under the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, and the Bridge Credit Agreement, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

122.    **Distributions.**  The procedures governing distributions contained in Article VI of the Plan shall be, and hereby are, approved in their entirety.

123.    **Subordination.**  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to seek to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

124.    **Release of Liens.**  Except as otherwise expressly provided in the Exit ABL Facility Documents, the Exit Term Loan Documents, the Asset Financing Takeback Debt Documents, the Plan, or this Confirmation Order or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim or any related Claim that may be asserted against a Non-Debtor Subsidiary, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for the Asset Financing Agreement Claims and the Other Secured Claims that the Debtors elect to Reinstate in

accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any Non-Debtor Subsidiary shall be fully released and discharged, and all of the right, title, benefit, and interest of any Holder (and the applicable Agents of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns, as set forth in Article VIII.B of the Plan (the "Lien Releases").  Any Holder of such Secured Claim or Claim against a Non-Debtor Subsidiary (and the applicable Agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor or Non-Debtor Subsidiary (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable Agents for such Holder) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  For the avoidance of doubt, any Liens, claims, and encumbrances arising under the Term Loan Facility, the Bridge Facility, or the ABL Facility that may be asserted against a Non-Debtor Subsidiary shall be fully released and discharged on the Effective Date.  The presentation or filing of this Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, mortgages, deeds of trust, pledges, and other security interests.

125.    **General Settlement of Claims and Interests.**  As discussed in detail in the Disclosure Statement and as otherwise provided in the Plan and this Confirmation Order, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the

Effective Date, the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including the Committee Settlement and the 9019 Order (to the extent such controversies have not already been compromised and settled in accordance with the terms and conditions of the DIP Orders), including (a) any challenge to the amount, validity, perfection, enforceability, priority, or extent of the DIP Term Loan Claims, the DIP ABL Claims, the Term Loan Claims, the Allowed Asset Financing Agreement Claims, the Allowed Go-Forward Vendor Claims, or the Allowed General Unsecured Claims and (b) any Claim to avoid, subordinate, or disallow any DIP Term Loan Claims, DIP ABL Claims, Term Loan Claims, Asset Financing Agreement Claims, Allowed Go-Forward Vendor Claims, or Allowed General Unsecured Claims, whether under any provision of chapter 5 of the Bankruptcy Code on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.   The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.   Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be, and shall be, final.   The compromises, settlements, and releases described herein and in the Plan are nonseverable from each other and from all other terms of the Plan.   In accordance with and subject to the provisions of the Plan (including the consent rights thereunder),

pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of this Court, after the Effective Date, the Litigation Trustee, subject to the Litigation Trust Agreement, may compromise and settle the retained Causes of Action that have vested in the Litigation Trust.

126. **Committee Settlement.**  The entry of this Confirmation Order constitutes the Bankruptcy Court's approval of the Committee Settlement, all transactions contemplated therein and thereby, and all the terms and conditions thereof, as incorporated in the Plan and the Plan Supplement.  The Plan incorporates and implements the Committee Settlement, a compromise and settlement of numerous issues and disputes between and among Debtors, the DIP Lenders, the Bridge Lenders, the Term Loan Lenders, the ABL Lenders, the Agents, and the Committee, and is designed to achieve a reasonable and effective resolution of the Chapter 11 Cases.  Except as otherwise expressly set forth herein or in the Plan, the Committee Settlement constitutes a settlement of all potential issues and Claims between and among the Debtors, the DIP Lenders, the Bridge Lenders, the Term Loan Lenders, the ABL Lenders, the Agents, and the Committee.

127. **Litigation Trust**.  The entry of this Confirmation Order constitutes the Bankruptcy Court's approval of the establishment of the Litigation Trust in accordance with the Plan and the Litigation Trust Documents and approves the Debtors' and the Litigation Trustee's entry into the Litigation Trust Documents.   Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Debtors and the Reorganized Debtors, as applicable, shall transfer the Litigation Trust Assets to the Litigation Trust, which, except to the extent the Debtors or the Reorganized Debtors determine otherwise in accordance with the Restructuring Transactions Memorandum to treat all or any portion of the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, shall be a

"liquidating trust" as that term is used under section 301.7701 4(d) of the Treasury Regulations, and such treatment is assumed with respect to the following discussion.

128.    The Litigation Trust shall be established for the purposes of liquidating the Litigation Trust Assets, reconciling certain Claims asserted against the Debtors and the Reorganized Debtors, if applicable, and distributing the proceeds thereof in accordance with the Plan and the Litigation Trust Documents, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust and the purposes described in the Plan.  Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the Debtors and the Reorganized Debtors will have no reversionary or further interest in, or with respect to, the Litigation Trust Assets.  Beneficial interests in the Litigation Trust shall be passive and shall not have voting, consent, or other shareholder-like control rights with respect to the Litigation Trust.  The beneficial interests in the Litigation Trust will not be certificated and may not be transferred, sold, pledged, or otherwise disposed of, or offered for sale except as otherwise provided in the Litigation Trust Documents. To the extent beneficial interests in the Litigation Trust are deemed to be "Securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests.

129.    In furtherance of the transfer of the Litigation Trust Assets to the Litigation Trust and in accordance with the Litigation Trust Agreement, on the Effective Date, the Debtors and/or the Reorganized Debtors shall be deemed to have irrevocably vested in, transferred, granted, and assigned to the Litigation Trust, and the Litigation Trust shall receive and accept, any and all of the Permitted Litigation Claims.  The foregoing transfer shall be:  (a) free and clear of any and all

actual or alleged Liens or encumbrances of any nature whatsoever (other than the Permitted Litigation Claims); (b) absolute and without requirement of any further action by the Debtors, the Litigation Trust, the Bankruptcy Court, or any other Person; and (c) governed by, and construed in accordance with, the Bankruptcy Code, the Plan, and the Litigation Trust Documents.

130.    Notwithstanding the foregoing, the Litigation Trustee shall have the power to assign and/or transfer the Permitted Litigation Claims in accordance with the Litigation Trust Documents.

131.    The Litigation Trustee, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Permitted Litigation Claims in accordance with the Plan and the Litigation Trust Agreement.  Subject to the terms of the Plan and the Litigation Trust Agreement, the Litigation Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Permitted Litigation Claims, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.  On the Effective Date (and subject to the establishment of the Litigation Trust), the Litigation Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred

subsequent to the date upon which the Litigation Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

132.    The Litigation Trust shall make distributions in accordance with the Plan, this Confirmation Order, and the Litigation Trust Documents and such distributions are hereby approved.

133.    **Exit ABL Facility.**  On the Effective Date, the Reorganized Debtors are authorized to enter into the Exit ABL Facility, the terms of which will be set forth in the Exit ABL Facility Documents.  Confirmation of the Plan shall be deemed (a) approval of the Exit ABL Facility (including the transactions and related agreements contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit ABL Facility, including the Exit ABL Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit ABL Facility.

134.    As of the Effective Date, upon the granting or continuation of Liens, as applicable, in accordance with the Exit ABL Facility Documents, all of the Liens and security interests to be granted in accordance with the Exit ABL Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and

security interests in, the applicable collateral in accordance with the respective terms of the Exit ABL Facility Documents, and (c) shall be deemed perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit ABL Facility Documents.

135.     To the extent provided in the Exit ABL Facility Documents, the Holder(s) of Liens under the Exit ABL Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents and to take any other action in order to evidence, validate, and perfect such Liens or security interests that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required).  The guarantees, mortgages, pledges, Liens, and other security interests, if any, granted to secure the obligations arising under the Exit ABL Facility Documents shall not be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute a preferential transfer or a fraudulent conveyance under the Bankruptcy Code or any applicable non-bankruptcy Law, and the priorities of such Liens and security interests shall be set forth in the Exit ABL Facility Documents.

136.     **Exit Term Loan Facility**.  On the Effective Date, the Reorganized Debtors are authorized to enter into the Exit Term Loan Facility, the terms of which will be set forth in the Exit Term Loan Documents, which must be in form and substance consistent with Article IV.F.5 of the Plan and the Exit Term Loan Term Sheet as Filed on or prior to the Voting Deadline.  Confirmation of the Plan shall be deemed (a) approval of the Exit Term Loan Facility (including the transactions and related agreements contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized

Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Term Loan Facility, including the Exit Term Loan Documents, and incur and pay any fees and expenses in connection therewith and (ii) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Term Loan Facility.

137.    As of the Effective Date, upon the granting or continuation of Liens, as applicable, in accordance with the Exit Term Loan Documents, all of the Liens and security interests to be granted in accordance with the Exit Term Loan Documents (a) shall be deemed to be granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Term Loan Documents, and (c) shall be deemed perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Term Loan Documents.

138.    To the extent provided in the Exit Term Loan Documents, the Holder(s) of Liens under the Exit Term Loan Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents and to take any other action in order to evidence, validate, and perfect such Liens or security interests that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order and any such filings, recordings,

approvals, and consents shall not be required).  The guarantees, mortgages, pledges, Liens, and other security interests, if any, granted to secure the obligations arising under the Exit Term Loan Documents shall not be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute a preferential transfer or a fraudulent conveyance under the Bankruptcy Code or any applicable non-bankruptcy Law, and the priorities of such Liens and security interests shall be set forth in the Exit Term Loan Documents.  Upon the effectiveness of each of the Exit Term Loan Documents in accordance with their terms (and any documents related thereto and as may be amended from time to time in accordance with the terms thereof), all Holders under the Exit Term Loan Facility were and hereby shall be deemed to be a party to, and bound by, the applicable Exit Term Loan Documents, regardless of whether such Holder has executed a signature page thereto.

139.   The Debt Backstop Premium payable to the Debt Backstop Parties in additional principal of the Exit Term Loan Facility is approved in all respects.  Subject only to the occurrence of the Effective Date, the provision of the Exit Term Loan Documents and the terms and conditions for any closing fees, discounts, fees, and/or premiums, including, without limitation, the Debt Backstop Premium, shall be deemed fully satisfied and earned as of the entry of this Confirmation Order.  The amount of the Debt Backstop Premium is a bargained-for and an integral part of the Restructuring Transactions contemplated under the Plan and is approved in all respects.

140.   **Asset Financing Takeback Debt**.  On the Effective Date, the Reorganized Debtors are authorized to issue the Asset Financing Takeback Debt, the terms of which will be set forth in the Asset Financing Takeback Debt Documents.  To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Asset Financing Takeback Debt (including the transactions and related agreements contemplated thereby and all actions to be taken, undertakings

to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Asset Financing Takeback Debt, and incur and pay any fees and expenses in connection therewith and (ii) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, with the reasonable consent of the Required DIP Term Loan Lenders, may deem to be necessary to issue the Asset Financing Takeback Debt.

141.    As of the Effective Date, upon the granting of Liens in accordance with the Asset Financing Takeback Debt Documents, all of the Liens and security interests, if any, to be granted in accordance with the Asset Financing Takeback Debt Documents (a) shall be deemed to be granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Asset Financing Takeback Debt Documents, and (c) shall be deemed perfected on or prior to the Effective Date, subject only to such Liens and security interests, if any, as may be permitted under the respective Asset Financing Takeback Debt Documents.

142.    To the extent provided in the Asset Financing Takeback Debt Documents, the Holder(s) of Liens, if any, under the Asset Financing Takeback Debt Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents and to take any other action in order to evidence, validate, and perfect such Liens or security interests that would be applicable in the absence of the Plan and this Confirmation Order (it being understood

that perfection shall occur automatically by virtue of the entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required).  The guarantees, mortgages, pledges, Liens, and other security interests, if any, granted to secure the obligations arising under the Asset Financing Takeback Debt Documents shall not be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute a preferential transfer or a fraudulent conveyance under the Bankruptcy Code or any applicable non-bankruptcy Law, and the priorities of such Liens and security interests shall be set forth in the Asset Financing Takeback Debt Documents.

143.   **DIP ABL Claims**.  All DIP ABL Claims shall be deemed Allowed as of the Effective Date in an amount equal to the "Obligations" (as defined in the DIP ABL Documents), including without limitation, (a) the principal amount outstanding under the DIP ABL Credit Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP ABL Credit Agreement.

144.   Notwithstanding the entry of this Confirmation Order, from the Confirmation Date through the Effective Date, each Allowed DIP ABL Claim and all Liens securing such Allowed DIP ABL Claim shall continue in full force and effect and shall continue to constitute the legal, valid, binding, and enforceable obligations of Debtors, which shall not be impaired, prejudiced, or modified in any way until, (a) with respect to any DIP ABL Claims that are not being rolled into the Exit ABL Facility Loans, indefeasibly paid in full in Cash on the Effective Date, (b) with respect to any DIP ABL Claims that are (solely at the election of each applicable DIP ABL Lender) rolled into the Exit ABL Facility Loans or other outstanding obligations thereunder (such as letters of credit, as provided in the Plan), refinanced by the Exit ABL Facility by means of a cashless

settlement in the amount of the remaining DIP ABL Claims, and (c) accrued interest and fees under the DIP ABL Facility shall be paid in full in Cash on the Effective Date, and in any event, immediately prior to the effectiveness and conversion of the DIP ABL Claims into the Exit ABL Facility pursuant to the foregoing clause (b), and nothing in the Plan, the Plan Supplement or this Confirmation Order shall or shall be construed to release, discharge, relieve, limit, or impair in any way the rights of any Holder of an DIP ABL Claim or any Lien securing such Claim. Until such time as all of the conditions precedent to the effectiveness of the Exit ABL Facility Documents have been satisfied, including the occurrence of the Effective Date, the rights and remedies of each of the DIP ABL Agent and the DIP ABL Lenders under the DIP ABL Facility shall remain in full force and effect.

145.    Upon the Effective Date, the DIP Secured Parties (as defined in the DIP Orders) shall be released from any and all liability, responsibility, and/or obligation to hold, reserve for, or otherwise fund or ensure the funding of the Carve Out (as defined in the DIP Orders), or any other expenses included within the Carve Out and from any obligation, responsibility, or liability to the Debtors, any of the Professional Persons (as defined in the DIP Orders) or any other third party to pay, fund, or otherwise satisfy the fees and expenses of such Professional Persons.

146.    **New Organizational Documents and the Issuance of New Interests.** The terms of the New Organizational Documents (or the term sheets thereof), including the New Equityholders' Agreement, in each case as may be amended, restated, amended and restated, supplemented, or modified on or before the Effective Date consistent with the Plan are approved in all respects. To the extent any New Organizational Document is not attached to the Plan Supplement as of the date of entry of this Confirmation Order, such new Organizational Document is approved to the extent that it is consistent with this Confirmation Order, the Plan, and the Plan

Supplement.  The obligations of the applicable Reorganized Debtors related thereto will, upon execution, constitute legal, valid, binding, and authorized obligations of each of the Debtors or the Reorganized Debtors, as applicable, enforceable in accordance with their terms and not in contravention of any state, federal, or foreign Law.  To the extent applicable, entry of this Confirmation Order shall be deemed approval of the New Organizational Documents and the issuance of the New Interests contemplated thereunder (in each case, including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the applicable Debtors or the Reorganized Debtors, as applicable, and/or any successors, assigns, or transferees of the applicable Debtors or Reorganized Debtors, including in connection with the Restructuring Transactions, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously.  On the Effective Date, without any further action by the Bankruptcy Court or the directors, officers, or equityholders of any of the Reorganized Debtors, each Reorganized Debtor, as applicable, will be and is authorized to enter into the New Organizational Documents and all related documents, to which such Reorganized Debtor is contemplated to be a party on the Effective Date.

147.  In addition, on the Effective Date, without any further action by the Bankruptcy Court or the directors, officers, or equityholders of any of the Reorganized Debtors, each applicable Reorganized Debtor will be and is authorized to:  (a) execute, deliver, file, and record any other contracts, assignments, certificates, instruments, agreements, guaranties, or other documents executed or delivered in connection with the New Organizational Documents and the New Interests;  (b) issue the New Interests;  (c) perform all of its obligations under the New Organizational Documents; and (d) take all such other actions as any of the responsible officers of

such Reorganized Debtor may determine are necessary, appropriate, or desirable in connection with the consummation of the transactions contemplated by the New Organizational Documents and for the issuance of the New Interests.  Notwithstanding anything to the contrary in this Confirmation Order or <u>Article XI</u> of the Plan, after the Effective Date, any disputes arising under the New Organizational Documents will be governed by the jurisdictional provisions therein.  For the avoidance of doubt, any claimant's acceptance of the New Interests shall be deemed as its agreement to be bound by the New Organizational Documents without the need for execution by any party other than Reorganized Ascend and regardless of whether such Entity executes or delivers a signature page to any of the New Organizational Documents.  Notwithstanding anything to the contrary in this Confirmation Order, the Plan, the New Equityholders' Documents, or any other documents, (i) New Interests to be distributed pursuant to the Plan shall be held on the Company's corporate register as maintained by Kroll Issuer Services US LLC ("<u>Kroll</u>"), as equity agent, (ii) on or as soon as practicable after the Effective Date, Kroll shall provide Holders entitled to receive New Interests pursuant to the Plan with instructions as to how such Holders can claim their distributions of New Interests, and (iii) no such Holder shall be issued or receive such New Interests or be (or be deemed to be) a Holder of such New Interests unless and until such Holder affirmatively claims such distribution.

148. **Debt Rights Offering**.  On or prior to the Effective Date, the Debtors are authorized to consummate the Debt Rights Offering in accordance with the Debt Rights Offering Procedures and the Debt Rights Offering Documents.  Through and after the Effective Date, all documents necessary or desirable to effectuate the Debt Rights Offering (including, without limitation, the Debt Rights Offering Procedures) shall constitute legal, valid, and binding obligations of the applicable Reorganized Debtors and be enforceable in accordance with their

respective terms.  The Debt Rights Offering Procedures and all related forms, agreements, and notices are hereby approved, and the consummation of the Debt Rights Offering shall be deemed a reasonable exercise of the Debtors' business judgment.  The Debtors are authorized to (a) consummate the Debt Rights Offering on the Effective Date and (b) take such actions as may be necessary to effectuate the Debt Rights Offering pursuant to the Debt Rights Offering Documents.

149.  **Master Metal Agreements**.  On the Effective Date, each Master Metal Agreement[5] shall be assumed pursuant to section 365 of the Bankruptcy Code by APM Ops, and any security interest APM Ops granted in favor of the Metal Lessors[6] thereunder shall continue to be in full force and effect through and after the Effective Date, without further action, filing or notice. Notwithstanding anything to the contrary herein or the Plan, in connection with the assumption of each Master Metal Agreement under the Plan, the liabilities under each Master Metal Agreement will be paid by the Debtors and/or Reorganized Debtors in accordance with the terms and conditions of such agreements in the ordinary course of business—without regard to whether the Metal Lessors Filed any proof of claim, Administrative Claim, or Cure objections.  The Cure amount set forth in the Assumed Executory Contracts and Unexpired Leases Schedule [Docket No. 1175] reflects all amounts outstanding under the Master Metal Agreements as of the date that the Assumed Executory Contracts and Unexpired Leases Schedule was Filed (excluding legal fees and contingent indemnification obligations for which no claim has been made), which are all due

---

[5]  "Master Metal Agreement" means (a) that certain Master Metal Agreement dated as of December 20, 2019, as amended, by and between APM Ops and Wells Fargo Commodities LLC ("WFCLLC"); and (b) that certain Master Metal Agreement dated as of February 14, 2023, as amended, by and between APM Ops and Wells Fargo Bank, N.A. ("WFBNA").  For the avoidance of doubt, the Master Metal Agreements include all documents evidencing any Transaction (as such term is defined in each of the Master Metal Agreement).

[6]  "Metal Lessors" mean, collectively, WFCLLC and WFBNA.

on or before December 15, 2025.  If after the date the Assumed Executory Contracts and Unexpired

Leases Schedule [Docket No. 1175] was Filed and prior to the Effective Date, any new Transaction

(as defined in the Master Metal Agreement) is executed (including renewal of leases or entry into

new leases) or APM Ops fails to return any leased metal at the expiration of the applicable lease

or otherwise breaches its obligations under any of the Master Metal Agreement, the resulting

amounts due to the applicable Metal Lessor will not be deemed Cure amounts, and the Debtors

and/or the Reorganized Debtors will continue to be liable for all such amounts.  The Bankruptcy

Court shall retain jurisdiction over any dispute over the Cure amounts.  All other matters related

to the Master Metal Agreements shall be governed by the jurisdictional provisions therein and the

Bankruptcy Court shall not retain jurisdiction with respect thereto.  Notwithstanding anything to

the contrary herein or the Plan, in connection with the assumption of the Master Metal Agreements,

the collateral agent for the Exit ABL Credit Agreement, and the collateral agent for the Exit Term

Loan Facility shall each execute a subordination agreement in form and substance similar to the

existing subordination agreement between each Metal Lessor and the ABL Agent.

150.    **United States Fire Insurance Company**.  The Debtors hereby ratify, reinstate,

and reaffirm all of their obligations arising under or related to all surety bonds (the "U.S. Fire

Surety Bonds") issued by United States Fire Insurance Company on behalf of the Debtors in

connection with certain ongoing regulatory and contractual obligations related to the Debtors'

business operations, including, without limitation, all obligations under any indemnity, collateral,

and other agreements entered into in connection with the U.S. Fire Surety Bonds (the "U.S. Fire

Surety Agreements").

151.    The U.S. Fire Surety Bonds and U.S. Fire Surety Agreement's obligations shall not

be discharged, impaired, modified, enlarged, expanded, or otherwise affected by confirmation of

the Plan and shall continue in full force and effect in accordance with their respective terms. Notwithstanding anything to the contrary in this Confirmation Order, the Plan, or otherwise, the Debtors and the Reorganized Debtors and the issuers of the U.S. Fire Surety Bonds reserve all rights and defenses with respect to any right, claim, interest, or obligation arising under the U.S. Fire Surety Bonds or the U.S. Fire Surety Agreements.

152. **ClimeCo LLC**.   On the Effective Date, the Debtors have assumed the Joint Development Agreement, dated February 18, 2019 (as amended) and the Emission Reduction Purchase Agreement, dated April 26, 2024 (as amended) (together, the "<u>Carbon Credit Agreements</u>"), both between APM Ops and ClimeCo LLC ("<u>ClimeCo</u>"), and the Debtors and Reorganized Debtors, as applicable, shall continue to honor their obligations arising under such Carbon Credit Agreements as of the Effective Date.

153. Notwithstanding any other provision in this Confirmation Order to the contrary, and for the avoidance of doubt, (a) any VERs (as defined in the Carbon Credit Agreements) sold to ClimeCo under the Carbon Credit Agreements and that may be resold by ClimeCo to third party purchasers, (b) any other rights and interests related to VERs sold or otherwise transferred to ClimeCo under the Carbon Credit Agreements, and (c) all proceeds to which ClimeCo is entitled from any such sale and resale made under the Carbon Credit Agreements, to the extent, in each of (a)–(c), that the same are free and clear of liens, claims, and encumbrances belonging to the DIP Lenders under applicable law, including the Final DIP Order, shall not be considered collateral under, nor subject to any liens granted by, the Reorganized Debtors in connection with the Exit ABL Facility, the Exit Holdco Loan Facility, and the Asset Financing Takeback Debt.

154. **Citizens Asset Finance**.   The Debtors hereby reaffirm all of their obligations arising under and related to (a) that certain lease schedule no. 001, dated as of May 14, 2020,

(b) that certain lease schedule no. 002, dated as of August 27, 2020, (c) that certain lease schedule no. 003, dated as of October 29, 2020, (d) that certain lease schedule no. 004, dated as of January 14, 2021, (e) that certain lease schedule no. 005, dated as of November 30, 2020, (f) that certain lease schedule no. 006, dated as of March 25, 2021, (g) that certain lease schedule no. 007, dated as of May 1, 2022, (h) that certain lease schedule no. 008, dated as of July 22, 2022, and (i) that certain lease schedule no. 009, dated as of June 24, 2022, as amended, and each of the lease schedules described in clauses (a) through (i) (the "Citizens Non-CoGen Lease Schedules") entered by and between Citizens Asset Finance, a division of Citizens Bank, N.A. ("CAF"), as lessor, and APM Ops, as lessee (APM Ops, together with CAF, the "Citizens Lease Parties"), in connection with that certain master lease agreement, dated as of January 8, 2020, by and between the Citizens Lease Parties.  CAF's claims on account of the Citizens Non-CoGen Lease Schedules are Class 1 Other Secured Claims and shall be reinstated.

155.    For the avoidance of doubt, pursuant to the Citizens CoGen Asset Financing Takeback Documents, each of Citizens and the other lessors thereunder (a) each voted in favor of the Plan, (b) each did not opt out of the Releases, and (c) shall each be both Released Parties and Releasing Parties, and shall not be Excluded Parties.

156.    **SDI, Inc**.  Notwithstanding any provisions in this Confirmation Order or the Plan, all rights, terms and conditions set forth in the *Order (I) Authorizing the Assumption of the SDI MRO Agreement, as Amended, Effective as of October 10, 2025 and (II) Granting Related Relief* [Docket No. 1066], shall remain in full force and effect and survive unmodified notwithstanding entry of this Confirmation Order.

157.    **Treatment of Chubb Surety Bond Agreements.**  ACE European Group Limited; ACE INA Insurance Company; ACE American Insurance Company; ACE Property and Casualty

Insurance Company; ACE Monterrey Seguros S.A.; Bankers Standard Insurance Company; Chubb Indemnity Insurance Company; Executive Risk Indemnity Inc.; Federal Insurance Company; Great Northern Insurance Company; Indemnity Insurance Company of North America; Insurance Company of North America; Pacific Employers Insurance Company; Pacific Indemnity Company; Vigilant Insurance Company; Westchester Fire Insurance Company; any of their direct or indirect subsidiaries or affiliates, whether in existence now or formed or acquired hereafter; any of their co-sureties or fronting companies; any persons or entities which any of them may procure to execute or deliver any applicable bonds; any persons or entities that join in executing or delivering any applicable bonds; any persons or entities providing reinsurance with respect to any applicable bonds; and the successors and assigns of each of the aforesaid persons and entities (collectively, the "Chubb Sureties") executed certain surety bonds on behalf of certain of the Debtors, one of which has not expired, terminated, been cancelled, been replaced, and/or been discharged (the "Existing Chubb Bond"). In consideration of the applicable Chubb Sureties executing the Existing Chubb Bond, APM Ops, as successor to APM Holdings, is party to that certain Agreement of Indemnity in favor of the Chubb Sureties dated March 6, 2014, as amended by that certain Rider to Agreement of Indemnity dated March 2, 2022 (the "Chubb Agreement of Indemnity," and collectively with the Existing Chubb Bond and any document related to the Agreement of Indemnity and Existing Chubb Bond, the "Chubb Surety Documents").

158.    Notwithstanding anything to the contrary in or contemplated under the Plan, Plan Supplement, Confirmation Order, Definitive Documents, Litigation Trust Agreement, Restructuring Transactions, or any document related to the foregoing, on the Effective Date, the Chubb Surety Documents and all rights and obligations arising thereunder shall (a) be deemed reinstated, reaffirmed, and/or ratified by the applicable Debtor or Reorganized Debtor;

(b) continue in full force and effect; and (c) not be barred, altered, limited, enlarged, expanded, modified, discharged, enjoined, impaired, or released by the Plan, Plan Supplement, Confirmation Order, Definitive Documents, Litigation Trust Agreement, Restructuring Transactions, or any document related to the foregoing.  For the avoidance of doubt, the Chubb Sureties explicitly opt-out of Article VIII.D of the Plan and shall not be deemed or included as Releasing Parties or Released Parties.  Nothing in the Plan, Plan Supplement, Confirmation Order, Definitive Documents, Litigation Trust Agreement, Restructuring Transactions, or any document related to the foregoing shall impair any rights or obligations under the Chubb Surety Documents as between any of the Chubb Sureties, on the one hand, and any applicable Debtor or Reorganized Debtor, on the other hand.  For the avoidance of doubt, the Debtors and the Reorganized Debtors reserve all rights and defenses with respect to any right, claim, interest, or obligation arising under the Existing Chubb Bond and the Chubb Surety Documents.

159.    **Calpine Energy Solutions, LLC**.  Calpine Energy Solutions, LLC (as successor to Nobel Americas Energy Solutions LLC) ("CES") and APM Texas are parties to (a) that certain Electricity Sales and Purchase Agreement, dated as of June 12, 2014 (the "ESPA") and (b) that certain Addendum (Superseding Tiered Price, Fixed Volume Electricity), dated effective October 3, 2022, as supplemented and amended by (i) that Superseding Solar Confirmation, dated effective October 3, 2022 and (ii) that Superseding Layered Transaction Schedule, dated effective January 24, 2024 (collectively, the "Addendum" and together with the ESPA and all other related agreements, addendums, schedules, contracts, transaction confirmations, and other related contracts, as each may be amended, restated, supplemented, or otherwise modified, the "CES Agreements").  Notwithstanding anything else to the contrary in this Confirmation Order or the Plan, the CES Agreements shall be deemed rejected by the Reorganized Debtors on the Effective

Date as contemplated in Article V of the Plan, and CES may, on or after the Effective Date, subject to all claims, counterclaims, defenses, and rights of setoff and recoupment that the Debtors or the Reorganized Debtors, as applicable, may have with respect thereto, exercise any and all rights, remedies, powers, privileges, Claims, or other interests that CES may have under, or with respect to, the CES Agreements, sections 365 and 1123 of the Bankruptcy Code, and non-bankruptcy law, including without limitation the right to calculate a "termination payment" (as referenced in the ESPA) as rejection damages and to assert a Claim for such damages within the time periods set forth in Article V.B of the Plan.  For the avoidance of doubt, CES may, in calculating such termination payment, subject to all claims, counterclaims, defenses, and rights of setoff and recoupment that the Debtors or the Reorganized Debtors, as applicable, may have with respect thereto, offset, setoff, or recoup any Claims, rights, or Causes of Action that CES may hold under the CES Agreements against any Claims, rights, or Causes of Action that the Debtors or the Reorganized Debtors may hold against CES under such CES Agreements, as the CES Agreements and applicable non-bankruptcy Law otherwise permit notwithstanding any contrary provision in the Plan or this Confirmation Order, and CES shall not, among other things, be obligated to provide notice of, or File a motion with respect to, such offset, setoff or recoupment, as otherwise required by Article VI.J and Article VIII.F of the Plan; *provided*, *however*, that nothing contained in this paragraph 159 of this Confirmation Order shall in any way impact, limit, or modify the discharge or exculpation provisions contained in Article VIII.A or Article VIII.E of the Plan.  Further, by virtue of this paragraph 159 of this Confirmation Order, CES has opted out of the releases

contained in Article VIII.D of the Plan, and CES shall, therefore, not constitute a Releasing Party

or a Released Party for any purposes under the Plan.

160.     **Texas Local Taxing Authorities**.  Notwithstanding anything to the contrary in the

Plan, any Plan Supplements, or this Confirmation Order, any Allowed Claims of the Texas Taxing

Authorities[7] with respect to ad valorem taxes (the "Texas Tax Claims") shall be paid on the later

of (a) the Effective Date (or as soon as practical thereafter) or (b) when due pursuant to the Texas

Tax Code (subject to any applicable extensions, grace periods, or similar rights thereunder).  The

Texas Tax Claims shall, subject to any applicable limitation in the Bankruptcy Code, include all

accrued interest properly charged under applicable non-bankruptcy Law through the date of

payment, to the extent the Texas Tax Code provides for interest with respect to any portion of the

Texas Tax Claims.  With respect to the Texas Taxing Authority Claims, any properly perfected,

unavoidable, and valid prepetition and postpetition tax liens (the "Texas Taxing Authorities'

Liens") of the Texas Taxing Authorities shall be expressly retained in accordance with applicable

non-bankruptcy Law until the applicable Texas Taxing Authority claim is paid.  The Texas Taxing

Authorities' Liens shall not be primed or subordinated by any exit financing approved by the

Bankruptcy Court in conjunction with the Confirmation of the Plan. In the event that the collateral

that secures the Texas Tax Claims of the Texas Taxing Authorities is returned to a creditor holding

a lien that is junior to that of the applicable Texas Taxing Authorities, the Debtors or Reorganized

Debtors, as applicable, shall first pay all ad valorem property taxes that are secured by such

---

[7]   The "Texas Taxing Authorities" means Fort Bend County, Galveston County, Harris County Emergency Service District #01, Harris County Emergency Service District #24, Harris County Emergency Service District #50, City of Houston, Houston City College, Houston Independent School District, Lone Star College System, Texas City Independent School District, City of Rosenberg, Clear Creek Independent School District, Spring Branch Independent School District, Harris County WCID #84, Channelview Independent School District, La Porte Independent School District, Greens Parkway MUD, City of Houston, San Jacinto Community College District, and Brazoria County, et al.

collateral, to the extent that the Debtors are liable for such ad valorem property taxes under applicable non-bankruptcy law. The Reorganized Debtors shall pay all postpetition ad valorem tax liabilities (tax year 2026 and subsequent tax years) owing to the Texas Taxing Authorities in the ordinary course of business as such tax debt comes due. All rights and defenses of the Debtors and Reorganized Debtors under non-bankruptcy Law and the Bankruptcy Code are reserved and preserved with respect to such Texas Tax Claims.

161. **Pension Benefit Guaranty Corporation**. On the Effective Date, the Reorganized Debtors shall assume and continue to maintain the Pension Plan in accordance with the terms of the Pension Plan (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Debtors reserve all of their rights thereunder). After the Effective Date, the Reorganized Debtors shall (a) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 for the Pension Plan, (b) pay all required PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307 for the Pension Plan, and (c) administer the Pension Plan in accordance with the applicable provisions of ERISA and the Internal Revenue Code, and the Reorganized Debtors reserve all of their rights thereunder. With respect to the Pension Plan, no provision of the Plan, this Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve the Reorganized Debtors from liabilities or requirements imposed under any law or regulatory provision arising after the Effective Date with respect to the Pension Plan or the PBGC. The PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability against the Reorganized Debtors with respect to the Pension Plan as a result of any provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code that provides for the release, exculpation, and discharge of claims.

PBGC and the Reorganized Debtors agree that all proofs of claim filed by PBGC shall be deemed to be withdrawn as of the Effective Date.

162.  **Marathon**.   Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the setoff and recoupment rights of Marathon Petroleum Company LP ("Marathon") under the Petrochemicals Product Sales Agreement, as amended (the "Sales Agreement"), and applicable law are preserved, and upon the Debtors' assumption and assignment of the Sales Agreement, the Sales Agreement shall be enforceable by Marathon and the assignee in accordance with its terms and conditions, and the assignee shall be responsible for all accrued, but unbilled charges under the Sales Agreement, whether accruing prior to or after the effective date of assumption and assignment of the Sales Agreement, when such charges become due in accordance with the terms of the Sales Agreement, subject to all claims, counterclaims, defenses, and rights of setoff and recoupment the Debtors or the Reorganized Debtors, as applicable, may have with respect thereto.  Further, for the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, shall pay the 11 U.S.C. § 503(b)(9) portion of the cure amount listed on the Assumed Executory Contracts and Unexpired Leases Schedule within ten business days of execution of the trade agreement between the parties and the remaining cure amount shall be paid pursuant to agreement between the parties.

163.  **Cyanco**.  Cyanco International, LLC ("Cyanco") and APM Texas are parties and subject to a Master Agreement dated April 15, 2011 (together with all amendments, exhibits, schedules, attachments, annexes, statements of work, invoice terms, and other integrated documents, the "Cyanco Agreement").  Among other things, the Cyanco Agreement sets forth certain obligations with respect to (a) the lease of real property by Cyanco from APM Texas, (b) the supply of hydrogen cyanide liquid, sodium hydroxide, and certain utilities by APM Texas

to Cyanco, and (c) APM Texas' operation and maintenance of Cyanco's sodium cyanide manufacturing, packing, loading, and distribution facility.  In resolution of the *Limited Objection and Reservation of Rights to the Second Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and Its Debtor Affiliates* [Docket No. 1118], and notwithstanding anything in the Plan or this Confirmation Order to the contrary, all of Cyanco's rights, claims, remedies, defenses, objections, arguments, and counterclaims are reserved with respect to (i) any assumption or rejection of the Cyanco Agreement, (ii) the determination of Cure costs in connection with any assumption of the Cyanco Agreement, and (iii) the rights of Cyanco under section 365(h) of the Bankruptcy Code or other applicable Law relating to continuing post-rejection rights of Cyanco under the Cyanco Agreement; *provided* that the Debtors' and Reorganized Debtors', as applicable, rights, claims, remedies, defenses, objections, arguments, and counterclaims are reserved with respect thereto.

164.    **Excluded Parties**.  Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or otherwise, each of the Excluded Parties shall be deemed to have opted out of (and hereby opts out of) the Third-Party Releases contained in Article VIII.D of the Plan and shall not be Releasing Parties or Released Parties.  For the avoidance of doubt, the Debtors, the Reorganized Debtors, and the Litigation Trustee, as applicable, and each of the Excluded Parties reserve all rights, claims, remedies, affirmative defenses, objections, arguments, and counterclaims (any such defenses, objections, and arguments, the "Excluded Party Defenses," and any such claims, including counterclaims, the "Excluded Party Claims") that may be asserted by or against the Excluded Parties, as applicable, and the Excluded Parties may assert the Excluded Party Claims in the same judicial, arbitral, or other proceeding commenced against one or more Excluded Party without any requirement to seek further order or authorization from this Court to assert or exercise

such rights with respect to any such Claims and Defenses against all Released Parties except for the Debtors and/or the Reorganized Debtors, as applicable; *provided*, *however*, that nothing contained in this paragraph 164 of the Confirmation Order shall in any way impact, limit, or modify the discharge or exculpation provisions contained in Article VIII.A or Article VIII.E of the Plan or the injunction provision contained in Article VIII.F solely with respect to the Exculpated Parties; *provided*, *further*, *however*, that notwithstanding anything to the contrary in the Plan, this Confirmation Order, or otherwise, including any injunctions thereunder, all of the Excluded Party Defenses to any claims asserted against the Excluded Parties are fully preserved, and the Excluded Parties may assert the Excluded Party Defenses in the same judicial, arbitral, or other proceeding commenced against one or more Excluded Party without any requirement to seek further order or authorization from this Court to assert or exercise such rights with respect to any such Excluded Party Defenses against any party, including the Debtors and Reorganized Debtors.

165.    **Texas Comptroller**.  Notwithstanding anything else to the contrary in the Plan or this Confirmation Order, the Texas Comptroller of Public Accounts (the "Texas Comptroller") reserves the following rights:  (a) any statutory or common Law setoff rights in accordance with 11 U.S.C. § 553; (b) any rights to pursue any non-Debtor third parties for tax debts or claims; and (c) to the extent that interest is owing under applicable bankruptcy and non-bankruptcy Law with respect to any Allowed Administrative Claim, Priority Tax Claim, or Secured Tax Claim of the Texas Comptroller, interest at the statutory rate pursuant to Texas Tax Code § 111.060.  The Texas Comptroller is not required to File a motion or application for payment of Administrative Claims pursuant to 11 U.S.C. § 503(b)(1)(D).

166.    Should the Reorganized Debtors fail to make any payments to an agency of the State of Texas that are required in this Plan or this Confirmation Order, the Texas Comptroller

shall provide written notice of such default to the Reorganized Debtors and the Reorganized Debtors' attorneys.  Following receipt of such notice, the Reorganized Debtors shall have twenty-one (21) days to cure the default. The Reorganized Debtors shall be allowed to cure up to two such defaults.  Only upon the third such default, the Texas Comptroller may pursue all rights and remedies available under applicable Texas Law to collect the full amount of all taxes, penalties, and interest, to the extent owed.  Notwithstanding anything in this or the foregoing paragraph to the contrary, (a) the Debtors reserve the right to object to any Claim of the Texas Comptroller, and (b) nothing in this or the foregoing paragraph shall be construed as an admission by any party of liability to the Texas Comptroller.

167.    **Chubb Insurance Program.**  Notwithstanding anything to the contrary in this Confirmation Order, the Plan, the Disclosure Statement, the Plan Supplement, any of the other Definitive Documents, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, or grants an injunction, discharge, or release, requires a party to opt out of any releases, or confers Bankruptcy Court jurisdiction), and as a supplement to Articles V.E., V.I., and VI.L of the Plan (and any corresponding paragraphs of this Confirmation Order):

a.    on the Effective Date, all insurance policies (including any D&O Liability Insurance Policies) that have been issued at any time by ACE American Insurance Company, Pacific Employers Insurance Company, Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, Indemnity Insurance Company of North America, Agri General Insurance Company, Federal Insurance Company, Executive Risk Indemnity Inc., and/or each of their respective U.S.-based affiliates, predecessors, and/or successors (collectively, "Chubb") to (or providing coverage to) any of the Debtors or any of their affiliates or predecessors, together with all extensions and renewals thereof, and all agreements, documents, or instruments related thereto (each as amended, modified, or supplemented, and including any exhibit or addenda thereto, collectively, the "Chubb Insurance Program") shall be deemed assumed in their entirety by the Reorganized Debtors pursuant to sections 105 and 365 of the Bankruptcy Code, and the Chubb Insurance Program shall continue in

full force and effect unaltered thereafter in accordance with the terms and conditions thereof;

b. nothing alters or modifies the terms and conditions of (or the coverage provided by) the Chubb Insurance Program, except that on and after the Effective Date, the Reorganized Debtors shall become and remain liable in full for all of their and the Debtors' obligations under the Chubb Insurance Program, regardless of whether such obligations arise or become due before, on, or after the Effective Date, without the need, requirement, or obligation for Chubb to file or serve a Cure objection to a notice of proposed Cure amount (or lack of such notice) or a request, application, Proof of Claim, or motion for payment or allowance of any Administrative Claim, but, in each case, subject to the rights and defenses of the Debtors and the Reorganized Debtors (as applicable) under the Chubb Insurance Program and applicable non-bankruptcy Law;

c. nothing in the Plan (including, without limitation, Article IV.D.4.e), the Plan Documents, or in this Confirmation Order modifies the obligations of the Debtors or the Reorganized Debtors under the Chubb Insurance Program, and any such obligations of the Debtors or the Reorganized Debtors shall be determined pursuant to the terms and conditions of the Chubb Insurance Program and applicable non-bankruptcy Law;

d. nothing shall permit or otherwise effectuate a sale, assignment, or other transfer of the Chubb Insurance Program and/or any rights, proceeds, benefits, claims, rights to payment, or recoveries under or relating thereto without the prior express written consent of Chubb unless otherwise permitted pursuant to the terms of the Chubb Insurance Program or applicable non-bankruptcy Law; *provided*, that nothing in this paragraph 167(d) shall prohibit or obstruct the vesting of the Litigation Trust Assets in the Litigation Trust or the rights of the Litigation Trustee under the Litigation Trust;

e. on and after the Effective Date, the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII of the Plan (and any corresponding paragraph of this Confirmation Order), if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit:  (i) claimants with valid workers' compensation claims or direct action claims against Chubb under applicable non-bankruptcy Law to proceed with their claims; (ii) Chubb to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against Chubb under applicable non-bankruptcy Law, or where a Final Order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article VIII of the Plan (and any corresponding paragraph of this Confirmation Order), to proceed with its claim, and (C) all costs in relation to each of the foregoing; (iii) subject to, and to the extent permissible under, the terms of the Chubb Insurance Program, Chubb to draw against any or all of the collateral or security provided by or on behalf of the Debtors

(or the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable), and/or to apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the Chubb Insurance Program in accordance with the terms and conditions of the Chubb Insurance Program (and, solely to the extent permissible under the Chubb Insurance Program, in such order as Chubb may determine); *provided*, *however*, that, for the avoidance of doubt, all of the Debtors' and the Reorganized Debtors' rights with respect to the foregoing shall be unaltered and preserved; and (iv) Chubb to cancel any insurance policy under the Chubb Insurance Program, and to take any other actions relating to the Chubb Insurance Program (including effectuating a setoff or recoupment) subject to, and to the extent permitted under, the Chubb Insurance Program and/or applicable non-bankruptcy Law; *provided*, *however*, that nothing herein shall lift the automatic stay of section 362(a) of the Bankruptcy Code and/or the injunctions set forth in Article VIII of the Plan with respect to Claims covered by the Chubb Insurance Program that are not workers' compensation claims and direct action claims;

f.   solely to the extent that any claimant seeks coverage under the Chubb Insurance Program, no estimation of such claimants' claims, including pursuant to Article VII.D of the Plan (and any corresponding paragraph of this Confirmation Order), shall be binding on Chubb or have any effect on the Chubb Insurance Program; provided that the Debtors or the Reorganized Debtors' right to request that the Bankruptcy Court estimate any Disputed Claim alleged against the Debtors pursuant to the Plan shall not be affected or impaired; and

g.   notwithstanding the third paragraph of Article VIII.F of the Plan, and any corresponding paragraph of this Confirmation Order, any claim covered by and/or asserted under the Chubb Insurance Program shall be handled in accordance with the terms and conditions of the Chubb Insurance Program and applicable non-bankruptcy Law.

168.   **Texas Commission on Environmental Quality**.  Nothing in this Confirmation Order, the Plan, or any amendments or documents related thereto discharges, releases, precludes, or enjoins:  (a) any police or regulatory liability to the Texas Commission on Environmental Quality ("TCEQ") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (b) any Claim of TCEQ arising on or after the Confirmation Date; (c) any Claim to TCEQ arising after the Confirmation Date under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property; or (d) any liability to TCEQ on the part of any non-Debtors.  Nor shall anything in this Order enjoin or otherwise bar TCEQ from asserting or

enforcing, outside this Court, any liability described in the preceding sentence; *provided*, that the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan.

169.   Further, nothing in this Confirmation Order, the Plan, any amendments thereto, or related documents, authorizes the transfer or assignment of any of TCEQ's (a) licenses, (b) permits, (c) registrations, (d) authorizations, or (e) approvals or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under non-bankruptcy police or regulatory law; *provided*, that this sentence shall in no way prejudice the Reorganized Debtors' right (x) to assume or assume and assign any Executory Contract pursuant to section 365 of the Bankruptcy Code as set forth in the Plan or the Plan Supplement, (y) to transfer any assets, or (z) to merge, dissolve, reincorporate, or convert the corporate form of any entity to the extent explicitly set forth in the Plan, each of (x)-(z) in accordance with the Bankruptcy Code and all applicable legal requirements.[8]

170.   For the avoidance of doubt, TCEQ opts out of any and all releases provided in the Plan.

171.   For the avoidance of doubt, TCEQ is a Governmental Unit as defined in the Plan.

172.   **Department of Justice**.  Nothing in the Plan, any Plan Supplement, or this Confirmation Order shall limit or expand the scope of discharge, release, or injunction permitted to Debtors under the Bankruptcy Code, nor shall anything in the Plan, any Plan Supplement, or this Confirmation Order discharge, release, impair, enjoin, or exculpate:  (a) any police or regulatory liability to any Governmental Unit that is not a Claim as defined in 11 U.S.C. § 101(5)

---

[8]   This provision is only applicable to the Debtors based on the facts specific to this case and shall not be construed to apply broadly to other entities or used in future cases.

(a, "Claim"); (b) any Claim of a Governmental Unit arising on or after the Confirmation Date; (c) any liability to the United States under police or regulatory law that any entity would be subject to as the owner, lessor, lessee, permittee, controller, or operator of property or a facility after the Confirmation Date, including, but not limited to, liability for contamination; pollution; hazardous or toxic substances; protection of the environment; and impacts on human health, safety, and welfare that, in each case, is not a Claim; or (d) any liability of any non-Debtor to the United States. Nothing in the Plan, any Plan Supplement, or this Confirmation Order shall affect any setoff or recoupment right asserted by the United States against the Debtors or the Reorganized Debtors; *provided, however*, that the rights and defenses of the Debtors and the Reorganized Debtors with respect to any such rights of setoff or recoupment are fully preserved. For the avoidance of doubt, the Debtors and the Reorganized Debtors expressly reserve the right to argue that alleged liability of the Debtors or the Reorganized Debtors does not fall within the enumerated categories (a) through (d) above.

173.    Nothing in the Plan, any Plan Supplement, or this Confirmation Order authorizes the transfer or assignment of any governmental: (a) lease, (b) license, (c) permit, (d) registration, (e) authorization, (f) certification, or (g) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements (including under applicable non-bankruptcy Laws), regulations, and rules (including police or regulatory law or environmental Law, or otherwise); *provided, however*, that the Debtors, the Reorganized Debtors, and their respective successors reserve the right to assert any rights or defenses they may have under the Bankruptcy Code and applicable non-bankruptcy Law; *provided, further*, that this sentence shall in no way limit, prejudice, or impair the Debtors' or the Reorganized Debtors' (or any successors) right (including pursuant to the Plan) (i) to assume or assume and assign any Executory Contract

pursuant to section 365 of the Bankruptcy Code as set forth in the Plan or the Plan Supplement, (ii) transfer any assets, or merge, dissolve, reincorporate, or (iii) convert the corporate form of any entity, in each case to the extent set forth in the Plan, Plan Supplement, or this Confirmation Order, and in the case of (i)-(iii) each must be done in compliance with the Bankruptcy Code and applicable non-bankruptcy Law.  The Bankruptcy Court retains jurisdiction to determine whether environmental claims asserted by any Governmental Unit are discharged or otherwise barred by this Confirmation Order, the Plan, the Plan Supplement, or the Bankruptcy Code (it being understood that nothing in this clause divests any tribunal of any concurrent jurisdiction (if any)). Nothing in this Confirmation Order or the Plan divests any tribunal of any jurisdiction it may have under police or regulatory Law to interpret the Plan, any Plan Supplement, or this Confirmation Order or to adjudicate any defense asserted thereunder.

174. **Memorial Hermann Medical Group**.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order, Memorial Hermann Medical Group has validly opted out of the Third-Party Releases and is not and will not be deemed to be a Releasing Party.

175. **Thermo Fisher Scientific**.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order, Thermo Fisher Scientific has validly opted out of the Third-Party Release and is not and will not be deemed to be a Releasing Party.

176. **Compromise of Controversies**.  In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

177.    **Conditions to Effective Date**.  The provisions governing the conditions precedent to the Effective Date set forth in Article IX of the Plan shall be, and hereby are, approved in their entirety.  The Debtors are authorized to consummate the Plan at any time after the entry of this Confirmation Order, subject to satisfaction or waiver of such provisions pursuant to their terms.

178.    **Modifications or Amendments.**  The provisions governing the modification, revocation, or withdrawal of the Plan set forth in Article X of the Plan shall be, and hereby are, approved in their entirety.  The Debtors, subject to the consent requirements set forth in the Plan, may modify or amend the Plan Supplement until the occurrence of the Effective Date.

179.    **Retention of Jurisdiction.**  The provisions governing the retention of jurisdiction set forth in Article XI of the Plan shall be, and hereby are, approved in their entirety.  Upon the Effective Date, to the fullest extent set forth in the Plan, and as otherwise consistent with applicable Law, the Bankruptcy Court shall retain exclusive jurisdiction over the matters arising in, and under, and related to, these Chapter 11 Cases, as set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

180.    **Indemnification.**  Consistent with applicable Law, all Indemnification Provisions, other than the Indemnification Provisions in favor of any Excluded Party, in place immediately before the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) shall be assumed, modified, or rejected as determined by the Debtors and pursuant to Article IV.L of the Plan with the consent of the Required DIP Term Loan Lenders.  All such obligations shall be deemed and treated as Executory Contracts to be assumed, modified, or rejected under the Plan.

181.     As to directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of each of the Debtors and the Non-Debtor Subsidiaries, as applicable, in each case to the extent that such Person or Entity was employed by any of the Debtors or the Non-Debtor Subsidiaries on the Petition Date and is not an Excluded Party, such Indemnification Provisions shall (a) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or this Confirmation Order, (b) remain intact, in full force and effect, and irrevocable, (c) not be limited, reduced, or terminated after the Effective Date, and (d) survive the effectiveness of the Plan on terms no less favorable to such directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors and the Non-Debtor Subsidiaries than the Indemnification Provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date.  All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan, and all such obligations of the Debtors and the Non-Debtor Subsidiaries shall continue as obligations of the Reorganized Debtors so long as such Person or Entity is not an Excluded Party.

182.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order, none of the Indemnification Provisions providing for indemnification of (a) the Excluded Parties or (b) any Sponsor, in each case, by the Debtors or the Non-Debtor Subsidiaries shall be assumed or vest in the Reorganized Debtors, and such Indemnification Provisions shall be rejected as of the Effective Date.

183.     **Authorization to Consummate.**  The Debtors are authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article IX of the Plan.

184.    **Professional Compensation.**  All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount that the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, if applicable, as soon as reasonably practicable after such Professional Claim is Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.  The Reorganized Debtors will establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

185.    The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Claims that are Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  When all such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

186.    Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan

and Consummation incurred by the Debtors.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

187.    **Certain Securities Law Matters**.  Securities issued in reliance upon section 1145 of the Bankruptcy Code (including the New Interests issued pursuant to the DIP Equity Recovery), to the fullest extent permitted and available under applicable Law, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable federal Securities Law or state Securities Law requiring registration prior to the offering, issuance, distribution, or sale of Securities (except with respect to a Person that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code).  For the avoidance of doubt, all of the New Interests issued pursuant to the DIP Equity Recovery shall be issued in reliance on the exemption provided by section 1145 of the Bankruptcy Code in all respects.  Except as otherwise provided in the Plan or the governing certificates or instruments (including the New Organizational Documents), any and all such Securities so issued under the Plan (including with respect to the DIP Equity Recovery):  (a) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act; and (b) will be freely tradeable and transferable under the Securities Act by any Holder thereof that, at the time of transfer, (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act and (ii) has not been such an "affiliate" of the Reorganized Debtors within ninety (90) days of such transfer of the Reorganized Debtors, subject to (A) the provisions of section 1145(b)(1) of the Bankruptcy Code

relating to the definition of an "underwriter" in section 1145(b) of the Bankruptcy Code, (B) compliance with applicable Securities Laws, including any rules and regulations of the SEC or U.S., state, or local Securities Laws that are applicable (if any) at the time of any future transfer of such Securities or instruments, and (C) any restrictions in the New Organizational Documents. The issuance of the New Interests or any other Securities shall not constitute an invitation or offer to sell, or the solicitation of an invitation or offer to buy, any Securities in contravention of any applicable Law in any jurisdiction. No action has been taken, or will be taken, in any jurisdiction that would permit a public offering of any of the New Interests (other than Securities issued pursuant to section 1145 of the Bankruptcy Code) in any jurisdiction where such action for that purpose is required.

188.    Persons who acquire the New Interests pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D or Regulation S promulgated thereunder (or other similar exemption from registration) will hold "restricted securities." Such Persons include the participants under the Debt Rights Offering, Holders of any New Interests (or other Securities) issued pursuant to the Debt Rights Offering, including the Exit Term Loan Additional Equity Commitment (to the extent applicable), the Exit Term Loan Conversion (to the extent applicable), and/or the Management Incentive Plan who receive New Interests of Reorganized Ascend. Resales of such restricted Securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable Law. Subject to any restrictions in the New Organizational Documents and any other applicable Securities Laws, Holders of "restricted securities" would, however, be permitted to resell New Interests without registration under the Securities Act if they are able to comply with the applicable

provisions of Rule 144 or Rule 144A under the Securities Act (if available) or any other exemption from registration under the Securities Act, or if such Securities are registered with the SEC.

189.   **Cooperation by the DTC**.  The Reorganized Debtors need not provide any further evidence other than the Plan or this Confirmation Order to any Entity (including DTC and any transfer agent for the New Interests) with respect to the treatment of the New Interests to be issued under the Plan under applicable Securities Laws.  Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Interests through the facilities of DTC, DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC or any transfer agent for Securities) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Securities to be issued under the Plan are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services (to the extent applicable).

190.   **Section 1146(a) Exemption.**  To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Interests; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security for the Exit

ABL Facility; (f) the grant of collateral as security for the Exit Term Loan Facility; or (g) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.   All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

191.    **Directors, Officers, and Managers**.  As of the Effective Date, the terms of the current members of the board of directors of Ascend Parent shall expire and the new directors and officers of Reorganized Ascend shall be appointed in accordance with the New Organizational Documents; *provided* that the Disinterested Directors shall retain their authority following the Effective Date solely with respect to matters relating to Professional Claim requests by Professionals acting at their authority and direction in accordance with the terms of the Plan.  The

Disinterested Directors shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Reorganized Debtors or any other Entity without the Disinterested Directors' prior written consent.  Each Disinterested Director of the Debtors retains the right to review, approve, and make decisions, and to file papers and be heard before the Bankruptcy Court, on all matters under their continuing authority.

192.    **Restructuring Expenses**.  The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid) in accordance with, and subject to, as applicable, the Plan and any other fee arrangements, without any requirement to File a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice in summary form (but without the need for itemized time detail and may be redacted) from the applicable Entity entitled to such Restructuring Expenses.   All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.   On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Reorganized Debtors.

193.    **Certain Tax Matters**.  Pursuant to sections 105, 505, and 1129 of the Bankruptcy Code, the Court finds that, for all relevant U.S. federal and state income tax purposes, the Downstream Merger (as defined in the Restructuring Transactions Memorandum) will meet each of the statutory and non-statutory requirements of, and will qualify as a transaction described in,

Section 368(a)(1)(G) of the Internal Revenue Code (a "G Reorganization"). Because the Downstream Merger will qualify as a G Reorganization, for all relevant U.S. federal and state income tax purposes (other than with respect to any state that is a non-conforming income tax state), any excess loss account that exists prior to the Downstream Merger with respect to Ascend Parent's equity of Ascend Performance Materials Operations LLC (the "ELA") will be eliminated without being taken into income pursuant to Section 1.1502-19(b)(2)(i) of the United States Treasury Regulations (the "Treasury Regulations"). Sections 1.1502-19(b)(2)(ii) and 1.1502-19(e) of the Treasury Regulations are inapplicable and do not prevent the ELA from being eliminated without being taken into taxable income. Additionally, the Downstream Merger does not violate the so-called "economic substance" common law doctrine or Section 7701(o) of the Internal Revenue Code.

194.   The Court finds that the Accounting Intercompany Amounts[9] do not reflect true indebtedness for any purpose (including any applicable tax purpose).

195.   **Documents, Mortgages, and Instruments.** This Confirmation Order is, and shall be, binding upon and shall govern the acts of all Persons or Entities including, without limitation,

---

[9]   "Accounting Intercompany Amounts" means the following amounts reflected as obligations on the Debtors' books and records estimated as of December, not including any additions during 2025: (a) approximately $409 million reflected as owed by Ascend Performance Materials Inc. to Ascend Parent, (b) approximately $9,017 million reflected as owed by Ascend Performance Materials Inc. to Ascend Performance Materials Texas Inc., (c) approximately $9,781 million reflected as owed by APM Ops to Ascend Performance Materials Inc., (d) approximately $7,252 million reflected as owed by Ascend Performance Materials Texas Inc. to APM Ops, (e) approximately $779 million reflected as owed by Ascend Performance Materials Texas Inc. to Ascend Parent, (f) approximately $3,035 million reflected as owed by Ascend Parent to APM Ops, (g) approximately $20 million reflected as owed by APM (Canada) LLC to APM Ops, (h) approximately $11 million reflected as owed by Ascend Performance Materials Consumer Solutions LLC to APM Ops, (i) approximately $3 million reflected as owed by Ascend Performance Materials Consumer Solutions LLC to Ascend Parent, (j) less than $1 million reflected as owed by Circular Investments LLC to Ascend Parent, (k) less than $1 million reflected as owed by Ascend Performance Materials Inc. to APM (Canada) LLC, (l) approximately $32 million reflected as owed by Ascend Performance Materials Inc. to APM (Canada) LLC, (m) approximately $18 million reflected as owed by APM Ops to APM Foreign Holdings LLC, (n) less than $1 million reflected as owed by Ascend Performance Materials Inc. to APM Foreign Holdings LLC, (o) approximately $15 million reflected as owed by Ascend Performance Materials Texas Inc. to Ascend Performance Materials Consumer Solutions LLC, and (p)

all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and state officials, and corresponding officials in all applicable jurisdictions, both foreign and domestic, and all other Persons and Entities who may be required, by operation of Law, the duties of their office, or contract, to accept, File, register, or otherwise record or release any document or instrument.  Each and every federal, state, local, and foreign government agency is hereby directed to accept any and all documents and instruments necessary, useful, advisable, or appropriate (including financing statements under the applicable Uniform Commercial Code) to effectuate, implement, and consummate the transactions contemplated by the Plan, including the Restructuring Transactions, the Plan Supplement, and this Confirmation Order without payment of any stamp tax or similar tax imposed by state, local, or foreign Law, or, to the extent such persons or entities are not identified by the Debtors or the Reorganized Debtors, as applicable, after reasonable due inquiry, the Debtors or the Reorganized Debtors, as applicable, shall be granted power of attorney to sign on behalf of such Person or Entity.

196.    **Continued Effect of Stays and Injunction.**  Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court that is in existence upon entry of this Confirmation Order shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

---

approximately $3 million reflected as owed by Ascend Performance Materials Inc. to Ascend Performance Materials Consumer Solutions LLC.

197.    **Non-Severability of Plan Provisions Upon Confirmation.**  Each provision of the

Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be

deleted or modified without the Debtors' or the Reorganized Debtors' consent, as applicable;

*provided* that any such deletion or modification must be subject to and consistent with the consent

rights set forth in the Plan; and (c) non-severable and mutually dependent.

198.    **Post-Confirmation Modifications.**  In accordance with <u>Article X.A</u> of the Plan,

without the need for further order or authorization of the Bankruptcy Court, the Debtors or the

Reorganized Debtors, as applicable, are authorized and empowered to make any and all

modifications to any and all documents that are necessary or desirable to effectuate the Plan that

are consistent with the Plan and this Confirmation Order, subject to the applicable consent or

consultation rights set forth in the Plan. Subject to those restrictions on modifications set forth in

the Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019,

and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors

expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify the Plan one or

more times after Confirmation and, to the extent necessary, may initiate proceedings in the

Bankruptcy Court to so alter, amend, or modify the Plan, remedy any defect or omission, or

reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in

such matters as may be necessary to carry out the purposes and intent of the Plan.

199.    **Applicable Non-Bankruptcy Law.**  The provisions of this Confirmation Order,

the Plan and related documents, and any amendments or modifications thereto, shall apply and be

enforceable notwithstanding any otherwise applicable federal, state, or foreign Law.

200.    **Waiver of Filings.**  Any requirement under section 521 of the Bankruptcy Code or

Bankruptcy Rule 1007 obligating the Debtors to File any list, schedule, or statement with the

Bankruptcy Court or the Office of the U.S. Trustee is permanently waived as to any such list, schedule, or statement not Filed as of the Confirmation Date.

201. **Governmental Approvals Not Required.** This Confirmation Order shall constitute all approvals and consents required, if any, by the Laws, rules, or regulations of any state, federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement, including the documents contained in the Plan Supplement, the implementation and consummation of the Restructuring Transactions, and any other documents that are necessary or desirable to implement or consummate the Restructuring Transactions.

202. **Reporting.** After entry of this Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, shall have no obligation to File with the Bankruptcy Court, serve on any parties, or otherwise provide any party with any other report that the Debtors or the Reorganized Debtors, as applicable, were obligated to provide under the Bankruptcy Code or an order of the Bankruptcy Court, including obligations to provide (a) any reports to any parties otherwise required under the "first" and "second" day orders entered in these Chapter 11 Cases and (b) monthly operating reports (even for those periods for which a monthly operating report was not Filed before the Confirmation Date); *provided* that the Debtors or the Reorganized Debtors, as applicable, will comply with the U.S. Trustee's quarterly reporting requirements. From the Confirmation Date through the Effective Date, the Debtors will File such reports as are required under the Bankruptcy Local Rules.

203.    **Notices of Confirmation and Effective Date.**  The Reorganized Debtors shall cause to be served a notice of entry of this Confirmation Order and the occurrence of the Effective Date, substantially in the form attached hereto as **Exhibit B** (as may be revised to the applicable Debtors, the "Notice of Effective Date"), in accordance with Bankruptcy Rules 2002 and 3020(c) on all Holders of Claims and Interests within ten (10) Business Days after the Effective Date. Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed the First Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.   The First Confirmation Hearing Notice, the Confirmation Hearing Adjournment Notice, this Confirmation Order, and the Notice of Effective Date are adequate under the particular circumstances of these Chapter 11 Cases and no other or further notice is necessary.

204.    **Failure of Consummation.**  If Consummation does not occur for a Debtor, the Plan, and the findings in this Confirmation Order shall be null and void in all respects as to such Debtor and nothing contained in the Plan or the Disclosure Statement, as to such Debtor, shall:  (a) constitute a waiver or release of any claims by the Debtors, Claims, or Interests; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

205.    **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under section 1101(2) of the Bankruptcy Code.

206. **Waiver of 14-Day Stay.** Notwithstanding Bankruptcy Rule 3020(e) or 6004, this Confirmation Order is effective immediately and not subject to any stay.

207. **References to and Omissions of Plan Provisions.** References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan and any related document, agreement, or exhibit be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

208. **Headings.** Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

209. **Effect of Conflict.** This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order. If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.

210. **Final Order.** This Confirmation Order is a Final Order and the period in which an appeal must be Filed shall commence upon the entry hereof.

Signed: December 09, 2025

Christopher Lopez
United States Bankruptcy Judge

**EXHIBIT A**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ASCEND PERFORMANCE MATERIALS HOLDINGS INC., *et al.*,[1] | Case No. 25-90127 (CML) |
| Debtors. | (Jointly Administered) |

# FOURTH AMENDED JOINT CHAPTER 11
## PLAN OF REORGANIZATION OF ASCEND PERFORMANCE
## MATERIALS HOLDINGS INC. AND ITS DEBTOR AFFILIATES

**BRACEWELL LLP**
Jason G. Cohen (TX Bar No. 24050435)
Jonathan L. Lozano (TX Bar No. 24121570)
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone:  (713) 223-2300
Facsimile:  (800) 404-3970
Email:  jason.cohen@bracewell.com
  jonathan.lozano@bracewell.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  December 9, 2025

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher Marcus, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:  cmarcus@kirkland.com
  derek.hunter@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Claims and Noticing Agent at https://dm.epiq11.com/Ascend.  The location of Debtor Ascend Performance Materials Holdings Inc.'s principal place of business is 1010 Travis St., Suite 900, Houston, Texas 77002.

## TABLE OF CONTENTS

ARTICLE I.  DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ...................................................................................................1
    A.    Defined Terms. ...................................................................................................1
    B.    Rules of Interpretation. ....................................................................................23
    C.    Computation of Time. ......................................................................................23
    D.    Governing Law. ...............................................................................................23
    E.    Reference to Monetary Figures. .......................................................................24
    F.    Reference to the Debtors or the Reorganized Debtors. .....................................24
    G.    Controlling Document. .....................................................................................24
    H.    Consent Rights. ................................................................................................24

ARTICLE II.  ADMINISTRATIVE CLAIMS, DIP CLAIMS, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES ....................................................................................24
    A.    Administrative Claims. ....................................................................................24
    B.    DIP Claims. ......................................................................................................25
    C.    Professional Claims. ........................................................................................26
    D.    Priority Tax Claims. .........................................................................................27
    E.    Payment of Statutory Fees and Reporting to the U.S. Trustee. ..........................27
    F.    Restructuring Expenses. ...................................................................................28

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................................28
    A.    Classification of Claims and Interests. .............................................................28
    B.    Treatment of Claims and Interests. ..................................................................29
    C.    Special Provision Governing Unimpaired Claims. ............................................33
    D.    Elimination of Vacant Classes. ........................................................................33
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ........................33
    F.    Intercompany Interests. ....................................................................................33
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ...............34
    H.    Controversy Concerning Impairment. ...............................................................34
    I.    Subordinated Claims and Interests. ..................................................................34
    J.    Claims of the Sponsors. ...................................................................................34

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ...............................................................34
    A.    General Settlement of Claims and Interests. .....................................................34
    B.    Restructuring Transactions. ..............................................................................35
    C.    Reorganized Debtors. .......................................................................................35
    D.    Committee Settlement. .....................................................................................36
    E.    Litigation Trust. ...............................................................................................37
    F.    Sources of Consideration for Plan Distributions. ..............................................42
    G.    Corporate Existence. ........................................................................................49
    H.    Vesting of Assets in the Reorganized Debtors. .................................................49
    I.    Cancelation of Existing Securities and Agreements. .........................................50
    J.    Corporate Action. ............................................................................................50
    K.    New Organizational Documents. ......................................................................51
    L.    Indemnification Obligations. ............................................................................52
    M.    Directors and Officers of the Reorganized Debtors. ..........................................52
    N.    Effectuating Documents; Further Transactions. ................................................52
    O.    Section 1146 Exemption. .................................................................................53
    P.    Director and Officer Liability Insurance. ..........................................................53
    Q.    Management Incentive Plan. .............................................................................54
    R.    Retiree Benefits. ..............................................................................................54
    S.    Preservation of Causes of Action. ....................................................................54
    T.    Private Company. .............................................................................................55

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................ 56
    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. ................................ 56
    B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases. .................................... 57
    C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ............................... 57
    D.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ........ 58
    E.     Insurance Policies. ....................................................................................................................... 59
    F.     Modifications, Amendments, Supplements, Restatements, or Other Agreements. ...................... 59
    G.     Reservation of Rights. .................................................................................................................. 59
    H.     Nonoccurrence of Effective Date. ................................................................................................ 59
    I.     Employee Compensation and Benefits. ....................................................................................... 59

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................................... 60
    A.     Distributions on Account of Claims Allowed as of the Effective Date. ...................................... 60
    B.     Distribution Agent. ...................................................................................................................... 61
    C.     Rights and Powers of the Distribution Agent. ............................................................................. 61
    D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. ................................. 61
    E.     Manner of Payment. ..................................................................................................................... 62
    F.     Compliance with Tax Requirements. ........................................................................................... 63
    G.     Allocations. .................................................................................................................................. 63
    H.     No Postpetition Interest on Claims. ............................................................................................. 63
    I.     Foreign Currency Exchange Rate. ............................................................................................... 64
    J.     Setoffs and Recoupment. ............................................................................................................. 64
    K.     No Double Payment of Claims. .................................................................................................... 64
    L.     Claims Paid or Payable by Third Parties. .................................................................................... 64

ARTICLE VII.   PROCEDURES FOR RESOLVING   CONTINGENT, UNLIQUIDATED, AND DISPUTED
            CLAIMS ....................................................................................................................................... 65
    A.     Allowance of Claims and Interests. ............................................................................................. 65
    B.     Claims Administration Responsibilities. ..................................................................................... 65
    C.     Disputed Claims Process. ............................................................................................................. 65
    D.     Estimation of Claims and Interests ............................................................................................. 66
    E.     Adjustment to Claims or Interests without Objection. ................................................................ 66
    F.     Time to File Objections to Claims. .............................................................................................. 66
    G.     Disallowance of Claims or Interests. ........................................................................................... 66
    H.     No Distributions Pending Allowance. .......................................................................................... 67
    I.     Distributions After Allowance. .................................................................................................... 67

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............................ 67
    A.     Discharge of Claims and Termination of Interests. ..................................................................... 67
    **B.**     **Release of Liens.** ........................................................................................................................... 67
    **C.**     **Releases by the Debtors.** ............................................................................................................. 68
    **D.**     **Releases by the Releasing Parties.** .............................................................................................. 69
    **E.**     **Exculpation.** ................................................................................................................................ 70
    **F.**     **Injunction.** .................................................................................................................................. 71
    G.     Protections Against Discriminatory Treatment. .......................................................................... 72
    H.     Document Retention. .................................................................................................................... 72
    I.     Reimbursement or Contribution. ................................................................................................. 72

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ...................................... 72
    A.     Conditions Precedent to the Confirmation Date. ........................................................................ 72
    B.     Conditions Precedent to the Effective Date. ................................................................................ 73
    C.     Waiver of Conditions. .................................................................................................................. 74
    D.     Effect of Failure of Conditions. ................................................................................................... 74
    E.     Substantial Consummation ........................................................................................................... 74

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....................................74

    A.      Modification and Amendments. ...............................................................................................74

    B.      Effect of Confirmation on Modifications. ..............................................................................74

    C.      Revocation or Withdrawal of Plan. ........................................................................................75

ARTICLE XI. RETENTION OF JURISDICTION ...........................................................................................75

ARTICLE XII. MISCELLANEOUS PROVISIONS ........................................................................................77

    A.      Immediate Binding Effect. .....................................................................................................77

    B.      Additional Documents. ...........................................................................................................77

    C.      Payment of Statutory Fees. ....................................................................................................77

    D.      Dissolution of the Committee and Any Other Statutory Committee and Cessation of Fee and Expense Payment. ............................................................................................................77

    E.      Reservation of Rights. ............................................................................................................77

    F.      Successors and Assigns. .........................................................................................................78

    G.      Notices. ...................................................................................................................................78

    H.      Term of Injunctions or Stays. ................................................................................................80

    I.      Entire Agreement. ...................................................................................................................80

    J.      Plan Supplement. ....................................................................................................................80

    K.      Nonseverability of Plan Provisions. ......................................................................................80

    L.      Votes Solicited in Good Faith. ...............................................................................................80

    M.      Closing of Chapter 11 Cases. .................................................................................................81

    N.      Waiver or Estoppel. ................................................................................................................81

## INTRODUCTION

Ascend Performance Materials Holdings Inc. and the other above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint chapter 11 plan of reorganization (as amended, supplemented, or otherwise modified from time to time, the "Plan" or this "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article I.A. of this Plan. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor. Holders of Claims against, or Interests in, the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, risk factors, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. The classification of Claims and Interests set forth in Article III of this Plan apply separately with respect to each Plan proposed by each Debtor, as applicable, and as set forth herein. This Plan does not contemplate substantive consolidation of any of the Debtors.

ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS PLAN (INCLUDING, WITHOUT LIMITATION, UNDER ARTICLE IV.F.1 AND ARTICLE IV.O HEREOF) IN FULL.

THE ISSUANCE OF ANY SECURITIES REFERRED TO IN THIS PLAN SHALL NOT CONSTITUTE AN INVITATION OR OFFER TO SELL, OR THE SOLICITATION OF ANY INVITATION OR OFFER TO BUY, ANY SECURITIES IN CONTRAVENTION OF APPLICABLE LAW IN ANY JURISDICTION. NO ACTION HAS BEEN TAKEN, NOR WILL BE TAKEN IN ANY JURISDICTION THAT WOULD PERMIT A PUBLIC OFFERING OF ANY SECURITIES REFERRED TO IN THIS PLAN (OTHER THAN SECURITIES ISSUED PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE IN A DEEMED PUBLIC OFFERING) IN ANY JURISDICTION WHERE SUCH ACTION FOR THAT PURPOSE IS REQUIRED.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.     "*36th Street Financing Agreement*" means that certain agreement, dated as of January 26, 2024, by and among APM Ops, TCSEF Texas, LP, and the other parties thereto, together with all amendments, modifications, schedules, and supplements thereto, as may be amended, restated, supplemented, or otherwise modified from time to time.

2.     "*36th Street Financing Agreement Claim*" means any and all Claims against a Debtor arising from, or based upon, the 36th Street Financing Agreement.

3.     "*36th Street Financing Takeback Debt*" means the takeback debt to be distributed to the Holders of Allowed 36th Street Financing Agreement Claims as set forth in Article IV.F.5 of this Plan.

4.     "*36th Street Financing Takeback Debt Documents*" means, collectively, any and all agreements, documents, and instruments delivered or entered into in connection with the 36th Street Financing Takeback Debt, including the Asset Financing Agreement Schedule and any amendments, modifications, or supplements related thereto, and including any related notes, certificates, agreements, intercreditor agreements, security agreements,

documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

5.      "*ABL Advisors*" means (a) Greenberg Traurig, LLP, as U.S. counsel to the ABL Agent and DIP ABL Agent, (b) Mayer Brown International, as U.K. counsel to the ABL Agent and DIP ABL Agent, (c) NautaDutilh, as Dutch and Belgian counsel to the ABL Agent and the DIP ABL Agent, (d) Carl Marks Advisory Group LLC, as financial advisor to the ABL Agent and DIP ABL Agent, and (e) any other local or foreign counsel to the ABL Agent and the DIP ABL Agent, as permitted under the ABL Credit Agreement and the DIP ABL Credit Agreement or otherwise in consultation with counsel to the Company Parties.

6.      "*ABL Agent*" means Wells Fargo Capital Finance, LLC, in its capacity as administrative agent under the ABL Credit Agreement.

7.      "*ABL Credit Agreement*" means that certain Third Amended and Restated Credit Agreement, dated as of August 27, 2019, by and among certain of the Debtors party thereto, certain of the Non-Debtor Subsidiaries party thereto, the guarantors from time to time party thereto, the lenders and issuing banks from time to time party thereto, and the ABL Agent, as amended by that certain Increase Joinder to Third Amended and Restated Credit Agreement, dated as of December 30, 2021, as amended by that certain Third Amendment to Third Amended and Restated Credit Agreement, dated as of October 28, 2022, as amended by that certain Fourth Amendment to Third Amended and Restated Credit Agreement, dated as of February 5, 2024, as amended by that certain Fifth Amendment to Third Amended and Restated Credit Agreement and Forbearance Agreement, dated as of April 1, 2025, and as amended by that certain Sixth Amendment to Third Amended and Restated Credit Agreement and Reaffirmation of Forbearance Agreement dated as of April 16, 2025.

8.      "*ABL Facility*" means that certain asset-based revolving credit facility issued under the ABL Credit Agreement.

9.      "*ABL Lenders*" means the lenders from time to time party to the ABL Credit Agreement.

10.     "*Ad Hoc Group*" means that certain ad hoc group of the DIP Term Loan Lenders, the Bridge Lenders, and Term Loan Lenders represented by the Ad Hoc Group Advisors.

11.     "*Ad Hoc Group Advisors*" means, collectively:  (a) Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc Group; (b) Evercore Group L.L.C., as financial advisor to the Ad Hoc Group; (c) Howley Law PLLC, as local counsel to the Ad Hoc Group; and (d) any other local or foreign counsels to the Ad Hoc Group or any other professionals or advisors retained by the Ad Hoc Group, in consultation with counsel to the Company Parties.

12.     "*Ad Hoc Group Steerco*" means that certain steering committee of the Ad Hoc Group.

13.     "*Administrative Claim*" means a Claim against any of the Debtors arising before the Effective Date for the costs and expenses of the administration of the Chapter 11 Cases pursuant to sections 330, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) the Allowed Professional Claims; (c) the DIP Adequate Protection Claims; (d) the Restructuring Expenses; (e) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code; and (f) the Disinterested Director Fee Claims.

14.     "*Administrative Claims Bar Date*" means the applicable deadline by which all requests for payment of Administrative Claims, other than Claims arising under section 503(b)(9) of the Bankruptcy Code and the Restructuring Expenses, must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, which shall be:  (a) with respect to Administrative Claims other than Professional Claims, thirty (30) days after the Effective Date; and (b) with respect to Professional Claims, forty-five (45) days after the Effective Date.

15.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  Notwithstanding anything to the contrary in this Plan, no Excluded Party shall constitute an Affiliate under this Plan.

2

16.     "*Agent*" means any administrative agent, collateral agent, escrow agent, or similar Entity under the Bridge Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the DIP ABL Credit Agreement, and the DIP Term Loan Credit Agreement, including any successors thereto.  For the avoidance of doubt, Agents include the ABL Agent, the DIP ABL Agent, and the DIP Term Loan Agent.

17.     "*Allowed*" means, with respect to any Claim or Interest (or portion thereof), except as otherwise provided herein:  (a) a Claim or Interest that is evidenced by a Proof of Claim Filed by the Claims Bar Date or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim a Proof of Claim is not required under this Plan, the Bankruptcy Code, or a Final Order, including the DIP Order); (b) a Claim or Interest that is scheduled by the Debtors as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim or proof of Interest, as applicable, has been timely Filed; or (c) a Claim or Interest allowed pursuant to this Plan or a Final Order, including the DIP Order; *provided* that with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof is interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest has been Allowed by a Final Order.  Any Claim or Interest that has been or is hereafter listed on the Schedules as contingent, unliquidated, or Disputed, and for which no contrary or superseding Proof of Claim or proof of Interest is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable.  Notwithstanding anything to the contrary in this Plan, (a) a Proof of Claim Filed after the Claims Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim and (b) any Claim held by an Excluded Party shall be deemed Disputed unless otherwise determined by the Special Committee based on the outcome of the Independent Investigation with the consent of the Required DIP Term Loan Lenders.  "Allow" and "Allowing" shall have correlative meanings.

18.     "*Amended Plan*" means the *First Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates*, Filed by the Debtors on October 15, 2025.

19.     "*Ansley Park Financing Agreement*" means that certain agreement, dated as of November 13, 2024, by and among Ascend Performance Materials Texas Inc., Ansley Park Capital LLC, and the other parties thereto, together with all amendments, modifications, schedules, and supplements thereto, as may be amended, restated, supplemented, or otherwise modified from time to time.

20.     "*Ansley Park Financing Agreement Claim*" means any and all Claims against a Debtor arising from, or based upon, the Ansley Park Financing Agreement.

21.     "*Ansley Park Financing Takeback Debt*" means the takeback debt to be distributed to the Holders of Allowed Ansley Park Financing Agreement Claims as set forth in Article IV.F.5 of this Plan.

22.     "*Ansley Park Financing Takeback Debt Documents*" means, collectively, any and all agreements, documents, and instruments delivered or entered into in connection with the Ansley Park Financing Takeback Debt, including the Asset Financing Agreement Schedule and any amendments, modifications, or supplements related thereto, and including any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

23.     "*APM Disc*" means APM Disc Holdings LLC, a limited liability company formed under the Laws of the state of Delaware.

24.     "*APM Ops*" means Ascend Performance Materials Operations LLC, a limited liability company formed under the Laws of the state of Delaware.

25.     "*Ascend Company Representative*" means an employee of the Reorganized Debtors, as may be designated from time to time by the Reorganized Debtors, to whom the Litigation Trust's reasonable requests for documents or information from the Reorganized Debtors shall be made.

26.     "*Ascend Interest Distribution*" means 0.3% of the New Interests, subject to dilution on account of the Exit Term Loan Conversion (to the extent applicable), the Exit Term Loan Additional Equity Commitment (to the extent applicable), and the Management Incentive Plan.

27.     "*Ascend Parent*" means Ascend Performance Materials Holdings Inc., a corporation formed under the Laws of the state of Delaware.

28.     "*Asset Financing Agreement Claims*" means any and all Claims against a Debtor arising from, or based upon, the Asset Financing Agreements.

29.     "*Asset Financing Agreements*" means, collectively, the 36th Street Financing Agreement, the Ansley Park Financing Agreement, and the Citizens CoGen Financing Agreement.

30.     "*Asset Financing Agreement Schedule*" means the schedule setting forth the applicable takeback debt for the Asset Financing Agreement Claims.

31.     "*Asset Financing Takeback Debt*" means the takeback debt to be distributed to the Holders of Allowed Asset Financing Agreement Claims, which shall include the 36th Street Financing Takeback Debt, the Ansley Park Financing Takeback Debt, and the Citizens CoGen Financing Takeback Debt.

32.     "*Asset Financing Takeback Debt Documents*" means, collectively, the 36th Street Financing Takeback Debt Documents, the Ansley Park Financing Takeback Debt Documents, and the Citizens CoGen Financing Takeback Debt Documents.

33.     "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to this Plan, which shall also set forth the Debtors' good faith estimate of proposed Cure amounts (if any) with respect to each of the Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.  Notwithstanding anything to the contrary in this Plan, the Debtors may add Executory Contracts or Unexpired Leases to the Assumed Executory Contracts and Unexpired Leases Schedule at any time up to the Effective Date; *provided* that the Debtors may not remove any Executory Contracts or Unexpired Leases from the Assumed Executory Contracts and Unexpired Leases Schedule after the Voting Deadline; *provided*, *however*, that, (a) in the event that the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory Contract or Unexpired Lease exceeds the amount set forth on the Assumed Executory Contracts and Unexpired Leases Schedule by more than $500,000 or (b) the applicable Debtor or Reorganized Debtor and the applicable counterparty consensually agree, the Debtors and/or the Reorganized Debtors shall retain the right to remove such Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule up until five (5) Business Days after entry of the Order determining such Cure amount; *provided, further*, that (i) in the event that the Debtors or the Reorganized Debtors remove any Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule after the Voting Deadline, the deadline for the applicable counterparty to elect to opt out of the releases contained in <u>Article VIII.D</u> hereof shall be automatically extended to ten (10) Business Days after the filing of a revised Assumed Executory Contracts and Unexpired Leases Schedule removing such Executory Contract or Unexpired Lease; and ii) in the event that the Debtors remove an Executory Contract or an Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule after the Voting Deadline and prior to the Confirmation Hearing, the deadline for the counterparty to such Executory Contract or Unexpired Lease to object to the Confirmation of the Plan shall be automatically extended to the Confirmation Hearing.

34.     "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by, or on behalf of, the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes

of Action, or remedies arising under chapter 5 of the Bankruptcy Code, or other similar or related local, state, federal, or foreign statutes, common Law, including fraudulent transfer Law or other applicable Law.

35. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time, and as applicable to the Chapter 11 Cases.

36. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas.

37. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time, and as applicable to the Chapter 11 Cases.

38. "*Bridge Credit Agreement*" means that certain Super Priority Credit Agreement, dated as of March 7, 2025, by and among certain of the Debtors party thereto, the guarantors from time to time party thereto, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent, and each lender from time to time party thereto, as amended by that certain Amendment No. 1 to Super Priority Credit Agreement, dated as of March 13, 2025, that certain Incremental Amendment No. 1 and Amendment No. 2 to Super Priority Credit Agreement, dated as of March 25, 2025, and that certain Incremental Amendment No. 2 and Amendment No. 3 to Super Priority Credit Agreement, dated as of April 1, 2025.

39. "*Bridge Facility*" means those certain term loan facilities issued pursuant to the Bridge Credit Agreement, including any fees and interest that have been paid in kind.

40. "*Bridge Lenders*" means the lenders from time to time party to the Bridge Credit Agreement.

41. "*Bridge Loan Claims*" means any Secured Claim on account of the Bridge Loan Documents, including (a) any Claim against any Debtor arising from, or based upon, the Bridge Loan Documents, which shall be Allowed in the aggregate amount of $149,542,180.98, *plus* all other obligations related thereto, including any accrued and unpaid interest, premiums, costs, fees, and indemnities and (b) any DIP Adequate Protection Claims granted as adequate protection for the benefit of the Bridge Lenders.

42. "*Bridge Loan Documents*" has the meaning ascribed to "Prepetition Super Priority Term Loan Documents" in the DIP Orders.

43. "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York. When a period of days under this Agreement ends on a day that is not a Business Day, then such period shall be extended to the specified hour of the following Business Day.

44. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender in the state of New York.

45. "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

46. "*Causes of Action*" means, collectively, any and all claims, interests, damages, remedies, causes of action, reimbursement Claims, contribution Claims, recoupment rights, debts, judgments, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, Avoidance Actions, counterclaims and cross claims, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable, asserted or unasserted, direct or indirect, choate or inchoate, reduced to judgment or otherwise, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, Law, equity, or otherwise pursuant to any theory of Law. "Causes of Action" also includes: (a) all rights of setoff, counterclaim, or recoupment and Claims under contracts or for breaches of duties imposed by Law or in equity; (b) any Claim based on, or relating to, or in any manner arising from, in whole or in part, tort, breach of contract,

breach of fiduciary duty, violation of state or federal Law or breach of any duty imposed by Law or in equity, including Securities Laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) Claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (f) any other Avoidance Actions; and (g) with respect to each of the Excluded Parties, all of the aforementioned Causes of Action that can be or may be asserted against any Excluded Party.

47.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

48.     "*Citizens CoGen Financing Agreement*" means that certain agreement, dated as of March 13, 2020, by and among APM Ops, Citizens Asset Finance, and the other parties thereto, together with all amendments, modifications, schedules, and supplements thereto, as may be amended, restated, supplemented, or otherwise modified from time to time.

49.     "*Citizens CoGen Financing Agreement Claim*" means any and all Claims against a Debtor arising from, or based upon, the Citizens CoGen Financing Agreement.

50.     "*Citizens CoGen Financing Takeback Debt*" means the takeback debt to be distributed to the Holders of Allowed Citizens CoGen Financing Agreement Claims as set forth in Article IV.F.5 of this Plan.

51.     "*Citizens CoGen Financing Takeback Debt Documents*" means, collectively, any and all agreements, documents, and instruments delivered or entered into in connection with the Citizens CoGen Financing Takeback Debt, including the Asset Financing Agreement Schedule and any amendments, modifications, or supplements related thereto, and including any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

52.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

53.     "*Claims and Noticing Agent*" means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

54.     "*Claims Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be Filed with respect to all Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the Holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

55.     "*Claims Objection Deadline*" means the deadline for objecting to a Claim asserted against a Debtor, which shall be (a) one hundred and twenty (120) days after the Effective Date for Claims asserted by Trade Vendors or (b) for all Claims other than those asserted by Trade Vendors, on the date that is the later of (i) one hundred and eighty (180) days after the Effective Date and (ii) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, or by an order of the Bankruptcy Court for objecting to such Claims.

56.     "*Claims Ombudsman*" means the Person or Entity, selected by the Committee in consultation with the Required DIP Term Loan Lenders and the Debtors or the Reorganized Debtors, as applicable, whose rights, powers, and duties are set forth in Article IV.D.3 of this Plan.

57.     "*Claims Ombudsman Agreement*" means the agreement described in Article IV.D.3 of this Plan, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof with the reasonable consent of the Debtors and the Required DIP Term Loan Lenders and substantially in the form set forth in the Plan Supplement.

58.     "*Claims Ombudsman Fee Cap*" means a cap of $100,000.00 for all reasonable and documented fees and expenses incurred by, or on behalf of, the Claims Ombudsman.  Any amounts incurred by the Claims Ombudsman, whether prior to or after the Effective Date, in excess of the Claims Ombudsman Fee Cap shall be deemed disallowed by this Plan and the Bankruptcy Code for all purposes, and shall not be Allowed or payable by the DIP Lenders, the Debtors, the Reorganized Debtors, the Litigation Trust, or any of the Debtors' Estates, nor otherwise payable as an Allowed Claim.

59.     "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

60.     "*Class*" means a class of Claims or Interests as set forth in <u>Article III</u> of this Plan pursuant to section 1122(a) of the Bankruptcy Code.

61.     "*CM/ECF*" means the Bankruptcy Court's case management and electronic case filing system.

62.     "*Committee*" means the official statutory committee of unsecured creditors, appointed in the Chapter 11 Cases by the U.S. Trustee, pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 223], on May 5, 2025 and reconstituted pursuant to the *United States Trustee's Notice of Reconstitution of the Official Committee of Unsecured Creditors* [Docket No. 664], on July 17, 2025.

63.     "*Committee Accrued Fee Cap*" means a cap of $18,020,000.00 for (a) all reasonable and documented fees and expenses accrued by the Committee Advisors from the Petition Date through the date of the Disclosure Statement Hearing and (b) the Ducera Fees.  Any amounts incurred by the Committee Advisors from the Petition Date through the date of the Disclosure Statement Hearing in excess of the Committee Accrued Fee Cap shall be deemed disallowed by this Plan and the Bankruptcy Code for all purposes and shall not be Allowed or payable by the DIP Lenders, the Debtors, the Reorganized Debtors, the Litigation Trust, or any of the Debtors' Estates, nor otherwise payable as an Allowed Claim.

64.     "*Committee Advisors*" means, collectively:  (a) Brown Rudnick LLP, as co-counsel to the Committee; (b) AlixPartners, LLP, as financial advisor to the Committee; (c) Ducera, as investment banker to the Committee; and (d) Parkins & Rubio LLP, as local counsel to the Committee.

65.     "*Committee Go-Forward Fee Cap*" means a cap of $200,000.00 for all reasonable and documented fees and expenses accrued by the Committee Advisors after the date of the Disclosure Statement Hearing through the Effective Date, which fees and expenses, for the avoidance of doubt, shall exclude the Ducera Fees and the Committee Plan Support Carve-Out.  Any amounts incurred by the Committee Advisors after the date of the Disclosure Statement Hearing through the Effective Date, other than those fees and expenses incurred pursuant to the Committee Plan Support Carve-Out, in excess of the Committee Go-Forward Fee Cap shall be deemed disallowed by this Plan and the Bankruptcy Code for all purposes and shall not be Allowed or payable by the DIP Lenders, the Debtors, the Reorganized Debtors, the Litigation Trust, or any of the Debtors' Estates, nor otherwise payable as an Allowed Claim. For the avoidance of doubt, all reasonable and documented fees for services rendered, and actual and necessary costs incurred, in connection with any applications Filed by the Committee Advisors for allowance of the Professional Claims shall be subject to the Committee Go-Forward Fee Cap and the Committee Plan Support Carve-Out.

66.     "*Committee Plan Support Carve-Out*" means a cap of $250,000.00 for all reasonable and documented fees and expenses incurred by the Committee Advisors after the date of the Disclosure Statement Hearing through the Effective Date in support of Confirmation of this Plan, payable under the terms of the Interim Compensation Order, which fees and expenses, for the avoidance of doubt, shall (a) exclude the Ducera Fees and (b) be in addition to the Committee Go-Forward Fee Cap; *provided* that the Committee Advisors may use the Committee Plan Support Carve-Out for all reasonable and documented fees for services rendered, and actual and necessary costs incurred, in connection with any applications Filed by the Committee Advisors for allowance of the Professional Claims.  Any amounts incurred by the Committee Advisors after the date of the Disclosure Statement Hearing, other than those incurred pursuant to the Committee Plan Support Carve-Out, in excess of the Committee Plan Support Carve-Out shall be deemed disallowed by this Plan and the Bankruptcy Code for all purposes and shall not be Allowed or payable by the DIP Lenders, the Debtors, the Reorganized Debtors, the Litigation Trust, or any of the Debtors' Estates, nor otherwise payable as an Allowed Claim.

67. "*Committee Settlement*" means the comprehensive settlement between the Debtors and the Committee as set forth in Article IV.D of the Plan.

68. "*Company Parties*" means, collectively, the Debtors and the Non-Debtor Subsidiaries.

69. "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, wages, compensation, benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, the employees, former employees, and retirees of their subsidiaries, including all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements, and plans, incentive plans, deferred compensation plans and life, accidental death, and dismemberment insurance plans, in each case existing with the Debtors as of immediately prior to the Effective Date.

70. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

71. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

72. "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider the Confirmation of this Plan, pursuant to Bankruptcy Rule 3020(b)(3) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

73. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

74. "*Consummation*" means the occurrence of the Effective Date as to the applicable Debtor.

75. "*Critical Vendor*" means those highly specialized vendors, service providers, and other businesses as described in the Critical Vendor Motion in paragraphs eighteen (18) through twenty-four (24) thereof.

76. "*Critical Vendor Motion*" means the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(B)(9) Claimants, (B) Lien Claimants, (C) Critical Vendors, and (D) Foreign Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 12], Filed by the Debtors on April 21, 2025.

77. "*Critical Vendor Order*" means the *Final Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(B)(9) Claimants, (B) Lien Claimants, (C) Critical Vendors, and (D) Foreign Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 348], entered by the Bankruptcy Court on May 21, 2025.

78. "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

79. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") covering any of the Debtors' current or former directors', officers', managers', and/or employees' liability and all agreements, documents, or instruments relating thereto.

8

80.     "*Debt Backstop Parties*" means at any time and from time to time, the members of the Ad Hoc Group Steerco that have committed to backstop the Debt Rights Offering in accordance with the Debt Rights Offering Procedures and the Debt Rights Offering Subscription Form.  Each Debt Backstop Party may assign all or a portion of its backstop only to (a) any other Debt Backstop Party, or (b) their Lender Fund Affiliates, as set forth in the Exit Term Loan Documents, the Debt Rights Offering Procedures, and/or the Debt Rights Offering Subscription Form.

81.     "*Debt Backstop Premium*" has the meaning ascribed to it in the Debt Rights Offering Documents and described in Article IV.F.2(d) of this Plan.

82.     "*Debt Rights Offering*" means the offering of the Debt Subscription Rights to be conducted in accordance with the Debt Rights Offering Documents.

83.     "*Debt Rights Offering Amount*" means $235,000,000.

84.     "*Debt Rights Offering Documents*" means, collectively, any and all other agreements, documents, and instruments delivered or entered into in connection with the Debt Rights Offering, including the Debt Rights Offering Procedures, the Debt Rights Offering Subscription Rights, the Exit Term Loan Documents, and any other procedures or forms related to the exercise of the Debt Subscription Rights.

85.     "*Debt Rights Offering Eligible Offerees*" means, collectively, the Holders of the DIP Term Loan Claims and/or their Lender Fund Affiliates, as set forth in the Debt Rights Offering Procedures.

86.     "*Debt Rights Offering Participant*" means, collectively, the Debt Rights Offering Eligible Offerees that validly exercise their respective Debt Subscription Rights and agree to fund the Exit Term Loan Facility.

87.     "*Debt Rights Offering Procedures*" means those certain procedures governing the Debt Rights Offering.

88.     "*Debt Rights Offering Subscription Form*" means that certain subscription form, including any supplements or amendments thereto, governing the Debt Rights Offering.

89.     "*Debt Subscription Rights*" means the rights to participate in the Exit Term Loan Facility (including the commitment to provide the Exit Term Loan Additional Equity Commitment and/or the receipt of New Interests pursuant to the Exit Term Loan Conversion, in each case, to the extent applicable) pursuant to the Debt Rights Offering Documents.

90.     "*Definitive Documents*" means:  (a) this Plan; (b) the Confirmation Order; (c) the Disclosure Statement; (d) the Disclosure Statement Order; (e) the Solicitation Materials; (f) the Plan Supplement; (g) the DIP Documents; (h) the DIP Orders; (i) the MIP Term Sheet (if applicable); (j) the New Organizational Documents; (k) the Exit ABL Facility Documents; (l) the Exit Term Loan Documents; (m) the Debt Rights Offering Documents; (n) the Asset Financing Takeback Debt Documents; (o) the New Equityholders' Documents; and (p) the Litigation Trust Documents; in each case, including any amendments, modifications, and supplements.  For the avoidance of doubt, all Definitive Documents shall be subject to the consent of the Required DIP Term Loan Lenders and any other terms or conditions as outlined in this Plan, including the consent, approval, and consultation rights of the Required DIP ABL Lenders and the DIP ABL Agent set forth in Article I.H of this Plan.

91.     "*DIP ABL Agent*" means Wells Fargo Capital Finance, LLC, in its capacity as administrative agent under the DIP ABL Credit Agreement.

92.     "*DIP ABL Claims*" means any Claim arising under the DIP ABL Documents or the DIP Orders with respect to the DIP ABL Facility.

93.     "*DIP ABL Credit Agreement*" means that certain ABL Credit Agreement attached as Exhibit A to that certain Ratification and Amendment Agreement, dated as of April 23, 2025, by and among certain of the Debtors party thereto, certain of the Non-Debtor Subsidiaries party thereto, the guarantors party thereto, the DIP ABL Agent,

and each lender and issuing bank from time to time party thereto, as may be amended, restated, supplemented, or otherwise modified from time to time.

94.     "*DIP ABL Documents*" means, collectively, the DIP ABL Credit Agreement and any amendments, modifications, or supplements thereto, and including any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

95.     "*DIP ABL Facility*" means the asset-based revolving credit facility provided to the Debtors on the terms and conditions set forth in the DIP ABL Documents and the DIP Orders.

96.     "*DIP ABL Lenders*" means the lenders from time to time party to the DIP ABL Credit Agreement.

97.     "*DIP Adequate Protection Claims*" has the meaning ascribed to "507(b) Claims" in the DIP Orders.

98.     "*DIP Agents*" means, collectively, the DIP ABL Agent and the DIP Term Loan Agent.

99.     "*DIP Budget*" means the initial debtor-in-possession financing budget attached to the Interim DIP Order, and any subsequent debtor-in-possession financing budget agreed to in accordance with the DIP Orders.

100.    "*DIP Claims*" means, collectively, any DIP ABL Claims and any DIP Term Loan Claims.

101.    "*DIP Documents*" means, collectively, the DIP ABL Documents, the DIP Term Loan Documents, the DIP Budget, and any amendments, modifications, or supplements thereto, and including any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

102.    "*DIP Equity Recovery*" means the recovery afforded to Holders of DIP Term Loan Claims in the form of New Interests, equal to 100% of the New Interests, *minus* the Ascend Interest Distribution, which DIP Equity Recovery is subject to dilution on account of the Exit Term Loan Conversion (to the extent applicable), the Exit Term Loan Additional Equity Commitment (to the extent applicable), and the Management Incentive Plan.

103.    "*DIP Facilities*" means, collectively, the DIP ABL Facility and the DIP Term Loan Facility.

104.    "*DIP Lenders*" means, collectively, the DIP ABL Lenders and the DIP Term Loan Lenders.

105.    "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

106.    "*DIP Term Loan Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the DIP Term Loan Credit Agreement.

107.    "*DIP Term Loan Claims*" means any Claim arising under the DIP Term Loan Documents or the DIP Orders with respect to the DIP Term Loan Facility, including, without limitation, the Bridge Loan Claims.

108.    "*DIP Term Loan Credit Agreement*" means that certain Superpriority Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of April 23, 2025, by and among certain of the Debtors party thereto, certain of the Non-Debtor Subsidiaries party thereto, the guarantors from time to time party thereto, Wilmington Savings Fund Society, FSB, as administrative and collateral agent, and each lender from time to time party thereto, as may be amended, restated, supplemented, or otherwise modified from time to time.

109.    "*DIP Term Loan Documents*" means, collectively, the DIP Term Loan Credit Agreement and any amendments, modifications, or supplements thereto, and including any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

110.     "*DIP Term Loan Facility*" means the superpriority senior secured debtor-in-possession financing facility provided to the Debtors on the terms and conditions set forth in the DIP Term Loan Documents and the DIP Orders.

111.     "*DIP Term Loan Lenders*" means the lenders from time to time party to the DIP Term Loan Credit Agreement.

112.     "*Disclosure Statement*" means the related disclosure statement with respect to this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan, as may be amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable Law.

113.     "*Disclosure Statement Hearing*" means the hearing to be held by the Bankruptcy Court to consider the approval of the Disclosure Statement, as such hearing may be continued from time to time.

114.     "*Disclosure Statement Order*" means the order (and all exhibits thereto), entered by the Bankruptcy Court approving, among other things, the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence.

115.     "*Disinterested Director*" means each of the independent and disinterested managers and directors of each of the boards of managers and boards of directors, as applicable, of each of the Debtors.

116.     "*Disinterested Director Fee Claims*" means all due and owing unpaid fees and expenses as of the Effective Date due to the Disinterested Directors of each of the Debtors pursuant to their respective director agreements with the applicable Debtor Entity.  On the Effective Date, the Disinterested Director Fee Claims shall be deemed Allowed Administrative Claims against the Debtors.

117.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest (or portion thereof):  (a) that is not Allowed; (b) that is not disallowed by this Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy Law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or a request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.  Any and all Claims asserted by any of the Excluded Parties are Disputed.

118.     "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to this Plan, which Entity may include the Claims and Noticing Agent or the Agents, as applicable; *provided* that, (a) the DIP Term Loan Agent shall be the presumptive Distribution Agent for the Litigation Trust Class A Interests, the Litigation Trust Class B Interests, the Litigation Trust Class C Interests, and the Litigation Trust Class D Interests issued to Holders of the Term Loan Deficiency Claims, and (b) the Litigation Trustee, or a designee thereof, shall be the Distribution Agent for the Litigation Trust Class D Interests that are not issued to Holders of the Term Loan Deficiency Claims.

119.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, as applicable, on or after the Effective Date, with the first such date occurring on or as soon as reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims that are entitled to receive distributions under this Plan.

120.     "*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be on or before the Effective Date or such other date agreed to by the Debtors.

121.     "*DTC*" means the Depository Trust Company.

122.     "*Ducera*" means Ducera Partners LLC, as investment banker to the Committee.

123. "*Ducera Fees*" means, collectively, all reasonable and documented fees and expenses, including those certain monthly fees and that certain restructuring fee, incurred by Ducera pursuant to the Ducera Letter Agreement through the Effective Date, subject to the terms and conditions of the Ducera Letter Agreement.

124. "*Ducera Letter Agreement*" means that certain letter agreement dated as of May 9, 2025, by and between Ducera and the Committee, and as approved by the Bankruptcy Court pursuant to the *Order (I) Authorizing the Retention and Employment of Ducera Partners LLC as Investment Banker Effective as of May 9, 2025, and (II) Granting Related Relief* [Docket No. 667] entered by the Bankruptcy Court on July 18, 2025.

125. "*Effective Date*" means, as to the applicable Debtor, the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.C of this Plan.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

126. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

127. "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

128. "*Exchange Act*" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a, *et seq.* or any similar federal, state, or local Law, as now in effect or hereafter amended and the rules and regulations promulgated thereunder.

129. "*Excluded Parties*" means:  (a) the Sponsor; (b) Rescar Companies; and (c) all Entities that are identified on the Schedule of Excluded Parties; *provided* that any Entity may be removed from this definition and the Schedule of Excluded Parties if such removal is both (i) determined by the Special Committee based on the outcome of the Independent Investigation and (ii) consented to by the Required DIP Term Loan Lenders; *provided*, *further*, that, for the avoidance of doubt, none of the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the DIP Secured Parties (as defined in the DIP Orders) and each of their Related Parties, or the Prepetition Secured Parties (as defined in the DIP Orders) and each of their Related Parties in any capacity, shall be an Excluded Party.  For the avoidance of doubt, neither the Sponsor nor any Entity identified on the Schedule of Excluded Parties shall be a Related Party or an Affiliate of the Debtors, the Non-Debtor Subsidiaries, or the Reorganized Debtors for the purposes of this Plan, including any releases, injunctions, and exculpations contained in this Plan.

130. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Disinterested Directors of the Debtors; and (c) the Committee and each of its members, solely in their respective capacities as such.

131. "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

132. "*Exit ABL Credit Agreement*" means the credit agreement governing the Exit ABL Facility.

133. "*Exit ABL Facility*" means that certain asset-based revolving credit facility to be issued on the Effective Date pursuant to the Exit ABL Credit Agreement.

134. "*Exit ABL Facility Documents*" means the Exit ABL Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge, and collateral agreements, intercreditor agreements, and other security documents.

135. "*Exit ABL Facility Loans*" means the loans outstanding from time to time under the Exit ABL Facility.

136. "*Exit ABL Term Sheet*" means the term sheet outlining certain material terms for the Exit ABL Facility.

137.    "*Exit Term Loan Additional Equity Commitment*" means a commitment provided on the Effective Date by the Exit Term Loan Lenders to pay $75,000,000 in the future for an amount of New Interests equal to 21.0% of New Interests as calculated (a) immediately after the funding of the Exit Term Loan Additional Equity Commitment and (b) as if the New Interests issuable pursuant to the Exit Term Loan Conversion were fully issued on such date, subject to dilution on account of the Management Incentive Plan, in accordance with the Exit Term Loan Documents and an equity commitment letter.

138.    "*Exit Term Loan Conversion*" means, to the extent applicable, the conversion of the Exit Term Loan Facility into 90.0% of the New Interests following the Effective Date, pursuant to the terms and conditions set forth in the Exit Term Loan Term Sheet, the Exit Term Loan Credit Agreement, and Article IV.F.4(f) of this Plan and any other documents that may be entered into by and among the Exit Term Loan Lenders.

139.    "*Exit Term Loan Credit Agreement*" means the credit agreement governing the Exit Term Loan Facility. For the avoidance of doubt, the Exit Term Loan Credit Agreement must be in form and substance consistent with the terms set forth in Article IV.F.2 and Article IV.F.4 of this Plan and the Exit Term Loan Term Sheet as Filed on or prior to the Voting Deadline.

140.    "*Exit Term Loan Documents*" means the Exit Term Loan Credit Agreement, the Exit Term Loan Term Sheet, and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge, and collateral agreements, intercreditor agreements, and other security documents.

141.    "*Exit Term Loan Facility*" means that certain term loan facility to be issued on the Effective Date pursuant to the Exit Term Loan Credit Agreement.

142.    "*Exit Term Loan Lenders*" means the lenders from time to time party to the Exit Term Loan Credit Agreement.

143.    "*Exit Term Loans*" means the loans outstanding from time to time under the Exit Term Loan Facility.

144.    "*Exit Term Loan Term Sheet*" means the term sheet outlining all material terms for the Exit Term Loan Facility in form and substance consistent with the terms set forth in Article IV.D.5 of this Plan. The Exit Term Loan Term Sheet must be (a) approved by the Required DIP Term Loan Lenders, (b) Filed in agreed form on or prior to the Voting Deadline, and (c) consistent with Article IV.F.1, Article IV.F.2, and Article IV.F.4 of this Plan.

145.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

146.    "*File*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.  "Filed" and "Filing" shall have correlative meanings.

147.    "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* [Docket No. 389], entered by the Bankruptcy Court on May 27, 2025.

148.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or another court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, vacated, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing thereof has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy

13

Rules (or any analogous rules applicable in another court of competent jurisdiction) or section 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment will not preclude such order from being a Final Order.

149.    "*First Lien Agents*" means, collectively, the ABL Agent and the Term Loan Agent.

150.    "*General Unsecured Claim*" means any Claim against any of the Debtors that is not:  (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) a DIP Claim; (c) an Administrative Claim; (d) a Priority Tax Claim; (e) a Secured Tax Claim; (f) an Other Secured Claim; (g) an Other Priority Claim; (h) a Term Loan Claim; (i) an Asset Financing Agreement Claim; (j) a Go-Forward Vendor Claim; (k) an Intercompany Claim; or (l) a Section 510(b) Claim.  For the avoidance of doubt, General Unsecured Claims include (i) all Claims resulting from the rejection of Executory Contracts and Unexpired Leases, (ii) all Claims resulting from litigation against one or more of the Debtors, (iii) the Term Loan Deficiency Claims, and (iv) all Claims between the Sponsor or its Affiliates, on the one hand, and any Debtor or its Affiliates, on the other hand.

151.    "*General Unsecured Claim Distribution*" means the recovery afforded to Holders of General Unsecured Claims, which shall include their Pro Rata share of the Litigation Trust Class D Interests, as set forth in the Litigation Trust Documents.

152.    "*Go-Forward Vendor Claim*" means any Claim held by any trade vendor that provided ordinary course trade, vendor, or other goods and services to the Debtors, who, in the Debtors' business judgment, will, or is reasonably likely to be, a vendor, professional, or provider of other goods and services with which the Reorganized Debtors do business after the Effective Date.  For the avoidance of doubt, Go-Forward Vendor Claims shall exclude any Claim against any of the Debtors that is (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) a DIP Claim; (c) an Administrative Claim; (d) a Priority Tax Claim; (e) a Secured Tax Claim; (f) an Other Secured Claim; (g) an Other Priority Claim; (h) a Term Loan Claim; (i) an Asset Financing Agreement Claim; (j) a General Unsecured Claim; (k) an Intercompany Claim; (l) a Section 510(b) Claim; (m) held by a Sponsor or Related Party of a Sponsor; (n) held by a current or former director, officer, or manager of the Debtors (or a Related Party of any of the foregoing); (o) arising from the rejection of Executory Contracts and Unexpired Leases; (p) resulting from litigation against one or more of the Debtors; (q) for liquidated damages; (r) arising under a guarantee, indemnity, or contribution agreement, obligation, or related provision; (s) paid pursuant to the Critical Vendor Order or any other order of the Bankruptcy Court; (t) arising under section 502(h) of the Bankruptcy Code; or (u) asserted by a Governmental Unit.

153.    "*Go-Forward Vendor Claim Schedule*" means the schedule of Holders of Go-Forward Vendor Claims, which shall be Filed no later than the deadline for Filing the Plan Supplement.

154.    "*Go-Forward Vendor Recovery Pool*" means a Cash pool equal to the lesser of (a) $13,700,000 and (b) 25% *multiplied* by the cumulative amount of all Allowed Go-Forward Vendor Claims.

155.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

156.    "*Holder*" means an Entity that is the record owner of a Claim against, or an Interest in, any Debtor, as applicable.  For the avoidance of doubt, affiliated record owners of Claims or Interests held by, or held by funds or accounts managed or advised by, the same institution shall constitute separate Holders.

157.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

158.    "*Indemnification Provisions*" means, collectively, all indemnification provisions in place immediately before the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise).

159.   "*Independent Investigation*" means the independent director investigation conducted by the Special Committee.

160.   "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

161.   "*Intercompany Claim*" means any Claim held by a Debtor or Non-Debtor Subsidiary against another Debtor or Non-Debtor Subsidiary.  In no event shall any Claim held by a Debtor or a Non-Debtor Subsidiary against any of the Excluded Parties or any Sponsor be considered an Intercompany Claim.

162.   "*Intercompany Interest*" means an Interest in a Debtor or Non-Debtor Subsidiary held by another Debtor or Non-Debtor Subsidiary.  In no event shall any Interest held by a Debtor or a Non-Debtor Subsidiary against any of the Excluded Parties or any Sponsor be considered an Intercompany Interest.

163.   "*Interests*" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, partnership interests, membership interests, and any other equity, ownership, or profits interests of any Company Party and options, warrants, rights, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights, or other Securities or agreements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, partnership interests, membership interests, or any other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement and regardless of whether such equity interests are held directly or indirectly).

164.   "*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief* [Docket No. 387] entered by the Bankruptcy Court on May 29, 2025.

165.   "*Interim DIP Order*" means the *Revised Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Authorizing the Use of Cash Collateral, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 96] entered by the Bankruptcy Court on April 23, 2025.

166.   "*IRS*" means the Internal Revenue System.

167.   "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, and as applicable to the Chapter 11 Cases.

168.   "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

169.   "*Lender Fund Affiliates*" means any of the following, with respect to the Holders of the DIP Term Loan Claims, (a) any Affiliates or related funds, accounts, investment funds, vehicles, Entities, or managed funds that are managed, advised, sub-advised, or under common management or advisement by such Holder, its Affiliates, or the same Person or Entity as such Holder or its Affiliates, or (b) for the Entities described in the foregoing clause (a), any of their designees, in accordance with the Debt Rights Offering Documents and the related procedures.

170.   "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

171.   "*Litigation Trust*" means one or more trusts and/or sub-trusts formed pursuant to the Litigation Trust Agreement, which trust(s) shall hold the Litigation Trust Assets.

172.   "*Litigation Trust Agreement*" means the trust or similar agreement providing for the Litigation Trust, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof and substantially in the form set forth in the Plan Supplement.

173.    "*Litigation Trust Assets*" means, collectively, (a) the Permitted Litigation Claims, including the Specified Contract Claims and (b) the proceeds of the Permitted Litigation Claims.

174.    "*Litigation Trust Beneficiaries*" means the Holders of Claims that receive Litigation Trust Interests pursuant to this Plan and the Litigation Trust Documents.

175.    "*Litigation Trust Class A Interests*" means the class A beneficial interests in the Litigation Trust as provided for in the Litigation Trust Agreement, which interests shall only be issued to the Holders of Allowed DIP Term Loan Claims.

176.    "*Litigation Trust Class B Interests*" means the class B beneficial interests in the Litigation Trust as provided for in the Litigation Trust Agreement, which interests shall only be issued to the Holders of Allowed Term Loan Adequate Protection Claims.

177.    "*Litigation Trust Class C Interests*" means the class C beneficial interests in the Litigation Trust as provided for in the Litigation Trust Agreement, which interests shall only be issued to the Holders of Allowed Term Loan Claims.

178.    "*Litigation Trust Class D Interests*" means the class D beneficial interests in the Litigation Trust as provided for in the Litigation Trust Agreement, which interests shall only be issued to the Holders of Allowed General Unsecured Claims, including the Term Loan Deficiency Claims.

179.    "*Litigation Trust Cooperation Agreements*" means the cooperation agreements that shall be in form and substance reasonably acceptable to the Debtors, the Litigation Trustee, and the Required DIP Term Loan Lenders whereby each party thereto will agree to use commercially reasonable efforts to fully cooperate with the investigation and prosecution of the Permitted Litigation Claims, taking into account the individual circumstances of each party thereto, including personal obligations and go-forward contributions and obligations to the Reorganized Debtors.

180.    "*Litigation Trust Documents*" means the Litigation Trust Agreement and all other agreements, documents, procedures, and instruments delivered or entered into in connection with the establishment, formation, and implementation of the Litigation Trust, including the Litigation Trust Cooperation Agreements, each of which shall be subject to the consent of the Required DIP Term Loan Lenders.

181.    "*Litigation Trust Expenses*" means the reasonable and documented fees and expenses incurred by the Litigation Trust and reimbursable pursuant to the Litigation Trust Agreement.

182.    "*Litigation Trust Interests*" means, collectively, the Litigation Trust Class A Interests, the Litigation Trust Class B Interests, the Litigation Trust Class C Interests, and the Litigation Trust Class D Interests.

183.    "*Litigation Trust Reserve*" means the amounts funded as of the Effective Date, or as may be funded from time to time by the Debtors, Reorganized Debtors, or another party, to pay the Litigation Trust Expenses and any other amounts as specified in the Litigation Trust Agreement.

184.    "*Litigation Trustee*" means the trustee for the Litigation Trust to be selected by the Required DIP Term Loan Lenders in consultation with the Debtors.

185.    "*Management Incentive Plan*" means a management incentive plan, in form and substance consistent with the MIP Term Sheet, to be designed and adopted by the New Board on or after the Effective Date, to be used to incentivize and compensate employees, directors, consultants, and other service providers, which will include (a) the ability to grant Interests in Reorganized Ascend and (b) other terms and conditions customary for similar type equity plans as determined by the New Board in its sole discretion (including, with respect to participants, allocation of awards, and vesting).

186.    "*MIP Term Sheet*" means a term sheet providing for certain material terms of the Management Incentive Plan, to be Filed with the Plan Supplement.

187.   "*New Board*" means the board of directors or similar governing body of Reorganized Ascend.

188.   "*New Equityholders' Agreement*" means the document providing for the corporate governance of Reorganized Ascend, to be Filed with the Plan Supplement.  The New Equityholders' Agreement must be in form and substance consistent with the terms set forth in <u>Article IV.F.1</u>, <u>Article IV.F.2</u>, and <u>Article IV.F.4</u> of this Plan and the New Equityholders' Term Sheet as Filed.

189.   "*New Equityholders' Documents*" means the New Equityholders' Agreement, the New Equityholders' Term Sheet, and any amendments, modifications, or supplements related thereto, and including any related agreements, documents, and instruments (including any amendments, modifications, or supplements of the foregoing) delivered or entered into in connection therewith.

190.   "*New Equityholders' Term Sheet*" means the term sheet outlining all material terms for the New Equityholders' Agreement.  The New Equityholders' Term Sheet must be (a) approved by the Required DIP Term Loan Lenders, (b) Filed in agreed form on or prior to the Voting Deadline, and (c) in form and substance consistent with the terms set forth in <u>Article IV.F.1</u>, <u>Article IV.F.2</u>, and <u>Article IV.F.4</u> of this Plan.

191.   "*New Interests*" means equity interests, common stock, membership interests, or limited liability company interests, as applicable, in accordance with the Restructuring Transactions Memorandum, to be issued by Reorganized Ascend on or after the Effective Date.

192.   "*New Organizational Documents*" means, collectively and as applicable, the New Equityholders' Documents, and any other organizational and governance documents for Reorganized Ascend and the other Reorganized Debtors, as applicable, including, without limitation, any charters, bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be set forth in the Plan Supplement, consistent with section 1123(a)(6) of the Bankruptcy Code, as applicable.

193.   "*Non-Debtor Subsidiaries*" means the direct and indirect subsidiaries of Ascend Parent that are not Debtors.

194.   "*Other Priority Claim*" means any Claim against any of the Debtors other than an Administrative Claim or a Priority Tax Claim that is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

195.   "*Other Secured Claim*" means any Secured Claim other than a DIP Claim, a DIP Adequate Protection Claim, a Secured Tax Claim, or a Term Loan Claim.

196.   "*Pension Plan*" means that certain Pension Plan for Nylon Employees, restated as of January 1, 2020, as may be amended, restated, supplemented, or otherwise modified from time to time.

197.   "*Permitted Litigation Claims*" means all of the Estates' rights, titles, and interest in the claims and Causes of Action that are not being released under this Plan and are (a) against the Excluded Parties or (b) designated by the Special Committee with the reasonable consent of the Required DIP Term Loan Lenders in accordance with the Litigation Trust Documents.  For the avoidance of doubt, Permitted Litigation Claims shall include all claims and Causes of Action held by APM Disc and APM Disc Inc. against other Persons or Entities; *provided*, *however*, that the Permitted Litigation Claims do not include any claims and Causes of Action against the DIP Secured Parties or any of their Related Parties or the Prepetition Secured Parties or any of their Related Parties, in any capacity.

198.   "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

199.   "*Personal Injury Claims*" means any Claims on account of personal injury Causes of Action that arose prior to the Petition Date.

200.   "*Petition Date*" means April 21, 2025, the date on which the Debtors commenced the Chapter 11 Cases.

201.    "*Plan Distribution*" means a payment or distribution to the Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with this Plan.

202.    "*PI Insurance Policies*" means, collectively, each of the Debtors' insurance policies that provide insurance coverage for the Personal Injury Claims, which are subject to the applicable limits, deductibles, retentions, exclusions, terms, and conditions set forth therein.

203.    "*Plan Effective Date Unit Count*" means the number of New Interests issued to the Holders of DIP Term Loan Claims and pursuant to the Ascend Interest Distribution on the Effective Date.

204.    "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules) to be Filed prior to the Confirmation Hearing to the extent applicable and available, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable:  (a) the New Equityholders' Agreement; (b) the New Equityholders' Term Sheet; (c) to the extent known, the identities of the members of the New Board; (d) the Assumed Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; (f) the MIP Term Sheet (if applicable); (g) the Schedule of Excluded Parties; (h) the Restructuring Transactions Memorandum; (i) the Exit ABL Credit Agreement; (j) the Exit ABL Term Sheet; (k) the Debt Rights Offering Documents; (l) the Asset Financing Agreement Schedule; (m) the Litigation Trust Agreement; (n) the Exit Term Loan Term Sheet; (o) the Exit Term Loan Credit Agreement; (p) the Claims Ombudsman Agreement; and (q) the Go-Forward Vendor Claim Schedule.  The Debtors (with the consent of the Required DIP Term Loan Lenders and the reasonable consent of the Required DIP ABL Lenders) shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date as set forth in this Plan, except for (i) the Claims Ombudsman Agreement, which may only be altered, amended, modified, or supplemented with the consent of the Committee and (ii) the Go-Forward Vendor Claim Schedule, to which Go-Forward Vendor Claims may only be added or removed with the consent of the Committee.  For the avoidance of doubt, all Plan Supplement documents shall be subject to the consent of the Required DIP Term Loan Lenders and any other terms or conditions as outlined in this Plan, including the consent, approval, and consultation rights of the Required DIP ABL Lenders and the DIP ABL Agent set forth in <u>Article I.H</u> of this Plan.

205.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

206.    "*Privileges*" means all attorney-client privileges, work product protections, and other applicable privileges, immunities, or protections from disclosure held by any one or more of the applicable Debtors.

207.    "*Pro Rata*" means, as of the applicable record date, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in such Class.

208.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

209.    "*Professional Claim*" means any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred by such Professionals through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent that such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court and/or in the ordinary course of business and consistent with past practice.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Claim.  For the avoidance of doubt, the Restructuring Expenses shall not be considered Professional Claims, and any such amounts shall be paid in accordance with the DIP Orders and this Plan, as applicable.

210.    "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates the Professionals shall deliver to the Debtors as set forth in Article II.C of this Plan.

211.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors or the Reorganized Debtors, as applicable, with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

212.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date or the applicable Administrative Claims Bar Date, as applicable.

213.    "*Reinstate*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder, and the Holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstate" and "Reinstatement" shall have correlative meanings.

214.    "*Related Party*" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or Entity's current and former directors, managers, officers, committee members, members of any governing body, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns (whether by operation of Law or otherwise), subsidiaries, current, former, and future associated Entities, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, fiduciaries, trustees, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees. Notwithstanding anything to the contrary in this Plan, no Excluded Party shall constitute a Related Party.

215.    "*Released Claims*" means any Claims or Interests that have been released, satisfied, terminated, discharged, or are subject to compromise, settlement, or exculpation pursuant to this Plan.  For the avoidance of doubt, no Claim or Cause of Action against any Excluded Party shall be a Released Claim.

216.    "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the DIP ABL Lenders; (d) each of the ABL Lenders; (e) each member of the Ad Hoc Group (including in their capacity as DIP Term Loan Lenders, Bridge Lenders, Term Loan Lenders, and Debt Backstop Parties, as applicable); (f) the Committee and each of its members (exclusively in their capacities as Committee members); (g) each of the Releasing Parties that is not an Excluded Party; (h) each of the Agents; (i) MasTec Industrial Corporation (f/k/a MasTec Power Corporation); (j) each current and former Affiliate of each Entity in clause (a) through the following clause (k); and (k) each Related Party of each Entity in clauses (a) through (k); *provided* that, in each case, an Entity shall not be a Released Party if it:  (i) elects to opt out of the releases contained in Article VIII.D hereof; (ii) timely objects to the releases contained in Article VIII.D hereof and such objection is not resolved before Confirmation; or (iii) is an Excluded Party.

217.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the DIP ABL Lenders; (d) each of the ABL Lenders; (e) the Committee and each of its members (exclusively in their capacities as Committee members); (f) each of the Agents; (g) MasTec Industrial Corporation (f/k/a MasTec Power Corporation); (h) all Holders of Claims or Interests that vote to accept this Plan; (i) each member of the Ad Hoc Group (including in their capacity as DIP Term Loan Lenders, Bridge Lenders, Term Loan Lenders, and Debt Backstop Parties, as applicable); (j) all Holders of Claims who are deemed to accept this Plan; (k) all Holders of Claims or Interests who abstain from voting on this Plan; (l) all Holders of Claims or Interests who vote to reject this Plan or are deemed to reject this Plan; (m) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (n); and (n) to the maximum extent permitted by Law, each Related Party of each Entity in clauses (a) through (n); *provided* that, in each case, an Entity in clauses (i) through (n) shall not be a Releasing Party if it:  (i) affirmatively elects to opt out of the releases contained in Article VIII.D by checking the box on the applicable ballot or notice of non-voting

status indicating that they opt not to grant the releases provided for in this Plan; or (ii) timely objects to the releases contained in Article VIII.D hereof and such objection is not resolved before Confirmation.

218.   "*Reorganized Ascend*" means either Ascend, or any successor or assignee thereto, by merger, consolidation, reorganization, or otherwise, in the form of a new corporation, limited liability company, partnership, or other Entity that may be formed, or any Entity designated by the Debtors in connection with the implementation of the Restructuring Transactions and in accordance with the Restructuring Transactions Memorandum, which in any case shall be the ultimate parent of the Company Parties on and after the Effective Date.

219.   "*Reorganized Debtor*" means a Debtor as reorganized pursuant to and under this Plan, or any successor or assignee thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form in accordance with the Restructuring Transactions Memorandum, as the case may be, on and after the Effective Date, including Reorganized Ascend.

220.   "*Required DIP ABL Lenders*" has the meaning ascribed to "Required Lenders" in the DIP ABL Credit Agreement.

221.   "*Required DIP Term Loan Lenders*" has the meaning ascribed to "Required Lenders" in the DIP Term Loan Credit Agreement.

222.   "*Restructuring Expenses*" means the reasonable, documented, and due and owing fees and out-of-pocket expenses of (a) the Ad Hoc Group Advisors, (b) the ABL Advisors, (c) the DIP Agents, (d) the First Lien Agents, and (e) the advisors to each of the foregoing set forth in clauses (c) and (d) (including, in each case, fees and expenses incurred before, on, or after the Petition Date, to the extent applicable) accrued since the inception of their respective engagements and continuing through the implementation of the Restructuring Transactions and in accordance with their respective engagement letters or fee letters with the Company Parties and/or any applicable order of the Bankruptcy Court; *provided* that any and all fixed monthly fees, restructuring fees, liability management fees, and/or transaction fees shall be deemed reasonable to the extent provided for in the respective engagement letter or fee letter between the Debtors and any of the foregoing set forth in clauses (a) through (e).

223.   "*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in this Plan and the Restructuring Transactions Memorandum, the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued or executed pursuant to this Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as more fully set forth in Article IV.B of this Plan.

224.   "*Restructuring Transactions Memorandum*" means a document that will set forth a summary of the transaction steps to be carried out to effectuate the Restructuring Transactions in accordance with this Plan.

225.   "*Schedule of Excluded Parties*" means the schedule of Entities based on (a) the determination of the Special Committee based on the outcome of the Independent Investigation and (b) the consent of the Required DIP Term Loan Lenders; *provided* that the Debtors may not add any Trade Vendors or Holders of Go-Forward Vendor Claims to the Schedule of Excluded Parties without the consent of the Committee.

226.   "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that shall vest in the Reorganized Debtors or the Litigation Trust, in accordance with the Litigation Trust Documents, this Plan, and/or the Confirmation Order on the Effective Date that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.  For the avoidance of doubt, the Schedule of Retained Causes of Action shall include (a) the Permitted Litigation Claims and (b) any and all claims and Causes of Action and Avoidance Actions against the Excluded Parties.  For the avoidance of doubt, any Avoidance Actions, Claims, and Causes of Action that are determined to be released by the Special Committee and with the consent of the Required DIP Term Loan Lenders shall not be included on the Schedule of Retained Causes of Action, it being understood that no Avoidance Actions, claims, and Causes of Action against or that could be asserted against

the DIP Secured Parties or any of their Related Parties or the Prepetition Secured Parties or any of their Related Parties, collectively or individually, in any capacity, shall be included on the Schedule of Retained Causes of Action.

227. "*SEC*" means the United States Securities and Exchange Commission.

228. "*Section 510(b) Claim*" means any Claim or Interest against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of Law or contract.

229. "*Secured Claim*" means a Claim that is:  (a) secured by a valid, perfected, and enforceable Lien on collateral in which any of the Debtors has an interest to the extent of the value of the Debtors' interest in such collateral and to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the amount that is subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code; or (c) Allowed pursuant to this Plan, or separate order of the Bankruptcy Court, as a secured claim.

230. "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

231. "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local Law, as now in effect or hereafter amended, together with the rules and regulations promulgated thereunder.

232. "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

233. "*SOFR*" means the Secured Overnight Financing Rate as administered by the Federal Reserve Bank of New York (or a successor administrator).

234. "*Solicitation Materials*" means, collectively, all documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on this Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including the Disclosure Statement.

235. "*Special Committee*" means, collectively, the special committee of independent and disinterested managers and directors of each of the boards of managers and boards of directors, as applicable, of each of the Debtors.

236. "*Specified Contract Claims*" means any claims and Causes of Action arising from potential breaches of contracts by and among (a) any Debtor and/or Non-Debtor Subsidiary and (b) one or more Excluded Parties.

237. "*Sponsor*" means, collectively, (a) SK Titan Holdings LLC, (b) SK Titan Holdings II LLC, (c) any other direct or indirect Holder of Interests in Ascend Parent and APM Disc, and (d) any of their current and former direct and indirect shareholders, Insiders, officers, directors, managers, successors, assigns, joint ventures, and subsidiaries and their current and former Affiliates (except, in each of the forgoing clauses (a) through (d), for the Debtors and the Debtors' direct and indirect Non-Debtor Subsidiaries).

238. "*Standing Motion*" means the *Motion of the Official Committee of Unsecured Creditors for (I) Leave, Derivative Standing, and Authority to Commence and Prosecute Certain Lien Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 673] Filed by the Committee on July 21, 2025.

239. "*Term Loan Adequate Protection Claims*" means the "507(b) Claims" (as defined in the DIP Orders) granted as adequate protection for the benefit of the Term Loan Lenders and the Bridge Lenders.

240. "*Term Loan Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent under the Term Loan Credit Agreement.

241.    "*Term Loan Claims*" means any Secured Claim against any Debtor arising from, or based upon, the Term Loan Documents, *plus* all other obligations related thereto, including any accrued unpaid interest, costs, fees, and indemnities described in the DIP Orders.

242.    "*Term Loan Credit Agreement*" means that certain Credit Agreement, dated as of August 27, 2019, by and among certain of the Debtors party thereto, the guarantors from time to time party thereto, Wilmington Savings Fund Society, FSB, as administrative agent, and each lender from time to time party thereto, as amended by that certain Refinancing Amendment No. 1, dated as of February 11, 2021, that certain LIBOR Transition Amendment No. 2, dated as of September 19, 2022, that certain Amendment No. 3 to Credit Agreement, dated as of March 7, 2025, that certain Amendment No. 4 to Credit Agreement, dated as of March 13, 2025, that certain Agency Resignation, Appointment, Assumption and Amendment Agreement, dated as of March 14, 2025, and that certain Forbearance and Amendment No. 6 to Credit Agreement, dated as of April 1, 2025, as may be further amended, restated, supplemented, or otherwise modified from time to time.

243.    "*Term Loan Deficiency Claim*" means any Claim arising under the Term Loan Credit Agreement that is not a Secured Claim.

244.    "*Term Loan Distribution*" means the recovery afforded to Holders of Term Loan Claims in the form of their Pro Rata share of the Litigation Trust Class C Interests, as set forth in the Litigation Trust Documents.

245.    "*Term Loan Documents*" has the meaning ascribed to the "Prepetition Term Loan Documents" in the DIP Orders.

246.    "*Term Loan Facility*" means that certain term loan facility issued pursuant to the Term Loan Credit Agreement.

247.    "*Term Loan Lenders*" means the lenders from time to time party to the Term Loan Credit Agreement.

248.    "*Trade Vendor*" means any trade vendor that (a) provided ordinary course trade, vendor, or other goods and services to the Debtors within ninety (90) days of the Petition Date or (b) received payment under the Critical Vendor Order or is party to an agreement with one or more of the Debtors pursuant to the Critical Vendor Order.

249.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

250.    "*Unclaimed Distribution*" means any distribution under this Plan on account of an Allowed Claim or Allowed Interest (if applicable) to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within ninety (90) calendar days of receipt after the Effective Date; (b) only with respect to Holders of Allowed Claims, given notice to the Reorganized Debtors or the Distribution Agent, as applicable, of an intent to accept a particular distribution within ninety (90) calendar days of receipt after the Effective Date; (c) validly responded to the Debtors', Reorganized Debtors', or the Distribution Agent's requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

251.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

252.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

253.    "*Voting Deadline*" means the date and time by which the Claims and Noticing Agent must actually receive the ballots in order for such ballots to be counted, as set forth in the Solicitation Materials.

B.      *Rules of Interpretation.*

For the purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (8) subject to the provisions of any contract, charter, bylaw, limited liability company agreements, operating agreements, certificates of incorporation, or other organizational documents or shareholders' agreements, as applicable, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with applicable Law, including the Bankruptcy Code and the Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (15) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (16) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; (17) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors, as applicable, in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (18) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective Person or Entity that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Subject to the requirements of the Restructuring Transactions Memorandum and any other Definitive Document, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the Laws of the State of New York, without giving effect to the principles of conflict of Laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, enforcement, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the

governing Law of such agreement shall control) and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the Laws of the jurisdiction of incorporation or formation of the relevant Debtor or the Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and this Plan, including the Plan Supplement, the Confirmation Order shall control.

H.      *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consent, approval, and consultation rights of the Required DIP ABL Lenders (or requisite DIP ABL Lenders, as applicable), the DIP ABL Agent, and the Required DIP Term Loan Lenders set forth herein or in the DIP Orders, including with respect to the form and substance of this Plan, the Plan Supplement, and all other Definitive Documents (including any amendments, restatements, supplements, or other modifications to such documents and any consents, waivers, or other deviations under or from any such documents), shall be incorporated herein by this reference (including the applicable definitions in <u>Article I</u> hereof) and fully enforceable as if stated in full herein.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, DIP CLAIMS,**
**PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, Restructuring Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> hereof.

A.      *Administrative Claims.*

Unless (i) otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors with the reasonable consent of the Required DIP Term Loan Lenders or the Reorganized Debtors, as applicable, (ii) such Holder has been paid by any Debtors on account of such Allowed Administrative Expense Claim prior to the Effective Date, or (iii) otherwise provided for under this Plan (including in <u>Article II.B</u> with respect to the DIP Claims), each Holder of an Allowed Administrative Claim (other than Holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such

24

Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of this Plan, and except with respect to Administrative Claims that are Professional Claims, Restructuring Expenses, or Disinterested Director Fee Claims, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors or the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Debtors or the Reorganized Debtors, as applicable, or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party no later than the Claims Objection Deadline. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

B.    *DIP Claims.*

1.    DIP ABL Claims.

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the Allowed DIP ABL Claims, (a) any DIP ABL Claims that are not being rolled into the Exit ABL Facility Loans shall be indefeasibly paid in full in Cash, (b) any DIP ABL Claims that are (solely at the election of each applicable DIP ABL Lender) rolled into the Exit ABL Facility Loans or other outstanding obligations thereunder (such as letters of credit, as provided below) shall be refinanced by the Exit ABL Facility by means of a cashless settlement in the amount of the remaining DIP ABL Claims, and (c) accrued interest and fees under the DIP ABL Facility shall be paid in full in Cash on the Effective Date and in any event immediately prior to the effectiveness and the conversion of the DIP ABL Claims into Exit ABL Facility pursuant to the foregoing clause (b) of this Article II.B.1.

With respect to the DIP ABL Claims that are refinanced by means of a cashless settlement into the Exit ABL Facility, (a) the principal amount of all Loans (as defined in the DIP ABL Credit Agreement) shall be, on a dollar-for-dollar basis, automatically converted into, and deemed to be, Exit ABL Facility Loans and (b) to the extent that the applicable issuer of any Letter of Credit (as defined in the DIP ABL Credit Agreement) has elected to roll its DIP ABL Claims into the Exit ABL Facility, then the Letters of Credit issued by such issuer under the DIP ABL Credit Agreement shall constitute letters of credit issued and outstanding under the Exit ABL Facility Documents or otherwise be treated consistent with the Exit ABL Facility Documents, including consistent with the applicable documentary requirements of the letter of credit issuer.

For the avoidance of doubt, upon entry of the Confirmation Order, all DIP ABL Claims shall be deemed to be Allowed for all purposes as Secured Claims and Administrative Claims in an amount equal to (a) the principal amount of such Claims outstanding under the DIP ABL Facility on such date, (b) all interest accrued and unpaid thereon to the date of payment, and (c) any and all accrued and unpaid fees, expenses, and indemnification or other obligations of any kind payable under the DIP ABL Documents. Such DIP ABL Claims shall not be subject to any avoidance, reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection, or any other challenge under any applicable law or regulation by any Entity. Furthermore, all Restructuring Expenses related to the DIP ABL Facility shall be paid in full in Cash in accordance with the terms of the DIP Orders and this Plan, as applicable.

    2.   <u>DIP Term Loan Claims</u>.

On the Effective Date, except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Allowed DIP Term Loan Claim (other than any DIP Term Loan Claims that constitute Restructuring Expenses), each Holder of an Allowed DIP Term Loan Claim shall receive its Pro Rata share of: (a) the DIP Equity Recovery; and (b) the Litigation Trust Class A Interests, as set forth in the Litigation Trust Documents.

Holders of Allowed DIP Term Loan Claims shall also have the option to participate, up to their Pro Rata share of the Debt Rights Offering. To the extent that a Holder of an Allowed DIP Term Loan Claim does not elect to participate in their Pro Rata share of the Debt Rights Offering, any resulting deficit shall be backstopped by the Debt Backstop Parties pursuant to the Debt Rights Offering Documents.

The DIP Term Loan Lenders and each Debt Rights Offering Participant, as applicable, shall be entitled to designate participation in the DIP Equity Recovery and/or the Debt Rights Offering, as applicable, to one or more Lender Fund Affiliates.

For the avoidance of doubt, upon entry of the Confirmation Order, all DIP Term Loan Claims shall be deemed to be Allowed for all purposes as Secured Claims and Administrative Claims in an amount equal to (a) the principal amount of such Claims outstanding under the DIP Term Loan Facility on such date, (b) all interest accrued and unpaid thereon to the date of payment, and (c) any and all accrued and unpaid fees, expenses, premiums, and indemnification or other obligations of any kind payable under the DIP Term Loan Documents. Such DIP Term Loan Claims shall not be subject to any avoidance, reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection, or any other challenge under any applicable law or regulation by any Entity. Furthermore, all Restructuring Expenses related to the DIP Term Loan Facility shall be paid in full in Cash in accordance with the terms of the DIP Orders and this Plan, as applicable.

    3.   <u>Term Loan Adequate Protection Claims</u>.

On the Effective Date, except to the extent that a Holder of an Allowed Term Loan Adequate Protection Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Term Loan Adequate Protection Claim, each Holder of an Allowed Term Loan Adequate Protection Claim shall receive its Pro Rata share of the Litigation Trust Class B Interests; *provided* that the Holders of DIP Term Loan Claims must be paid in full prior to the Holders of Litigation Trust Class B Interests receiving any recovery on account of their Litigation Trust Class B Interests.

*C.*   *Professional Claims.*

    1.   <u>Final Fee Applications and Payment of Professional Claims</u>.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Claims in Cash in the amount that the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, if applicable, as soon as reasonably practicable after such Professional Claim is Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code. The Reorganized Debtors will establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date.

2.   <u>Professional Fee Escrow Account</u>.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors using Cash on hand.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Claims that are Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Allowed Professional Claims shall be paid in Cash to the Professional by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed.  When all such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   <u>Professional Fee Amount</u>.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors, the Ad Hoc Group Advisors, and the ABL Advisors no later than three (3) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment for Filed Professional Claims in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional.

4.   <u>Post-Effective Date Fees and Expenses</u>.

Except as otherwise specifically provided in this Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

D.   *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.   *Payment of Statutory Fees and Reporting to the U.S. Trustee.*

All fees due and payable pursuant to section 1930(a) of title 28 of the United States Code shall be paid by the Debtors, the Reorganized Debtors, or the Distribution Agent (on behalf of the Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  All monthly reports shall be Filed, and all such fees due and payable, shall be paid by the Debtors or the Reorganized Debtors (or the Distribution Agent on behalf of the Reorganized Debtors), as applicable, on the Effective Date.  Following the Effective Date, the Reorganized Debtors (or the Distribution Agent on behalf of the Reorganized Debtors) shall (1) pay such fees as such fees are assessed and come due for each quarter (including any fraction thereof) and (2) File quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee and to File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

27

F.      *Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid) in accordance with, and subject to, as applicable, this Plan and any other fee arrangements, without any requirement to File a fee application with the Bankruptcy Court and without any requirement for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice in summary form (but without the need for itemized time detail and may be redacted) from the applicable Entity entitled to such Restructuring Expenses.   All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.   On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Reorganized Debtors.

After the Effective Date, the Reorganized Debtors shall promptly pay in Cash in full any unpaid Restructuring Expenses within seven (7) calendar days of receiving any such invoice.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation, and making distributions in accordance with the Plan in respect of Claims against, and Interests in, the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, including the Plan Supplement, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to this Plan is as set forth below.  This Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors, except for the Class 8 Interests in Ascend Parent, which shall apply only to Ascend Parent, and the Class 9 Interests in APM Disc, which shall apply only to APM Disc.

The classification of Claims and Interests against the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Term Loan Claims | Impaired | Entitled to Vote |
| Class 4A | 36th Street Financing Agreement Claims | Impaired | Entitled to Vote |
| Class 4B | Ansley Park Financing Agreement Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 4C | Citizens CoGen Financing Agreement Claims | Impaired | Entitled to Vote |
| Class 5A | Go-Forward Vendor Claims | Impaired | Entitled to Vote |
| Class 5B | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| Class 8 | Interests in Ascend Parent | Impaired | Entitled to Vote |
| Class 9 | Interests in APM Disc | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.     *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, as applicable, except to the extent different treatment is agreed to in writing by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's or Interest's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

1.   Class 1 – Other Secured Claims

   (a)     *Classification*:  Class 1 consists of all Other Secured Claims.

   (b)     *Treatment:*  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' (with the reasonable consent of the Required DIP Term Loan Lenders) or the Reorganized Debtors' option:

   (i)     in full and final satisfaction of such Allowed Other Secured Claim, payment in full in Cash of its Allowed Other Secured Claim;

   (ii)     in full and final satisfaction of such Allowed Other Secured Claim, the collateral securing its Allowed Other Secured Claim;

   (iii)     Reinstatement of its Allowed Other Secured Claim; or

   (iv)     such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   (c)     *Voting:*  Claims in Class 1 are Unimpaired under this Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

29

2.   Class 2 – Other Priority Claims

     (a)     *Classification*:  Class 2 consists of all Other Priority Claims.

     (b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim shall receive such treatment consistent with section 1129(a)(9) of the Bankruptcy Code.

     (c)     *Voting*:  Claims in Class 2 are Unimpaired under this Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.   Class 3 – Term Loan Claims

     (a)     *Classification*:  Class 3 consists of all Term Loan Claims.

     (b)     *Treatment*:  In exchange for the full and final satisfaction, settlement, release, and discharge of the Term Loan Claims, each Holder of an Allowed Term Loan Claim shall receive its Pro Rata share of the Term Loan Distribution.

     (c)     *Voting*:  Claims in Class 3 are Impaired under this Plan.  Holders of Allowed Term Loan Claims are entitled to vote to accept or reject this Plan.

4.   Class 4A – 36th Street Financing Agreement Claims

     (a)     *Classification*:  Class 4A consists of all 36th Street Financing Agreement Claims.

     (b)     *Treatment:*  In exchange for the full and final satisfaction, settlement, release, and discharge of the 36th Street Financing Agreement Claims, each Holder of an Allowed 36th Street Financing Agreement Claim shall receive the 36th Street Financing Takeback Debt.

     (c)     *Voting*:  Claims in Class 4A are Impaired under this Plan.  Holders of Allowed 36th Street Financing Agreement Claims are entitled to vote to accept or reject this Plan.

5.   Class 4B – Ansley Park Financing Agreement Claims

     (a)     *Classification*:  Class 4B consists of all Ansley Park Financing Agreement Claims.

     (b)     *Treatment:*  In exchange for the full and final satisfaction, settlement, release, and discharge of the Ansley Park Financing Agreement Claims, each Holder of an Allowed Ansley Park Financing Agreement Claim shall receive the Ansley Park Financing Takeback Debt.

     (c)     *Voting*:  Claims in Class 4B are Impaired under this Plan.  Holders of Allowed Ansley Park Financing Agreement Claims are entitled to vote to accept or reject this Plan.

6. <u>Class 4C – Citizens CoGen Financing Agreement Claims</u>

    (a)    *Classification*:  Class 4C consists of all Citizens CoGen Financing Agreement Claims, which shall be deemed Allowed on the Effective Date.

    (b)    *Treatment:*  In exchange for the full and final satisfaction, settlement, release, and discharge of the Citizens CoGen Financing Agreement Claims, each Holder of an Allowed Citizens CoGen Financing Agreement Claim shall receive the Citizens CoGen Financing Takeback Debt.

    (c)    *Voting*:  Claims in Class 4C are Impaired under this Plan.  Holders of Allowed Citizens CoGen Financing Agreement Claims are entitled to vote to accept or reject this Plan.

7. <u>Class 5A – Go-Forward Vendor Claims</u>

    (a)    *Classification*:  Class 5A consists of all Go-Forward Vendor Claims.

    (b)    *Treatment*:  In exchange for the full and final satisfaction, settlement, release, and discharge of the Go-Forward Vendor Claims, each Holder of an Allowed Go-Forward Vendor Claim shall receive its Pro Rata share of the Go-Forward Vendor Recovery Pool.

    (c)    *Voting*:  Claims in Class 5A are Impaired under this Plan.  Holders of Go-Forward Vendor Claims are entitled to vote to accept or reject this Plan.

8. <u>Class 5B – General Unsecured Claims</u>

    (a)    *Classification*:  Class 5B consists of all General Unsecured Claims (including any Term Loan Deficiency Claim).

    (b)    *Treatment:*  In exchange for the full and final satisfaction, settlement, release, and discharge of the General Unsecured Claims, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claim Distribution; *provided* that, in no event, shall any Excluded Party receive any distribution on account of any Litigation Trust Assets.

    (c)    *Voting*:  Claims in Class 5B are Impaired under this Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject this Plan.

9. <u>Class 6 – Intercompany Claims</u>

    (a)    *Classification*:  Class 6 consists of all Intercompany Claims.

    (b)    *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required DIP Term Loan Lenders) or Reorganized Debtors in accordance with the Restructuring Transactions Memorandum, either:

        (i)    Reinstated; or

        (ii)    set off, settled, discharged, contributed, canceled, released without any distribution on account of such Intercompany Claim, or otherwise addressed at the option of the applicable Debtor (with the consent of the Required DIP Term Loan Lenders) or Reorganized Debtors in accordance with the Restructuring Transactions Memorandum.

The Plan and the distributions contemplated thereby constitute a global settlement of any and all Intercompany Claims by and between any of the Debtors that may exist as of the Effective Date.

(c)     *Voting*:  Claims in Class 6 are either Unimpaired, in which case the Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and not receiving any distribution under this Plan, in which case the Holders of such Allowed Intercompany Claims in Class 6 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

10.  Class 7 – Intercompany Interests

(a)     *Classification*:  Class 7 consists of all Intercompany Interests.

(b)     *Treatment*:  Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor (with the consent of the Required DIP Term Loan Lenders) or Reorganized Debtor in accordance with the Restructuring Transactions Memorandum, either:

(i)      Reinstated; or

(ii)     set off, settled, discharged, contributed, canceled, released without any distribution on account of such Intercompany Interest, or otherwise addressed at the option of the applicable Debtor (with the consent of the Required DIP Term Loan Lenders) or Reorganized Debtors in accordance with the Restructuring Transactions Memorandum.

(c)     *Voting*:  Interests in Class 7 are either Unimpaired, in which case the Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and not receiving any distribution under this Plan, in which case the Holders of such Allowed Intercompany Interests in Class 7 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

11.  Class 8 – Interests in Ascend Parent

(a)     *Classification*:  Class 8 consists of all Interests in Ascend Parent.

(b)     *Treatment*:  In exchange for the full and final satisfaction, settlement, release, and discharge of the Allowed Interests in Ascend Parent, each Holder of an Allowed Interest in Ascend Parent shall receive its Pro Rata share of the Ascend Interest Distribution, which shall come from amounts that Holders of Allowed DIP Term Loan Claims would otherwise be entitled to receive under the Plan.

(c)     *Voting*:  Interests in Class 8 are Impaired under this Plan.  Holder of Interests in Ascend Parent are entitled to vote to accept or reject this Plan.

12. Class 9 – Interests in APM Disc

    (a)    *Classification*:  Class 9 consists of all Interests in APM Disc.

    (b)    *Treatment*:  Each Interest in APM Disc shall be canceled, released, discharged, and extinguished without any distribution and will be of no further force or effect, and each Holder of an Interest in APM Disc shall not receive or retain any distribution, property, or other value on account of its Interest in APM Disc.

    (c)    *Voting*:  Interests in Class 9 are Impaired under this Plan.  Holder of Interests in APM Disc are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

13. Class 10 – Section 510(b) Claims

    (a)    *Classification*:  Class 10 consists of all Section 510(b) Claims.

    (b)    *Treatment*:  All Section 510(b) Claims shall be canceled, released, discharged, and extinguished without any distribution and will be of no further force or effect, and each Holder of a Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of its Section 510(b) Claim.

    (c)    *Voting*:  Claims in Class 10 are Impaired under this Plan.  Holders (if any) of Section 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders (if any) are not entitled to vote to accept or reject this Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan or the Plan Supplement shall affect, as applicable, the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject this Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted this Plan.

F.    *Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders of New Interests and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by

the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to Article III.B of this Plan.  The Debtors may seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify this Plan in accordance with Article X hereof to the extent, if applicable, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests or reclassifying Claims to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510(b) of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to reclassify any Allowed Claim in accordance with any contractual, legal, or equitable subordination rights relating thereto.  Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to this Plan.

J.      *Claims of the Sponsors.*

For the avoidance of doubt, any Allowed Claims held by any Sponsor (including any General Unsecured Claims related to the rejection of any Executory Contracts or other agreements that are not vesting in the Reorganized Debtors) shall be Class 5B General Unsecured Claims; *provided* that no such Allowed Claim shall be entitled to receive any distribution, property, or other value under this Plan on account of such Claim or the Litigation Trust Class D Interests.  This Plan shall be deemed to be an objection to any Proof of Claim filed by any Sponsor.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan, including the Committee Settlement (to the extent such controversies have not already been compromised and settled in accordance with the terms and conditions of the DIP Orders), including (1) any challenge to the amount, validity, perfection, enforceability, priority, or extent of the DIP Term Loan Claims, the DIP ABL Claims, the Term Loan Claims, the Asset Financing Agreement Claims, the Allowed Go-Forward Vendor Claims, or the Allowed General Unsecured Claims and (2) any Claim to avoid, subordinate, or disallow any DIP Term Loan Claims, DIP ABL Claims, Term Loan Claims, Asset Financing Agreement Claims, Allowed Go-Forward Vendor Claims, or Allowed General Unsecured Claims, whether under any provision of chapter 5 of the Bankruptcy Code on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  This Plan shall be deemed a motion to approve the good faith

34

compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to <u>Article VI</u> hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be, and shall be, final.

B.    *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors, subject to all applicable consent rights and in accordance with the Definitive Documents, shall consummate the Restructuring Transactions and shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions and the transactions described in, approved by, contemplated by, or necessary to effect this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including:  (1) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of this Plan and the Plan Supplement and that satisfy the requirements of applicable Law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms for which the applicable parties agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable Law; (4) the execution, delivery, and implementation of the Exit ABL Facility and any filings and documents related thereto; (5) the issuance of the New Interests (except for certain specified New Interests to be issued after the Effective Date in accordance with the Plan, including certain New Interests issued as a result of the Exit Term Loan Conversion (to the extent applicable), the Exit Term Loan Additional Equity Commitment (to the extent applicable), and the Management Incentive Plan); (6) the implementation of the Debt Rights Offering pursuant to the Debt Rights Offering Procedures and the Debt Rights Offering Subscription Form; (7) the execution, delivery, and implementation of the Exit Term Loan Facility and any filings and documents related thereto; (8) the adoption of the Management Incentive Plan and the issuance of any New Interests or other Interests contemplated to be issued under the Management Incentive Plan, if applicable; (9) the establishment of the Litigation Trust and the execution and delivery of the Litigation Trust Documents; (10) the implementation of the Committee Settlement; (11) the issuance of the Asset Financing Takeback Debt and entry into the Asset Financing Takeback Debt Documents; (12) the execution and delivery of the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, obligations to be incurred, and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (13) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Transactions Memorandum; and (14) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with this Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all of the foregoing and all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including any and all actions required to be taken under applicable non-bankruptcy Law.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions.

C.    *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt the New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan. Cash payments to be made pursuant to this Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Debtors and the Reorganized Debtors, in compliance with the applicable Definitive Documents, will be entitled

to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under this Plan, subject to the limitations set forth in the Exit ABL Facility Documents and the Exit Term Loan Documents.

D.      *Committee Settlement.*

The Debtors, the Required DIP Term Loan Lenders, the DIP ABL Agent, the Required DIP ABL Lenders, and the Committee agreed to the terms of the Committee Settlement to be implemented through the Plan and to be approved by the Bankruptcy Court as a good faith compromise and settlement of Claims and controversies among the Debtors, the DIP Lenders, the Bridge Lenders, the Term Loan Lenders, the ABL Lenders, the Agents, and the Committee. The compromises and settlements included in the Committee Settlement are each (a) integrated with and dependent on all other compromises and settlements contemplated in connection with the Plan and (b) necessary and integral to this Plan and the success of these Chapter 11 Cases. The principal terms of the Committee Settlement are reflected below.

1.    Consideration.

Holders of Class 5A Go-Forward Vendor Claims shall receive the Go-Forward Vendor Recovery Pool, as set forth in Article III of the Plan in full and final satisfaction, settlement, release, and discharge of their respective Class 5A Go-Forward Vendor Claims.

2.    Committee Advisors' Fees.

The Committee Advisors shall be subject to the Committee Accrued Fee Cap, the Committee Go-Forward Fee Cap, and the Committee Plan Support Carve-Out. All Allowed reasonable and documented fees and expenses incurred by the Committee Advisors shall be indefeasibly paid in full up to the applicable fee caps. For the avoidance of doubt, if a modified or amended Plan is Filed after the date of Filing of the Amended Plan in a manner that is inconsistent with the Committee Settlement (unless otherwise consented to by the Committee Advisors), any fees and expenses incurred by the Committee Advisors in direct response to such modifications or amendments shall not be subject to the Committee Accrued Fee Cap, the Committee Go-Forward Fee Cap, or the Committee Plan Support Carve-Out.

3.    Claims Ombudsman.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and Reorganized Debtors, as applicable, shall appoint a Claims Ombudsman, who shall be selected by the Committee after consultation with the Required DIP Term Loan Lenders and the Debtors or the Reorganized Debtors, as applicable. The Claims Ombudsman's rights, powers, and duties shall be set forth in the Claims Ombudsman Agreement and shall include: (a) certain rights with respect to the reconciliation, allowance, and settlement of Go-Forward Vendor Claims by or on behalf of (and in consultation with) the Reorganized Debtors; (b) rights and powers necessary to ensure that distributions to the Holders of Go-Forward Vendor Claims are consistent with the terms of the Committee Settlement and Article III of this Plan; (c) such other matters as may be agreed upon among the Debtors, the Reorganized Debtors, the Committee, and the Required DIP Term Loan Lenders; and (d) standing to take all actions and appear before the Bankruptcy Court and other courts of competent jurisdiction to seek any relief necessary and appropriate to accomplish the foregoing rights, powers, and duties.

All reasonable and documented fees and expenses incurred by, or on behalf of, the Claims Ombudsman (together with any fees charged by the Claims Ombudsman him or herself) shall be subject to, and may not exceed, the Claims Ombudsman Fee Cap. The Claims Ombudsman shall be a fiduciary to the Holders of the Go-Forward Vendor Claims.

The Claims Ombudsman shall not interfere with or have the authority to interfere with the Reorganized Debtors' operations or the affairs of the Litigation Trust after the Effective Date; *provided* that the Reorganized Debtors shall cooperate in good faith with the Claims Ombudsman in connection with the Claims Ombudsman's rights, powers, and duties.

36

4.   Other Committee Settlement Terms.

In addition to the foregoing terms set forth in this Article IV.D, the Debtors, the Required DIP Term Loan Lenders, and the Committee have agreed to the following additional terms pursuant to the Committee Settlement:

(a)   the Debtors shall assume and maintain the Pension Plan;

(b)   on the Effective Date, the Debtors shall be deemed to waive and release any and all Avoidance Actions held by the Debtors, other than any Avoidance Actions against the Excluded Parties.  For the avoidance of doubt, Avoidance Actions against the Excluded Parties are Permitted Litigation Claims that shall vest in the Litigation Trust;

(c)   the Debtors shall provide a Go-Forward Vendor Claim Schedule to counsel to the Committee prior to the date of Filing of the Amended Plan and shall File such Go-Forward Vendor Claim Schedule no later than the deadline for Filing the Plan Supplement;

(d)   upon the Filing of the Amended Plan, the Committee shall immediately withdraw the Standing Motion, which may be re-Filed solely in the event that the Effective Date does not occur;

(e)   any Holders of Personal Injury Claims shall be entitled to prosecute their Personal Injury Claims to judgment or settlement and to satisfy any award or resolution that the Holders of Personal Injury Claims may obtain against the PI Insurance Policies; *provided* that the Holders of Personal Injury Claims shall only be entitled to collect the proceeds, if any, of any such judgment or settlement from a PI Insurance Policy and not from the Debtors, their Estates, or the Reorganized Debtors; *provided*, *further*, that in no event shall the Debtors, their Estates, or the Reorganized Debtors be required to bear any costs or expenses or take any actions related to the prosecution, judgment, settlement, or satisfaction of the Personal Injury Claims against the PI Insurance Policies; and

(f)   nothing in this Plan, the Confirmation Order, or the Plan Supplement shall be deemed to affect, diminish, or impair any Person's or Entity's legal and equitable defenses and rights to setoffs and/or recoupment, or other legal defenses unless specifically addressed and agreed to by such Person or Entity, the Debtors, and the Required DIP Term Loan Lenders. All such rights and defenses are expressly preserved pursuant to the Committee Settlement.

E.   *Litigation Trust.*

On the Effective Date, the Debtors shall take all necessary steps to establish the Litigation Trust as one or more standalone trusts and/or sub-trusts in accordance with this Plan and the Litigation Trust Documents, and the Debtors and the Litigation Trustee shall enter into the Litigation Trust Documents.  Notwithstanding anything to the contrary herein, the Debtors and the Reorganized Debtors, as applicable, shall transfer the Litigation Trust Assets to the Litigation Trust, which, except to the extent the Debtors or the Reorganized Debtors determine otherwise in accordance with the Restructuring Transactions Memorandum to treat all or any portion of the Litigation Trust as a "qualified settlement fund," "disputed ownership fund," "widely held fixed investment trust," and/or otherwise, shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations, and such treatment is assumed with respect to the following discussion.  For the avoidance of doubt, in the event of any transfer of the Litigation Trust Assets to the Litigation Trust, the provisions set forth herein shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Causes of Action transferred to the Litigation Trust. The Litigation Trust shall be established for the purposes of liquidating the Litigation Trust Assets, reconciling certain Claims asserted against the Debtors and the Reorganized Debtors, if applicable, and distributing the proceeds thereof in accordance with this Plan and the Litigation Trust Documents, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust and the purposes described in this Plan.  Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the Debtors and the Reorganized Debtors will have no reversionary or further interest in, or with

respect to, the Litigation Trust Assets. Beneficial interests in the Litigation Trust shall be passive and shall not have voting, consent, or other shareholder-like control rights with respect to the Litigation Trust. The beneficial interests in the Litigation Trust will not be certificated and may not be transferred, sold, pledged, or otherwise disposed of, or offered for sale. To the extent beneficial interests in the Litigation Trust are deemed to be "Securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests. Prior to any transfer of the Litigation Trust Assets to the Litigation Trust, the Required DIP Term Loan Lenders may designate a trustee(s) for the Litigation Trust for the purposes of administering the Litigation Trust, as more fully described in the Litigation Trust Documents. The reasonable costs and expenses of the trustee(s) shall be paid from the Litigation Trust.

    1.   <u>Transfer of Permitted Litigation Claims</u>.

In furtherance of the transfer of the Litigation Trust Assets to the Litigation Trust and in accordance with the Litigation Trust Agreement, on the Effective Date, the Debtors and/or the Reorganized Debtors shall be deemed to have irrevocably vested in, transferred, granted, and assigned to the Litigation Trust, and the Litigation Trust shall receive and accept, any and all of the Permitted Litigation Claims. The foregoing transfer shall be: (a) free and clear of any and all actual or alleged Liens or encumbrances of any nature whatsoever (other than the Permitted Litigation Claims); (b) made to the maximum extent possible under applicable Law; (c) absolute and without requirement of any further action by the Debtors, the Litigation Trust, the Bankruptcy Court, or any other Person; and (d) governed by, and construed in accordance with, the Bankruptcy Code and the other applicable laws governing such Permitted Litigation Claims.

Notwithstanding the foregoing, the Litigation Trustee shall have the power to assign and/or transfer the Permitted Litigation Claims in accordance with the Litigation Trust Documents, subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust, as further described in the Litigation Trust Documents, to the extent permitted by applicable Law.

The Litigation Trustee, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Permitted Litigation Claims in accordance with this Plan and the Litigation Trust Agreement. Subject to the terms of this Plan and the Litigation Trust Agreement, the Litigation Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Permitted Litigation Claims, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

    2.   <u>Vesting of the Litigation Trust Assets in the Litigation Trust</u>.

The corpus of the Litigation Trust shall consist of the Litigation Trust Assets. On the Effective Date, pursuant to this Plan and in accordance with the Litigation Trust Documents, all rights, title, and interests in and to the Litigation Trust Assets shall be irrevocably transferred to the Litigation Trust. In accordance with section 1141 of the Bankruptcy Code, the Litigation Trust shall have no liability for, and the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of, any and all actual or alleged pre-petition and post-petition Claims, Causes of Action, Interests, Liens, encumbrances, or liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates, or their property (including, without limitation, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in this Plan and the Litigation Trust Documents. From and after the Effective Date, all proceeds of the Litigation Trust Assets shall be paid to the Litigation Trust to be applied in accordance with this Plan, including the treatment of claims set forth in <u>Article II</u> and <u>Article III</u> hereof, and the Litigation Trust Documents. Notwithstanding the foregoing, the Litigation Trustee shall have the power to assign and/or transfer Permitted Litigation Claims, subject to reasonable restrictions so as not to interfere with, increase costs to, or impede the efforts of, the Litigation Trust, as further described in the Litigation Trust Documents. For the avoidance of doubt, any insurance proceeds paid pursuant to an insurance claim asserted by or on behalf of the Litigation Trust must be paid into the Litigation Trust.

    3.   <u>Institution and Maintenance of Legal and Other Proceedings</u>.

On the Effective Date (and subject to the establishment of the Litigation Trust): (a) the Litigation Trust shall be empowered, and have the sole authority, to initiate, prosecute, defend, and resolve (as applicable) all legal actions and other proceedings related to any asset, liability, or responsibility of the Litigation Trust, including the Permitted Litigation Claims that are transferred to the Litigation Trust by operation of this Plan, subject to the terms and conditions of this Plan and the Litigation Trust Documents; and (b) subject to applicable Law and contractual rights, the Litigation Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the date upon which the Litigation Trust is established arising from, or associated with, any legal action or other proceeding brought pursuant to the foregoing.

4.   Litigation Trust Distributions.

The Litigation Trust shall make distributions in accordance with this Plan, the Confirmation Order, and the Litigation Trust Documents.  For the avoidance of doubt and notwithstanding anything to the contrary in this Plan, the Holders of Litigation Trust Interests shall receive distributions on account of such interests in accordance with the following priority waterfall:  (a) first, repayment of all funds used to finance the Litigation Trust Reserve until such amounts sufficient to fund the Litigation Trust are indefeasibly repaid in full; (b) any excess proceeds of the Litigation Trust Assets that are not distributed pursuant to the foregoing clause (a) shall be distributed to the Holders of DIP Term Loan Claims on account of their Litigation Trust Class A Interests until the DIP Term Loan Claims receive a distribution that is equivalent to their full Claim amount, marshalling last against the proceeds of the Specified Contract Claims; (c) any excess proceeds of the Litigation Trust Assets that are not distributed pursuant to the clauses (a) and (b) shall be distributed to the Holders of Term Loan Adequate Protection Claims on account of their Litigation Trust Class B Interests until the Term Loan Adequate Protection Claims receive a distribution that is equivalent to their full Claim amount, marshalling last against the proceeds of the Specified Contract Claims; (d) any excess proceeds of the Litigation Trust Assets that are Specified Contract Claims shall be distributed to the Holders of Term Loan Claims on account of their Litigation Trust Class C Interests until the Term Loan Claims receive a distribution that is equivalent to their full Claim amount; and (e) any excess proceeds of the Litigation Trust Assets that are not distributed pursuant to the foregoing clauses (a), (b), (c), and (d) shall be distributed to the Holders of General Unsecured Claims on account of their Litigation Trust Class D Interests until the General Unsecured Claims receive a distribution that is equivalent to their full Claim amount.

5.   Litigation Trust Tax Treatment.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Litigation Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and the Litigation Trustee will take this position on the Litigation Trust's tax return accordingly.  The Litigation Trust Beneficiaries shall be treated as the grantors of the Litigation Trust and as the deemed owners of the Litigation Trust Assets.  For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Litigation Trust Beneficiaries and, to the extent that any Litigation Trust Assets are allocable to Disputed Claims, to the applicable reserve for Disputed Claims, and (b) a second-step transfer by such Litigation Trust Beneficiaries and, to the extent relevant with respect to any applicable reserve for Disputed Claims, to the Litigation Trust.  As a result, the transfer of the Litigation Trust Assets to the Litigation Trust should be a taxable transaction, and the Debtors should recognize gain or loss equal to the difference between the tax basis and fair value of such assets.  The foregoing treatment shall also apply, to the extent permitted by applicable Law, for applicable U.S. state and local income tax purposes.  The Litigation Trustee shall file or cause to be filed returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) to the extent permitted by applicable Law.  The Litigation Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Litigation Trust that are required by any Governmental Unit.

As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.  The Litigation Trust shall, in no event, be dissolved later than five (5) years from the creation of such Litigation Trust unless the Bankruptcy Court, upon motion within the six- (6) month period prior to the fifth anniversary (or within the six- (6) month period prior to the end of

an extension period), determines that a fixed period extension (not to exceed five (5) years with a private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

6.    Disputed Ownership Fund, Qualified Settlement Fund, or Widely Held Fixed Investment Trust Treatment.

To the extent the Debtors or the Reorganized Debtors, as applicable, determine in their reasonable discretion to treat all or any portion of the Litigation Trust as a "disputed ownership fund" under section 1.468B-9 of the Treasury Regulations or a "qualified settlement fund" under section 1.468B-1 of the Treasury Regulations, any appropriate elections with respect thereto shall be made, and such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return may be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

7.    Litigation Trust Reserve.

On the Effective Date, the Debtors and/or Reorganized Debtors shall establish the Litigation Trust Reserve as specified in the Litigation Trust Agreement. The Litigation Trust Reserve shall be segregated from all other Litigation Trust Assets and shall be maintained in trust by the Litigation Trust.

8.    Cooperation of the Reorganized Debtors.

On or as soon as reasonably practicable following the Effective Date, at the sole cost of the Reorganized Debtors and pursuant to the Litigation Trust Documents: (a) to the extent consistent with applicable Law, the Reorganized Debtors shall use commercially reasonable efforts to deliver or cause to be delivered to the Litigation Trust any and all books and records and all other documents and communications, or copies of the same that were produced by any party (subject to receiving consent or other legal authorization consistent with the terms of the *Confidentiality Agreement and Stipulated Protective Order* [Docket No. 430]), including the Debtors, in discovery in the Chapter 11 Cases and relate to the Permitted Litigation Claims or as otherwise consented to by counsel to the Reorganized Debtors (such consent not to be unreasonably withheld); *provided* that any such books, records, documents, and communications so shared shall continue to be protected by the applicable Privileges consistent with Article IV.E.9 of this Plan; (b) the Reorganized Debtors shall use commercially reasonable efforts to provide reasonable and continuing access to such officers, directors, and employees of the Reorganized Debtors and their agents, advisors, attorneys, accountants, and any other professionals with knowledge of matters relevant to the Permitted Litigation Claims and Litigation Trust Assets (including any former officers, directors, employees, agents, advisors, attorneys, accountants, and other professionals who owe a continuing duty of cooperation to the Reorganized Debtors); and (c) the Reorganized Debtors shall promptly following receipt of a reasonable request from the Litigation Trust use commercially reasonable efforts to (i) take, or cause to be taken, all such reasonable further actions, and execute and/or deliver all such additional instruments, agreements, or documents, as the Litigation Trust may request in order to evidence or effectuate the transfer of the Permitted Litigation Claims, Litigation Trust Assets, and the Privileges to the Litigation Trust, and (ii) reasonably cooperate with the Litigation Trust in the prosecution of the Permitted Litigation Claims and otherwise liquidating the Litigation Trust Assets and fulfilling its duties thereunder. For the avoidance of doubt, any transfer of such records and documents to the Litigation Trust shall not waive any applicable Privileges. Any litigation hold in place by the Debtors prior to the Petition Date shall remain in effect following the Effective Date unless otherwise agreed to by the Reorganized Debtors and the Litigation Trustee.

If the Litigation Trust requires documents or information from the Reorganized Debtors, such requests shall be made by the Litigation Trust to the Ascend Company Representative. The Ascend Company Representative will use commercially reasonable efforts to respond to such information requests, including providing reasonable access to employees, as appropriate, to facilitate an efficient litigation recovery process. Any dispute regarding access set forth herein shall be resolved in accordance with the Litigation Trust Documents or by the Bankruptcy Court.

9.   Cooperation of the Disinterested Directors.

The Disinterested Directors shall produce to the Litigation Trust, on or shortly after the Effective Date:  (a) all interview memoranda regarding the interviews conducted in the Independent Investigation; (b) a list of all interviews requested in the Independent Investigation; and (c) all documents produced to the Disinterested Directors by the Debtors and/or any third parties.  The Disinterested Directors' agreement to produce these materials does not constitute a waiver of any Privileges or work product protections that might exist and may not be used by any Person or Entity to argue that such a waiver has occurred.  The Disinterested Directors will discuss in good faith whether to produce any additional factual documentation or information related to the Independent Investigation, which shall not include any legal analysis, privileged communications, legal memoranda, or research.  For the avoidance of doubt, all Privileges, other than the Disinterested Directors' Privileges, shall be shared with, and shall vest in, the Litigation Trust.

Notwithstanding the Debtors, the Reorganized Debtors, or any party-in-interest providing any privileged information to the Litigation Trust, such privileged information shall be without waiver in recognition of the joint and/or successor interest in investigating and prosecuting the Permitted Litigation Claims and Litigation Trust Assets and shall remain privileged.

For the avoidance of doubt, the actions taken by the Disinterested Directors, the Debtors, and the Reorganized Debtors in connection with the Plan or the formation of the Litigation Trust shall not be (or deemed to be) a waiver of any Privilege of any of the Disinterested Directors, the Debtors, and the Reorganized Debtors, as applicable, including any Privilege attaching to any document or communications (whether written or oral) transferred to the Litigation Trust.

10.   Privilege.

Except as expressly stated otherwise below, the Litigation Trust shall stand in the same position as the Debtors and their Estates (solely with regard to the Permitted Litigation Claims and Litigation Trust Assets) as to all Privileges (other than the Disinterested Directors' Privilege), shall have all of the rights of the Debtors and their Estates (solely with regard to the Permitted Litigation Claims and the Litigation Trust Assets) to preserve and assert any such Privileges (other than the Disinterested Directors' Privilege) as of the Effective Date; *provided* that, notwithstanding the foregoing, the Privileges of the Disinterested Directors are hereby recognized and shall remain in full force and effect and shall not be waived, nor shall any such privileged documents be turned over to any Person or Entity without the consent of each of the Disinterested Directors.

11.   Fiduciary Duties.

Pursuant to the Litigation Trust Documents, the Litigation Trustee shall act in a fiduciary capacity on behalf of all Litigation Trust Beneficiaries.

12.   The Litigation Trustee.

The Litigation Trust shall be administered by the Litigation Trustee.  The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include, without limitation, the power to:  (a) hire and compensate professionals and advisors selected by the Litigation Trustee with the consent of the Required DIP Term Loan Lenders (but without application to or order of the Bankruptcy Court); (b) investigate, prosecute, and settle Permitted Litigation Claims, subject to any applicable consent rights; and (c) make distributions, in each case in accordance with the Plan, the Confirmation Order, and the Litigation Trust Agreement.  The compensation of the Litigation Trustee shall be governed by the Litigation Trust Agreement.

*F.*     *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under this Plan with: (1) Cash on hand, including Cash from operations, the DIP Facilities, and the proceeds of the Debt Rights Offering; (2) the Debt Subscription Rights; (3) the New Interests; (4) the Exit ABL Facility; (5) the Exit Term Loan Facility; (6) the Asset Financing Takeback Debt; and (7) the Litigation Trust Interests.

1.     Issuance of the New Interests.

The issuance of the New Interests, including the DIP Equity Recovery, the Ascend Interest Distribution, and any New Interests issued as a result of the Exit Term Loan Additional Equity Commitment (to the extent applicable), the Exit Term Loan Conversion (to the extent applicable), or any options or other equity awards, if any, reserved for (or as a result of) the Management Incentive Plan by the Reorganized Debtors (as set forth in the Restructuring Transactions Memorandum) shall be authorized without the need for any further corporate action or without any further action by Holders of Claims or Interests. Reorganized Ascend shall be authorized to issue a certain number of shares of New Interests as required under this Plan and pursuant to the New Organizational Documents.

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to this Plan, including the New Interests. All of the shares of New Interests issued or authorized to be issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Interests shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms, and each such Entity will be bound thereby in all respects.

All New Interests issued under this Plan (other than any New Interests issued pursuant to the Exit Term Loan Additional Equity Commitment (to the extent applicable) or the Exit Term Loan Conversion (to the extent applicable) by the Reorganized Debtors (or any Securities that may be issued pursuant to the Debt Rights Offering) or any New Interests issued pursuant to the Management Incentive Plan) will be exempt from, among other things, the registration and prospectus delivery requirements under the Securities Act or any similar federal, state, or local Laws in reliance upon section 1145 of the Bankruptcy Code to the maximum extent permitted and applicable and, to the extent that reliance on such section is either not permitted or not applicable, the exemption set forth in section 4(a)(2) of the Securities Act and/or Regulation D or Regulation S promulgated thereunder (or another applicable exemption from the registration requirements of the Securities Act). All New Interests issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D or Regulation S promulgated thereunder (or other similar exemption from registration) will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Securities issued in reliance upon section 1145 of the Bankruptcy Code, to the fullest extent permitted and available, are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable federal Securities Law or state Securities Law requiring registration prior to the offering, issuance, distribution, or sale of Securities (except with respect to a Person that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code). Except as otherwise provided in this Plan or the governing certificates or instruments (including the New Organizational Documents), any and all such Securities so issued under this Plan (a) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) will be freely tradeable and transferable under the Securities Act by any Holder thereof that, at the time of transfer, (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act and (ii) has not been such an "affiliate" of the Reorganized Debtors within ninety (90) days of such transfer of the Reorganized Debtors, subject to (A) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 1145(b) of the Bankruptcy Code, (B) compliance with applicable Securities Laws, including any rules and regulations of the SEC or U.S., state, or local Securities Laws that are applicable (if any) at the time of any future transfer of such Securities or instruments, and (C) any restrictions in the New Organizational Documents. The issuance of the New

Interests or any other Securities shall not constitute an invitation or offer to sell, or the solicitation of an invitation or offer to buy, any Securities in contravention of any applicable Law in any jurisdiction. No action has been taken, or will be taken, in any jurisdiction that would permit a public offering of any of the New Interests (other than Securities issued pursuant to section 1145 of the Bankruptcy Code) in any jurisdiction where such action for that purpose is required.

Persons who acquire the New Interests pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D or Regulation S promulgated thereunder (or other similar exemption from registration) will hold "restricted securities." Such Persons include Holders of any New Interests (or other Securities) issued pursuant to the Debt Rights Offering, including the Exit Term Loan Additional Equity Commitment (to the extent applicable), the Exit Term Loan Conversion (to the extent applicable), and/or the Management Incentive Plan who receive New Interests of Reorganized Ascend. Resales of such restricted Securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable Law. Subject to any restrictions in the New Organizational Documents and any other applicable Securities Laws, Holders of "restricted securities" would, however, be permitted to resell New Interests without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act (if available) or any other exemption from registration under the Securities Act, or if such Securities are registered with the SEC.

The Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order to any Entity (including DTC and any transfer agent for the New Interests) with respect to the treatment of the New Interests to be issued under this Plan under applicable Securities Laws. Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Interests through the facilities of DTC, DTC shall be required to accept and conclusively rely upon this Plan and Confirmation Order in lieu of a legal opinion regarding whether the Securities to be issued under this Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in this Plan, no Entity (including, for the avoidance of doubt, DTC or any transfer agent for Securities) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the Securities to be issued under this Plan are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services (to the extent applicable).

All of the foregoing documents shall be binding on all Entities receiving, and all Holders of, the New Interests (and their respective successors and assigns), whether such New Interests (including any New Interests issued as a result of the Ascend Interest Distribution or the Debt Rights Offering (including the Exit Term Loan Additional Equity Commitment (to the extent applicable), the Exit Term Loan Conversion (to the extent applicable), or any other Securities) are received or to be received on or after the Effective Date and regardless of whether such Entity executes or delivers a signature page to any of the foregoing documents. Acceptance of New Interests (or any other Securities) pursuant to this Plan, the Ascend Interest Distribution, the Exit Term Loan Additional Equity Commitment, or the Exit Term Loan Conversion shall be deemed to constitute an agreement to be bound by, without the need for execution by such Holder of New Interests or such other Securities, the New Organizational Documents (including the New Equityholders Documents and any documents related thereto and as may be amended from time to time in accordance with the terms thereof).

2. <u>Debt Rights Offering</u>.

The Debtors will conduct the Debt Rights Offering, and, unless determined otherwise by the Debtors and the Required DIP Term Loan Lenders, it is expected that the Debt Rights Offering will commence as soon as reasonably practicable after the entry of the Disclosure Statement Order. Pursuant to this Plan and the Debt Rights Offering Documents, the Debtors or the Reorganized Debtors, as applicable, will allow for the exercise of the Debt Subscription Rights on or prior to the Effective Date in an aggregate amount equal to the Debt Rights Offering Amount. On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will enter into the Exit Term Loan Facility in accordance with the Debt Rights Offering Documents and the Debt Rights Offering Participants will fund the Exit Term Loan Facility as set forth below.

The Debt Rights Offering shall be open to all Debt Rights Offering Eligible Offerees, and the Debt Rights Offering Eligible Offerees shall be entitled to participate in the Debt Rights Offering up to a maximum amount of each such Debt Rights Offering Eligible Offeree's share of the Debt Subscription Rights as set forth in the Debt Rights

Offering Documents.  Each Debt Rights Offering Eligible Offeree may exercise either all or none of its Debt Subscription Rights.  Except as otherwise provided herein or in the Debt Rights Offering Documents, the Debt Subscription Rights are not separately transferrable, exercisable, or detachable from the DIP Term Loan Claims and may only be transferred together with the DIP Term Loan Claims.  To the extent the Debt Subscription Rights are deemed to be "Securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state Securities Laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code (or another exemption from the federal, state, or local Securities Law with respect to the offering, distribution, and issuance of Securities) would apply to the offering, issuance, and distribution of such Debt Subscription Rights.  For the avoidance of doubt, participations and/or loans in the Exit Term Loan Facility shall not be Securities, and the Reorganized Debtors need not provide any further evidence (other than this Plan or the Confirmation Order) to any Entity with respect to the treatment of the Debt Subscription Rights or the participations and/or loans to be issued pursuant to this Plan under any applicable U.S., state Securities, or local Securities Laws.

In accordance with the Debt Rights Offering Documents, the Debt Backstop Parties have committed to fully backstop, severally and not jointly, the Debt Rights Offering Amount and to fund the Exit Term Loan Facility.  Each Debt Backstop Party shall fund its commitment amount of the Exit Term Loan Facility.  Each Debt Rights Offering Eligible Offeree may elect to participate for its Pro Rata share of the Exit Term Loan Facility, and once elected, such Debt Rights Offering Eligible Offeree shall be committed to fund such amount as a Debt Rights Offering Participant in accordance with the Debt Rights Offering Documents.  For the avoidance of doubt, each Debt Backstop Party shall fully subscribe for its respective Pro Rata share of the Debt Rights Offering in its capacity as a Debt Rights Offering Participant.  Upon exercise of the Debt Subscription Rights pursuant to the terms of the Debt Rights Offering Documents, the Reorganized Debtors shall be authorized to enter into the Exit Term Loan Facility and consummate the Debt Rights Offering, including any later issuance of New Interests pursuant to the Exit Term Loan Additional Equity Commitment or the Exit Term Loan Conversion, as may be applicable.

Participation in the Debt Rights Offering shall be deemed to constitute an agreement to be bound by, without the need for execution by such Debt Rights Offering Participant, the Exit Term Loan Documents (including any documents related thereto and as may be amended from time to time in accordance with the terms thereof).  All of the foregoing documents shall be binding on all Entities receiving, and all Holders of, the Exit Term Loan Facility (and their respective successors and assigns), whether such loans under the Exit Term Loan Facility are received or to be received on or after the Effective Date and regardless of whether such Entity executes or delivers a signature page to any of the foregoing documents.

The terms of the Debt Rights Offering shall be set forth in summary form in the Debt Rights Offering Documents and in definitive form through the Exit Term Loan Documents and the Debt Rights Offering Documents, and in any event, shall include the following terms:

> (a)   Offering Size:  the Debt Rights Offering shall be equal to the Debt Rights Offering Amount;

> (b)   Use of Proceeds:  the proceeds of the Debt Rights Offering shall be used to fund the costs of emergence and the Reorganized Debtors' go-forward liquidity needs;

> (c)   Backstop Parties:  the Debt Rights Offering shall be backstopped by the Debt Backstop Parties; and

> (d)   Debt Backstop Premium:  the Debt Backstop Parties shall be paid the Debt Backstop Premium, which shall equal 10.0% of such backstopped amounts and shall be paid in additional principal in the Exit Term Loan Facility.

3.   Exit ABL Facility.

On the Effective Date, the Reorganized Debtors shall enter into the Exit ABL Facility, the terms of which will be set forth in the Exit ABL Facility Documents.  Confirmation of the Plan shall be deemed (a) approval of the Exit ABL Facility (including the transactions and related agreements contemplated thereby and all actions to be taken,

44

undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit ABL Facility, including the Exit ABL Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit ABL Facility.

As of the Effective Date, upon the granting or continuation of Liens, as applicable, in accordance with the Exit ABL Facility Documents, all of the Liens and security interests to be granted in accordance with the Exit ABL Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit ABL Facility Documents, (c) shall be deemed perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit ABL Facility Documents, and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent provided in the Exit ABL Facility Documents, the Holder(s) of Liens under the Exit ABL Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests, if any, granted to secure the obligations arising under the Exit ABL Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law, and the priorities of such Liens and security interests shall be as set forth in the Exit ABL Facility Documents.

The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

4. Exit Term Loan Facility.

On the Effective Date, the Reorganized Debtors shall enter into the Exit Term Loan Facility, the terms of which will be set forth in the Exit Term Loan Documents, which must be in form and substance consistent with this Article IV.F.4 of this Plan and the Exit Term Loan Term Sheet as Filed on or prior to the Voting Deadline. Confirmation of the Plan shall be deemed (a) approval of the Exit Term Loan Facility (including the transactions and related agreements contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Term Loan Facility, including the Exit Term Loan Documents, and incur and pay any fees and expenses in connection therewith and (ii) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Term Loan Facility.

As of the Effective Date, upon the granting or continuation of Liens, as applicable, in accordance with the Exit Term Loan Documents, all of the Liens and security interests to be granted in accordance with the Exit Term Loan Documents (a) shall be deemed to be granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Term Loan Documents, (c) shall be deemed perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Term Loan Documents, and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent provided in the Exit Term Loan Documents, the Holder(s) of Liens under the Exit Term Loan Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests, if any, granted to secure the obligations arising under the Exit Term Loan Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law, and the priorities of such Liens and security interests shall be as set forth in the Exit Term Loan Documents.

The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

Entry of the Confirmation Order shall constitute approval of the Debt Backstop Premium payable to the Debt Backstop Parties in additional principal on the Effective Date. Subject only to the occurrence of the Effective Date, the provision of the Exit Term Loan Documents and the terms and conditions for any closing fees, discounts, fees, and/or premiums, including, without limitation, the Debt Backstop Premium, shall be deemed fully satisfied and earned as of the entry of the Confirmation Order. The amount of the Debt Backstop Premium is a bargained-for and integral part of the Restructuring Transactions contemplated under this Plan.

The terms of the Exit Term Loan Facility shall be set forth in the Exit Term Loan Documents, and in any event, shall include the following terms:

 (a)  <u>Borrower</u>:  Reorganized Ascend;

 (b)  <u>Guarantees</u>:  the Exit Term Loan Facility shall be guaranteed by certain of Reorganized Ascend's direct and indirect subsidiaries;

 (c)  <u>Rate</u>:  8.0% per annum, payable in kind;

 (d)  <u>Amortization</u>:  none;

 (e)  <u>Maturity</u>:  five (5) years after the date of issuance;

 (f)  <u>Exit Term Loan Conversion</u>:  means, to the extent applicable, the conversion of the Exit Term Loan Facility into 90.0% of the New Interests following the Effective Date, pursuant to the terms and conditions set forth in the Exit Term Loan Term Sheet, the Exit Term Loan

Credit Agreement, and this <u>Article IV.F.4(f)</u> of this Plan and any other documents as may be entered into by and among the Exit Term Loan Lenders;

(g)     <u>Exit Term Loan Additional Equity Commitment</u>: the additional equity commitment shall be fully committed on the Effective Date and funded post-Effective Date pursuant to an equity commitment letter to be entered into by all Exit Term Loan Lenders. The Exit Term Loan Additional Equity Commitment shall be committed based on each Exit Term Lender's Pro Rata share of the Debt Rights Offering;

(h)     <u>Multiple on Invested Capital</u>: a minimum multiple on invested capital of 2.00 (as shall be more particularly described in the Exit Term Loan Credit Agreement);

(i)     <u>Call Protection</u>: none;

(j)     <u>Ratings</u>: the Exit Term Loan Facility shall not be rated; and

(k)     <u>Financial Covenants</u>: the Exit Term Loan Facility shall not have any financial covenants.

5.    <u>Asset Financing Takeback Debt</u>.

On the Effective Date, the Reorganized Debtors shall issue the Asset Financing Takeback Debt, the terms of which will be set forth in the Asset Financing Takeback Debt Documents. To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Asset Financing Takeback Debt (including the transactions and related agreements contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Asset Financing Takeback Debt, and incur and pay any fees and expenses in connection therewith and (ii) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, with the reasonable consent of the Required DIP Term Loan Lenders, may deem to be necessary to issue the Asset Financing Takeback Debt.

As of the Effective Date, upon the granting of Liens in accordance with the Asset Financing Takeback Debt Documents, all of the Liens and security interests, if any, to be granted in accordance with the Asset Financing Takeback Debt Documents (a) shall be deemed to be granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Asset Financing Takeback Debt Documents, (c) shall be deemed perfected on or prior to the Effective Date, subject only to such Liens and security interests, if any, as may be permitted under the respective Asset Financing Takeback Debt Documents, and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent provided in the Asset Financing Takeback Debt Documents, the Holder(s) of Liens, if any, under the Asset Financing Takeback Debt Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests, if any, granted to secure the obligations arising under the Asset Financing Takeback Debt Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law, and the priorities of such Liens and security interests, if any, shall be as set forth in the Asset Financing Takeback Debt Documents.

The Reorganized Debtors and the Persons and Entities granted such Liens and security interests, if any, shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests, if any, under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests, if any, to third parties.

The terms of the 36th Street Financing Takeback Debt shall be set forth in the 36th Street Financing Takeback Debt Documents and shall include the following terms, which are subject to change, and may be superseded by the terms set forth in the 36th Street Financing Takeback Debt Documents:

(a) <u>Payment Terms</u>: (i) a one-time payment of $100,000.00 on December 1, 2025; (ii) commencing January 1, 2026 through and including December 1, 2026, $50,000.00 per month; (iii) commencing January 1, 2027 through and including October 1, 2027, $92,500.00 per month; and (iv) commencing November 1, 2027 through and including June 1, 2029, $310,000.00 per month;

(b) <u>Prepayment</u>: right to prepay the remaining obligations in full on thirty (30) days' notice in an amount equal to the Prepayment Amount (as defined in the 36th Street Financing Takeback Debt Documents); and

(c) <u>Maturity</u>: June 1, 2029.

The terms of the Ansley Park Financing Takeback Debt shall be set forth in the Ansley Park Financing Takeback Debt Documents and shall include the following terms, which are subject to change, and may be superseded by the terms set forth in the Ansley Park Financing Takeback Debt Documents:

(a) <u>Payment Terms</u>: (i) commencing December 1, 2025 through and including November 1, 2027, $250,000.00 per month; (ii) commencing December 1, 2027 through and including November 1, 2033, $548,196.52 per month; and (iii) a one-time payment of $2,194,968.67 on November 1, 2033;

(b) <u>Prepayment</u>: right to prepay the remaining obligations in full on any specified Payment Date in an amount equal to the Prepayment Amount (each as defined in the Ansley Park Financing Takeback Debt Documents); and

(c) <u>Maturity</u>: November 1, 2033.

The terms of the Citizens CoGen Financing Takeback Debt shall be set forth in the Citizens CoGen Financing Takeback Debt Documents and shall include the following terms, which are subject to change with the consent of Citizens Asset Finance, a Division of Citizens Bank, N.A., and the Lessors (as defined in the Citizens CoGen Financing Agreement), which shall be incorporated into and may be superseded by the terms set forth in the Citizen CoGen Financing Takeback Debt Documents:

(a) <u>Principal Payment Terms</u>: (i) commencing January 1, 2027 through and including April 1, 2031, $2,324,353.85 per quarter; and (ii) a one-time payment of $56,872,314.47 on July 1, 2031;

(b) <u>Interest Payment Terms</u>: (i) SOFR plus 4.0% per quarter, with SOFR plus 2.0% to be paid in Cash and 2.0% to be paid-in-kind, from October 1, 2025 through September 30, 2026

paid quarterly in arrears; and (ii) SOFR plus 4.0% per quarter, to be paid in Cash, from October 1, 2026 through and including Maturity paid quarterly in arrears;

(c)    <u>Principal Payment Holiday</u>:  no quarterly principal payments through January 1, 2027;

(d)    <u>Maturity</u>:  July 1, 2031; and

(e)    <u>Collateral</u>:  The Allowed Citizens CoGen Financing Agreement Claims shall be secured by a first-priority, valid, perfected, and enforceable Lien on the Collateral (as defined in the Citizens CoGen Financing Agreement).

6.    <u>Litigation Trust Interests</u>.

The Debtors or the Reorganized Debtors, as applicable, shall issue the Litigation Trust Interests to the Holders of the DIP Term Loan Claims, the Term Loan Adequate Protection Claims, the Term Loan Claims, and the General Unsecured Claims in accordance with the terms of this Plan, including <u>Article IV.E</u> hereof and the Litigation Trust Documents.  The Litigation Trust shall make distributions in accordance with this Plan, the Confirmation Order, and the Litigation Trust Documents.

G.    *Corporate Existence.*

Except as otherwise provided in this Plan, the Plan Supplement, or the Confirmation Order, or any agreement, instrument, or other document incorporated in this Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended, amended and restated, or replaced under this Plan or otherwise, including pursuant to the New Organizational Documents, in each case, consistent with this Plan.  To the extent the certificate of incorporation, bylaws, or any similar documents of a Debtor or Reorganized Debtor are amended, restated, or superseded in accordance with this Plan or the Plan Supplement, such documents are deemed to be amended, restated, or superseded pursuant to this Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, or federal Law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

H.    *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in (1) the Confirmation Order or this Plan (including the Restructuring Transactions Memorandum, <u>Article VIII</u>, and <u>Article IV.E.2</u> hereof), or (2) any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, this Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Effective Date, except as otherwise provided in this Plan, the Plan Supplement, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, including <u>Article VIII</u> hereof, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.  For the avoidance of doubt, (a) no Reorganized Debtor shall be treated as being liable on any Claim that is discharged pursuant to this Plan, and (b) no contract, agreement, instrument, or other document (including any and all Indemnification Provisions) or property of the Estate in favor of (i) the Sponsor or (ii) any other Excluded Party shall vest in the Reorganized Debtors.

I.       *Cancelation of Existing Securities and Agreements.*

On the Effective Date, except as otherwise provided in this Plan, the Definitive Documents (including the Plan Supplement), or the Confirmation Order, all notes, instruments, Securities (including equity Securities), certificates, credit agreements, indentures, security agreements, collateral agreements, and other documents evidencing (1) Claims against any of the Debtors or (2) Interests in Ascend Parent and APM Disc shall be canceled, and all present and future obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent), under or in connection with the ABL Credit Agreement, Bridge Credit Agreement, the Term Loan Credit Agreement, the DIP ABL Credit Agreement, the DIP Term Loan Credit Agreement, and the Asset Financing Agreements of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Subsidiaries thereunder, or in any way related thereto, shall be deemed satisfied in full, canceled, released, discharged, and of no force or effect without the need for further action or approval of the Bankruptcy Court or for a Holder to take further action, and the Agents shall be discharged and released and shall not have any continuing duties or obligations thereunder.  Holders of or parties to such canceled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancelation thereof, except the rights, distributions, and treatment provided for or preserved pursuant to this Plan or the Confirmation Order.

Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof and the Confirmation Order, the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the Bridge Credit Agreement, and the Asset Financing Agreements (including, in each case, all documents ancillary thereto), shall continue in effect to:  (1) permit Holders of Claims under the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the Bridge Credit Agreement, and the Asset Financing Agreements to receive their respective Plan Distributions, if any; (2) permit the Reorganized Debtors and the Distribution Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the Bridge Credit Agreement, and the Asset Financing Agreements, as applicable; and (3) permit each of the Agents under the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the Bridge Credit Agreement, and Asset Financing Agreements to seek indemnification, compensation, and/or reimbursement of fees and expenses through the exercise of charging Liens, to the extent provided for in the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, the Bridge Credit Agreement, and the Asset Financing Agreements.  Except as provided in this Plan (including Article VI hereof) or the Confirmation Order, on the Effective Date, the Agents and their respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, and the Bridge Credit Agreement, as applicable.  The commitments and obligations (if any) of the Holders of the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, and the Bridge Credit Agreement to extend any further or future credit or financial accommodations to any of the Debtors, any of the Non-Debtor Subsidiaries, or any of their respective successors or assigns under the DIP Term Loan Credit Agreement, the DIP ABL Credit Agreement, the ABL Credit Agreement, the Term Loan Credit Agreement, and the Bridge Credit Agreement, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

J.       *Corporate Action.*

Upon the Effective Date, all actions contemplated under this Plan shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions, including the Debt Rights Offering; (2) selection of the directors, managers, and officers for the Reorganized Debtors, including the New Board; (3) issuance and distribution of the New Interests, including pursuant to the Ascend Interest Distribution and the DIP Equity Recovery; (4) entry into the Debt Rights Offering Documents; (5) entry into the Exit ABL Facility; (6) entry into the Exit Term Loan Facility; (7) issuance of the Asset Financing Takeback Debt and entry into the Asset Financing Takeback Debt Documents; (8) establishment of the Litigation Trust; (9) adoption of the New Organizational Documents; (10) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (11) modification, rejection, adoption, or assumption, as applicable, of the Compensation and Benefits Programs; (12) adoption of the Management Incentive Plan; (13) implementation of the Committee Settlement; (14) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective

50

Date, including with respect to the Exit Term Loan Additional Equity Commitment (to the extent applicable), the Exit Term Loan Conversion (to the extent applicable), the Restructuring Transactions Memorandum, and any dissolutions, reorganizations, and/or equity or Interests issuances as may be contemplated thereunder); and (15) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date). All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, members, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.

On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit ABL Facility Documents, the New Interests, the Debt Rights Offering Documents, the Exit Term Loan Documents, the Asset Financing Takeback Debt Documents, the Litigation Trust Documents, the New Organizational Documents, any other Definitive Document, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy Law.

*K.      New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted or amended in a manner consistent with this Plan and as may be necessary to effectuate the transactions contemplated herein by the applicable Reorganized Debtor. To the extent required under this Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable secretaries of state and/or other applicable authorities in its respective state, province, or country of incorporation and organization if and to the extent required in accordance with the applicable Laws of the respective state or country of organization. The New Organizational Documents will (1) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code, (2) with respect to the New Organizational Documents for Reorganized Ascend, including the New Equityholders' Documents, authorize the issuance of the New Interests in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan, and (3) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the Restructuring Transactions contemplated herein. The New Organizational Documents shall also provide for standard and customary indemnification and exculpation of directors, officers, managers, and the other appropriate Persons to the fullest extent permitted by applicable Law.

On and as of the Effective Date, each Holder of New Interests shall be deemed to be a party to the New Equityholders' Agreement and bound by the New Organizational Documents (including any documents related thereto and as may be amended from time to time in accordance with the terms thereof) without the need for execution by such Holder. The New Equityholders' Agreement shall be binding on all Entities receiving, and all Holders of, the New Interests (and their respective successors and assigns), regardless of whether such New Interests (including any New Interests issued as a result of the Ascend Interest Distribution, the Exit Term Loan Additional Equity Commitment (to the extent applicable), or the Exit Term Loan Conversion (to the extent applicable)) are received or to be received on or after the Effective Date and regardless of whether such Entity executes or delivers a signature page to the New Equityholders' Agreement.

After the Effective Date, the Reorganized Debtors may amend, amend and restate, or otherwise modify their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended, amended and restated, or otherwise modified certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the Laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

L.      *Indemnification Obligations.*

Consistent with applicable Law, all Indemnification Provisions, other than the Indemnification Provisions in favor of any Excluded Party, in place immediately before the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, D&O Liability Insurance Policies, or otherwise) shall be assumed, modified, or rejected as determined by the Debtors and pursuant to this Article IV.L with the consent of the Required DIP Term Loan Lenders.  All such obligations shall be deemed and treated as Executory Contracts to be assumed, modified, or rejected under this Plan.

As to directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of each of the Debtors, as applicable, in each case to the extent that such Person or Entity was employed by any of the Debtors on the Petition Date and is not an Excluded Party, such Indemnification Provisions shall (1) not be discharged, impaired, or otherwise affected in any way, including by this Plan, the Plan Supplement, or the Confirmation Order, (2) remain intact, in full force and effect, and irrevocable, (3) not be limited, reduced, or terminated after the Effective Date, and (4) survive the effectiveness of this Plan on terms no less favorable to such directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the Indemnification Provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on, or after the Petition Date.  All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors so long as such Person or Entity is not an Excluded Party.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, none of the Indemnification Provisions providing for indemnification of (1) the Excluded Parties or (2) any Sponsor, in each case, by the Debtors or the Non-Debtors Subsidiaries shall be assumed or vest in the Reorganized Debtors, and such Indemnification Provisions shall be rejected as of the Effective Date.

For the avoidance of doubt, the Litigation Trust is not assuming or being assigned any of the Indemnification Provisions pursuant to this Plan or the Confirmation Order unless expressly provided for in the Litigation Trust Agreement.  Unless otherwise agreed to in writing by the Litigation Trustee, the Litigation Trust shall have no liability of any kind for any Claims or obligations related to the Debtors' assumption of the Indemnification Provisions.

M.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the terms of the current members of the board of directors of Ascend Parent shall expire and the new directors and officers of Reorganized Ascend shall be appointed in accordance with the New Organizational Documents; *provided* that the Disinterested Directors shall retain their authority following the Effective Date solely with respect to matters relating to Professional Claim requests by Professionals acting at their authority and direction in accordance with the terms of this Plan.  The Disinterested Directors shall not have any of their privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Reorganized Debtors or any other Entity without the Disinterested Directors' prior written consent.  Each Disinterested Director of the Debtors retains the right to review, approve, and make decisions, and to file papers and be heard before the Bankruptcy Court, on all matters under their continuing authority.  The New Board shall consist of directors or managers, as applicable, as designated in accordance with the New Equityholders' Agreement.  The initial members of the New Board will be identified in the Plan Supplement to the extent known at the time of Filing.  Each such director, manager, and/or officer, as applicable of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the New Organizational Documents and the other constituent documents of the Reorganized Debtors.  Corporate governance for Reorganized Ascend, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code and the New Organizational Documents.

N.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to

effectuate, implement, and further evidence the terms and conditions of this Plan and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

O.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Interests; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Exit ABL Facility; (6) the grant of collateral as security for the Exit Term Loan Facility; or (7) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.      *Director and Officer Liability Insurance.*

To the extent consistent with Article IV.L of this Plan, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.  To the extent consistent with Article IV.L of this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed.  Coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals insured thereunder, to the extent consistent with Article IV.L of this Plan.

In addition, to the extent consistent with Article IV.L of this Plan, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors, managers, and/or officers, as applicable, of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and/or officers, as applicable, remain in such positions after the Effective Date.

The Debtors and the Reorganized Debtors, as applicable, shall maintain tail coverage under any D&O Liability Insurance Policies for the six- (6) year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies, to the extent consistent with Article IV.L of this Plan.  In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.

To the extent consistent with Article IV.L of this Plan, the Debtors or the Reorganized Debtors, as applicable, shall not terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies in effect prior

to the Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

Q.      *Management Incentive Plan.*

On or after the Effective Date, the New Board shall adopt the Management Incentive Plan consistent with the MIP Term Sheet, which shall be included in the Plan Supplement.  All grants under the Management Incentive Plan shall ratably dilute all New Interests issued pursuant to the Plan, including any New Interests issued pursuant to the DIP Equity Recovery and the Debt Rights Offering.

R.      *Retiree Benefits.*

For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law.

S.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code and the allocation of duties and vesting of assets provided for herein and in the Litigation Trust Documents, but subject to Article VIII hereof, each Reorganized Debtor and the Litigation Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, including the Permitted Litigation Claims, whether arising before or after the Petition Date, including any actions specifically enumerated on the Schedule of Retained Causes of Action, and the Reorganized Debtors' and the Litigation Trust's rights to commence, prosecute, or settle such retained Causes of Action, including the Permitted Litigation Claims, shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of this Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in this Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.  **For the avoidance of doubt, any and all Causes of Action against the Excluded Parties are preserved.**

The Reorganized Debtors and/or the Litigation Trust may pursue such retained Causes of Action, including, for the avoidance of doubt, the Permitted Litigation Claims, as appropriate, in accordance with the best interests of the Reorganized Debtors and/or the Litigation Trust Beneficiaries, as applicable.  **No Person or Entity (other than the DIP Lenders, the Bridge Lenders, the Term Loan Lenders, the ABL Lenders, the Agents, and the members of the Ad Hoc Group) may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Litigation Trust, will not pursue any and all available retained Causes of Action of the Debtors against it.  Except as specifically released under this Plan or pursuant to a Final Order, the Debtors, the Reorganized Debtors, and the Litigation Trust, as applicable, expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except (1) as otherwise expressly provided in this Plan, including Article VIII hereof or (2) the DIP Lenders, the Bridge Lenders, the Term Loan Lenders, the ABL Lenders, the Agents, and the members of the Ad Hoc Group.  Unless otherwise agreed upon in writing by the parties to the applicable retained Causes of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Debtor or Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or the Litigation Trust, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors or the Litigation Trust, as applicable, may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Causes of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objecting party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity (other than the DIP Lenders, the Bridge Lenders, the Term Loan Lenders, the ABL Lenders, the Agents, and the members of the Ad Hoc Group) are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order (and for the avoidance of doubt, any Causes of Action on the

54

Schedule of Retained Causes of Action shall not be expressly relinquished, exculpated, released, compromised, or settled in the Plan), the Reorganized Debtors and the Litigation Trust, as applicable, expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Reorganized Debtors and the Litigation Trust, as applicable, reserve and shall retain such retained Causes of Action, including for the avoidance of doubt, the Permitted Litigation Claims, as appropriate, of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan and, with respect to any counterclaims or crossclaims held by the Debtors, notwithstanding the discharge of the underlying Claim or related Claims against the Debtors or their Related Parties. In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or pursuant to a Final Order, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors or the Litigation Trust, as applicable, except (1) as otherwise expressly provided in this Plan, including Article VIII hereof or (2) such Causes of Action that are against the DIP Lenders, the Bridge Lenders, the Term Loan Lenders, the ABL Lenders, the Agents, and the members of the Ad Hoc Group. The applicable Reorganized Debtors and the Litigation Trust, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action, including, for the avoidance of doubt, the Permitted Litigation Claims.

As between the Reorganized Debtors and the Litigation Trust, any Claim or Cause of Action not otherwise released pursuant to this Plan that is not a Permitted Litigation Claim shall be preserved for the Reorganized Debtors.

The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any retained Causes of Action that are not Permitted Litigation Claims and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding anything to the contrary in this Plan, in the Plan Supplement, or in the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, the Debtors shall preserve, transfer, and/or assign to the Litigation Trust all preserved and retained Causes of Action that are Permitted Litigation Claims and the right to commence, prosecute, and/or settle all Permitted Litigation Claims belonging to such Debtors or their Estates, subject to the occurrence of the Effective Date and the other terms and conditions set forth in this Plan; *provided* that: (1) the Litigation Trust shall be the successor-in-interest to the Debtors' rights, title, and interest in any Permitted Litigation Claims; (2) the Litigation Trust shall have exclusive standing to pursue the Permitted Litigation Claims; and (3) the Litigation Trust shall (a) retain and may exclusively enforce any and all Permitted Litigation Claims, and (b) have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment all such Permitted Litigation Claims and to decline to do any of the foregoing in its discretion and without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. In pursuing any Permitted Litigation Claims, the Litigation Trust shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code and shall succeed to the Debtors' rights with respect to the time periods in which a Permitted Litigation Claims may be bought under section 546 of the Bankruptcy Code. The Litigation Trust shall be entitled to recover on any Permitted Litigation Claims any settlement or judgment with respect to the other Permitted Litigation Claims, and no consent shall be necessary for the Litigation Trust to transfer such proceeds of any such Permitted Litigation Claims once received from an insurer or other third-party. For the avoidance of doubt, the Litigation Trust shall be solely responsible for effectuating all distributions on account of the Litigation Trust Assets.

*T.     Private Company.*

The Reorganized Debtors shall (1) continue as and emerge from these Chapter 11 Cases as a private company on the Effective Date, and the New Interests shall not be listed on a national Securities exchange, (2) not be voluntarily subject to any reporting or registration requirements promulgated by the SEC, and (3) not be required to list the New Interests on a recognized national Securities exchange.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.       *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Article V.I.1 and elsewhere herein, all Executory Contracts or Unexpired Leases will be deemed automatically rejected by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that:  (1) are identified on the Assumed Executory Contracts and Unexpired Leases Schedule as of the Effective Date; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to assume that is pending on the Effective Date; (5) have an ordered or requested effective date of rejection that is after the Effective Date; (6) are employment agreements that are not disclosed by the Required DIP Term Loan Lenders to the Debtors' counsel on or before October 15, 2025, none of which shall be rejected; (7) is a D&O Liability Insurance Policy, which shall be deemed automatically assumed; (8) are Indemnification Provisions, which shall be assumed or rejected in accordance with Article IV.L of this Plan; or (9) is a confidentiality agreement with one or more of the Debtors.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in this Plan or the Assumed Executory Contracts and Unexpired Leases Schedule, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in, and be fully enforceable by, the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule at any time up to the Effective Date; *provided* that the Debtors may not remove Executory Contracts from the Assumed Executory Contracts and Unexpired Leases Schedule after the Voting Deadline; *provided, however,* that, (1) in the event that the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory Contract or Unexpired Lease exceeds the amount set forth on the Assumed Executory Contracts and Unexpired Leases Schedule by more than $500,000 or (2) the applicable Debtor or Reorganized Debtor and the applicable counterparty consensually agree, the Debtors and/or the Reorganized Debtors shall retain the right to remove such Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule up until five (5) Business Days after entry of the Order determining such Cure amount; *provided, further,* that (A) in the event that the Debtors or the Reorganized Debtors remove any Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule after the Voting Deadline, the deadline for the applicable counterparty to elect to opt out of the releases contained in Article VIII.D hereof shall be automatically extended to ten (10) Business Days after the filing of a revised Assumed Executory Contracts and Unexpired Leases Schedule removing such Executory Contract or Unexpired Lease; and (B) in the event that the Debtors remove an Executory Contract or an Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule after the Voting Deadline and prior to the Confirmation Hearing, the deadline for the counterparty to such Executory Contract or Unexpired Lease to object to the Confirmation of the Plan shall be automatically extended to the Confirmation Hearing.  Neither the Debtors nor the Reorganized Debtors shall amend, modify, or otherwise adjust the Assumed Executory Contracts and Unexpired Leases Schedule in a manner that would cause the Allowed Cure Costs to exceed the amount set forth

on the Assumed Executory Contracts and Unexpired Lease Schedule by more than $500,000 without the prior written consent of Creditors' Committee or Claims Ombudsman. The Debtors or the Reorganized Debtors, as applicable, shall File with the Bankruptcy Court and serve on the applicable counterparty any change to the Assumed Executory Contracts and Unexpired Leases Schedule, and any applicable counterparty shall have fourteen (14) days from the Filing of such notice to File an objection with the Bankruptcy Court.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

If certain, but not all, of a contract counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to this Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts or Unexpired Leases that are being rejected pursuant to this Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to this Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must File a timely objection to this Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by this Plan or a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, and (3) the Effective Date. The notice of the Plan Supplement shall be deemed appropriate notice of rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are (1) with a Sponsor Entity or (2) not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, their Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** Unless otherwise provided for herein, all Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.8 of this Plan, as applicable.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be filed with the Claims and Noticing Agent on or before fourteen (14) days after the service of the Assumed Executory Contracts and Unexpired Leases Schedule. Any objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure costs; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to File such request for payment of such Cure costs. The Reorganized Debtors also may settle any disputes related to Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure costs shall occur as soon as reasonably practicable (a) after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or (b) as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment of the Cure costs.

The Debtors or the Reorganized Debtors, as applicable, with the consent of the Required DIP Term Loan Lenders, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease on or before the Voting Deadline based upon the existence of any such unresolved dispute.  If the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth on the Assumed Executory Contracts and Unexpired Leases Schedule, the Debtors shall have the right to remove such Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule on or before the Voting Deadline, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection; *provided* that, (1) in the event that the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory Contract or Unexpired Lease exceeds the amount set forth on the Assumed Executory Contracts and Unexpired Leases Schedule by more than $500,000 or (2) the applicable Debtor or Reorganized Debtor and the applicable counterparty consensually agree, the Debtors and/or the Reorganized Debtors shall retain the right to remove such Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule up until five (5) Business Days after entry of the Order determining such Cure amount; *provided, further,* that (A) in the event that the Debtors or the Reorganized Debtors remove any Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule after the Voting Deadline, the deadline for the applicable counterparty to elect to opt out of the releases contained in <u>Article VIII.D</u> hereof shall be automatically extended to ten (10) Business Days after the filing of a revised Assumed Executory Contracts and Unexpired Leases Schedule removing such Executory Contract or Unexpired Lease; and (B) in the event that the Debtors remove an Executory Contract or an Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases Schedule after the Voting Deadline and prior to the Confirmation Hearing, the deadline for the counterparty to such Executory Contract or Unexpired Lease to object to the Confirmation of the Plan shall be automatically extended to the Confirmation Hearing.  Neither the Debtors nor the Reorganized Debtors shall amend, modify, or otherwise adjust the Assumed Executory Contracts and Unexpired Leases Schedule in a manner that would cause the Allowed Cure Costs to exceed the amount set forth on the Assumed Executory Contracts and Unexpired Lease Schedule by more than $500,000 without the prior written consent of Creditors' Committee or Claims Ombudsman.

Any counterparty to an Executory Contract or an Unexpired Lease that fails to object timely to the proposed assumption and/or Cure amount (including any request for an additional or different Cure amount) will be deemed to have consented to such assumption and/or Cure amount, and any untimely request for an additional or different Cure amount shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.

The assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary defaults, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption.  **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption, or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable,

under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any applicable non-bankruptcy Law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder.  Unless otherwise provided in this Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under this Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights.*

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Employee Compensation and Benefits.*

1.      Compensation and Benefits Programs.

Subject to the provisions of this Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under this Plan and shall be assumed, modified, or rejected as determined by the Debtors with the consent of the Required DIP Term Loan Lenders and pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:  (a) all Compensation and Benefits Programs with the Sponsor, which shall be rejected; (b) all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests in any of the Debtors, which shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date; (c) Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the applicable beneficiaries; and (d) employment agreements that are not disclosed by the Required DIP Term Loan Lenders to the Debtors' counsel

59

on or before October 15, 2025, none of which shall be rejected.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law.

A counterparty to a Compensation and Benefits Program assumed pursuant to this Plan shall have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed to by such counterparty and the applicable Reorganized Debtor(s)); *provided*, *however*, that any assumption of Compensation and Benefits Programs pursuant to this Plan or any of the Restructuring Transactions shall not trigger or be deemed to trigger any change of control, immediate vesting, termination, or similar provisions therein.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein and the Restructuring Transactions and related matters contemplated by this Plan shall be deemed not to trigger (i) any applicable change of control, immediate vesting, termination (similar provisions therein) or (ii) an event of "Good Reason" (or a term of like import), in each case as a result of the Consummation of the Restructuring Transactions.  A counterparty to a Compensation and Benefits Program assumed pursuant to this Plan shall have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed to by such counterparty and the applicable Reorganized Debtor(s)).

2.  Workers' Compensation Programs.

As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation Laws in jurisdictions in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance, each of which shall be deemed automatically assumed to the extent that such workers' compensation programs are determined to be Executory Contracts.  All Proofs of Claim on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law with respect to any such contracts, agreements, policies, programs, and plans; *provided*, *further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of the applicable Allowed Claim on the first Distribution Date, the Reorganized Debtors shall, on, or as soon as reasonably practicable after, the Effective Date, make initial distributions under this Plan on account of Claims or Interests Allowed as of the Effective Date, subject to the Reorganized Debtors' right to object to Claims or Interests; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of this Plan, and (3) Allowed Asset Financing Agreement Claims shall be paid in accordance with Article III.B.4-6 of this Plan, as applicable.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with and as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.  Thereafter, a Distribution Date shall occur no less frequently than once in any ninety (90) day period, as necessary, in the Reorganized Debtors' sole discretion.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  Except as otherwise provided in this Plan, Holders of Claims or Interests shall not

be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Any and all distributions to be made from the Litigation Trust Assets shall be governed and made in accordance with the Litigation Trust Agreement and shall not be subject to this Article VI.

B.      *Distribution Agent.*

All distributions under this Plan shall be made by the Distribution Agent.  The Distribution Agent shall not be required to give any bond or surety or other form of security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of the Distribution Agent.*

1.      Powers of the Distribution Agent.

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement Claims (including reasonable attorney fees and expenses), made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors; *provided* that the costs and expenses associated with the Litigation Trust shall be the responsibility of the Litigation Trust.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.      Delivery of Distributions in General.

Except as otherwise provided herein, the Distribution Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date, or if applicable, to such Holder's designee (to the extent prohibited under applicable Securities Laws), as appropriate (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date (or of a designee designated by the applicable Holder); (b) to the signatory set forth on any Proof of Claim or Proof of Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

61

3.   <u>Minimum Distributions</u>.

In the discretion of the Reorganized Debtors, (a) no Cash payments of less than $250 and (b) no distribution and issuance of New Interests on the Distribution Date comprising less than $250 in value (as determined in good faith by the Reorganized Debtors) shall be made, in each case, to a Holder of an Allowed Claim or Allowed Interest (taken together, as a whole, with such Holder's Affiliates for the purposes of the foregoing calculations) on account of such Allowed Claim or Allowed Interest.

Fractional shares of New Interests (or equivalent units of other interests) may be distributed, and no Cash shall be distributed in lieu of such fractional amounts.

4.   <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder or other necessary information for delivery, at which time such distribution shall be made to such Holder on the next Distribution Date without interest.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable or such distribution reverts to the Reorganized Debtors or is canceled pursuant to this <u>Article VI.D.4</u> and shall not be supplemented with any interest, dividends, or other accruals of any kind; *provided* that any distribution under this Plan that is an Unclaimed Distribution or remains undeliverable for a period of ninety (90) calendar days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code.  After such date, all unclaimed property or interests in property shall revest in the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property Laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.  Upon such revesting, the Claim (other than any Reinstated Claims) of the Holder or its successors with respect to such property shall be canceled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.  To the extent that such Unclaimed Distribution is comprised of New Interests, such New Interests may be canceled at the discretion of the Reorganized Debtors, and the Distribution Agent shall adjust the distributions of New Interests to reflect any such cancelation.

5.   <u>Surrender of Canceled Instruments or Securities</u>.

On the Effective Date or as soon as reasonably practicable thereafter, each Holder (and the applicable agents for such Holder) of a book-entry interest, certificate, or instrument evidencing a Claim or an Interest that has been canceled in accordance with <u>Article IV.I</u> hereof shall be deemed to have surrendered such book-entry interest, certificate, or instrument to the Distribution Agent.  Such surrendered book-entry interest, certificate, or instrument shall be canceled solely with respect to the Debtors, and any Non-Debtor Subsidiaries, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties (other than the Non-Debtor Subsidiaries) vis-à-vis one another with respect to such book-entry interest, certificate, or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for the purposes of allowing Holders to receive distributions under this Plan, charging Liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to book-entry interests, certificates, or instruments evidencing Claims that are Unimpaired under this Plan.

E.   *Manner of Payment*.

Except as otherwise set forth herein, the Plan Supplement, or any agreement, instrument, or document incorporated in this Plan or the Plan Supplement, all distributions of Cash and the New Interests to the Holders of the applicable Allowed Claims or Interests under this Plan shall be made by the Distribution Agent on behalf of the Debtors or Reorganized Debtors, as applicable.  At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *Compliance with Tax Requirements.*

In connection with this Plan, to the extent applicable, the Debtors, Reorganized Debtors, Distribution Agent, the Litigation Trust, the Litigation Trustee, and any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

As a condition to receive distributions under the Plan, all Litigation Trust Beneficiaries may be required to identify themselves to the Litigation Trustee and provide tax information and the specifics of their holdings, to the extent requested by the Litigation Trustee, including an IRS Form W-9 or, in the case of Litigation Trust Beneficiaries that are not U.S. persons for U.S. federal income tax purposes, certification of foreign status on an applicable IRS Form W-8, including all applicable supporting documents.  This identification requirement may, in certain cases, extend to Holders who hold their securities in street name.  The Litigation Trustee may refuse to make a distribution to any Litigation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that upon the delivery of such information by a Litigation Trust Beneficiary, the Litigation Trustee shall make such distribution to which the Litigation Trust Beneficiary is entitled, without interest; *provided*, *further*, that if the Litigation Trustee fails to withhold in respect of amounts received or distributable with respect to any such Holder and the Litigation Trustee is later held liable for the amount of such withholding, such Holder shall reimburse the Litigation Trustee for such liability.  If a Litigation Trust Beneficiary fails to comply with such a request for tax information within ninety (90) days, the Litigation Trustee may file a document with the Bankruptcy Court that will provide twenty-one (21) days' notice before such distribution may be deemed an Unclaimed Distribution.  In the event that the Litigation Trustee elects to make distributions through an intermediary (such as DTC), the party who would be the withholding agent with respect to distributions to the Litigation Trust Beneficiary under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Trustee.

Property deposited into any Claim distribution accounts described elsewhere in this Plan (including any reserve for Disputed Claims, which may include all or a portion of the Litigation Trust or the Go-Forward Vendor Recovery Pool) will be subject to disputed ownership fund treatment under section 1.468B-9 of the United States Treasury Regulations.  All corresponding elections with respect to such accounts shall be made, and such treatment shall be applied to the extent possible for state, local, and non-U.S. tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS with respect to such accounts, any taxes (including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution) imposed on such accounts shall be paid out of the assets of such accounts (and reductions shall be made to amounts disbursed from such accounts to account for the need to pay such taxes).

G.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

H.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Orders, this Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims (other than any Reinstated Claims) against the Debtors, and no Holder of a prepetition Claim (other than any Reinstated Claims) against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any

Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

I.       *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

J.       *Setoffs and Recoupment.*

Except as expressly provided in the DIP Order and this Plan, including pursuant to Article VIII hereof, each Reorganized Debtor may, pursuant to sections 553 and/or 558 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim any and all Claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all Claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of a Claim or Interest be entitled to recoup such Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.       *No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall only be a single recovery on account of that Allowed Claim.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

L.       *Claims Paid or Payable by Third Parties.*

1.       Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is fully repaid.

2.       Claims Payable by Third Parties.

No distributions under this Plan shall be made on account of an Allowed Claim or Interest that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies

with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy or is found liable for satisfying in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

       3.    <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Causes of Action that the Debtors, the Litigation Trust, or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING**
**CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    *Allowance of Claims and Interests.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest, as applicable, is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  The Debtors, with the reasonable consent of the Required DIP Term Loan Lenders, may determine to Reinstate a Claim that would be an Unimpaired Claim under this Plan, even if no timely Proof of Claim is filed therefor.

B.    *Claims Administration Responsibilities.*

The Debtors with the reasonable consent of the Required DIP Term Loan Lenders and the Reorganized Debtors, as applicable, shall have the exclusive authority to (1) File, withdraw, or litigate to judgment any objections to Claims or Interests, (2) settle or compromise any such objections to Claims and Interests, including Disputed Claims and Interests, without further notice to or action, order, or approval of the Bankruptcy Court, and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.  Except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Claim or Interest (including any Disputed Claim or Interest), including the Causes of Action retained pursuant to <u>Article IV.S</u> of this Plan.

C.    *Disputed Claims Process.*

If the Debtors with the reasonable consent of the Required DIP Term Loan Lenders or the Reorganized Debtors, as applicable, dispute any Proof of Claim that is Filed on account of an Unimpaired Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the Bankruptcy Court.  For the avoidance of doubt, Holders of Disputed Other Secured Claims may take no action to liquidate, repossess, or foreclose or otherwise collect upon such Claim(s) other than adjudication in the Bankruptcy Court (unless otherwise consensually resolved between the Debtors or Reorganized Debtors, as applicable, and such Holder, and any such consensual resolution shall not require any further notice to or action, order, or approval of the Bankruptcy Court) until such time as the relevant Other Secured Claim is Allowed.

If the Debtors with the reasonable consent of the Required DIP Term Loan Lenders or Reorganized Debtors, as applicable, dispute any Impaired Claim or Impaired Interest that is not Allowed as of the Effective Date pursuant to Article III.B or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), the Debtors or Reorganized Debtors, as applicable, shall File an objection with, and the dispute shall be determined, resolved, or adjudicated before, the Bankruptcy Court.

D.      Estimation of Claims and Interests

Before, on, or after the Effective Date, the Debtors with the reasonable consent of the Required DIP Term Loan Lenders or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in this Plan, a Claim that has been expunged from the Claims Register but that either is subject to appeal or has not been the subject of a Final Order shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under this Plan (including for purposes of distributions and discharge), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder Files a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

E.      Adjustment to Claims or Interests without Objection.

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to the Plan) on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      Time to File Objections to Claims.

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Deadline.

G.      Disallowance of Claims or Interests.

Except as otherwise expressly set forth herein, and subject to the terms hereof, including Article VIII, and the DIP Order, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, or 550 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, 553(b), or 724(a) of the Bankruptcy Code shall be deemed disallowed if:  (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided herein or as agreed to by the Debtors or the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders**

**of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

H.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

I.       *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in this Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan or the Plan Supplement, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims that the Reorganized Debtors resolve or compromise after the Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date, and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Interest has accepted this Plan. Any default by the Debtors or the Non-Debtor Subsidiaries with respect to any Claim or Interest immediately prior to or on account of Filing the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than any Reinstated Claims) and Interests (other than any Intercompany Interests thar are Reinstated) subject to the occurrence of the Effective Date.

**B.      Release of Liens.**

**Except as otherwise expressly provided in the Exit ABL Facility Documents, the Exit Term Loan Documents, the Asset Financing Takeback Debt Documents, this Plan, or the Confirmation Order or in any contract, instrument, release, or other agreement or document amended or created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim or any related Claim that may be asserted against a Non-Debtor Subsidiary, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for the**

Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any Non-Debtor Subsidiary shall be fully released and discharged, and all of the right, title, benefit, and interest of any Holder (and the applicable Agents of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim or Claim against a Non-Debtor Subsidiary (and the applicable Agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor or Non-Debtor Subsidiary (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable Agents for such Holder) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, mortgages, deeds of trust, pledges, and other security interests.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

**C.**   *Releases by the Debtors.*

Except as expressly set forth in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, effective on the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions and services of the Released Parties in facilitating the implementation of the Restructuring Transactions, the adequacy of which is hereby confirmed, each Released Party, including each of the DIP ABL Lenders and ABL Lenders (including in their capacities as Bank Product Providers (as defined in the DIP ABL Credit Agreement) or otherwise as financial institutions doing business with or for the benefit of any of the Debtors or the Non-Debtor Subsidiaries), is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any Avoidance Actions and derivative Claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, or their Estates, or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtors, or their Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business, financing, or contractual arrangements between any Debtor and any Released Party, any Securities issued by the Debtors' and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Term Loan Facility, the DIP ABL Facility, the ABL Facility, the Bridge Facility, the Term Loan Facility, the Exit ABL Facility, the Exit Term Loan Facility, the Debt Rights Offering, the Litigation Trust, the Management Incentive Plan, the Asset Financing Agreements, the Asset Financing Takeback Debt Documents, the Committee Settlement, the

68

Definitive Documents (including the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the DIP Term Loan Facility, the DIP ABL Facility, the ABL Facility, the Bridge Facility, the Term Loan Facility, the Exit ABL Facility, the Exit Term Loan Facility, the Debt Rights Offering, the Litigation Trust, the Management Incentive Plan, the Asset Financing Agreements, the Asset Financing Takeback Debt Documents, the Committee Settlement, or this Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article VIII.C do not release (1) any Causes of Action identified on the Schedule of Retained Causes of Action, (2) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Restructuring Transactions, or any document, instrument, or agreement (including those in the Plan Supplement) executed to implement this Plan or any claim or obligation arising under this Plan, (3) any claims or Causes of Action against the Excluded Parties, or (4) any claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor release; (3) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any claim or Cause of Action released by the Debtor release against any of the Released Parties.

D.      *Releases by the Releasing Parties.*

Except as expressly set forth in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, effective on the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions and services of the Released Parties in facilitating the implementation of the Restructuring Transactions, the adequacy of which is hereby confirmed, each Released Party is hereby deemed released and discharged by each and all of the Releasing Parties (other than the Debtors and the Reorganized Debtors), in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Entities who may purport to assert any Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, whether known or unknown, including any Avoidance Actions and derivative Claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates, whether liquidated or unliquidated, fixed, or contingent, matured, or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise that such Holders or their Estates, Affiliates, heirs, executors, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, or their Estates, or any other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, the Reorganized Debtors, or their Estates, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business, financing, or contractual arrangements between any Debtor and any Released Party, any Securities issued by the Debtors' and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Term Loan Facility, the DIP ABL

69

Facility, the ABL Facility, the Bridge Facility, the Term Loan Facility, the Exit ABL Facility, the Exit Term Loan Facility, the Debt Rights Offering, the Litigation Trust, the Management Incentive Plan, the Asset Financing Agreements, the Asset Financing Takeback Debt Documents, the Committee Settlement, the Definitive Documents (including the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the DIP Term Loan Facility, the DIP ABL Facility, the ABL Facility, the Bridge Facility, the Term Loan Facility, the Exit ABL Facility, the Exit Term Loan Facility, the Debt Rights Offering, the Litigation Trust, the Management Incentive Plan, the Asset Financing Agreements, the Asset Financing Takeback Debt Documents, the Committee Settlement, or this Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided*, *however*, that notwithstanding anything herein to the contrary, nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan and nothing in this Plan shall affect, limit, or release in any way any performance obligations of any party or Entity under this Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement and those Claims left Unimpaired by <u>Article III</u> of this Plan) executed to implement this Plan.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in this <u>Article VIII.D</u> do not release (1) any claims or Causes of Action against the Excluded Parties or (2) any claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the third-party release is: (1) consensual; (2) essential to Confirmation; (3) given in exchange for good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing this Plan; (4) a good faith settlement and compromise of the Claims or Causes of Action released by the third-party release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the third-party release.

E.    *Exculpation.*

Notwithstanding anything contained in this Plan, to the fullest extent permissible under applicable Law and without limiting the releases contained in this <u>Article VIII</u>, effective as of the Effective Date, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases prior to the Effective Date, including, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, this Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the Plan Supplement, the Filing of the Chapter 11 Cases, the Restructuring Transactions, the DIP Term Loan Facility, the DIP ABL Facility, the ABL Facility, the Bridge Facility, the Term Loan Facility, the Exit ABL Facility, the Exit Term Loan Facility, the Debt Rights Offering, the Litigation Trust, the Management Incentive Plan, the Asset Financing Agreements, the Asset Financing Takeback Debt Documents, the Committee Settlement, any other Definitive Document (including the Plan Supplement), or any other agreement, contract, instrument, release, or document (including any legal opinion requested by any Entity regarding any other agreement, transaction, contract, instrument, release, or document contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Transactions, the Disclosure Statement, this Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy

Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan, or such distributions made pursuant to this Plan, including the issuance of Securities hereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and other applicable Law or rules protecting such Exculpated Parties from liability. The Exculpated Parties and other parties set forth above have, and upon Confirmation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in this **Article VIII.E** do not exculpate (1) any claims or Causes of Action against the Excluded Parties or (2) any claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

Solely with respect to the exculpation provisions in this **Article VIII**, notwithstanding anything to the contrary in this Plan, each of the Exculpated Parties shall not incur liability for any Cause of Action or claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under this Plan.

## F.    *Injunction.*

Except as otherwise expressly provided in this Plan or the Confirmation Order, or for obligations or distributions issued or required to be paid pursuant to this Plan or the Confirmation Order (including the Exit ABL Facility, or the Exit Term Loan Facility), all Entities who have held, hold, or may hold Released Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such Released Claims, Causes of Action, liabilities, or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Released Claims, Causes of Action, liabilities, or Interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Released Claims, Causes of Action, liabilities, or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Released Claims, Causes of Action, liabilities, or Interests released or settled pursuant to this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this **Article VIII.F**.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to **Article VIII.C**, **Article VIII.D**, **Article VIII.E**, or **Article VIII.F** hereof, without the Bankruptcy Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

For the avoidance of doubt and notwithstanding any other provision of this Plan, in no event are any of the Excluded Parties released, exculpated, or the beneficiary of any injunction, gatekeeper, or any other provision of this **Article VIII** of this Plan.

G.   *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.   *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.   *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.   *Conditions Precedent to the Confirmation Date.*

It shall be a condition to the Confirmation Date that the following condition shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1. The New Equityholders' Term Sheet and the Exit Term Loan Term Sheet shall have been (i) Filed on or prior to the Voting Deadline and (ii) approved by the Required DIP Term Loan Lenders.

B. *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1. the Bankruptcy Court shall have entered the Confirmation Order, Filed in a manner consistent in all material respects with this Plan, and such order shall have become a Final Order;

2. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan shall be consistent with this Plan, the Definitive Documents and otherwise approved pursuant to all applicable consent thresholds;

3. the Final DIP Order shall be in full force and effect;

4. (i) the New Equityholders' Term Sheet and the Exit Term Loan Term Sheet shall have been (A) Filed on or prior to the Voting Deadline and (B) approved by Required DIP Term Loan Lenders, and (ii) the applicable Definitive Documents shall be in form and substance consistent with the as-filed versions of the New Equityholders' Term Sheet and the Exit Term Loan Term Sheet;

5. the Definitive Documents shall have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;

6. the New Interests to be issued at emergence shall have been issued;

7. the Debtors shall have received binding commitments to fund the Exit ABL Facility;

8. the Debt Rights Offering shall have been fully consummated pursuant to the Debt Rights Offering Procedures;

9. the DIP ABL Claims shall have been paid in full in Cash or rolled into the Exit ABL Facility in accordance with Article II.B.1 of this Plan;

10. the New Organizational Documents shall have been adopted;

11. the Claims Ombudsman Agreement shall have been executed;

12. all Professional Fee Amounts that require approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the approval of such fees and expenses by the Bankruptcy Court;

13. all fees, expenses, and other amounts due and payable to the Ad Hoc Group Advisors and the ABL Advisors pursuant to the DIP Orders and this Plan, including, without limitation, the Restructuring Expenses shall have been paid in full;

14. the Litigation Trust shall have been formed, and the Litigation Trust Assets shall have been transferred to the Litigation Trust;

15. the Debtors and the Litigation Trustee shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan and each of the other transactions contemplated by this Plan; *provided* that the Debtors shall not be required to obtain all authorizations,

consents, regulatory approvals, rulings, certificates, instruments, or documents that are necessary to issue New Interests pursuant to the Exit Term Loan Additional Equity Commitment and the Exit Term Loan Conversion; and

16. no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the Consummation of the Restructuring Transactions.

C.      *Waiver of Conditions.*

Except as otherwise specified in this Plan, any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX may be waived by the Debtors with the consent of the Required DIP Term Loan Lenders, other than (1) Article IX.B.3 and Article IX.B.4 hereof, which may only be waived with the consent of each member of the Ad Hoc Group Steerco, (2) Article IX.B.8 hereof, which may only be waived with the consent of the DIP ABL Lenders, and (3) Article IX.B.10 and Article IX.B.11 (as to Professional Fee Amounts incurred by the Committee Advisors) hereof, which may only be waived with the consent of the Committee, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

D.      *Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, this Plan shall be null and void in all respects as to such Debtor and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims against or Interests in such Debtor held by any Holders of Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity with respect to such Debtor; or (3) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity with respect to such Debtor.

E.      *Substantial Consummation.*

"Substantial Consummation" of this Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify this Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan, in each case, with the consent of the Required DIP Term Loan Lenders; *provided* that, no modification shall affect the treatment of the DIP ABL Claims without the consent of the DIP ABL Lenders, and that no modification shall affect the definition or treatment of the General Unsecured Claims, the Go-Forward Vendor Claims, the Claims Ombudsman, or any other provisions related to, or in connection with, the Committee Settlement without the consent of the Committee. Subject to those restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify this Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C.*      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then:  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

     a.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

     b.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

     c.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

     d.    ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of this Plan and adjudicate any and all disputes arising from or relating to distributions under this Plan;

     e.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

     f.    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

     g.    enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

h.  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

i.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

j.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

k.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, discharge, injunctions, exculpations, and other provisions contained in this Plan, including Article VIII hereof, whether arising on or after the Effective Date, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

l.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

m.  enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

n.  determine any other matters that may arise in connection with or relate to this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan or the Disclosure Statement;

o.  enter an order concluding or closing the Chapter 11 Cases;

p.  adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

q.  consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

r.  determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

s.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

t.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

u.  hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article VIII hereof;

v.  hear and determine all disputes with respect to the Litigation Trust Agreement;

w.  hear and determine all disputes with respect to the Litigation Trust Assets;

x.  hear and determine all disputes with respect to the Committee Settlement;

y.  enforce all orders previously entered by the Bankruptcy Court; and

z.    hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this <u>Article XI</u> to the contrary, the Litigation Trust Documents, the New Organizational Documents (including the New Equityholders Documents), the Exit Term Loan Documents and the Exit ABL Facility Documents and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to <u>Article IX.A</u> hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor third parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims or Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

B.    *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests (as applicable) receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

C.    *Payment of Statutory Fees.*

All fees due and payable before the Effective Date pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors in full in Cash on the Effective Date.  The Reorganized Debtors and the Distribution Agent shall remain obligated to pay such fees until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.    *Dissolution of the Committee and Any Other Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve and the members thereof and the Professionals retained by the Committee shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from or related to the Chapter 11 Cases and under the Bankruptcy Code, except in connection with the final fee applications of the Committee Advisors.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or the Professionals retained by any statutory committees (1) after the Effective Date or (2) in excess of:  (a) the Committee Go-Forward Fee Cap; (b) the Committee Plan Support Carve-Out; (c) the Committee Accrued Fee Cap; or (d) the Claims Ombudsman Fee Cap for any purpose.

E.    *Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed

to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors in order to be effective shall be in writing (including by e-mail and/or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by e-mail and/or facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Ascend Performance Materials Holdings Inc.<br>1010 Travis St., Suite 900<br>Houston, Texas 77002<br>Attention: Scott Andrew Ralston, Senior Vice President and General Counsel<br>E-mail address: sarals@ascendmaterials.com | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention: Christopher Marcus, P.C., Derek I. Hunter, Oliver Paré<br><br>E-mail addresses: cmarcus@kirkland.com, derek.hunter@kirkland.com, oliver.pare@kirkland.com<br><br>and<br><br>Bracewell LLP<br>711 Louisiana Street, Suite 2300<br>Houston, Texas 77002<br>Attention: Jason G. Cohen, Jonathan L. Lozano<br>E-mail addresses: jason.cohen@bracewell.com, jonathan.lozano@bracewell.com |

| United States Trustee | Counsel to the Ad Hoc Group |
|---|---|
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>Attn: Jana Whitworth, Jayson Ruff<br>E-mail Address: Jana.Whitworth@usdoj.gov<br>                  Jayson.B.Ruff@usdoj.gov | Gibson Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York 10166-0193<br>Attention: Scott J. Greenberg<br>E-mail address: SGreenberg@gibsondunn.com<br><br>and<br><br>Gibson Dunn & Crutcher LLP<br>1700 M Street N.W.<br>Washington, D.C. 20036-3504<br>Attention: AnnElyse Scarlett Gains<br>E-mail address: AGains@gibsondunn.com<br><br>and<br><br>Gibson Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, California 90071<br>Attention: Francis Petrie<br>E-mail address: FPetrie@gibsondunn.com |
| **Counsel to the ABL Agent & the DIP ABL Agent** | **Counsel to the Committee** |
| Greenberg Traurig, LLP<br>One International Place, Suite 2000<br>Boston, Massachusetts 02110<br>Attention: Julia Frost-Davies<br>E-mail addresses: Julia.FrostDavies@gtlaw.com<br><br>and<br><br>Greenberg Traurig, LLP<br>Terminus 200<br>3333 Piedmont Road NE, Suite 2500<br>Atlanta, Georgia 30305<br>Attention: Bethani R. Oppenheimer<br>E-mail addresses: oppenheimerb@gtlaw.com | Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036<br>Attention: Robert J. Stark, Bennett S. Silverberg<br>E-mail address: rstark@brownrudnick.com<br>                  bsilverberg@brownrudnick.com<br><br>and<br><br>Brown Rudnick LLP<br>One Financial Center<br>Boston, MA 02111<br>Attention: Sharon I. Dwoskin<br>E-mail address: sdwoskin@brownrudnick.com<br><br>and<br><br>Parkins & Rubio LLP<br>100 Park Avenue, Suite 1600<br>New York, NY 10017<br>Attention: Charles Rubio<br>E-mail address: crubio@parkinsrubio.com |

After the Effective Date, the Reorganized Debtors are authorized to notify Entities that, in order to continue to receiving documents pursuant to Bankruptcy Rule 2002, such Entities must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, this Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

J.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/Ascend or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided, however,* that any such alteration or interpretation shall be acceptable to the Debtors. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors' consent, as applicable, and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan or any previous plan, and, therefore, no such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close some or all of the Chapter 11 Cases, and all contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of any Reorganized Debtor that remains open; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Cases of all other Reorganized Debtors have been closed.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or with any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: December 9, 2025

ASCEND PERFORMANCE MATERIALS HOLDINGS INC.

on behalf of itself and all other Debtors

_/s/ Robert Del Genio_

Robert Del Genio
Chief Restructuring Officer, Ascend Performance
Materials Holdings Inc.

**<u>EXHIBIT B</u>**

**Proposed Notice of Effective Date**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASCEND PERFORMANCE MATERIALS | ) | Case No. 25-90127 (CML) |
| HOLDINGS INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF**
**(I) ENTRY OF FINDINGS OF FACT,**
**CONCLUSIONS OF LAW, AND AN ORDER**
**CONFIRMING THE FOURTH AMENDED JOINT**
**CHAPTER 11 PLAN OF REORGANIZATION OF ASCEND**
**PERFORMANCE MATERIALS HOLDINGS INC. AND ITS**
**DEBTOR AFFILIATES AND (II) OCCURRENCE OF EFFECTIVE DATE**

On December [●], 2025, the Honorable Christopher M. Lopez, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Fourth Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and its Debtor Affiliates* [Docket No. [●]] (the "Confirmation Order") confirming the Plan[2] of the above-captioned debtors (collectively, the "Debtors").

The Effective Date of the Plan occurred on [●], 2025.

This Confirmation Order, the Plan, and copies of all documents Filed in these Chapter 11 Cases are available free of charge by (a) calling the Debtors' restructuring hotline at (888) 890-9917 (US toll free) or +1 (971) 385-8728 (international); or (b) visiting the Debtors' restructuring website at: https://dm.epiq11.com/Ascend.  You may also obtain copies of any pleadings Filed in these Chapter 11 Cases for a fee via PACER at: www.txs.uscourts.gov.

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Ascend.  The location of Debtor Ascend Performance Materials Holdings Inc.'s principal place of business is 1010 Travis St., Suite 900, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the *Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization of Ascend Performance Materials Holdings Inc. and Its Debtor Affiliates* [Docket No. 1192] (as may be modified, amended, and supplemented from time to time, the "Plan") or this Confirmation Order, as applicable.

The Bankruptcy Court has approved certain discharge, release, exculpation, injunction, and related provisions in Article VIII of the Plan.

The Plan and its provisions are binding on the Debtors, the Reorganized Debtors, the Litigation Trustee, the Distribution Agent, and any Holder of a Claim or an Interest and such Holder's respective successors and assigns whether or not the Claim or the Interest of such Holder is Impaired under the Plan and whether or not such Holder voted to accept the Plan.

The Plan and this Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and this Confirmation Order in their entirety.

Houston, Texas
Dated: [●], 2025

*/s/ DRAFT*

| | |
|---|---|
| **BRACEWELL LLP** | **KIRKLAND & ELLIS LLP** |
| Jason G. Cohen (TX Bar No. 24050435) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Jonathan L. Lozano (TX Bar No. 24121570) | Christopher Marcus, P.C. (admitted *pro hac vice*) |
| 711 Louisiana Street, Suite 2300 | Derek I. Hunter (admitted *pro hac vice*) |
| Houston, Texas 77002 | 601 Lexington Avenue |
| Telephone:    (713) 223-2300 | New York, New York 10022 |
| Facsimile:    (800) 404-3970 | Telephone:    (212) 446-4800 |
| Email:        jason.cohen@bracewell.com | Facsimile:    (212) 446-4900 |
|              jonathan.lozano@bracewell.com | Email:        cmarcus@kirkland.com |
| | derek.hunter@kirkland.com |
| | |
| *Co-Counsel for the Debtors* | *Co-Counsel for the Debtors* |
| *and Debtors in Possession* | *and Debtors in Possession* |

2